# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF NEW YORK
  28 Liberty Street, 19th Floor
  New York, NY 10005

COMMONWEALTH OF MASSACHUSETTS
  One Ashburton Place
  Boston, MA 02108

DISTRICT OF COLUMBIA
  441 4th Street, NW
  Suite 630 South
  Washington, DC 20001

STATE OF CALIFORNIA
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550

STATE OF DELAWARE
  Carvel State Building, 6th Floor
  820 North French Street
  Wilmington, DE 19801

COMMONWEALTH OF KENTUCKY
  700 Capitol Avenue
  Capitol Building, Suite 118
  Frankfort, KY 40601

STATE OF MARYLAND
  200 St. Paul Place
  Baltimore, MD 21202

STATE OF NEW JERSEY
  Richard J. Hughes Justice Complex
  25 Market Street, 8th Floor, West Wing
  Trenton, NJ 08625-0080

STATE OF OREGON
  100 Market Street
  Portland, OR 97201

COMMONWEALTH OF PENNSYLVANIA
  Strawberry Square
  Harrisburg, PA 17120

COMMONWEALTH OF VIRGINIA
  202 North Ninth Street
  Richmond, VA 23219

Civ. Action No. 18-1747

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1

STATE OF WASHINGTON
    800 Fifth Avenue, Suite 2000
    Seattle, WA 98104

                                    Plaintiffs,

            v.

UNITED STATES DEPARTMENT OF LABOR
    200 Constitution Avenue NW
    Washington, DC 20210

R. ALEXANDER ACOSTA, *in his official*
*capacity as Secretary of the United States*
*Department of Labor*
    200 Constitution Avenue NW
    Washington, DC 20210

and UNITED STATES OF AMERICA,

                                    Defendants.

## INTRODUCTION

1.      This lawsuit challenges a U.S. Department of Labor final rule that upends a

decades-old understanding of a foundational employee benefits law for the purpose of exempting

a significant portion of the health insurance market from the Affordable Care Act's consumer

protections. The rule accomplishes this objective by permitting a broad range of associations to

offer health plans that do not have to comply with various Affordable Care Act protections.

Through that mechanism, the rule increases the risk of fraud and harm to consumers, requires

States to redirect significant enforcement resources to curb those risks, and jeopardizes state

efforts to protect their residents through stronger regulation. The rule is unlawful and should be

vacated.

2.      States have the responsibility to protect the health, safety and welfare of their

citizens. Under the Patient Protection and Affordable Care Act (ACA),[1] the States have made

_____

[1] Pub. L. No. 111-148, 124 Stat. 119 (2010).

enormous progress in decreasing uninsured rates, ensuring comprehensive coverage, and stabilizing the individual and small group health insurance markets. The uninsured rate nationwide dropped to nine percent in 2017, down from sixteen percent in 2010.[2] The rule challenged here aims to undo this progress and will destabilize state insurance markets, increase fraud and abuse, decrease comprehensive health coverage, and substantially increase costs to the States. When health plans do not sufficiently cover health care or plans are no longer affordable, our residents suffer.

3.      Prior to the ACA, health insurance markets for individuals and small employers (generally those with fifty or fewer employees) were subject to more premium volatility and abuse than the market for large employers (generally those with more than fifty employees). Individual and small group insurance plans often lacked important coverage, and premiums were unaffordable because they were based on the health risk of the applicants either on an individual basis or as a small group. Health insurers adopted discriminatory practices to cherry-pick healthy people and to weed out those with pre-existing health conditions, leaving them uninsured or underinsured with coverage that did not cover medically necessary care.

4.      In enacting the ACA, Congress targeted the individual and small group markets to ensure that individuals (including children) with pre-existing conditions like cancer or diabetes could purchase or maintain comprehensive coverage. In those markets, the ACA curtailed discrimination in premiums based on nearly all factors, including health, gender, age (limited to a certain narrow band), region, and occupation. The ACA requires that individual and small group plans cover an "essential health benefits package" that includes ten essential benefits, and

_____

[2] Nat'l Ctr. for Health Statistics, Health Insurance Coverage 2 (2018), *at* https://www.cdc.gov/nchs/data/nhis/earlyrelease/insur201802.pdf

so guarantees comprehensive coverage. The ACA further requires that insurers treat all enrollees in each of the individual and the small group markets—whether healthy or sick—as part of unified insurance pools. In short, a chief ACA purpose was to bar cherry-picking in pricing or benefits in the individual and small group markets. Because most large employers already offered comprehensive health insurance to their employees, the ACA did not impose the same array of reforms on the large group market, though some reforms did apply to the large group market as well.

5.      One of President Trump's primary policy goals is to dismantle the ACA. During his presidential campaign, President Trump promised to immediately repeal and replace the ACA, which he called a "disaster."[3] Since taking office, the Trump Administration has engaged in a sustained effort to "explode" the ACA.[4] On his first day in office, President Trump signed an Executive Order confirming this policy.[5]

6.      The rule challenged in this lawsuit is part of this Administration's broad effort to undermine the ACA. *See* 83 Fed. Reg. 28,912 (June 21, 2018) (to be codified at 29 C.F.R. pt. 2510) (hereinafter the "Final Rule"). Announcing the Final Rule, the President proclaimed that it was another "truly historic step in our efforts to rescue Americans from ObamaCare and the ObamaCare nightmare" and would "escape some of ObamaCare's most burdensome mandates."[6]

---

[3] *See, e.g.*, Donald Trump (@realDonaldTrump), Twitter (Oct. 15, 2016, 8:22 AM), https://twitter.com/realdonaldtrump/status/790936603590033408?lang=en.

[4] *See* Amy Goldstein & Juliet Eilperin, *Affordable Care Act Remains "Law of the Land," but Trump Vows to Explode It*, WASH. POST, Mar. 24, 2017.

[5] E.O. 13765 of Jan. 20, 2017, *Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal*, 82 Fed. Reg. 8351 (Jan. 24, 2017).

[6] President Donald Trump, Remarks at the National Federation of Independent Businesses 75th Anniversary Celebration (June 19, 2018), *at*

7.      The Final Rule's purpose and effect are simple: to shift, through manipulation of the Employment Retirement Income Security Act (ERISA), a large number of small employers and individuals into the large group market *because* the ACA's core protections do not apply to that market. Worse yet, health plans created under the Final Rule would lack basic market incentives and statutory protections under federal law that apply to plans from true large employers. The results will be adults and children with less coverage and fewer benefits than Congress intended in all three markets (individual, small group, and large group), and destabilized individual and small group markets with premiums that may be unaffordable for people with pre-existing conditions who need the ACA's core protections.

8.      The Final Rule reflects Secretary of Labor R. Alexander Acosta's belief that the choices made by Congress in the ACA to protect individuals and employees of small employers were "backward."[7] However, as Congress understood, absent stronger protections, insurance in the individual and small group markets erected significant barriers to coverage through coverage caps, gaps, and outright denials, and led to vastly diverging premiums for people with pre-existing conditions. The ACA reforms leveled the playing field for people in those markets. The Final Rule would return the country to the pre-ACA world where people with pre-existing conditions will lack federal protections that enable them to obtain quality, affordable health insurance.

---

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-federation-independent-businesses-75th-anniversary-celebration/. The White House's official transcript of these remarks is missing the word "rescue," but video of the event available on C-SPAN shows that word in the President's remarks as delivered. *See* Announces Affordable Health Insurance Plan for Groups, C-SPAN (June 19, 2018) (beginning at 01:54), https://www.c-span.org/video/?c4736395/president-trump-nfib.

[7] Alexander Acosta, *A Health Fix for Mom and Pop Shops*, Wall St. J., June 18, 2018.

9.     To undermine core ACA protections, the U.S. Department of Labor (DOL) in the Final Rule redefines the term "employer" in Section 3(5) of ERISA—a law enacted in 1974 to protect employees by regulating employers' pension and benefit plans—in an unprecedented way that is contrary to ERISA and the ACA, and that violates the Administrative Procedure Act (APA). Through this unlawful redefinition, the Final Rule expands the class of "large employers" under the ACA to include a broad range of "associations." These associations may be formed for the primary purpose of selling insurance—which, until now, has been unlawful. They may be composed of entirely unrelated and separate employers (including potentially all employers in a State) and purportedly self-employed individuals. The result: denying individuals and small groups who join health plans offered by such associations the ACA's core protections, while simultaneously undermining the single risk pools intended to spread risk across healthy and sick people in the market for comprehensive health insurance.

10.    The Final Rule is unlawful in many respects. First, the Final Rule conflicts with the clear statutory structure that Congress adopted in the ACA to apply fundamental protections to the individual and small group markets. The Final Rule would achieve this unlawful goal by allowing associations composed of small employers and individuals to sponsor association health plans ("AHPs")—and then treating such plans as large group plans not subject to the strong consumer protections that the ACA imposes on health plans offered to small employers and individuals. This maneuver violates the text, structure, and purpose of the ACA, which applied *stronger* protections in the individual and small group markets than in the large group market, in part because of the economic incentives of large employers—incentives DOL admits associations and AHPs do not share. And while large plans are subject to a minimum actuarial comprehensiveness standard applied to large employers through the tax code, AHPs will avoid

this standard because the employers in the associations will remain small employers for tax code purposes. The result is health plans inferior to anything Congress intended for all three markets.

11. Second, the Final Rule conflicts with the ACA, ERISA, and established case law by enabling a purportedly self-employed individual (denominated a "working owner") with no other employees—and with minimal income and verification—to be both an "employer" and "employee" under ERISA with the authority to establish a group health plan. This change will unlawfully allow the creation of AHPs that can sell large group plans that skirt the ACA's market protections to unrelated, unconnected, and purportedly self-employed individuals, placing these and other consumers' health and financial security at risk.

12. Third, the Final Rule unlawfully expands ERISA to allow all employers (including self-employed individuals described *supra* ¶ 11) in a State or "metropolitan area" to group together into a profit-making commercial insurance enterprise. ERISA's definition of "employer" can include an association of employers "acting . . . indirectly in the interest of an employer," 29 U.S.C. § 1002(5), but federal courts for decades have interpreted that phrase to cover *only* associations whose members share a true commonality of interest, or close nexus, with one another. These requirements, among others, advance a core purpose of ERISA—to "protect . . . the interests of participants in employee benefit plans and their beneficiaries," 29 U.S.C. § 1001(b)—without enabling a new class of unlicensed, entrepreneurial "associations" to market insurance plans. Several major statutes, including the ACA, incorporate and rely on that settled foundation. DOL cannot, through a radical and unprecedented new definition, upend what Congress built.

13. The Final Rule also is arbitrary and capricious for several reasons. Among those reasons is that DOL failed to justify its drastic departure from nearly forty years of settled law

under ERISA. Moreover, DOL failed to account for the history of fraud and abuse committed by AHPs. The factors motivating DOL—segmenting risk pools, providing less-comprehensive benefits supposedly to lower costs for some, and destabilizing the individual and small group markets to further efforts to dismantle the ACA—could not conceivably have been factors Congress intended DOL to consider.

14.     Finally, the Final Rule exceeds DOL's authority, because DOL's action is not designed to implement ERISA but instead to circumvent the ACA. *See* 5 U.S.C. § 706(2)(C).

15.     As detailed further below, the Final Rule will substantially harm the States. It is designed to vastly expand the number of AHPs over which, for example, state non-insurance regulation may be limited because of ERISA preemption, and it will reduce state tax revenue. As DOL concedes, it also will require that States devote additional resources to police a flood of inadequate or fraudulent plans newly offered by associations. Thus, even in States like New York that have protective state insurance laws, States will be required to undertake additional burdens to ensure that any AHPs that impact the State comply with State insurance laws and that all of the applicable State insurance laws are enforced against such AHPs. And, as DOL further concedes, the Final Rule will encourage healthy individuals and employees to leave the traditional health insurance markets and purchase cheaper plans with fewer benefits through AHPs, thus shrinking the risk pool and requiring the most vulnerable—those with pre-existing conditions or who later develop other health needs—to purchase more expensive comprehensive coverage or lose coverage entirely. And as more people leave the traditional market in States without sufficiently protective state laws, costs for those who need to purchase comprehensive coverage will continue to rise, undermining the individual and small group health insurance markets that States have worked so diligently under the ACA to build over the last several years.

16.     The States accordingly ask that the Court declare that the Final Rule is invalid on a series of grounds, vacate the Final Rule in its entirety, and award other relief as set forth below.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

18.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (e)(1). Defendants are United States agencies or officers sued in their official capacities; Defendants reside in this District; and a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

19.     The State of New York, represented by and through its Attorney General, Barbara D. Underwood, is a sovereign State in the United States of America. The Attorney General is New York State's chief law enforcement officer, and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

20.     The Commonwealth of Massachusetts, represented by and through its Attorney General, Maura Healey, is a sovereign State in the United States of America. The Attorney General is Massachusetts's chief law enforcement officer, and is authorized to pursue this action pursuant to Massachusetts General Law ch. 12 § 10.

21.     The District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District

of Columbia, Karl A. Racine. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

22.     The State of California is a sovereign State in the United States of America. The California Attorney General is the chief law enforcement officer of the State of California and has the authority to file civil actions in order to protect public rights and interests. Cal. Const., art. V, § 13. This challenge is brought pursuant to Attorney General Becerra's independent constitutional, statutory, and common law authority to represent the public interest.

23.     The State of Delaware, represented by and through its Attorney General, Matthew P. Denn, is a sovereign State in the United States of America. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

24.     The Commonwealth of Kentucky, represented by and through its Attorney General, Andy Beshear, is a sovereign State in the United States of America. The Attorney General is the chief law officer of the Commonwealth, and is authorized to pursue this action pursuant to Ky. Rev. Stat. § 15.020.

25.     The State of Maryland, represented by and through its Attorney General, Brian Frosh, is a sovereign State in the United States of America. The Attorney General is Maryland's chief legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare

of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1 (Feb. 15, 2017).

26.     The State of New Jersey, represented by and through its Attorney General, Gurbir S. Grewal, is a sovereign State in the United States of America. The Attorney General is the State of New Jersey's chief law enforcement officer, and is authorized to pursue this action pursuant to N.J. Stat. Ann. § 52:17A-4.

27.     The State of Oregon, represented by and through its Attorney General, Ellen Rosenblum, is a sovereign State in the United States of America. The Attorney General is Oregon's chief law enforcement officer, and is authorized to pursue this action pursuant to Oregon Revised Statute § 180.060.

28.     The Commonwealth of Pennsylvania is a sovereign State in the United States of America and brings this action by and through Attorney General Josh Shapiro. The Attorney General is "the chief law officer of the Commonwealth," Pa. Const., art. IV, § 4.1, and is authorized to bring this action on behalf of the Commonwealth pursuant to his statutory authority under 71 P.S. § 732-204.

29.     The Commonwealth of Virginia, represented by its Attorney General, Mark R. Herring, is a sovereign State in the United States of America. The Attorney General is responsible for "[a]ll legal service in civil matters for the Commonwealth." Va. Code Ann. § 2.2-507(A).

30.     The State of Washington, represented by and through its Attorney General, Robert W. Ferguson, is a sovereign State in the United States of America. The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern.

31.     Plaintiff States (hereinafter, "the States") are aggrieved by the actions of the federal Defendants and have standing to bring this action. *See infra* ¶¶ 100–106 (describing harms to States).

32.     Defendant DOL is an agency of the United States government and has responsibility for implementing and enforcing portions of ERISA. It is an "agency" under 5 U.S.C. § 551(1).

33.     Defendant R. Alexander Acosta is the Secretary of Labor and is sued in his official capacity.

34.     Defendant the United States of America is sued as allowed by 5 U.S.C. § 702.

## ALLEGATIONS

## I.      STATUTORY AND REGULATORY BACKGROUND

### A.      Congress Enacted ERISA to Protect Employees

35.     Congress enacted ERISA in 1974 principally to protect employees, pensioners, and their employee pension and welfare benefits. ERISA imposed fiduciary obligations on plan administrators, and implemented disclosure requirements, and other safeguards. Title I of ERISA, which governs employee benefit plans—including group health plans—"was adopted …[in part] to remedy the abuses that existed in the handling and management of welfare and pension plan assets…. Workers in such traditional employer-employee relationships are more vulnerable than self-employed individuals to abuses because the workers usually lack the control and understanding required to manage pension funds created for their benefit. . . ." *Schwartz v. Gordon*, 761 F.2d 864, 868 (2d Cir. 1985).

36.     An ERISA plan can include a plan, fund, or program that provides employee

health benefits.[8] The statute provides that an "employee welfare benefit plan" means "any plan, fund, or program . . . established or maintained by an employer or employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants and beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits." 29 U.S.C. § 1002(1). A "participant" refers to an "employee or former employee of an employer, or any member or former member of an employee organization." *Id.* § 1002(7). "Employee" means "any individual employed by an employer." *Id.* § 1002(6).

37.    ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." *Id.* § 1002(5).

**B.    Only Associations That Are Not Formed to Provide Insurance, That Are Controlled by Employer Members, and That Are "Bona Fide" Can Be "Employers" under ERISA.**

38.    Although the statutory definition of employer includes "a group or association of employers," since ERISA's enactment, DOL and judicial interpretations of ERISA have arrived at a settled view of when any such associations qualify as an association "acting . . . indirectly in the interest of an employer."

39.    Courts interpreting ERISA distilled two requirements for a "group or association" to act indirectly in the interest of an employer within the meaning of 29 U.S.C. § 1002(5) in sponsoring an employee benefit plan.

---

[8] Under ERISA, an "employee welfare benefit plan" can also be formed to offer "benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services," 29 U.S.C. § 1002(1), or any benefit listed in 29 U.S.C. § 186(c). ERISA also establishes "employee pension benefit plans." *Id.* § 1002(2). All of these types of plans are governed by the definition of "employer" at § 1002(5).

40.     First, the group or association must be "tied by a common economic or representation interest, *unrelated to the provision of benefits*," and associations operating to make money by marketing insurance do not qualify—a principle Congress reaffirmed shortly after passing ERISA. *E.g., Gruber v. Hubbart Bert Karle Weber, Inc.*, 159 F.3d 780, 787 (3d Cir. 1998) (emphasis added) (quotation marks omitted); *Wisconsin Educ. Ass'n Ins. Trust v. Iowa State Bd. of Pub. Instruction*, 804 F.2d 1059, 1064–65 (8th Cir. 1986). This established principle is important because a "cohesive bond between the employers, other than their common participation in the disputed plan," helps "ensure that the plan administration is acting in the best interest of the employers." *Atl. Health Care Benefits Tr. v. Foster*, 809 F. Supp. 365, 373 (M.D. Pa. 1992), *aff'd*, 6 F.3d 778 (3d Cir. 1993). The existence of such a common economic or representation interest creates a "protective nexus" in which the employee "can rely on the person acting directly as an employer or the person acting indirectly in the interest of that employer to represent the employee's interests relating to the provision of benefits." *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 186 (5th Cir. 1992) (quotation marks omitted).

41.     Second, the association's employer members must have control—in form and substance—over, and direct involvement in the establishment or maintenance of, the plan and the association. *See Matthew 25 Ministries, Inc. v. Corcoran*, 771 F.2d 21, 22 (2d Cir. 1985) (holding that group of "disparate and unaffiliated businesses" could not show that they played a role in the management of a purported ERISA trust, and so could not show that the trust was "established or maintained" by employer members).

42.     Over the last several decades, DOL has likewise established criteria to determine whether an association is a "bona fide association" under ERISA based on: (1) the process by which the association was formed and the purposes for which it was formed; (2) the existence, if

14

any of pre-existing relationships among employer members; (3) whether employer members were

solicited; (4) who is entitled to participate and who actually participates in the association; (5) the

powers, rights, and privileges of employer members; and (6) whether employer members actually

control and direct the activities of the benefit plan. *See, e.g.*, DOL Op. No. 2007-06A (Aug. 16,

2007); DOL Op., 1992 ERISA LEXIS 45 (Oct. 30, 1992) (Op. No. Not Assigned); DOL Op. No.

91-42A (Nov. 12, 1991). For example, if a trust were formed by a plan administrator, or if the

plan solicits employer members, then those circumstances "tend to indicate" that the plan "was []

established and is [] operating as a vehicle for marketing insurance products to employers" and is

not a bona fide association. DOL Op. No. 80-42A (July 11, 1980). The same is true if

participating employers lack any pre-existing relationship. DOL Op. No. 89-19A (Aug. 18,

1989).

### C.  Under ERISA, "Employer" Does Not Include a "Working Owner" With No Other Employees.

43.     ERISA does not enable a sole proprietor or partners with no employees to

establish an ERISA plan. Multiple courts, including the Second Circuit, have held that the term

"employer" excludes such sole proprietors. *Marcella v. Capital Dist. Physicians' Health Plan,*

*Inc.*, 293 F.3d 42, 48 (2d Cir. 2002). Moreover, the Supreme Court has concisely stated that

"Courts agree that if a benefit plan covers only working owners, it is not covered by Title I."

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 21 n.6 (2004) (*Yates*).

### D.  Congress Understood That Multiple Employer Welfare Arrangements (MEWAs) Historically Have Defrauded Consumers and Made Clear That MEWAs Generally Are Not ERISA Plans.

44.     Immediately after ERISA's passage, various individuals and entities began

offering health insurance plans through multi-employer entities, a form of AHP later called

multiple employer welfare arrangements, or MEWAs. These MEWAs were rife with fraud and

abuse, left behind a trail of unpaid claims, and took advantage of confusion about ERISA's

substantive and preemptive scope.[9]

45.     Those MEWAs' claims to ERISA status were contrary to Congress' intent as was

made clear in a House of Representatives report that has been recognized as "virtually conclusive

as to legislative intent" by a host of federal courts. This report stated:

> Certain entrepreneurs have undertaken to market insurance products to employers
> and employees at large, claiming these products to be ERISA covered plans. For
> instance, persons whose primary interest is in profiting from the provision of
> administrative services are establishing insurance companies and related
> enterprises. The entrepreneur will then argue that his enterprise is an ERISA
> benefit plan which is protected under ERISA's preemption provision from state
> regulation. We are concerned with this type of development, but on the basis of
> the facts provided us, we are of the opinion that these programs are not 'employee
> benefit plans' as defined in Section 3(3). As described to us, these plans are
> established and maintained by entrepreneurs for the purpose of marketing
> insurance products or services to others. They are not established or maintained
> by the appropriate parties to confer ERISA jurisdiction, nor is the purpose for
> their establishment or maintenance appropriate to meet the jurisdictional
> prerequisites of the Act. They are no more ERISA plans than is any other
> insurance policy sold to an employee benefit plan.

*Bell v. Emp. Sec. Benefit Ass'n*, 437 F. Supp. 382, 392 (D. Kan. 1977) (describing report as

"virtually conclusive as to legislative intent") (quoting Activity Report of the Committee on

Education and Labor of the U. S. House of Representatives, H.R. Rep. No. 94-1785, at 48

(1976)); *see also, e.g.*, *Gruber*, 159 F.3d at 786 n.4 (same).

46.     When States sought to enforce their own insurance laws to regulate these plans,

the entities invoked ERISA's preemption provision (arguing that they were ERISA plans not

subject to state law). At the same time, DOL claimed to lack authority over these insurance

---

[9] Mila Kofman, Health Policy Inst., Association Health Plans: Loss of State Oversight
Means Regulatory Vacuum and More Fraud 2 (2005), https://hpi.georgetown.edu/ahp.html
(providing history of attempts to regulate AHPs by state and federal governments).

arrangements, asserting that most were not, in fact, ERISA plans, because the groups or associations offering plans were not "bona fide"—and therefore did not fall under ERISA's "employer" definition. The result was confusion that hindered state efforts to stop fraudulent and illegal activity.[10] In the seventies and eighties, DOL itself argued that ERISA's plain language *precluded* a holding that what then were known as "multiple employer trusts" (METs) qualified as "single, umbrella-like ERISA plan[s]." *See, e.g.*, Br. for Appellant DOL, at *7, *Donovan v. Dillingham*, 668 F.2d 1196 (11th Cir. 1982) (No. 80-7879), 1980 WL 340211. DOL took the same position before Congress. 128 Cong. Rec. at 11395 (May 21, 1982) (Statement of Rep. Erlenborn) (describing DOL testimony).

47.     These concerns about MEWAs led Congress in 1983 to amend ERISA to make clear that States retain authority to apply insurance laws to these entities. *See* 29 U.S.C. § 1144(b)(6)(A).[11]

---

[10] Kofman, *supra* note 9, at 7; *see also* U.S. Gen. Accounting Office (GAO), Employee Benefits: States Need Labor's Help Regulating Multiple Employer Welfare Arrangements 8, GAO/HRD-92-40 (1992), *at* https://www.gao.gov/assets/220/215647.pdf; U.S. Dep't of Labor, MEWAs: Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation 3 (2013), *at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/mewa-under-erisa-a-guide-to-federal-and-state-regulation.pdf.

[11] This amendment did not establish that any MEWA was covered by ERISA—reflecting Congress's and DOL's understanding that most were not. *Oversight Investigation of Certain Multiple Employer Health Insurance Trusts (METs), Evading State and Federal Regulation, Hrg. Before the H. Subcomm. on Labor-Management Relations of the H. Comm. on Educ. and Labor*, 97th Cong. 45 (1982) (describing claims to ERISA status as "in almost all instances . . . a subterfuge."). Rather, it provided that to the extent any such plan was an ERISA plan, state insurance law would continue to apply. *See* 29 U.S.C. § 1144(b)(6)(A) (applying exceptions "in the case of an employee welfare benefit plan which is a multiple employer welfare arrangement").

48.     Despite that statutory change, these entities persisted in casting themselves as ERISA plans immune from state laws. The result was an extensive record of fraud, gross mismanagement, and illegal activity in the marketing and operation of MEWAs and AHPs.[12] From 1988 to 1991, failed MEWAs left thousands of people in dozens of States without health insurance and nearly 400,000 patients with unpaid medical claims exceeding $123 million.[13] Following a 1991 Senate report finding that fraudsters attempted to use ERISA to avoid state oversight, Congress eventually required MEWAs to register with DOL before operating in a State. 29 U.S.C. § 1021(g).

49.     A 2004 GAO report found that employers and individuals were vulnerable to unlicensed or "bogus" entities selling fraudulent health insurance coverage through, among other things, "associations they created or through established associations of employers or individuals." GAO, *Private Health Insurance*, *supra* note 12, at 1–4. GAO noted that, to create regulatory confusion, "[t]he operators of these entities often characterized the entities in one of several ways that gave an appearance of being exempt from state insurance regulation when they should have been subject to regulation." *Id.* at 4.

50.     State Attorneys General have worked vigorously to protect individuals and small employers from predatory entities that seek to defraud or deceive customers through the use of associations. For example, in 2011, Massachusetts filed a complaint alleging that the United

---

[12] *See, e.g.*, GAO, Private Health Insurance: Employers and Individuals Are Vulnerable to Unauthorized or Bogus Entities Selling Coverage 3–5, GAO-04-312 (2004), *at* https://www.gao.gov/assets/250/241559.pdf; GAO, Employee Benefits, *supra* note 10, at 3–7; Mila Kofman, et al., Proliferation of Phony Health Insurance: States and the Federal Government Respond 13–15 (2003).

[13] GAO, Employee Benefits, *supra* note 10, at 2–3.

States Life Insurance Company in the City of New York required consumers to join associations to enroll in its plans and misrepresented to consumers the terms, benefits, and (very limited) coverage provided by these plans, as well as the fact that the policies had not been approved for sale in that State; the company agreed to pay full restitution to consumers in Massachusetts.[14] In 2007, the operators of an association that deceptively marketed its discount health plan products to Massachusetts residents as "Affordable Healthcare Plans" and "Top Rated Insurance" were ordered to pay restitution to the defrauded consumers, a substantial civil penalty, and attorney's fees, and were permanently enjoined from engaging in related conduct in Massachusetts.[15] In 2009, pursuant to a consent judgment, HealthMarkets, Inc. and its subsidiaries were ordered to pay $17 million, resulting from unfair and deceptive practices through the sale of insurance products packaged with memberships in three different associations.[16]

---

[14] *See* Press Release, Att'y Gen. of Mass., *Health Insurance Company to Pay $760,000 for Unlawfully Selling Unauthorized Health Insurance in Massachusetts and Failing to Cover Mandated Benefits* (Apr. 25, 2011), http://www.mass.gov/ago/news-and-updates/press-releases/2011/health-insurance-company-to-pay-760000.html; *see also* Compl. ¶¶ 7, 35–36, 66, Commonwealth of Mass. v. The United States Life Ins. Co. in the City of New York, Compl. No. 11-1542-B (Mass. Super. Ct. Apr. 21, 2011).

[15] Compl. ¶ 19, Commonwealth of Mass. v. Nat'l Alliance of Assocs. Professional Benefit Consultants, Inc., Compl. No. 09-1404B (Mass Super. Ct. Apr. 6, 2009).

[16] *See* Press Release, Att'y Gen. of Mass., *Attorney General Martha Coakley Reaches $17 Million Settlement with Health Insurers Regarding Unfair and Deceptive Conduct* (Aug. 31, 2009), http://www.mass.gov/ago/news-and-updates/press-releases/2009/ag-reaches-17-million-settlement-with-health.html.

**E.      Congress Enacted ACA Market Protections Targeted to the Individual and Small Group Markets.**

*(i) Congress Focused ACA Reforms on the Individual and Small Group Markets.*

51.      Prior to the ACA's enactment, a large majority of Americans in the private insurance market had access to health insurance provided by large employers.[17] This market was in need of some reform, and Congress enacted certain requirements in the ACA applicable to the large group market and others applicable to large employers. For example, Congress mandated that large employers provide health coverage or pay a tax penalty, *see* 26 U.S.C. § 4980H, hinging that penalty on whether an employer's coverage was affordable for the employee and provided "minimum value" in the sense that it covered sixty percent of essential health benefit costs on an actuarial basis, *id.* § 4980H(b)(1)(B).[18] Although not an essential health benefits requirement, *see infra* ¶ 57, that tax penalty does provide some minimal protection for employees to ensure relatively comprehensive benefits are provided by large employers. Among other requirements, Congress also forbade exclusions based on pre-existing conditions in all three

---

[17] Cong. Budget Office, An Analysis of Health Insurance Premiums under the Patient Protection and Affordable Care Act 5 (Nov. 30, 2009) (noting that seventy percent of the nonelderly population in the health insurance market was in the large group market, defined as employers having more than fifty employees); *America's Affordable Health Choices Act of 2009*, H.R. Rep. No. 111-299, pt. 1, at 321 ("Approximately 99% of large employers (200 or more workers) offer health benefits to at least some of their employees.").

[18] Under 26 U.S.C. § 4980H(b), an employer who provides health coverage in the large group market can be subject to the provision's $3,000 penalty only if an employee buys a different policy on an exchange using a premium tax credit under the ACA. The employee can be *eligible* for such a credit only if the employer's coverage does not provide "minimum value," defined as at least sixty percent of the "total allowed costs of benefits provided under the plan." 26 U.S.C. § 36B(c)(2)(C)(ii). The ACA elsewhere states that, in assessing "the percentage of the total allowed costs of benefits provided under a group health plan or health insurance coverage that are provided by such plan or coverage," including under the Internal Revenue Code, the rules for making that determination based on essential health benefits apply. 42 U.S.C. § 18022(d)(2)(C).

markets, *see* 42 U.S.C. § 300gg-3; required that all group health plans, including large group plans, cover certain benefits, such as preventive care and screenings for women, without cost-sharing, *see id.* § 300gg-13(a); and required that such plans cover an insured's "adult child until the child turns 26 years of age," *id.* § 300gg-14.

52.     Congress also enacted additional reforms specific to the individual and small group market, based on the fact that health insurance markets for individuals and small businesses were much more prone to abuse, including discrimination in pricing and benefits. *See supra* ¶¶ 3, 4. Because of those abuses, prior to the ACA's enactment, far fewer small employers offered health insurance to their employees, and individuals faced substantial discrimination in (or were effectively priced out of) the insurance market.[19] In simple terms: in some states, insurance companies were able to discriminate in premiums or coverage against individuals and small businesses based on pre-existing conditions, claims history, health status, age, gender, occupation, and other factors. That risk segmentation led to wide and unsustainable fluctuations in costs for individuals and small businesses. *See, e.g.*, Cong. Research Serv., *Private Health Insurance Provisions in Senate-Passed H.R. 3590, the Patient Protection and Affordable Care Act* 5 (Jan. 29, 2010). Congress responded by specifically targeting the most comprehensive reforms to the individual and small group markets. *See supra* ¶¶ 3, 4 and *infra* ¶¶ 53–62.

53.     Core ACA reforms thus "depend[] on whether the coverage is treated as individual or group coverage and, in turn, whether the group coverage is small or large group coverage." *See, e.g.*, 83 Fed. Reg. 614, 615 (Jan. 5, 2018).

---

[19] H.R. Rep. No. 111-299, pt. 1, at 322 ("Less than half of all small employers (less than 50 employees) offer health insurance coverage to their employees.").

54.     To address problems in the individual and small group markets, the ACA requires insurers to consider all enrollees in the individual market to "be members of a single risk pool," and requires the same in the small group market. ACA § 1312(c), 42 U.S.C. § 18032(c). This provision addressed a core ACA mission: spreading risk across all enrollees so the risk pools include the healthy and the sick. To further that goal, Congress established a related program, known as "risk adjustment," that spreads risk among insurers in such markets, ACA § 1343, 42 U.S.C. § 18063. These provisions, and others, were enacted in Title I of the ACA and codified in 42 U.S.C. §§ 18001–18122.

55.     The ACA also added reforms to part A of title 27 of the Public Health Service Act (PHSA) (42 U.S.C. §§ 300gg–300gg-28). At least three of those reforms are central to the ACA's scheme. First, Congress required each insurer offering coverage in the individual and group markets in a State to "accept every employer and individual in the State that applies for such coverage"—what is known as "guaranteed issue." 42 U.S.C. § 300gg-1(a). As a corollary, an insurer in the individual or group market cannot limit or exclude coverage based on a pre-existing condition. *Id.* § 300gg-3.

56.     Second, Congress enacted a "community rating" provision to limit premium discrimination in the individual and small group markets. The community rating provision forbids premium variation except based on certain narrow factors. ACA § 2701, 42 U.S.C. § 300gg. Tobacco use is a permissible factor, "except that such rate shall not vary by more than 1.5 to 1"; so is age, "except that such rate shall not vary by more than 3 to 1 for adults"; and geography may be considered only in the context of rating areas established by the State. *Id.* Factors such as health status, claims history, race, gender, sexual orientation, geography (except

for rating areas established by the State), occupation, and many others cannot be considered by insurers in setting rates. *See id.*

57.     Third, Congress required that all individual and small group plans provide a "comprehensive" benefits package known as the "essential health benefits package." 42 U.S.C. § 300gg-6(a). The package must include ambulatory patient services, emergency services, hospitalization, maternity and newborn care, mental health services, substance abuse services, prescription drugs, rehabilitative and habilitative services and devices, laboratory services, preventive and wellness services and chronic disease management, and pediatric services (including oral and vision care). 42 U.S.C. § 18022(b). This package also has financial protections for enrollees.[20]

58.     Congress directed that these fundamental reforms, and other provisions, included in part A of title 27 of the PHSA (42 U.S.C. §§ 300gg–300gg-28) apply across the governing scheme of interlocking and interdependent acts regulating the health insurance markets. Congress amended ERISA to state that these provisions "shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart [of ERISA]." 29 U.S.C. § 1185d(a)(1) (enacted by ACA § 1563(e)). Congress further provided that those PHSA provisions prevail in any conflict with any other provision in part 7 of ERISA. 29 U.S.C. § 1185d(a)(2) ("[T]o the extent that any provision of this part conflicts with a provision of such part A with respect to group health plans, or health insurance issuers providing health insurance coverage in connection with group health plans, the provisions of such part A shall apply."). Congress added similar language to chapter 100 of the

---

[20] *See* 42 U.S.C. § 18022(a), (c) (limitations on cost-sharing); *id.* § 18022(d) (minimum actuarial value).

Internal Revenue Code (IRC). *See* 26 U.S.C. § 9815 (as added by ACA § 1563(f)). The net result is that if an ACA requirement—such as the requirement that a policy cover essential health benefits, *see supra* ¶¶ 4, 57—applies to the small group market but not the large group market, then that same distinction will carry forward under ERISA and the IRC.

> *(ii) Core ACA Reforms Depend on Market Definitions That Do Not Contemplate Aggregating All Employees Who Work for an Association's Members.*

59.     The ACA's fundamental protections and reforms are based on, and depend on, defining three different markets for health insurance: the individual market, the small group market, and the large group market.

60.     Under definitional provisions governing several core ACA provisions in the PHSA,[21] the small group market generally covers individuals who "obtain health insurance coverage (directly or through any arrangement) . . . through a group health plan maintained by a small employer," defined to mean "an employer who employed an average of at least 1 but not more than 50 employees on business days during the preceding calendar year and who employs at least 1 employees [sic] on the first day of the plan year." 42 U.S.C. § 300gg-91(e)(4–5). Those provisions likewise define the "large group market" as "the health insurance market under which individuals obtain health insurance coverage (directly or through any arrangement) on behalf of themselves (and their dependents) through a group health plan maintained by a large employer," which is defined to mean "an employer who employed an average of at least 51 employees on business days during the preceding calendar year and who employs at least 2 employees on the first day of the plan year." 42 U.S.C. § 300gg-91(e)(2)–(3).

---

[21] As noted *supra* ¶ 58, these reforms were incorporated into ERISA and the IRC.

61.     These definitions *exclude* sole proprietors with no other employees from the definition of "employer." 42 U.S.C. § 300gg-91(d)(6) ("The term 'employer' has the meaning given such term under section 3(5) of [ERISA], *except that such term shall include only employers of two or more employees*." (emphasis added)). And, the definition of "individual market" includes "coverage offered in connection with a group health plan that has fewer than two participants as current employees on the first day of the plan year" (subject to the decision by a State to include these plans in the small group market). 42 U.S.C. § 300gg-91(e)(1).

62.     Other portions of the ACA that set benefits requirements and protections depend on similar definitions. For example, section 1304 of the ACA, 42 U.S.C. § 18024(b), defines the small group market for these provisions as covering "an employer who employed" not more than 50 employees, with an option for States to raise that number to 100. The definition of "employer" in 42 U.S.C. § 300gg-91 (which excludes sole proprietors with no other employees from the definition of "employer," *see supra* ¶ 61) applies as well to these ACA provisions. *See* 42 U.S.C. § 18111. Several core ACA provisions are governed by these market definitions, including the provision establishing "single risk pools" for the individual and small group markets, *see* ACA § 1312(c), 42 U.S.C. § 18032(c); the provision establishing the risk adjustment program, *see* ACA § 1343, 42 U.S.C. § 18063; and the provisions establishing health exchanges, qualified health plans, assistance to States to create exchanges, and assistance to small employers in enrolling their employees, *see* ACA § 1311, 1321, 42 U.S.C. §§ 18031, 18041.

63.     In both sets of market definitions (those at 42 U.S.C. §§ 300gg-91(e) and 18024), the ACA uses specific and well-established rules under the IRC to determine when employees can be aggregated across legally distinct employers. These rules are known as "aggregation rules" because they allow an employer to aggregate employees across a range of entities to

determine whether a group is small or large. For example, under provisions in part A of title 27 of the PHSA, "all persons treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of title 26 shall be treated as 1 employer." 42 U.S.C. § 300gg-91(e)(6); *see also* 42 U.S.C. § 18024(b)(4) (same). These aggregation rules cover corporations in a controlled group, partnerships or proprietorships under common control, and affiliated service groups. *See* 26 U.S.C. § 414(b), (c), (m), (o). None of these rules enables members of a multi-employer association to aggregate all of their members' employees and be treated as a single employer who can then establish a large group health plan.

## II.   CONGRESS REPEATEDLY REJECTED LEGISLATION TO EXPAND ASSOCIATION HEALTH PLANS.

64.    Not only did Congress demonstrate specific legislative and policy choices in enacting the ACA that are incompatible with those embodied in the Final Rule, but Congress also specifically rejected the policy changes the Final Rule purports to effectuate.

65.    Congress for decades has rejected repeated efforts to allow for an expansion of AHPs across the nation's insurance markets under ERISA.

66.    For example, in reporting out a bill in 2005, the Committee on Education and the Workforce of the House of Representatives described the purpose of such proposed legislation: "The bill would authorize the creation of [AHPs] which would allow small businesses to join together through bona fide trade associations to purchase health insurance for their workers, thus enjoying the larger economies of scale presently enjoyed by many large corporations and unions and enabling them to purchase coverage at a lower cost than they currently must pay." *Small Business Health Fairness Act of 2005*, H.R. Rep. No. 109-41, at 1.

67.     The report also described Congress's repeated failure to enact such legislation. The report described hearings and proposed bills in 1995, 1996, 1997, 1998, 1999, 2001, 2002, 2003. *Id.* at 1–5.

68.     In support of the 2005 legislation, then-Secretary of Labor Elaine Chao testified before Congress that AHPs were "a key component of the President's efforts to make quality, affordable health benefits available to all Americans," and a "central component of the President's overall plan for expanding access to health care." *Helping Small Business Provide Health Coverage and Lower Costs, Hrg. before the S. Comm. on Small Business*, 109th Cong. 30, 32–33 (2005) (testimony of Elaine L. Chao, Secretary, U.S. Department of Labor).

69.     Even though AHPs were a signature initiative of President George W. Bush, DOL did not seek to upend the health insurance markets by radically expanding AHPs through an ERISA regulation. Instead, DOL asked Congress to pass legislation that would have permitted the expansion of AHPs, similar to what will be permitted by the Final Rule.[22]

70.     Nevertheless, Congress again declined to enact this legislation in 2005. *See* S. 1955, 109th Cong.

71.     Four years later, certain members of Congress who supported AHPs sought either to include them in the ACA or enact them instead of the ACA. Their efforts were rejected in committee and on the House floor. *See* H.R. Rep. No. 111-299, pt. 3, at 77; H. Amdt. 510, 111th Cong., §§ 201–02; Roll Call Vote No. 885, 111th Cong., Nov. 7, 2009.[23]

---

[22] The Proposed Rule describes H.R. 525 from the 109th Congress as an "AHP-like proposal" and invokes a Congressional Budget Office analysis of the legislation. 83 Fed. Reg. at 629.

[23] http://clerk.house.gov/evs/2009/roll885.xml

72.     In 2017, Congress again firmly rejected—as part of members' efforts to repeal the ACA—yet another attempt to expand the use of AHPs under ERISA. AHPs were a component of the Senate majority's bill to repeal the ACA. *See* Better Care Reconciliation Act, H.R. 1628, § 139.[24] Those efforts failed as well, with a bipartisan rejection on the Senate floor by a procedural vote of 43-57. *See* S. Amdt. 270, § 140, 115th Cong.; Roll Call Vote No. 168, 115th Cong., July 25, 2017;[25] Jordain Carney and Jessie Hellman, *Senate Rejects ObamaCare Repeal, Replacement Amendment*, The Hill, July 25, 2017.

## III.  PRESIDENT TRUMP'S EXECUTIVE ORDER ON ASSOCIATION HEALTH PLANS AND THE FINAL RULE PLAINLY ATTEMPT TO GUT THE ACA THROUGH EXECUTIVE ACTION.

73.     Soon after the ACA repeal effort failed on the Senate floor in the current Congress, President Trump signed Executive Order 13813 on October 12, 2017 directing his administration to prioritize AHPs.[26] The proposed rule, issued on January 5, 2018, was DOL's response to the President's order. *See* 83 Fed. Reg. 614 (the "Proposed Rule").

74.     The Proposed Rule openly acknowledged that it was designed to "avoid" ACA requirements. 83 Fed. Reg. at 615. The Proposed Rule highlighted several ACA requirements for the individual and small group markets that DOL concluded should be avoided:

> With respect to insured coverage, whether coverage is offered in the individual, small group, or large group market affects compliance obligations under the Affordable Care Act and other State and Federal insurance laws. For example, only individual and small group market health insurance coverage is subject to the

---

[24] https://www.budget.senate.gov/imo/media/doc/SENATEHEALTHCARE.pdf (Discussion Draft).

[25] https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=115&session=1&vote=00168

[26] https://www.whitehouse.gov/presidential-actions/presidential-executive-order-promoting-healthcare-choice-competition-across-united-states/

requirement to cover essential health benefits as defined under section 1302 of the Affordable Care Act.

Moreover, the risk adjustment program, which transfers funds from plans with lower-risk enrollees to plans with higher-risk enrollees, applies only to health insurance issuers offering coverage in the individual and small group markets, not the large group market.

The single risk pool requirement, which requires each health insurance issuer to consider the claims experience of all individuals enrolled in plans offered by the issuer in the individual market to be in a single risk pool, and all its individuals in the small group market to be members of a single risk pool, also applies only in the individual and small group markets, not the large group market.

In addition, the health insurance premium rules that prohibit issuers from varying premiums except with respect to location, age (within certain limits), family size, and tobacco use (within certain limits) apply only in the individual and small group markets.

Finally, the Medical Loss Ratio (MLR) provisions, which limit the portion of premium dollars health insurance issuers may spend on administration, marketing, and profits establish different thresholds for the small group market and the large group market.

83 Fed. Reg. at 618 (paragraph spacing added).

75.     DOL received more than 900 comments on the Proposed Rule. 83 Fed. Reg. at 28,914.[27] Reportedly "[m]ore than 95% of healthcare groups that have commented on President Trump's effort to weaken Obama-era health insurance rules criticized or outright opposed the proposals," referring to the AHP rule and a related proposal on short-term insurance. Noam Levey, *Trump's New Insurance Rules are Panned by Nearly Every Healthcare Group that Submitted Formal Comments*, L.A. Times, May 30, 2018. "The extraordinary one-sided outpouring came from more than 300 patient and consumer advocates, physician and nurse

---

[27] The complete set of numbered comment documents is available at www.dol.gov/agencies/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85.

organizations and trade groups representing hospitals, clinics and health insurers across the country. . . ." *Id.*

76.     The American Cancer Society warned, for example, "The proposed rule could seriously erode the affordable comprehensive coverage now available in most states' individual and small group markets that is so critical to cancer patients and survivors."[28]

77.     The American Heart Association and American Stroke Association noted: "One of the most troubling aspects of Association Health Plans is that they do not have to comply with [Essential Health Benefit] coverage requirements that are the core of the ACA. . . . This is deeply concerning because patients with [cardiovascular disease] rely on these coverage requirements for access to medically necessary care."[29]

78.     The American Academy of Pediatrics and other children's health groups warned: "Children are not little adults; they require services and care specific to their unique developmental and medical needs. However, under the proposed rule, both children and pregnant women enrolled in an AHP may not be assured that their plan will cover important benefits like maternity care, vaccines, prescription drugs, mental health services, dental and vision services, and habilitative services. Gaps in these core benefits can result in life-long health consequences that are both avoidable and costly for families and society."[30] Other commenters stated that

---

[28] American Cancer Society Cancer Action Network, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0530.

[29] American Heart Association and American Stroke Association, Comment Letter on Proposed Rule (Mar. 5, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0408.

[30] American Academy of Pediatrics et al., Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0627.

allowing AHPs to decline to cover essential health benefits is a form of de facto discrimination against individuals with pre-existing conditions.[31] This undermines the final rule's guaranteed issue requirement and is the exact subterfuge for discrimination based on health factors that the Final Rule purports to prevent.

79.     The American Academy of Actuaries stated that, in the small group market, "benefit design differences between AHPs and ACA plans could cause market fragmentation. AHPs could design plans more attractive to lower-cost small groups, leading to adverse selection and higher premiums among ACA small group plans."[32] And: "The ACA individual market could deteriorate and result in higher premiums not only because lower-cost individuals would be more likely to enroll in an AHP, but also because AHP enrollees who later develop health problems could re-enroll in an ACA plan during a subsequent open enrollment period or potentially during a special enrollment period. For example, individuals might find lower premiums through an AHP in part because fewer benefits are covered by the AHP. If the individual's health status deteriorates and those benefits become important, they can return to the ACA pool in worse health, subject to the open enrollment and special enrollment requirements. The increase in premiums could be particularly harmful to unsubsidized enrollees."[33]

---

[31] American Nurses Association, Comment Letter on Proposed Rule (Mar. 2, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0308; American Diabetes Association, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0632.

[32] American Academy of Actuaries, Comment Letter on Proposed Rule (Mar. 5, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0387.

[33] American Academy of Actuaries, Comment Letter on Proposed Rule (Mar. 5, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0387.

80.     Many Plaintiff States, through their Attorneys General and other state regulators, submitted comments describing various ways the Proposed Rule violated the law and was bad public policy.[34]

81.     The National Association of Insurance Commissioners (NAIC) and individual insurance commissioners likewise highlighted the history of fraud, abuse, unpaid claims, and insolvencies—even for well-intentioned MEWAs and AHPs—and highlighted various potential shortcomings of the Rule as proposed.[35]

82.     DOL released the Final Rule on June 19, 2018 and published it in the *Federal Register* on June 21, 2018. *See* 83 Fed. Reg. 28,912.

83.     President Trump and Secretary Acosta appeared before an industry trade group to tout the Final Rule on June 19, 2018. The President proclaimed that the Final Rule was a "truly historic step in our efforts to rescue Americans from ObamaCare and the ObamaCare nightmare."[36] The President said "ObamaCare has been especially brutal for small businesses"

---

[34] *See* Attorney General of New York et al., Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0658; New York State Department of Financial Services, Comment Letter on Proposed Rule (Mar. 2, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0593; Muriel Bowser, Mayor of the District of Columbia, and Phil Mendelson, Chairman of the Council of the District of Columbia, Comment Letter on Proposed Rule (Mar. 6. 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0663; District of Columbia Health Benefit Exchange Authority, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0643; and New Jersey Department of Banking and Insurance, Comment on Proposed Rule (Mar. 6, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0646.

[35] *See* NAIC, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0611; Pennsylvania Insurance Department, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0542.

[36] *See supra* note 6 and accompanying text.

and that the Final Rule would allow them to "escape some of ObamaCare's most burdensome mandates."[37] The President likewise stated, "For the first time ever, sole proprietors will be able to come together and buy lower-cost group insurance instead of getting ripped off by this disaster that we all know as Obamacare."[38]

84.     In substance, DOL "decided to adopt the Proposed Rule as a final rule, with certain modifications made in response to public comments." 83 Fed. Reg. at 28,915.

85.     To avoid ACA requirements, the Final Rule makes two primary changes to settled understandings of when an "association" can qualify as an "employer" under ERISA for purposes of sponsoring an AHP.

86.     First, it dramatically redefines "employer" under ERISA contrary to congressional intent as evidenced by decades of interpretations defining the type of association that can act indirectly in the interest of an employer within the meaning of 29 U.S.C. § 1002(5). In contrast to the well-established "bona fide association" test, *see supra* ¶¶ 40–46, the Final Rule enables numerous employers to join together in an association formed primarily to offer insurance,[39] and then offer a large group plan if the employers merely are in the "same trade, industry, line of

---

[37] *See supra* note 6 and accompanying text.

[38] *See supra* note 6 and accompanying text.

[39] Whereas the Proposed Rule would have enabled an AHP to form for the "sole" purpose of offering insurance, the Final Rule continues to allow an association with the "primary purpose" of offering health insurance to qualify, if the association has another "substantial business purpose." 83 Fed. Reg. at 28,918. The Final Rule does not, however, define "substantial business purpose" and as described in the Final Rule preamble the standard is apparently easy to satisfy. Such a purpose "is considered to exist" if the association is a viable entity apart from its health insurance plan, which could cover every local or statewide chamber of commerce in the country. *Id.* An organization apparently may qualify simply by having tax-exempt status, by advertising or publishing on business issue of interest, or by issuing educational materials or holding conferences. *Id.*

business, or profession" *or* "have a principal place of business within a region that does not exceed the same State or the same metropolitan area (even if the metropolitan area includes more than one State)." 83 Fed. Reg. at 28,922. Such an association could offer a large group plan by considering, "in the aggregate," all of the employees of the association's members—even if no member is a large employer. 83 Fed. Reg. at 28,934–35.

87.     The result would be that associations (1) newly formed (2) primarily to sell insurance (3) for profit (4) to all employers in the same industry or geographic area (an undefined term that could include a whole State or an area that crosses many States' borders) will qualify as "employers" under ERISA.[40] Little would distinguish these entities—which are unlikely to act in their employer members' interests—from health insurance companies or insurance brokers seeking to develop and market plans for their own profit.

88.     Enabling associations that meet such minimal standards to qualify as "employers" under ERISA is inconsistent with ERISA, as evidenced by decades of DOL interpretations and practice. *See* DOL Op. No. 2008-07A (Sept. 26, 2008) (rejecting chamber of commerce's attempt to become AHP); DOL Op. No. 94-07A (Mar. 14, 1994) ("USA has numerous members spread across the country who are engaged in operating small businesses. The activities of USA appear to consist primarily of offering its members services or programs of a consumer nature, among which the opportunity to purchase health care benefits may be the most significant. None of the information furnished points to a common economic or representation interest linking employees of USA's members to USA that is unrelated to their obtaining benefits.").

---

[40] The Final Rule does not define "geographic area." DOL makes clear that an area could be *as large as* a State or metropolitan area (undefined), but "nothing in the final rule requires [] that a group or association or their AHP cover the entire State or an entire metropolitan area in order for the group or association to qualify as bona fide." 83 Fed. Reg. at 28,925.

89.     Second, the Final Rule deems self-employed individuals with no other employees

to be both employers and employees, such that they can participate in employer associations. The

test under the Final Rule for an individual to be considered self-employed is minimal. For

example, an individual need only work twenty hours per week (or eighty hours per month)[41] *or*

earn income that "at least equals the working owner's cost of coverage." 83 Fed. Reg. at 28,964.

That means earning as little as a few hundred dollars per month would suffice. *Cf. id.* at 28,931

(suggesting that "knitting *a single scarf* to be offered for sale on the internet" might not be

enough (emphasis added)). The individual does not even have to establish a track record of

meeting those very low standards. *See id.* at 28,932 ("A working owner could demonstrate this

by . . . a reasonable projection of expected self-employment hours worked in a trade or

business."). Even with those loose standards, DOL makes clear that an AHP may reasonably rely

on "the accuracy of the information in written documentation or a sworn statement submitted by

a working owner, without independent verification." *Id.* at 28,932.

90.     The result of these changes—and the reason why DOL promulgated the Final

Rule—will be an expansion of associations that qualify as single, large employers that evade

core ACA protections and remove millions of people from the individual and small group

markets, in some cases threatening those markets' viability. "As large groups," DOL stated in the

Proposed Rule, AHPs "could offer small businesses relief from ACA and State rules that restrict

issuers' product offerings and pricing in individual and small group markets." 83 Fed. Reg. at

626; *see also* 83 Fed. Reg. at 28,912 (Final Rule) (noting that "small employers and working

owners" would be able to "enjoy flexibility with respect to benefit package design comparable to

---

[41] These hours requirements are 33 percent lower than those in the Proposed Rule. 83
Fed. Reg. at 28,932.

that enjoyed by large employers"); 83 Fed. Reg. at 28,935 (Final Rule) (noting the Final Rule

would "treat[] AHPs like large employers").

91.     Not only will AHPs evade the ACA's protections for the small group and

individual markets, but they also appear to be able to evade a core protection for employees in

the large group market: the ACA's shared responsibility provision, which ensures that large

employers offer meaningful health coverage to their employees. *See supra* ¶ 51 (describing how

shared responsibility provision ensures employees are offered minimum value coverage by large

employers). The Final Rule suggests that this provision—which applies to "an employer who

employed an average of at least 50 full-time employees," 26 U.S.C. § 4980H(c)(2)—applies to

each employer member of an association, but not to the association as one large employer. 83

Fed. Reg. at 28,933. By creating an entity that is a "large employer" for some purposes, but still

composed of "small employers" for others, the Final Rule would create plans worse than

anything the ACA permits in the small *or* large group markets. Such plans would lack *both* the

comprehensive coverage required in the small group market and the lesser, but still significant,

protections ensuring large employers offer reasonably comprehensive coverage.

92.     Throughout the Final Rule, DOL stresses the purported benefits of evading the

ACA's requirements by segmenting risk and offering fewer benefits with AHPs. The Final Rule

states, for example, that AHPs would "design more tailored, less comprehensive health coverage

and set more actuarially fair prices that generally are lower for lower risk groups and higher for

higher risk ones." *See, e.g.*, 83 Fed. Reg. at 28,939; *id.* at 28,944 (similar). DOL projected that

the magnitude of such benefits would outweigh any purported administrative savings. "[T]he

magnitude of such savings is likely to be smaller than the savings AHPs can deliver by offering

more tailored, less comprehensive benefits, offering actuarially fair price discounts to low-risk

groups, and assembling favorable risk pools." *Id.* at 28,943. DOL projected such discrimination

might "deliver economic value . . . even if these AHPs have relatively high administrative costs,"

*id.*, suggesting the primary driver of savings for an AHP is risk segmentation and reduced

benefits, nothing else.

93.      The Final Rule affords far less protection under federal law against premium

discrimination than the ACA. First, it enables discrimination based on factors that are not "health

factors."[42] Second, the Final Rule allows even health-factor discrimination if participants in an

AHP are divided into groups that are not deemed "similarly situated." 83 Fed. Reg. at 28,927.

The Final Rule stressed a range of factors that would differentiate groups from one another

within an AHP, thus allowing health-factor discrimination across such groups.[43] The ACA's

mandated protections for the small group and individual markets are far more robust. *See supra*

¶¶ 3, 4, 52–62.

94.      Purportedly as a measure to prevent AHPs from becoming "commercial

insurance-type arrangements," DOL also prohibited an AHP from treating "member employers

---

[42] "Health factor," under applicable rules, does not include age, group size, sex, income, industry, education level, gender, sexual orientation, occupation, and other factors. 29 C.F.R. § 2590.702(a); *see also* 83 Fed. Reg. at 28,929 (describing "age," "case size," "industry," and "gender" as "non-health factor[s]").

[43] Under the Final Rule, factors that can be used to consider groups as not "similarly situated" include: (1) "full-time versus part-time status, different geographic location, membership in a collective bargaining unit, date of hire, length of service, current employee versus former employee status, and different occupations," 83 Fed Reg. at 28,926; (2) whether a purportedly distinct group consists of "participants" (generally meaning "employees") or "beneficiaries" (such as spouses and children), *id.* at 28,926; and (3) as among beneficiaries, "the relationship to the participant, marital status, . . . age or student status . . . and other factors if the factor is not a health factor," *id.* at 28,926–27. Such distinctions are permitted unless they are "directed at individual participants or beneficiaries based on any health factor of the participants or beneficiaries." *Id.* at 28,926.

as distinct groups of similarly-situated individuals." 83 Fed. Reg. at 28,927–29.[44] DOL did not

explain how allowing AHPs to discriminate (1) across the same broad range of factors otherwise

applicable in the large group market (which is served by commercial insurers), (2) across

different groups of similarly situated individuals based on health factors, such as claims

experience (which large group insurers can do under federal law), and (3) using more factors

than permitted in the small group and individual markets (which also are served by commercial

insurers), would be sufficient to distinguish an AHP from a commercial insurer.

95.     DOL rejected comments urging that AHPs be required to include the essential

health benefits package required for individual and small group market plans. DOL's reasoning

was that such a requirement "would run contrary to the goal" of reducing protections in the small

and individual markets, and that such a protection "could reduce AHPs' flexibility to tailor

coverage to the particular needs of the members of the group or association offering the benefits,

and thereby reduce access to AHPs by making them less attractive options for providing

affordable coverage." *Id.* at 28,933.

96.     DOL likewise rejected comments urging that "AHPs should be limited to the

rating factors currently allowed in the small group market." *Id.* at 28,927. DOL's position boiled

down to the following statement: "Federal rating rules that some commenters suggested should

apply to AHPs are grounded in the PHS Act and apply to health insurance issuers in the

individual and small group markets, but not to issuers in the large group market or to group

---

[44] On this point, DOL stated that AHPs qualifying as "bona fide associations" using standards applicable prior to the Final Rule will not need to comply with these requirements, 83 Fed. Reg. at 28,928 n.40, and effectively created two tiers of AHPs. DOL stated that "[t]his final rule provides an *additional* mechanism for groups or associations to meet the definition of 'employer' and sponsor a single ERISA-covered group health plan; it is not the sole mechanism." 83 Fed. Reg. at 28,916 (emphasis in original).

health plans. Thus, these rules do not apply those Federal rating rules to self-insured AHPs, or to insured AHPs that have employer members with a total of more than 50 employees, as insurance coverage sold to the latter would generally be regulated as large group coverage." *Id.* at 28,928.

97.     In the Final Rule, DOL made clear that States will be able to apply their insurance laws to AHPs that are not fully insured[45] and apply certain insurance laws to AHPs that are fully insured. *Id.* at 28,936. Despite the fraud and abuse that similar plans unleashed on the States in the past, the Final Rule pointedly threatens to use ERISA to enact future regulations to preempt state authority if "state insurance laws … go too far in regulating non-fully-insured AHPs in ways that interfere with the important policy goals advanced by this final rule." *Id.* at 28,936.

98.     The Final Rule contains a series of effective and applicability dates. It is scheduled to become effective on August 20, 2018. *Id.* at 28,912. The Final Rule allows "fully insured plans to begin operating under the new rule on September 1, 2018," *id.* at 28,953, so AHPs that obtain insurance from a state-licensed insurer will be able to begin operating within weeks, free from federal ACA protections not otherwise duplicated under state law. In addition, "[e]xisting self-insured AHPs can begin operating under the new rule on January 1, 2019, and new self-insured AHPs can begin on April 1, 2019." *Id.* at 28,953.

99.     DOL stated that these months-long delays in applicability of the Final Rule for self-insured AHPs would allot "additional time for the Department and State authorities to address concerns about self-insured AHPs' vulnerability to financial mismanagement and abuse." *Id.* at 28,953. The Final Rule noted that "[t]he Department and State authorities both

---

[45] An AHP is "fully insured only if the terms of the arrangement provide for benefits the amount of all of which the Secretary determines are guaranteed under a contract, or policy of insurance, issued by an insurance company, insurance service, or insurance organization, qualified to conduct business in a State." 29 U.S.C. § 1144(b)(6)(D).

need time to build and implement adequate supervision and possible infrastructure to prevent

fraud and abuse," *id.*, and, with respect to the April 1, 2019 date for new self-insured AHPs, to

"provide sufficient time for the Department and the States to implement a robust supervisory

infrastructure and program," *id.* DOL does not state how it will drastically increase its oversight

abilities given its prior acknowledgement that it had the capability to review plans under its

jurisdiction only once every 300 years.[46]

## IV.   THE FINAL RULE HARMS THE STATES

100.    The Final Rule harms the States' sovereign, quasi-sovereign,[47] economic, and

proprietary interests.

101.    The Final Rule harms the States' interests in enforcing their own laws as a result

of ERISA's express preemption provision. The Final Rule is designed to vastly expand the

number of AHPs that qualify as "employee benefit plans" governed by ERISA, and that thus

must be subject to an analysis under ERISA's express preemption provision. 29 U.S.C. § 1144.

The Final Rule notes that this statutory provision generally preserves State insurance laws as to

AHPs that are not fully insured, and refers to the statutory language that states that, as to such

plans, "any law of any State which regulates insurance may apply to the extent not inconsistent

---

[46] National Employment Law Project, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-0469.

[47] The District of Columbia is uniquely situated among the Plaintiff States, as it has no sovereign interest to claim as against the Federal Government. *See* Const. art. I, § 8, cl. 17; *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 76 (1982) (plurality op.); *District of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.*, 797 F.2d 1041, 1046 (D.C. Cir. 1986) (Congress acts "as sovereign of the District of Columbia"). Rather, the District asserts its quasi-sovereign interests and its authority to enforce its laws and uphold the public interest under its Attorney General Act, which was intended to incorporate the common law authority of States' attorneys general. D.C. Code. § 1-301.81; *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 608 n.15 (1982) (recognizing that Puerto Rico "has a claim to represent its quasi-sovereign interests in federal court at least as strong as that of any State").

with" ERISA. *See* 29 U.S.C. § 1144(b)(6)(A)(ii); 83 Fed. Reg. at 28,959. Moreover, DOL

threatens to use ERISA to enact future regulations to preempt State insurance laws as to AHPs

plans if States go "too far" in regulating them. *See* 83 Fed. Reg. at 28,937. And, as to non-

insurance state laws, the Proposed Rule asserted that under ERISA those may be preempted as

well, 83 Fed. Reg. at 617, with no statement in the Final Rule disclaiming that intent. By limiting

States' sovereign "power to create and enforce a legal code," *Alfred L. Snapp & Son, Inc. v.*

*Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982), the Final Rule injures the States.

*Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers); *Alaska v.*

*U.S. Dep't of Transportation*, 868 F.2d 441, 442–44 (D.C. Cir. 1989).

102.    Many States will suffer harm in the form of lost tax revenue or administrative fees

paid to state agencies for small group and individual plans obtained on a state insurance

exchange. Both the Proposed Rule and the Final Rule openly acknowledge that this is the case.

83 Fed. Reg. at 28,943 (noting that self-insured AHPs "may avoid the potentially significant cost

to comply with State rules that apply to large group issuers, including for example premium

taxes"); 83 Fed. Reg. at 627 ("State revenue may also decline in States that tax insurance

premiums.").

103.    The Final Rule also openly contemplates a substantially increased regulatory

burden on the States. For example, the Final Rule contemplates fighting fraud and abuse only if

States do so: "the final rule importantly depends on state insurance regulators for oversight and

enforcement to, among other things, prevent fraud, abuse, incompetence and mismanagement,

and avoid unpaid health claims." 83 Fed. Reg. at 28,960. The Final Rule notes, for example, that

it has granted a few months of delay until it goes into full effect because States "need time to

build and implement adequate supervision and possible infrastructure to prevent fraud and

abuse" and "to implement a robust supervisory infrastructure and program." *Id.* at 28953–54.

Thus, the States will be harmed by being forced to substantially ramp up enforcement against a

new type of plan, or face a wave of fraud and abuse similar to what occurred with MEWAs in

past decades. Even AHPs that are not ERISA plans under the Final Rule will exploit confusion—

just as such entities have done for decades—to argue that state oversight and enforcement of

AHPs is preempted, spending participants' premiums on litigation rather than benefits and

forcing States to expend their own resources to exercise their sovereign law enforcement powers.

104.    Further, in States where state law does not duplicate ACA requirements for

individual and small group plans, the health insurance markets will experience substantial harm.

As DOL anticipates, the Final Rule will encourage healthy individuals and employers with

healthy employees to leave the traditional health insurance markets and purchase cheaper plans

with fewer benefits through AHPs. Many of those individuals, employees, and their dependents

(including children)—healthy at the time of enrollment in an AHP—will get sick, some

seriously, and require health care their AHP does not cover. The most vulnerable individuals,

employees, and dependents—those with the greatest health needs, including those with pre-

existing conditions—will be left to purchase more expensive comprehensive coverage from the

start or will lose coverage entirely. An actuarial analysis submitted to DOL during the comment

period estimates that the District of Columbia's small group market will shrink by as much as 90

percent, and the individual market will lose 25 percent of its participants.[48] And as more people

---

[48] *See* District of Columbia Health Benefit Exchange Authority, Comment Letter on
Proposed Rule (Mar. 6, 2018), https://www.regulations.gov/document?D=EBSA-2018-0001-
0643.

leave the traditional market in states without sufficiently protective state laws,[49] costs for those who need to purchase comprehensive coverage will continue to rise, undermining the reformed individual and small group health insurance markets that were intended by Congress and that the States have worked so diligently under the ACA to build over the last several years.

105.    The District of Columbia's actuarial analysis estimates that premiums for small groups may rise by more than 25 percent, and premiums for individuals may rise more than 10 percent based on the Final Rule alone. Unaffordable premiums will lead to the loss of insurance for the people who need the benefits the most. And, in some instances, insurance carriers, faced with smaller, sicker pools of individuals and small groups, will choose to leave the individual and small group insurance markets altogether, making comprehensive insurance coverage completely unavailable to individuals and small groups.

106.    Many States will also experience a rise in their uncompensated care costs due to the Final Rule, especially for individuals with high health needs who risk losing their access to advanced premium tax credits. If an employee who makes less than 400 percent of the federal poverty level currently works for a small employer who does not offer health coverage, that employee is able to use an advanced premium tax credit to purchase a qualified health plan on the exchange. If, under the Final Rule, that small employer makes an AHP available to its

---

[49] New York is an example of a State with sufficiently protective state laws that will undertake the regulatory burden to prevent these harms from occurring within the State. The New York Department of Financial Services ("DFS") regulates the commercial health insurance market in New York. Under New York law, a group or association of employers can sponsor a group health plan in New York only if the group is recognized as a group under the N.Y. Insurance Law regardless of the final rule. The Final Rule expressly states that it does not preempt state law and makes clear that state regulators, such as DFS, maintain their full authority under state law to regulate their state insurance markets. Nonetheless, DFS will be required to undertake an additional regulatory burden to ensure that any AHPs that impact the State comply with New York law regardless of the Final Rule and that all of the applicable New York laws are enforced against AHPs that impact the State.

employees and that AHP meets the requirements of minimum essential coverage (which does not cover all essential health benefits) under the ACA, that employee will lose her eligibility for the tax credit. An employee with a chronic condition or high health needs not covered by her AHP would now have no reasonable way to access the coverage she needs. The employee's options would be: (a) purchase a plan in the marketplace without financial assistance, an unaffordable option if the employee had income low enough to qualify for a tax credit in the first place; (b) enroll in the AHP even if the AHP does not cover services she relies on, such as maternity care, mental health care, or prescription drugs, or (c) remain uninsured. This individual who formerly had access to coverage through the marketplace will now be underinsured or uninsured due to the Final Rule. States will, in many cases, become responsible for providing care to individuals who cannot afford coverage or who are underinsured.

107.    The requested relief, if granted, will redress the injuries to the States' interests caused by the Final Rule.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Administrative Procedure Act —Contrary to Law—Market Structure)

108.    The States reallege and incorporate by reference the allegations set forth in all preceding paragraphs of the complaint.

109.    Under the APA, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

110.    In ACA provisions that Congress incorporated into ERISA, PHSA, and elsewhere, Congress defined the small group market by reference to whether a business is "an employer who employed" a small number of employees—generally, fifty or fewer, but also up to

one hundred, *see supra* ¶¶ 51–58. This definition and others are at the core of the ACA's health insurance market structure. *See supra* ¶¶ 59–63.

111.   But DOL's purported "goal" of applying the same regulatory standards to large employers and small employers, 83 Fed. Reg. at 28,933, is directly contrary to the text, structure, and purpose of the ACA, in which Congress decided that stronger protections *should apply* to employees of small employers than to employees of large employers *because of* historic deficiencies in the small group market.

112.   The ACA's text confirms Congress's intent. The phrasing used by the ACA's definitions of "large employer" and "small employer"—"an employer who employed" a given number of employees—plainly adopts the traditional common law test for whether a "hiring party" has substantial enough control over a "hired party" to establish an employer-employee relationship. *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992) (using test to determine whether a person is "employed by an employer" under ERISA). An association of all, or many, small employers in a State cannot be the "employer who employed" all of its members' employees.

113.   Confirming that view, Congress delineated very narrow circumstances in which employees could be "aggregated" across businesses, based on well-established rules under the IRC covering corporate control groups and the like. *See supra* ¶ 63. It would be contrary to the ACA to conclude that Congress permitted an unstated means to undo core ACA reforms for approximately 90 percent of businesses and many individuals,[50] particularly through a generally

---

[50] According to the U.S. Census Bureau's County Business Patterns data, there were more than 7.75 million business establishments in the United States in 2016, and more than 94 percent of them had between 1 and 49 employees. That same data set showed more than 544,000 businesses in New York alone, with approximately 95 percent of them having between 1 and 49

worded definition in a long-extant statute such as ERISA. *See King v. Burwell*, 135 S. Ct. 2480, 2488–89 (2015); *Utility Air Reg. Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014).

114.     The Final Rule conflicts with the ACA's structure by creating plans that are treated as "large employers" for some purposes but not with respect to the shared responsibility protection at 26 U.S.C. § 4980H. That provision requires such large employers to provide health coverage to their full-time employees that is meaningfully comprehensive in the sense that it is affordable and provides "minimum value" to the enrollee. *See supra* ¶ 51. Although less prescriptive than the essential health benefits package required for the individual and small group markets, this requirement effectively ensures that a large employer (on pain of a significant tax penalty) provides meaningful coverage. By treating AHPs as large employers for other ACA purposes, but not here, the Final Rule creates plans outside of comprehensive coverage requirements applicable to *all three ACA markets*, contrary to what Congress intended.

115.     The Final Rule's treatment of AHPs thus is contrary to law.

116.     The Final Rule is unlawful and should be set aside. 5 U.S.C. § 706(2)(A).

### SECOND CAUSE OF ACTION
**(Administrative Procedure Act—Contrary to Law—"Working Owners")**

117.     The States reallege and incorporate by reference the allegations in all preceding paragraphs of the complaint.

118.     Under the APA, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

---

employees. These data sets are available through the following link: https://www.census.gov/data/tables/2016/econ/cbp/cbp-tables.html.

119.    The Final Rule unlawfully attempts to fragment the individual market by treating self-employed individuals (denominated "working owners") with no other employees as both "employer" and "employee," contrary to ERISA, congressional intent, specific definitions governing group health plans under ERISA and the PHSA, and judicial precedent.

120.    This provision is contrary to ERISA and the legislative intent of Congress. "Courts agree that if a benefit plan covers only working owners, it is not covered by Title I" of ERISA. *Yates*, 541 U.S. at 21 n.6.

121.    This provision also violates statutory definitions applicable to group health plans under ERISA. Congress installed the ACA's individual and group market reforms in the PHSA and ERISA. *See* 29 U.S.C. § 1185d; *see also supra* ¶ 58. These provisions—which govern not only typical group health plans, but also any plan that purportedly is an AHP—use ERISA's definition of "employer," except that they limit the definition to "include only employers of two or more employees," which clearly does not include sole proprietors. *See* 42 U.S.C. § 300gg-91(d)(6). This provision makes it abundantly clear that a working owner who has no other employees cannot be an employer under ERISA provisions governing group health plans, and so cannot join an "association of employers" within the meaning of that definition.

122.    The Final Rule also unlawfully enables a so-called "working owner" to claim this designation with no obligation to demonstrate indicia of bona fide employment. But ERISA requires a true, bona fide employment relationship—based on a traditional common law test— for an individual to establish that she is an "employee" of an "employer." *Darden*, 503 U.S. at 324; *Cmty for Creative Non-Violence v. Reid*, 490 U.S. 731, 739–51 (1989). The Final Rule's minimal requirements are contrary to law.

123.    The Final Rule is unlawful and should be set aside. 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
**(Administrative Procedure Act—Contrary to Law—Bona Fide Association)**

124.    The States reallege and incorporate by reference the allegations set forth in all preceding paragraphs of the complaint.

125.    From shortly after ERISA's enactment, and consistently thereafter, ERISA has been understood to permit only certain types of associations—those tied by a commonality of interest unrelated to the provision of benefits, and subject to control by employer members—to qualify as an "association" acting indirectly in an employer's interest under ERISA's definition of employer. *See supra* ¶¶ 38–46. The courts and DOL have endorsed that interpretation for decades; DOL even argued that ERISA foreclosed an interpretation that would allow an entrepreneurial association of unrelated employers to be considered an "employer." *See supra* ¶ 46.

126.    The Final Rule unlawfully guts these established principles, effectively enabling commercial insurance operations to qualify as ERISA plans. *See, e.g.*, 83 Fed. Reg. at 28,918. This provision is contrary to ERISA. *See Wisc. Educ. Ass'n*, 804 F.2d at 1064–65. ERISA requires an association's employer-members to have a "common economic or representation interest, unrelated to the provision of benefits." *Id.* The Final Rule enables AHPs who have the primary purpose of selling insurance for profit and who (in States without sufficiently protective state laws) can discriminate across a broad range of factors—leaving them little different from insurance companies—to qualify as ERISA plans.

127.    The Final Rule also eviscerates the requirement that an association's employer members have a substantial "commonality of interest," a key requirement in assessing whether an association is "acting indirectly in the interest of" its employer members, or instead acting as a commercial insurance provider. Despite acknowledging that its "historical approach" on the

issue "was designed to ensure that the Department's regulation of employee benefit plans is *focused on employment-based arrangements, as contemplated by ERISA*, rather than merely commercial insurance-type arrangements that lack the requisite connection to the employment relationship," 83 Fed. Reg. at 28,914, the Final Rule effectively eliminates the commonality of interest requirement by allowing fly-by-night organizations that have no established track record and that cover all employers in a State to qualify as a "bona fide association" (and thus an "employer"). The Final Rule does this by providing that the employer members have a sufficient commonality of interest if they merely "have a principal place of business within a region that does not exceed the boundaries of the same State or the same metropolitan area (even if the metropolitan area includes more than one State)" or are in the "same trade, industry, line of business, or profession." 83 Fed. Reg. at 619 (Proposed Rule); 83 Fed. Reg. at 28,923 (Final Rule). This is contrary to well-established judicial interpretations of ERISA holding that mere proximity among businesses does not provide the "protective nexus" sufficient to fall within ERISA.

128.    Congress has enacted a web of statutes governing health care spending, which comprises nearly one-fifth of the national economy,[51] and other major economic actors (such as pensions) based on the long-standing, settled meaning of "employer" under ERISA. DOL is not free—through a radical reinterpretation of the term "employer"—to upend the application of these statutes.

129.    The Final Rule is unlawful and should be set aside. 5 U.S.C. § 706(2)(A).

---

[51] *National Health Expenditure Data,* Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html

**FOURTH CAUSE OF ACTION**
**(Administrative Procedure Act—In Excess of Statutory Authority)**

130.    The States reallege and incorporate by reference the allegations set forth in all preceding paragraphs of the complaint.

131.    Under the APA, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

132.    In the provision DOL relies upon as authority for the Final Rule, 83 Fed. Reg. at 28,961, Congress granted the Secretary of Labor regulatory authority to implement ERISA, providing: "the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter." 29 U.S.C. § 1135.

133.    In the new regulatory language to be found at 29 C.F.R. § 2510.3-5, DOL claims that it is only "clarifying" who may act as an "employer" within the statutory meaning of ERISA. 83 Fed. Reg. 28,915, 28,961.

134.    Yet nothing in the Proposed Rule or Final Rule indicates that DOL is attempting to "carry out" Congress's intent to implement ERISA. DOL does not even apply its new interpretation to anything governed by ERISA *other than* AHPs, *see infra* ¶ 143, suggesting DOL has little interest in applying this interpretation to ERISA generally. Instead, DOL is exploiting its regulatory authority at the request of the President to circumvent Congress, which has repeatedly refused to amend the law to authorize the expansion of AHPs. DOL is effectively legislating changes to the ACA's carefully considered market structures in defiance of Congress in order to undermine the ACA's robust consumer protections.

135.    DOL acted beyond its statutory authority when promulgating the Final Rule.

136.    Accordingly, the Final Rule should be set aside as in excess of DOL's statutory

authority pursuant to 5 U.S.C. § 706(2)(C).

## FIFTH CAUSE OF ACTION
### (Administrative Procedure Act—Arbitrary and Capricious)

137.    The States reallege and incorporate by reference the allegations set forth in all

preceding paragraphs of the complaint.

138.    Under the APA, courts must "hold unlawful and set aside agency action" that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A).

139.    The Final Rule is arbitrary and capricious for multiple reasons including but not

limited to those stated in the following paragraphs.

140.    First, without reasoned justification, the Final Rule drastically departs from nearly

four decades of settled law under ERISA that faithfully reflected congressional intent. DOL has

provided no detailed justification to justify its disregard of either the facts underlying its long-

standing interpretation or state governments' serious reliance interests on that interpretation in an

area where the States are the primary regulatory authority.

141.    Second, the Final Rule fails to address the history of rampant fraud and abuse that

attended the activities of prior AHPs and other MEWAs. DOL concedes that "[h]istorically, a

number of MEWAs have suffered from financial mismanagement or abuse, often leaving

participants and providers with unpaid benefits and bills." 83 Fed. Reg. at 631 (Proposed Rule);

83 Fed. Reg. at 28,951 (Final Rule) (similar). Reflecting on this history, DOL likewise admits

that the Final Rule will exacerbate these problems: according to DOL, the Final Rule "will

introduce increased opportunities for mismanagement or abuse, in turn increasing oversight

demands on the Department and State regulators," 83 Fed. Reg. at 28,953; *id.* at 28,928 (noting that Final Rule's relaxation of legal requirements would, without safeguards, create "cause for concern about fraud"). Despite acknowledging that the Final Rule will exacerbate this significant problem, the Final Rule lacks any meaningful measures to address the likelihood of fraud and abuse that the Final Rule will cause.

142.    Third, the Final Rule relies on factors Congress could not possibly have intended DOL to consider. These include that key purported benefits of the rule are that it would allow plans (1) to "avoid many" ACA requirements, 83 Fed. Reg. at 615 (Proposed Rule), and (2) to provide "less comprehensive health coverage and set more actuarially fair prices that generally are lower for lower risk groups and higher for higher risk ones." *E.g.,* 83 Fed. Reg. at 28,939.

143.    Fourth, the Final Rule creates blatant inconsistencies in statutory interpretation. For example, the Final Rule purports to apply its definitional change only to AHPs under ERISA, but not to other benefits covered by ERISA, and not to identical (or nearly identical) language in the Internal Revenue Code. 83 Fed. Reg. at 28915 n.10. DOL accentuated this failure by utterly failing to grapple with the applicable statutory text raised during the comment period.

144.    And, the Final Rule is tainted by a skewed analysis that touts illusory benefits, ignored significant costs, and is insufficiently quantified.

145.    Accordingly, the Final Rule is unlawful and should be set aside as arbitrary and capricious under 5 U.S.C. § 706(2)(A).

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.      Declare that the Final Rule is arbitrary, capricious, or otherwise contrary to law within the meaning of 5 U.S.C. § 706(2)(A);

b.     Declare that the Final Rule was promulgated by the DOL in excess of statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. § 706(2)(C);

c.     Declare that the Final Rule does not provide a legal basis for an association to qualify as a large employer under the ACA, because an association's qualifying as an employer under ERISA does not mean the association employs all of its members' employees under the ACA's market-size definitions;

d.     Vacate and set aside the Final Rule;

e.     Enjoin the DOL and all its officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Final Rule;

f.     Award the States' costs, expenses, and reasonable attorneys' fees; and,

g.     Award such other relief as the Court deems just and proper.

Respectfully submitted,

**BARBARA D. UNDERWOOD**
*Attorney General*
*State of New York*

By: */s/ Matthew Colangelo*
Matthew Colangelo (D.C. Bar No. 997893),
Executive Deputy Attorney General
Steven C. Wu (D.C. Bar No. 975434), Deputy
Solicitor General
Lisa Landau, Bureau Chief
Eric R. Haren (D.C. Bar No. 985189), Special
Counsel & Senior Advisor
Sara H. Mark, Special Counsel
Elizabeth Chesler, Assistant Attorney General
Matthew W. Grieco, Assistant Solicitor
General
Paulina Stamatelos, Assistant Attorney
General
Susan J. Cameron, Deputy Bureau Chief

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

By: */s/ Eric M. Gold*
Eric M. Gold, Assistant Attorney General
Stephen B. Vogel, Assistant Attorney General

Health Care Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Phone (617) 727-2200
eric.gold@state.ma.us
stephen.vogel@state.ma.us

Office of the New York State Attorney
General
Health Care Bureau
28 Liberty St., 19th Floor
New York, NY 10005
Phone: (212) 416-6305
Matthew.Colangelo@ag.ny.gov

**KARL A. RACINE**
*Attorney General*
*District of Columbia*

By: */s/ Robyn R. Bender*
Robyn R. Bender (D.C. Bar No. 465117),
Deputy Attorney General
Andrew J. Saindon (D.C. Bar No. 456987),
Senior Assistant Attorney General
Valerie M. Nannery (D.C. Bar No. 488529),
Assistant Attorney General

Public Advocacy Division
441 4th Street, NW
Suite 630 South
Washington, DC 20001
Phone: (202) 724-6610
Robyn.Bender@dc.gov
Andrew.Saindon@dc.gov
Valerie.Nannery@dc.gov

**MATTHEW P. DENN**
*Attorney General*
*State of Delaware*

By: */s/ Ilona Kirshon*
Ilona Kirshon, Deputy State Solicitor
Jessica M. Willey, Deputy Attorney General

Department of Justice
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801
Phone: (302) 577-8400
Ilona.Kirshon@state.de.us
Jessica.Willey@state.de.us

**XAVIER BECERRA**
*Attorney General*
*State of California*

By: */s/ Julie Weng-Gutierrez*
Julie Weng-Gutierrez, Senior Assistant
Attorney General
Kathleen Boergers, Supervising Deputy
Attorney General
Nimrod P. Elias, Deputy Attorney General
Karli Eisenberg, Deputy Attorney General

Office of the Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Phone: (916) 210-7913
Julie.Wenggutierrez@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Nimrod.Elias@doj.ca.gov
Karli.Eisenberg@doj.ca.gov

**ANDY BESHEAR**
*Attorney General*
*Commonwealth of Kentucky*

By: */s/ J. Michael Brown*
J. Michael Brown, Deputy Attorney General
La Tasha Buckner, Assistant Deputy Attorney
General
S. Travis Mayo, Executive Director, Office of
Civil and Environmental Law
Taylor Payne, Assistant Attorney General

Office of the Attorney General
700 Capitol Avenue
Capitol Building, Suite 118
Frankfort, Kentucky 40601

Phone: (502) 696-5300
Travis.Mayo@ky.gov
Taylor.Payne@ky.gov

**BRIAN E. FROSH**
*Attorney General*
*State of Maryland*

By: */s/ Steven A. Sullivan*
Steven A. Sullivan, Solicitor General
Kimberly S. Cammarata, Director, Health
Education and Advocacy

200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-7038
ssullivan@oag.state.md.us
kcammarata@oag.state.md.us

**ELLEN ROSENBLUM**
*Attorney General*
*State of Oregon*

By: */s/ Scott J. Kaplan*
Scott J. Kaplan, Senior Assistant
Attorney General
Henry Kantor, Trial Attorney
Sarah Weston, Trial Attorney

Oregon Department of Justice
100 Market Street
Portland, OR 97201
Phone: (971) 673-1880
Scott.Kaplan@doj.state.or.us
Henry.Kantor@doj.state.or.us
Sarah.Weston@doj.state.or.us

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

By: */s/ Matthew J. Berns*
Matthew J. Berns (D.C. Bar No. 998094),
Assistant Attorney General
Jeffrey S. Posta, Deputy Attorney General

Department of Law and Public Safety
Office of the Attorney General
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor, West Wing
Trenton, NJ 08625-0080
Phone: (609) 376-2965
Matthew.Berns@njoag.gov
Jeffrey.Posta@njoag.gov

**JOSH SHAPIRO**
*Attorney General*
*Commonwealth of Pennsylvania*

By: */s/ Michael J. Fischer*
Michael J. Fischer, Chief Deputy Attorney
General
Nikole N. Brock, Deputy Attorney General

Office of the Attorney General
Strawberry Square
Harrisburg, PA 17120
Phone: (215) 560-2171
mfischer@attorneygeneral.gov
nbrock@attorneygeneral.gov

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

By: */s/ Toby J. Heytens*
Toby J. Heytens, Solicitor General
Matthew R. McGuire, Principal Deputy
Solicitor General

Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
Phone: (804) 786-7773
theytens@oag.state.va.us
mmcguire@oag.state.va.us

**BOB FERGUSON**
*Attorney General*
*State of Washington*

By: */s/ Jeffrey G. Rupert*
Jeffrey G. Rupert, Chief, Complex Litigation
Division
Jeffrey T. Sprung, Assistant Attorney General
Marta Deleon, Assistant Attorneys General

Office of the Washington Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Phone: (206) 326-5492
Jeffrey.Rupert@atg.wa.gov
Jeff.Sprung@atg.wa.gov
Marta.Deleon@atg.wa.gov