**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA**

STATE OF NEW YORK, COMMONWEALTH OF MASSACHUSETTS, DISTRICT OF COLUMBIA, STATE OF CALIFORNIA, STATE OF DELAWARE, COMMONWEALTH OF KENTUCKY, STATE OF MARYLAND, STATE OF NEW JERSEY, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, COMMONWEALTH OF VIRGINIA, and STATE OF WASHINGTON,

Plaintiffs,

v.

U.S. DEPARTMENT OF LABOR; R. ALEXANDER ACOSTA, in his official capacity as Secretary of the U.S. Department of Labor, and UNITED STATES OF AMERICA,

Defendants.

Civ. Action No. 18-1747-JDB

**DECLARATION OF MARIA T. VULLO IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

MARIA T. VULLO, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Superintendent of the New York State Department of Financial Services ("DFS"), and submit this Declaration in support of the States' Motion for Summary Judgment.

2. I was confirmed as Superintendent on June 15, 2016 and served in an acting role before that beginning February 22, 2016. Prior to this role, I was a litigation partner at a large law firm

for over 20 years. I also previously served as Executive Deputy Attorney General for Economic Justice in the Office of the New York State Attorney General. I hold a J.D. from New York University School of Law, an MPA from the NYU Wagner Graduate School of Public Service and a B.A. and honorary Ph.D. from the College of Mount Saint Vincent.

3. As Superintendent of DFS, I am charged with protecting the viability of the health insurance markets in New York State and ensuring that residents of the State of New York have continued access to comprehensive and affordable health insurance.

4. DFS, among other responsibilities, regulates commercial accident and health issuers, non-profit health services corporations, and health maintenance organizations (collectively referred to as "Health Plans") and ensures their compliance with New York law and applicable federal law including the applicable provisions of the Patient Protection and Affordable Care Act ("ACA"). Some of DFS's most important responsibilities include overseeing the solvency of Health Plans, reviewing and approving health insurance policies and contracts, reviewing and approving health insurance plan premium rates and adjustments, and ensuring that Health Plans pay consumer claims for covered benefits as they become due. In addition, DFS acts to ensure that New Yorkers have access to high quality healthcare, which means ensuring that commercial health insurance policies sold in New York provide coverage for essential health benefits and do not discriminate based on age, gender, or pre-existing conditions.

5. Health Plans offer a variety of products in New York including Qualified Health Plans ("QHPs") through the New York State of Health ("NYSOH" or "Marketplace"), New York State's Official Health Plan Marketplace established pursuant to the ACA. On the NYSOH, individual and small group plans are sold to consumers and small businesses. Under New York law, small groups are those employers with 1-100 employees. In just six years, through the

establishment of products such as QHPs and the Marketplace, the ACA has succeeded in providing lower cost, higher quality coverage to millions of individuals and small businesses in New York. Since the ACA's implementation, New York's uninsured rate has dropped by approximately 50%, reducing the number of uninsured New Yorkers from approximately 10% to 5%. Under the ACA, approximately 4 million New Yorkers have received new coverage through our Marketplace – 227,796 of these enrollees are in QHPs in the individual market. In addition, commercial health insurance premiums for individuals remained over 50% less costly in 2017 than they would have been without the ACA. New York's healthcare market is robust, with 14 issuers offering individual coverage, 19 issuers offering small group coverage, and consumers in every county having a choice of coverage. As of March 31, 2018, there were 328,784 enrollees in the individual market and 1,076,361 enrollees in the small group market.

History of MEWAs in New York State

6. As initially enacted, ERISA created an exception to state regulation for employee benefit plans, including health care plans established or maintained by an employer. That was done through ERISA's preemption provision. Soon after ERISA's enactment, multiple-employer trusts and similar entities sought to take advantage of ERISA's preemption provision to claim ERISA status for entities that—like insurance companies—were marketing insurance policies to a range of small employers.

7. However, such arrangements were plagued with problems. For instance, it was reported that multiple employer arrangements were rife with fraud, fiscal mismanagement and insolvency. It was further reported that various third-party promoters viewed multiple employer arrangements as profit-making opportunities, claiming ERISA preemption of state laws, whether or not the arrangement was a legitimate ERISA plan. In short, multiple employer arrangements

promoters took advantage of the regulatory void and made money at the expense of their participants. Many such arrangements became insolvent, resulting in significant sums of unpaid claims and the loss of health insurance for many participants.

8. To remedy these problems, in 1983, Congress enacted the Erlenborn-Burton Amendment to add a new section 3(40) to ERISA to ensure states retain full authority under state insurance law to regulate associations and trusts of multiple employers. These were defined in section 3(40) as multiple employer welfare arrangements, or MEWAs. With the Erlenborn-Burton Amendment, Congress recognized that states are in the best position to use their insurance laws to protect their citizens and thus expressly authorized states to regulate these types of arrangements under those laws.

9. Despite that congressional action, fraud reportedly persisted. I am aware of several government agency reports and enforcement actions documenting the fraud and abuse committed by MEWAs and stating that such entities often left consumers without critical coverage or with unpaid claims. For example, the U.S. Government Accounting Office (GAO) noted in 1992: "Between January 1988 and June 1991, MEWAs left at least 398,000 participants and their beneficiaries with over $123 million in unpaid claims and many other participants without insurance. More than 600 MEWAs failed to comply with state insurance laws, and some violated criminal statutes. Moreover, MEWA problems increased in many states during this period. State efforts to regulate MEWAs, enforce state laws, and recover unpaid claims were hindered because the states could not identify MEWAs operating within their boundaries. Further, when states learned about problems, usually through complaints, many of their efforts to enforce compliance and collect unpaid claims were slowed because MEWAs asserted that they

were exempt from state regulation under ERISA."[1] That report also noted that "[t]he inability to identify MEWAs until after problems occur is at the heart of enforcement problems. Thirty-eight states said they were unable to proactively apply established standards-such as reporting and disclosure, as well as funding-because states were unable to identify MEWAS until complaints were received. For example, New York and Ohio officials said they could not enforce state-licensing requirements until the states had identified MEWAS through complaints from participants and others."[2]

10. In a 1995 report, the Department of Labor noted a case from New York in which the "First Class Health Plan, a MEWA which operated out of Buffalo, New York from 1988 until 1990, . . . collapsed, leaving $2 million in unpaid claims." The Department of Labor filed complaints charging "David Balzer and John Dunham, the MEWA administrators, with fiduciary breaches arising from their failure to place welfare plan assets in trust, causing participating plans to pay excessive administrative fees, failing to price premiums properly, failing to obtain appropriate actuarial studies, and using plan assets to satisfy their personal liability in a related New York State Insurance Division action."[3] The State of New York investigated and otherwise took action against such entities.[4]

[1] U.S. Gen. Accounting Office (GAO), Employee Benefits: States Need Labor's Help Regulating Multiple Employer Welfare Arrangements 2, GAO/HRD-92-40 (1992), at https://www.gao.gov/assets/220/215647.pdf.

[2] *Id.* at 7.

[3] U.S. Department of Labor, Labor Department Participation in ERISA Litigation and Significant Issues in Litigation, available on Westlaw at CA44 ALI-ABA 835, *884 (1995).

[4] *Id.*; *see also* New York State Department of Insurance, General Counsel Opinion No. 12-23-93, 1993 WL 13482549 (noting that two entities, including a trust and association, "are currently being investigated" and providing general guidance on treatment of MEWAs under ERISA).

11. Since the enactment of the Erlenborn-Burton Amendment in 1983, New York has adopted insurance laws designed to correct these problems and protect the integrity of its small group and individual health insurance markets, as well as consumers, that would otherwise be adversely affected by unregulated MEWAs.

12. Specifically, New York insurance law allows coverage to be issued to MEWAs for member employers only in certain carefully-defined circumstances. *See* New York Insurance Law § 4235(c)(1). New York generally regulates coverage issued to MEWAs at the employer-level, based on the size of each component employer. As many of these component employers have fewer than 100 employees, most employers receiving coverage through MEWAs in New York are issued small group coverage, which are therefore subject to DFS regulations to protect markets and consumers.

13. In particular, small groups are subject to "community rating," and large groups, with the exception of HMOs, are subject to "experience rating." Utilizing "community rating" to calculate premiums prevents issuers from varying premiums within a geographic area based on age, gender, health status, or other factors. "Community rating" contrasts with "experience rating" for large group plans, which rating allows premiums to be based on the group's claim history and the issuer's past experiences of providing health care coverage to the group during a given period of time, and is not subject to DFS's determination. This practice often results in groups whose members have increased health risks paying higher premiums. Community rating is considered a hallmark of the ACA as well as New York law, and its requirement in the small group market is fundamental to providing affordable coverage to all consumers. Moreover, New York law generally requires that coverage issued to a MEWA be based on its underlying member employers and not based on the size of the MEWA. Large employer members must be issued

large group coverage, small employer members must be issued small group coverage and individuals must be issued individual coverage. *See* New York Insurance Law §§ 3231(g) and 4317(d). These requirements protect the small group market in New York from higher premiums and adverse selection.

14. New York law also requires that individual and small group plans cover the essential health benefits package established under the ACA. *See* N.Y. Ins. Law § 3221(h).

15. If small employers were allowed to join together and be covered under a large group plan with out-of-state coverage, it would result in the loss of critical consumer protections that ensure consumers have adequate and affordable coverage.

The AHP Rule

16. Notwithstanding the AHP Rule, New York will continue to vigorously enforce its insurance laws, including those regarding community-rating and essential health benefits and those generally regulating insurance provided through an association at the level of the component employer. The AHP Rule expressly does not preempt state insurance law and makes clear that state insurance regulators, including DFS, maintain their full authority under state insurance law and regulations to enforce state law and regulate their state insurance markets. The AHP Rule further states that it "depends on state insurance regulators for oversight and enforcement to, among other things, prevent fraud, abuse, incompetence and mismanagement, and unpaid claims," 83 Fed. Reg. at 28,960, and that states will have to build and implement robust supervisory structures to prevent those outcomes from taking place, *id.*

17. Given the long and troubled history of MEWAs offering fraudulent plans, discriminating against consumers, and leaving consumers with unpaid claims, DFS already has taken action to prevent a potential influx of plans that purport to be authorized by the AHP Rule and ERISA but

would violate New York legal requirements and/or defraud New Yorkers. DFS will continue to take such actions to enforce New York laws to protect our markets and consumers.

18. New York will continue to regulate AHPs at the employer level, consistent with the State's small group and individual market requirements, and AHPs that do not comply with the State's laws and regulations will be prohibited from being sold to New Yorkers. DFS already has devoted staff time to analyzing the AHP Rule, both for associations based in New York and those that are based or may be formed in other States seeking to take advantage of the AHP Rule. DFS has used staff time to examine these issues, to advise insurers and other licensees of New York requirements, and to be prepared to enforce state protections notwithstanding the AHP Rule.

19. DFS is undertaking the additional regulatory burden to prevent harms from occurring in New York. DFS plans to devote additional staff resources and time to policing any such plans' attempts to sell such policies to New York consumers and to ensure that all applicable New York insurance laws are enforced against AHPs that may impact the State—as well as associated conduct of any broker or other agent in the State attempting to assist in such conduct. Further, DFS will take action against any issuer, agent or broker for any failure to comply with or attempt to circumvent New York statutory or regulatory requirements with respect to accident and health insurance coverage, employee welfare benefit plans or association health plans, including New York's requirements regarding the establishment of such groups, the provision of essential health benefits and other consumer protections. DFS also is prepared to undertake all additional enforcement actions necessary to protect New Yorkers from the AHP Rule.

20. Although the AHP Rule does not preempt state insurance law and does not impair DFS insurance regulation of AHPs, the AHP Rule creates confusion and will require DFS to expend

resources to ensure full enforcement of New York insurance law. For example, there may be AHPs that do not comply with New York's insurance requirements, but comport with other states' less stringent requirements, which may attempt to be sold to consumers in our State. As a result, DFS will need to deploy additional resources to enforce New York law against such plans being sold to New Yorkers, which will require additional expenditures of time and money by the State. These efforts will require the expenditure of significant staff time, expenses for current and additional staff, diversion of staff from other priorities, budgetary planning, and travel and other expenses for investigative and visitorial activities. These costs will grow even more with respect to any out-of-state AHP that attempts to sell into the New York market. DFS's enforcement efforts are needed to ensure that AHPs do not cross our borders in violation of New York law, and offer coverage with less comprehensive benefit packages than required under New York law. Moreover, as contemplated by the AHP Rule itself, those steps are also needed to prevent fraud and abuse of these plans that would harm consumers and markets.

21. It is important to view the impact of the AHP Rule as a matter of scale. As compared to prior ERISA law, the AHP Rule would authorize thousands (and likely many more) associations to provide association health plans under federal law. Whereas prior federal rules for the formation of a "bona fide association" under federal ERISA law were narrow and permitted that formation only rarely, the AHP Rule purports to authorize a vast expansion of such associations, to include, but not be limited to, any chamber of commerce in a geographic area up to the size of a State or metropolitan area. That change alone could allow for many additional entities to seek to qualify, under the federal AHP Rule, as "bona fide associations."[5] The AHP Rule would

[5] U.S. Chamber of Commerce, Accreditation (noting that there are "approximately 7,000 chambers in the United States"), *at* https://www.uschamber.com/members/chambers/accreditation.

authorize a much broader scope of associations or groups (existing and new) to qualify; it is not limited to chambers of commerce, and can cover trade or business associations unlimited by geography. As noted above, these efforts are contrary to New York law and thus will require the expenditure of DFS time and resources.

22. DFS will expend these additional resources to ensure that any association health plans impacting New York comply with New York State Insurance Law and protect New York's market. DFS must ensure that insurers and brokers do not seek to violate New York law and cause harm to consumers and the individual and small group markets that are under DFS supervision. DFS will not permit sub-standard products that negatively impact New York's insurance markets and thus will take on the additional regulatory and enforcement burden necessary to protect New York's consumers and markets from adverse selection and other risk segmentation.

23. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 22, 2018

Maria T. Vullo
Superintendent of Financial Services