**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW YORK, et al.,

              Plaintiffs,

      v.

U.S. DEPARTMENT OF LABOR, et al.,

            Defendants.

Civ. Action No. 18-1747-JDB

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... I

INTRODUCTION............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 3

   I.      STATUTORY AND REGULATORY FRAMEWORK ................................................... 3

      A.   *The ACA Adopted Fundamental Reforms for the Individual and Small Group Insurance Markets.*............................................................................................... 3

      B.   *ERISA's Definitions of "Employer" and "Bona Fide Association."*........................... 6

  II.     SUMMARY OF THE FINAL RULE ...................................................................... 8

ARGUMENT ..................................................................................................................... 11

   I.      THE FINAL RULE UNLAWFULLY SEEKS TO OVERRIDE THE AFFORDABLE CARE ACT'S MARKET STRUCTURE. .................................................................................... 14

      A.   *The ACA Requires That an Employer's Market Size Be Determined by Counting the Employees at the Individual Employer Level and Not at the Association-of-Employers Level.*............................................................................................................. 14

      B.   *Nothing in ERISA Authorizes DOL To Evade the Plain Meaning of "Large Employer" Under the ACA.*..................................................................................................... 21

      C.   *Congress Did Not Delegate to DOL the Authority To Issue Regulations Eliminating Consumer Protections or Substantially Impacting the Health Insurance Market.* .........23

  II.     THE FINAL RULE UNLAWFULLY EXPANDS THE DEFINITION OF "EMPLOYER" IN THE ACA AND ERISA. ................................................................................................... 28

      A.   *The Final Rule's Redefinition of a "Working Owner" with No Employees as an "Employer" Is Contrary to Both ERISA and the ACA.* ....................................... 28

      B.   *The Final Rule's Abandonment of DOL's Longstanding Interpretation of "Bona Fide Association" Conflicts with ERISA.*.......................................................................... 32

      C.   *DOL's Novel Expansion of the Definition of "Employer" Conflicts with Congress's Intent To Incorporate DOL's Longstanding Understanding of That Term into the ACA.* ................................................................................................................. 36

 III.    THE FINAL RULE IS ARBITRARY AND CAPRICIOUS........................................ 38

      A.   *The Final Rule Is A Substantial Departure from DOL's Longstanding Interpretation of "Employer" Without Adequate Justification.* ........................................................ 38

      B.   *The Final Rule Is Counter to the Evidence Before the Agency.* .........................42

      C.   *DOL Relied on Factors Congress Did Not Intend it To Consider.*....................50

      D.   *The Final Rule Is Predicated on Plainly Inconsistent Statutory Interpretations.* ..........52

CONCLUSION ................................................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air Transport Ass'n. of Am., Inc. v. Nat'l Mediation Bd.*,
719 F. Supp. 2d 26 (D.D.C. 2010) ...................................................................13–14

*Am. Civil Liberties Union v. FCC*,
823 F.2d 1554 (D.C. Cir. 1987) ...........................................................................28

*Am. Library Ass'n. v. FCC*,
406 F.3d 689 (D.C. Cir. 2005) .............................................................................28

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) .............................................................................38

*Atl. City Elec. Co. v. FERC*,
295 F.3d 1 (D.C. Cir. 2002) .................................................................................28

*BP Energy Co. v. FERC*,
828 F.3d 959 (D.C. Cir. 2016) .........................................................................7, 8

*Bell v. Emp. Sec. Benefit Ass'n*,
437 F. Supp. 382, 392 (D. Kan. 1977) ...............................................................7, 8

*Bellevue Hosp. Ctr. v. Leavitt*,
443 F.3d 163 (2d Cir. 2006) ................................................................................37

*Boggs v. Boggs*,
520 U.S. 833 (1997) ............................................................................................50

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ......................................................................................23, 28

*Chamber of Commerce of United States of America v. DOL*,
885 F. 3d 360 (5th Cir. 2018) ...................................................25, 34–35, 37–38

*Chamber of Commerce v. FEC*,
76 F.3d 1234 (D.C. Cir. 1996) ............................................................................49

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
538 U.S. 440 (2003) ............................................................................................16

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ............................................................................................16

*Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Tr.*,
744 F.3d 623 (10th Cir. 2014) ........................................................................................29

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
192 F. Supp. 3d 54 (D.D.C. 2016) ..................................................................................39

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ..............................................................................................41, 42

*FCC v. Fox Television Stations, Inc.*,
556 U.S. (2009) .......................................................................................................38–39

*FDA v. Brown & Williamson Tobacco Corp.\**,
529 U.S. 120 (2000) ......................................................................23, 27, 36–37, 38

*Gen. Elec. Co. v. Gilbert*,
429 U.S. 125 (1976) .................................................................................................34–35

*Good Fortune Shipping SA v. Comm'r of IRS*,
2018 WL 3595945 (D.C. Cir. July 27, 2018) .................................................................38

*Gruber v. Hubbard Bert Karle Weber, Inc.*,
159 F.3d 780 (3d Cir. 1998) .....................................................................................7, 33

*House v. Am. United Life Ins. Co.*,
499 F.3d 443 (5th Cir. 2007) ..........................................................................................29

*In re Watson*,
161 F.3d 593 (9th Cir. 1998) ...........................................................................................29

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
92 F.3d 1248 (D.C. Cir. 1996) ..................................................................................52–53

*INS v. Cardoza-Fonseca*,
480 U.S. 421 ....................................................................................................................26

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
626 F.3d 84 (D.C. Cir. 2010) ..........................................................................................44

*Investment Co. Inst. v. CFTC*,
891 F. Supp. 2d 162 (D.D.C. 2012) ................................................................................39

*John Wiley & Sons, Inc. v. DRK Photo*,
882 F.3d 394 (2d Cir. 2018) ............................................................................................18

*King v. Burwell*,
135 S. Ct. 2480 (2015) ...............................................................................................4, 24

*Loma Linda Univ. Med. Ctr. v. Sebelius*,
    684 F. Supp. 2d 42 (D.D.C. 2010) ..................................................................4, 23

*Marcella v. Capital Dist. Physicians' Health Plan, Inc.*,
    293 F.3d 42 (2d Cir. 2002) .....................................................................................29

*Mass. v. Morash*,
    490 U.S. 107 (1989) ...........................................................................................50–51

*Matthew 25 Ministries, Inc. v. Corcoran*,
    771 F.2d 21 (2d Cir. 1985) .................................................................................7, 33

*MCI Telecommunications Corp. v. AT&T*,
    512 U.S. 218 (1994) .................................................................................................28

*MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*,
    957 F.2d 178 (5th Cir. 1992) ...........................................................................33, 35

*MetLife, Inc. v. Fin. Stability Oversight Council*,
    177 F. Supp. 3d 219 (D.D.C. 2016) .....................................................................39

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015) ............................................................................................38

*Midwater Trawlers Coop. v. Dep't of Commerce*,
    282 F. 3d 710 (9th Cir. 2002) ...............................................................................50

*Morall v. DEA.*,
    412 F.3d 165 (D.C. Cir. 2005) ..............................................................................44

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..............................................................................42, 43, 50, 52

*NAACP v. Trump*,
    2018 WL 3702588 (D.D.C. Aug. 3, 2018) ...........................................................41

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) .........................................................39, 41, 55

*NAACP v. Trump*,
    2018 WL 3702588 (D.D.C. Aug. 3, 2018) ...........................................................41

*Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*,
    41 F.3d 721 (D.C. Cir. 1994) ...........................................................................49, 50

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006) ..............................................................................51

*Nationwide Mut. Ins. Co. v. Darden*,
    503 U.S. 318 (1992).................................................................................17

*New England Power Generators Ass'n v. FERC*,
    881 F.3d 202 (D.C. Cir. 2018) ...............................................................39

*Nutritional Health All. v. FDA*,
    318 F.3d 92 (2d Cir. 2003)......................................................................23

*Oakey v. U.S. Airways Pilots Disability Income Plan*,
    723 F.3d 227 (D.C. Cir. 2013) ...............................................................23

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015)............................................................................41

*Provident Life & Acc. Ins. Co. v. Sharpless*,
    364 F.3d 634 (5th Cir. 2004) ..................................................................29

*Public Citizen, Inc. v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993) ...............................................................38

*Public Citizen, Inc. v. Mineta*,
    340 F.3d 39 (2d Cir. 2003)...........................................................35–36, 38

*Schwartz v. Gordon*,
    761 F.2d 864 (2d Cir. 1985)...............................................................6, 29

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943).................................................................................55

*SEC v. Johnston*,
    143 F.3d 260 (6th Cir. 1998) ..................................................................29

*Sierra Club v. Jackson*,
    833 F. Supp. 2d 11 (D.D.C. 2012) .........................................................13

*Sierra Club v. Mainella*,
    459 F. Supp. 2d 76 (D.D.C. 2006) .........................................................14

*Slamen v. Paul Revere Life Ins. Co.*,
    166 F.3d 1102 (11th Cir. 1999) ..............................................................29

*Smith v. City of Jackson*,
    544 U.S. 228 (2005)...............................................................................54

*Stewart v. Azar*,
    2018 WL 3203384 (D.D.C. Jun. 29, 2018).......................................13, 55

v

*U.S. Aid Funds v. Devos*,
   237 F. Supp. 3d 1 (D.D.C. 2017) .................................................................39

*Util. Air Regulatory Group v. EPA*,
   134 S.Ct. 2427 (2014) ......................................................................42, 55

*Weary v. Cochran*,
   377 F.3d 522 (6th Cir. 2004) ..............................................................16

*Wisconsin Educ. Assoc. Ins. Trust v. Iowa State Bd.*,
   804 F.2d 1059 (8th Cir. 1986) .............................................................33

*Yates v. Hendon\**,
   541 U.S. 1 (2004) ................................................................................29

FEDERAL STATUTES

5 U.S.C. § 706(2)(A), (C) ...................................................................... passim

15 U.S.C.
   § 1011–15 .........................................................................................41

26 U.S.C.
   § 36B ..................................................................................................4
   § 36B(c)(2)(C)(ii) ..............................................................................5
   § 36B(c)(2)(C) ..................................................................................19
   § 45R ..................................................................................................4
   § 414(b), (c), (m), (o) .......................................................................18
   § 4980D .............................................................................................54
   § 4980H ........................................................................................4, 19
   § 4980H(b) .........................................................................................5
   § 4980H(b)(1)(B) ...............................................................................5
   § 4980H(c)(2)(A) ..............................................................................20
   § 4980H(c)(6) ...................................................................................20
   § 9815 ..........................................................................................19, 54

29 U.S.C.
   § 630(b) .............................................................................................16
   § 1002 ................................................................................................23
   § 1002(5) .......................................................................................6, 22
   § 1002(40) .........................................................................................53
   § 1002(40)(A) ...................................................................................16
   § 1031 ..............................................................................................7–8
   § 1137(b) .........................................................................................7–8
   § 1144(d) ......................................................................................8, 23
   § 1161(b) ...........................................................................................17
   § 1185d ......................................................................................19, 54

42 U.S.C.
  § 300gg.................................................................................................................4
  § 300gg-3.............................................................................................................5
  § 300gg-6(a)......................................................................................................4, 11
  § 300gg-13(a).......................................................................................................5
  § 300gg-14(a).......................................................................................................5
  § 300gg-22.....................................................................................................12, 41
  § 300gg-91...........................................................................................................5
  § 300gg-91(a)(1)..............................................................................................11, 32
  § 300gg-91(d)(3)..................................................................................................36
  § 300gg-91(d)(6)............................................................................................ passim
  § 300gg-91(e)...............................................................................................5, 15, 54
  § 300gg-91(e)(1)(A)..............................................................................................32
  § 300gg-91(e)(1)(B)(i)...........................................................................................32
  § 300gg-91(e)(2)...........................................................................................17, 18, 20
  § 12111...............................................................................................................16
  § 18022(a), (b), (c), (d) .....................................................................................4, 11
  § 18024................................................................................................................6
  § 18024(b)(1)–(2)............................................................................................5, 15
  § 18024(b)(4)......................................................................................................18
  § 18031.............................................................................................................4, 41
  § 18032(c)........................................................................................................3, 11
  § 18041(a)..........................................................................................................25
  § 18111................................................................................................................6

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ................ passim

Fed. R. Civ. P. 56.....................................................................................................12

Health Insurance Portability and Accountability Act, Pub. L. No. 104-191 (1996)...............19, 36

Internal Revenue Code, 26 U.S.C. § 1, *et seq*...............................................................15, 18, 19

Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (2010)* ......................... passim

Public Health Service Act, 42 U.S.C. § 201, *et seq*. ............................................................ passim

## FEDERAL REGULATIONS

26 C.F.R. § 54.4980B-2 .............................................................................................17

29 C.F.R.§ 2510.3-3(b), (c)....................................................................................29–30

## FEDERAL REGISTER

40 Fed. Reg. 34,526 (Aug. 15, 1975).......................................................................8, 29

83 Fed. Reg. 28, 912 (June 21, 2018)* ............................................................... passim

83 Fed. Reg. 614 (Jan. 5, 2018) ..................................................................................... passim

**AGENCY GUIDANCE**

DOL Op., 1992 ERISA LEXIS 45 (Oct. 30, 1992) ........................................................8

DOL Op. No. 93-29A  ...............................................................................17, 53, 54

DOL Op. No. 91-42A (Nov. 12, 1991)............................................................................8

DOL Op. No. 07-06A (Aug. 16, 2007).........................................................................30

DOL Op. No. 08-07A (Sept. 26, 2008).....................................................................33–34

DOL Op. No. 03-13A (Sept. 20, 2003).........................................................................30

DOL Op. No. 77-75A (Sept. 21, 1977).........................................................................30

DOL Op. No. 94-07A (Mar. 14, 1994) .....................................................................33–34

DOL Op. No. 95-01A (Feb. 13, 1995).........................................................................30

DOL Op. No. 75-19 (Oct. 10, 1975).........................................................................30

U.S. Dep't of Labor, MEWAs: *Multiple Employer Welfare Arrangements under
the Employee Retirement Income Security Act (ERISA): A Guide to Federal &
State Regulation* 22 (2013). .........................................................................22, 53

**LEGISLATIVE MATERIALS**

115 Cong. Rec. S14,126 (daily ed. Dec. 2, 2009) (statement of Sen. Ensign) ..............................26

115 Cong. Rec. S13,681 (daily ed. Dec. 21, 2009) (statement of Sen. Enzi)...............................26

115 Cong. Rec. S13,829 (daily ed. Dec. 23, 2009) (statement of Sen. Kyl) ...............................26

128 Cong. Rec. H1,1084 (daily ed. May 21, 1982) (statement of Sen. Erlenborn)...................8, 45

155 Cong. Rec. S13,563-64 (daily ed. Dec. 20, 2009) (statement of Sen. Isaakson)...................26

155 Cong. Rec. S13,573 (daily ed. Dec. 20, 2009) (statement of Sen. Baucus) .........................27

155 Cong. Rec. S13,573 (daily ed. Dec. 23, 2009) (statement of Sen. Klobuchar) .....................27

156 Cong. Rec. H1,919 (daily ed. Mar. 21, 2010) (statement of Rep.
Frelinghusyen) ...........................................................................................26

*America's Healthy Future Act of 2009*, S. Rept. 111-89 .............................................32

Activity Report of the Committee on Education and Labor of the U. S. House of
   Representatives, H.R. Rep. No. 94-1785 (1976) ............................................................. passim

*Small Business Health Fairness Act of 2005*, H.R. Rep. No. 109-41 ..........................................26

*Small Business Health Plans Act of 2008*, S. 2818, 110th Cong., § 802 ......................................26

*Small Business Health Plans Act of 2017*, S. 1818, 115th Cong. ................................................26

*Oversight Investigation of Certain Multiple Employer Health Insurance Trusts
   (METs), Evading State and Federal Regulation, Hrg. Before the Subcomm. on
   Labor-Management Relations of the H. Comm. on Education and Labor*, 97th
   Cong., Mar. 5, 1982 ................................................................................................................40

**OTHER AUTHORITIES**

Agency for Healthcare Research and Quality, MEPS Insurance Chartbook 23
   (2016) ..............................................................................................................................52

Alexander Acosta, *A Health Fix For Mom and Pop Shops*, Wall St. J. (June 18,
   2018) ...........................................................................................................................11–12

Br. for Appellant DOL, *Donovan v. Dillingham*,
   668 F.2d 1196 (11th Cir. 1982) (No. 80-7879), 1980 WL 340211 ....................................8, 45

Cong. Research Serv., R40942, *Private Health Insurance Provisions in Senate-
   Passed H.R. 3590, the Patient Protection and Affordable Care Act 5* (Jan. 29,
   2010) ................................................................................................................................3

CMS, Ins. Stds. Bulletin Series (Sept. 1, 2011) .................................................................21, 36

CMS Center for Consumer Information and Insurance Oversight,
   https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-
   Marketplaces/SHOP.html .................................................................................................31

Executive Order 13813 .............................................................................................................8

HEALTHCARE.GOV, https://www.healthcare.gov/self-employed/coverage/#self-
   employedorsmallemployer.................................................................................................31

Noam N. Levey, *Trump's New Insurance Rules are Panned by Nearly Every
   Healthcare Group that Submitted Formal Comments*, L.A. Times, May 30,
   2018...................................................................................................................................43

President Donald Trump, Remarks at the National Federation of Independent
   Businesses 75th Anniversary Celebration (June 19, 2018) .......................................................1

## INTRODUCTION

This lawsuit challenges a Final Rule issued by the U.S. Department of Labor that departs from decades of settled practice and authorizes a dramatic expansion of the circumstances under which employers may join together in an association to offer health insurance coverage exempt from critical consumer protections. The Final Rule authorizes the expansion of association health plans ("AHPs") for the express purpose of overriding the Patient Protection and Affordable Care Act ("ACA") and exempting a significant portion of the health insurance market from the ACA's core protections. When announcing the Final Rule, the President proclaimed that the Rule was another "truly historic step in our efforts to rescue Americans from ObamaCare and the ObamaCare nightmare" and would "escape some of ObamaCare's most burdensome mandates."[1] The Final Rule seeks to further this goal by redefining the term "employer" in Section 3(5) of the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA") to allow individuals and small employers to join "associations" that can offer large group health plans not subject to the ACA's principal safeguards. 83 Fed. Reg. 28,912 (June 21, 2018) (to be codified at 29 C.F.R. pt. 2510) (hereinafter the "Final Rule"). Simply put, the Final Rule seeks to expand AHPs in order to undermine the ACA.

Plaintiffs—eleven States and the District of Columbia that are harmed by the Final Rule—ask this Court to vacate and set aside the Final Rule under the Administrative Procedure Act ("APA") on the ground that it is arbitrary, capricious, not in accordance with law, and in excess of statutory jurisdiction. 5 U.S.C. §§ 706(2)(A), (C).

---

[1] President Donald Trump, Remarks at the National Federation of Independent Businesses 75th Anniversary Celebration (June 19, 2018), at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-federationindependent-businesses-75th-anniversary-celebration/.  *See also* Compl. ¶ 6 (ECF No. 1).

The Final Rule violates the ACA by seeking to overturn Congress's reforms of the individual and small group markets—reforms that were intended to ensure that individuals and employees of small employers could purchase or maintain comprehensive health insurance coverage. To accomplish that goal in those markets, the ACA curtails discrimination in premiums based on factors including health, gender, age, region, and occupation. The ACA also requires coverage of ten "essential health benefits" and further requires that insurers treat all enrollees in each of the individual and the small group markets—healthy or sick—as part of unified insurance pools. Because of these reforms, the States have made enormous progress in decreasing uninsured rates, ensuring comprehensive coverage, and achieving market stabilization in the individual and small group markets. If the Final Rule takes effect as the Department of Labor ("DOL") intends, the result will be a vast expansion of associations that qualify as single, large employers that evade core ACA protections and that will result in millions of people exiting the unified risk pools for the individual and small group markets in many states—destabilizing and potentially destroying those markets.

The Final Rule also violates ERISA and unlawfully upends nearly forty years of ERISA precedent. For the first time in ERISA's history, the Final Rule deems sole proprietors with no employees (called "working owners") to be eligible to form associations under ERISA. And in a dramatic departure from well-settled precedent and DOL's own longstanding practice, the Final Rule allows entirely unrelated and separate employers in a state or metropolitan area to form associations, including associations created for the primary purpose of selling insurance for profit. Because the States are entitled to judgment as a matter of law that the Final Rule is unlawful, arbitrary, and capricious under the APA, Plaintiffs respectfully request that this Court grant their motion for summary judgment and vacate the Rule.

## STATEMENT OF FACTS

## I.    STATUTORY AND REGULATORY FRAMEWORK

### A.  The ACA Adopted Fundamental Reforms for the Individual and Small Group Insurance Markets.

In a series of enactments culminating in the ACA in 2010, Congress created a statutory scheme of several interlocking and interdependent Acts governing health insurance at the national level. *See* Pub. L. No. 111-148, 124 Stat. 119 (2010). The core reforms of the ACA focused on health insurance provided to individuals and to employees of small businesses (defined as businesses employing fifty or fewer employees). Because the risk pools in these markets prior to the ACA had been fragmented into multiple segments—thus pooling risk only across small slices of the relevant population—premiums were volatile, benefits often were inadequate, and people experienced severe discrimination based on health status and other factors.[2] Risk segmentation, in particular, led to wide and unsustainable fluctuations in costs for individuals and small businesses. *See, e.g.,* Cong. Research Serv., R40942, *Private Health Insurance Provisions in Senate-Passed H.R. 3590, the Patient Protection and Affordable Care Act 5* (Jan. 29, 2010).

The ACA's comprehensive reform of health insurance directly addressed these problems in several ways. With respect to risk segmentation within the individual and small group market, the ACA required insurers to treat all enrollees in each of those markets as "members of a *single risk pool*." 42 U.S.C. § 18032(c) (emphasis added). To ensure more uniform and robust health coverage, the ACA required that all individual and small group plans provide a "comprehensive" benefits package known as the "essential health benefits package" ("EHBs"). 42 U.S.C. § 300gg-

---

[2] *See* Declaration of Kevin Lucia ("Lucia Dec.") ¶ 16; *see also* Compl. ¶¶ 3, 52 (ECF No.1).

6(a).[3] This package also has financial protections for enrollees.[4] And, rather than permitting wide variations in premiums that previously had priced out many consumers, the ACA severely limited premium variation in the individual and small group markets. This provision, known as the "community rating" provision, forbids premium variation except based on certain narrow factors. 42 U.S.C. § 300gg.

In addition, the ACA provided tax credits to subsidize individuals' purchase of health insurance, *see* 26 U.S.C. § 36B; credits to encourage small businesses to provide health coverage, *see id.* § 45R; and exchanges to enable marketplace shopping for individual and small group coverage, *see* 42 U.S.C. § 18031. *See generally King v. Burwell*, 135 S. Ct. 2480 (2015).

In contrast to its treatment of the individual and small group markets, the ACA adopted different reforms for the large group market, which generally serves employers that employ more than fifty employees. Because most large employers already offered comprehensive health insurance to their employees, the ACA did not impose the same array of reforms on the large group market. For example, broader variation in premiums is allowed. While Congress mandated that large employers provide health coverage or pay a tax penalty, *see* 26 U.S.C. § 4980H, the mandated coverage need not meet the standards of comprehensiveness set for the individual and small group markets. A large employer pays this tax penalty only if the coverage the employer provides is either unaffordable or does not provide "minimum value," in the sense that it covers

---

[3] The package must include ambulatory patient services, emergency services, hospitalization, maternity and newborn care, mental health services, substance abuse services, prescription drugs, rehabilitative and habilitative services and devices, laboratory services, preventive and wellness services and chronic disease management, and pediatric services. 42 U.S.C. § 18022(b).

[4] *See* 42 U.S.C. § 18022(a), (c) (limitations on cost-sharing); *id.* § 18022(d) (minimum actuarial value).

sixty percent of essential health benefit costs on an actuarial basis, *id.* § 4980H(b)(1)(B).[5] Although not an essential health benefits requirement, that tax penalty provides some protection for employees to ensure that relatively comprehensive benefits are provided by large employers.[6]

In short, whether the ACA's core protections apply to a particular type of coverage depends on whether the coverage is individual, small group, or large group. The ACA supplies essentially identical definitions of these terms at 42 U.S.C. § 300gg-91 and § 18024.[7] Under each, a "small employer" is an "employer who employed an average of at least 1 but not more than 50 employees on business days during the preceding calendar year and who employs at least 1 employees [sic] on the first day of the plan year," and a "large employer" is an "employer who employed" more than fifty employees. 42 U.S.C. §§ 300gg-91(e), 18024(b)(1)–(2). These same sections define "employer" by reference to Section 3(5) of ERISA, 29 U.S.C. § 1002(5), "*except that such term shall include only employers of two or more employees*," thus excluding sole proprietors with no other employees. 42 U.S.C. §§ 300gg-91(d)(6) (emphasis added).[8]

---

[5] Under 26 U.S.C. § 4980H(b), an employer who provides health coverage in the large group market can be subject to the provision's $3,000 penalty only if an employee buys a different policy on an exchange using a premium tax credit under the ACA. The employee can be *eligible* for such a credit only if the employer's coverage does not provide "minimum value," defined as at least sixty percent of the "total allowed costs of benefits provided under the plan." 26 U.S.C. § 36B(c)(2)(C)(ii).

[6] Some of the ACA's reforms applied to all three markets (individual, small group, and large group). For example, Congress forbade exclusions based on pre-existing conditions in all three markets, *see* 42 U.S.C. § 300gg-3; required that all group health plans, including large group plans, cover certain benefits, such as preventive care and screenings for women, without cost-sharing, *see* 42 U.S.C. § 300gg-13(a); and required that such plans cover an insured's "adult child until the child turns 26 years of age," 42 U.S.C. § 300gg-14(a).

[7] Two sets of definitions apply because ACA provisions are codified in different parts of Title 42.

[8] 42 U.S.C. § 18024 does not have its own definition of "employer," but the definition contained in 42 U.S.C. §300gg-91(d)(6) applies. *See* 42 U.S.C. § 18111 ("Unless specifically provided for otherwise, the definitions contained in section 300gg–91 of this title shall apply with respect to this title," referring to Title I of the ACA, where 42 U.S.C. § 18024 was enacted).

**B. ERISA's Definitions of "Employer" and "Bona Fide Association."**

Congress enacted ERISA in 1974 principally to protect employees, pensioners, and their employee pension and welfare benefits. ERISA imposed fiduciary obligations on plan administrators and implemented disclosure requirements and other safeguards. Title I of ERISA —which governs employee benefit plans, including group health plans—"was adopted [in part] to remedy the abuses that existed in the handling and management of welfare and pension plan assets[.] Workers in such traditional employer-employee relationships are more vulnerable than self-employed individuals to abuses because the workers usually lack the control and understanding required to manage pension funds created for their benefit[.]" *Schwartz v. Gordon*, 761 F.2d 864, 868 (2d Cir. 1985).

Under ERISA, an "employer" is "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5). ERISA's definition of employer includes the employer who acts *directly* as an employer, and can include an entity, like an association, that acts indirectly in the direct employer's interest.

Because ERISA's definition of "employer" refers to "a group or association of employers," entities began abusing that definition to offer health insurance plans through purported groups known as multi-employer welfare arrangements ("MEWAs," of which AHPs are one type). Those entities engaged in widespread fraud and abuse.[9] In response to such abuses, DOL and the courts crafted a narrow interpretation of when an "association of employers" can be deemed an "employer" under ERISA. First, the employer-members of the association must be

---

[9] *See* Lucia Dec. ¶¶ 8-11; 83 Fed. Reg. at 28,954 n. 142 (acknowledging history of fraud and abuse).

tied by a common economic or representational interest, unrelated to the provision of benefits.

Because of this requirement, associations formed to make money by selling insurance do not

qualify—a principle Congress reaffirmed shortly after passing ERISA. *See Bell v. Emp. Sec.*

*Benefit Ass'n*, 437 F. Supp. 382, 392 (D. Kan. 1977) (quoting Activity Report of the Committee

on Education and Labor of the U. S. House of Representatives, H.R. Rep. No. 94-1785, at 48

(1977)).[10] Second, the association's employer-members must have meaningful control over, and

direct involvement in, the establishment or maintenance of the plan and the association. *See, e.g.*,

*Gruber v. Hubbard Bert Karle Weber, Inc.,* 159 F.3d 780, 787 (3d Cir. 1998); *Matthew 25*

*Ministries, Inc. v. Corcoran*, 771 F.2d 21, 22 (2d Cir. 1985).

Over the last several decades, DOL has established well-settled criteria to determine

whether an association is a "bona fide association" that qualifies as an "employer" under ERISA

Section 3(5). These criteria include: (1) the process by which the association was formed and the

purposes for which it was formed; (2) the existence, if any, of pre-existing relationships among

employer members; (3) whether employer members were solicited; (4) who is entitled to

participate and who actually participates in the association; (5) the powers, rights, and privileges

of employer members; and (6) whether employer members actually control and direct the

activities of the benefit plan.  *See, e.g.*, DOL Op. No. 2007-06A (Aug. 16, 2007); DOL Op., 1992

ERISA LEXIS 45 (Oct. 30, 1992) (Op. No. Not Assigned); DOL Op. No. 91-42A (Nov. 12,

1991). Associations that fail to satisfy these criteria cannot offer plans that would qualify as

ERISA plans. Thus, for example, when so-called "multiple employer trusts" formed as

entrepreneurial "associations" for profit-making purposes soon after ERISA's enactment, DOL

---

[10] *See also* Compl. ¶ 45 (noting that this House report has been described as "virtually conclusive as to legislative intent" by a host of federal courts).

testified before Congress that they were not ERISA plans, and argued in the courts that ERISA's statutory language precluded recognizing them as such. *See Bell*, 437 F. Supp. at 392 (quoting H.R. Rep. No. 94-1785, at 48).[11]

It likewise has been settled for decades that an individual with no employees cannot be both an "employer" and "employee" under ERISA. DOL has adhered to this interpretation since 1975, when the agency first implemented ERISA. *See* Coverage; Reporting and Disclosure Requirements, 40 Fed. Reg. at 34,526, 34,533 (Aug. 15, 1975).

Congress expressly provided that ERISA does not "alter, amend, modify, invalidate, impair, or supersede any law of the United States," and restricted DOL's authority to construe the statute to do so. 29 U.S.C. § 1144(d).

## II.    SUMMARY OF THE FINAL RULE

President Trump signed Executive Order 13813 on October 12, 2017, directing his administration to look for ways to expand AHPs. In January 2018, DOL published a notice of proposed rulemaking in response to the President's order. *See* Proposed Rule, 83 Fed. Reg. at 614 (Jan. 5, 2018). DOL received more than 900 comments on the Proposed Rule. *See* Final Rule, 83 Fed. Reg. at 28,914. DOL released the Final Rule at issue in this case, "Definition of 'Employer' under Section 3(5) of ERISA – Association Health Plans," on June 19, 2018, and published it in the Federal Register on June 21, 2018. *See id.* at 28,912. With the purpose of undermining core ACA protections, the Final Rule redefines the term "employer" in Section 3(5)

---

[11] *See also*, *e.g.*, Br. for Appellant DOL, at *7, *Donovan v. Dillingham*, 668 F.2d 1196 (11th Cir. 1982) (No. 80-7879), 1980 WL 340211; 128 Cong. Rec. H1,1084 at 11395 (daily ed. May 21, 1982) (statement of Sen. Erlenborn) (describing DOL congressional testimony); *see infra* at 39–40 (describing congressional testimony of Administrator for Pension and Welfare Benefits Jeffrey Clayton).

of ERISA to expand what may qualify as an "association of employers" under ERISA. The intended effect of this redefinition is to allow these associations to qualify as large employers subject to the ACA's more limited protections for large group plans and to shift millions of the States' residents out of the ACA's individual and small group markets, thereby causing them to lose the ACA's most robust protections and destabilizing those markets.

The Final Rule accomplishes this goal through two primary changes. First, reversing DOL's longstanding reliance on the "bona fide association" test, the Final Rule enables numerous unrelated employers to join an "association" formed primarily to offer insurance, and then permits that association to include employers that are merely in the "same trade, industry, line of business, or profession" *or* "have a principal place of business within a region that does not exceed the same State or the same metropolitan area (even if the metropolitan area includes more than one State)." *Id*. at 28,922. The result would be that associations (1) newly formed (2) primarily to sell insurance (3) for profit (4) to all employers in the same industry or geographic area (an undefined term that could include a whole state or an area that crosses many states' borders) will qualify as "employers" under ERISA for the purpose of creating AHPs.[12]

Second, for the first time in ERISA's history, the Final Rule deems self-employed individuals with no other employees to be "employers" under ERISA, thus enabling them to form and/or join employer associations. The test under the Final Rule for an individual to be considered self-employed is minimal. Under the Final Rule, to qualify as a so-called "working owner," an individual must merely "[w]ork[] on average at least 20 hours per week or at least 80

---

[12] The Final Rule does not define "geographic area." DOL makes clear that an area could be *as large as* a state or metropolitan area (undefined), but "nothing in the final rule requires [] that a group or association or their AHP cover the entire State or an entire metropolitan area in order for the group or association to qualify as bona fide." 83 Fed. Reg. at 28,925.

hours per month providing personal services to the working owner's trade or business," or must have "wages or self-employment income from such trade or business that at least equals the working owner's cost of coverage for participation by the working owner and any covered beneficiaries in the group health plan sponsored by the group or association in which the individual is participating." *Id*. at 28,964.

In addition, the preamble to the Final Rule purports to expand the number of AHPs that will be deemed large group plans for the purposes of the ACA, by aggregating "the total number of employees of all the employer-members participating in the AHP." *Id*. at 28,915. Thus, which ACA protections are applicable will be determined by counting the number of employees in the entire association, rather than the number of employees of each direct employer.

The Final Rule became effective on August 20, 2018. *Id.* at 28,912. The Final Rule allows "fully insured plans"—i.e., plans that purchase insurance from third-party insurance companies—"to begin operating under the new rule on September 1, 2018," *id.* at 28,953, thus enabling such AHPs to begin operating within weeks, free from federal ACA protections not otherwise duplicated under state law. In addition, "[e]xisting self-insured AHPs"—that directly offer insurance themselves—"can begin operating under the new rule on January 1, 2019, and new self-insured AHPs can begin on April 1, 2019." *Id*. The Final Rule states that this "modest" delay will allow DOL and states to prepare for the anticipated need to increase investigatory and enforcement resources to prevent AHPs from engaging in fraud and abuse. *Id*. at 28,912, 28,954.[13]

---

[13] Plaintiffs are not at this point seeking preliminary injunctive relief, but are carefully monitoring the phased implementation of the Final Rule and may seek a preliminary injunction in the future if circumstances warrant.

# ARGUMENT

Defendants promulgated the Final Rule for the express purpose of undermining the ACA and to avoid the heightened protections established by that Act for individuals and employees of small employers. Those protections include a guarantee that premiums for the individual and small group markets will not vary based on a wide range of factors such as gender or health status[14]; the requirement that health plans in these markets cover ten essential health benefits[15]; and the requirement that all enrollees in a given State's individual and small group markets, respectively, be placed in a common risk pool.[16] By contrast, health plans offered by large employers are not subject to the same consumer protections.

The Final Rule explicitly seeks to overturn this congressional judgment. In the notice of adoption, DOL acknowledged that its permissive rules for AHPs are intended to "level[] the playing field between small employers in AHPs, on the one hand, and large employers, on the other, who generally are not subject" to the ACA's consumer protections. 83 Fed. Reg. at 28,933. Defendant Acosta, the Secretary of Labor, publicly stated that the purpose of the Final Rule is to exempt small employers from the ACA's "benefit mandates and rating restrictions." Alexander Acosta, *A Health Fix For Mom and Pop Shops*, Wall St. J. (June 18, 2018). As Secretary Acosta admitted, the purpose of the Final Rule is to override Congress's intent—he declared that Congress's judgment in the ACA was "backward" because "[s]mall businesses should face the same regulatory burden as large companies, if not a lighter one." *Id.*

---

[14] *See* 42 U.S.C. § 300gg-91(a)(1); *see also* Compl. ¶¶ 4, 56 (describing other factors the ACA does not permit to influence premiums).

[15] *See* 42 U.S.C. §§ 300gg-6(a), 18022(a)(1), (b)(1).

[16] *See* 42 U.S.C. § 18032(c).

The Final Rule is unlawful under both the ACA and ERISA, and is arbitrary and capricious as well. First, by allowing millions of unrelated individuals and small employers to count as if they all worked for one large employer—for the express purpose of negating the ACA's most important consumer protections—the Final Rule conflicts with the health insurance market structure at the heart of the ACA. Second, by allowing individuals with no employees to be treated as "employers" for purposes of forming large group health plans, the Final Rule violates the plain language of ERISA and the ACA. Moreover, the Final Rule violates the decades-old, settled understanding of when an "association" can qualify as an "employer" under ERISA. Third, the Final Rule is arbitrary and capricious because it departs from longstanding agency practice without sufficient explanation, is counter to the evidence in the record before the agency, relies on factors Congress did not intend DOL to consider, and is predicated on mutually inconsistent statutory interpretations.

States will suffer significant harm as a result of the Final Rule. Many states have relied on the ACA's individual and small market protections as intended by Congress,[17] but have not enacted similar protections in their own laws.[18] When AHPs authorized under the Final Rule infiltrate those states' markets with skimpy coverage that will no longer adhere to ACA coverage requirements, the result, borne out by history, will be serious harm to those markets and the individuals who rely on them to obtain quality, affordable health coverage.[19]

---

[17] Congress empowered the states to enforce core ACA provisions, with the Department of Health and Human Services ("HHS") stepping in only if a state substantially failed to do so. *See* 42 U.S.C. § 300gg-22.

[18] *See, e.g.*, Declaration of Stephen C. Taylor ("Taylor Dec.") ¶ 20.

[19] *See, e.g.*, Declaration of J. Michael Brown ("Brown Dec.") ¶ 13; Declaration of Pritika Dutt ("Dutt Declaration") ¶¶ 6–8; Declaration of Kevin Lucia ("Lucia Dec.") ¶¶ 7–11; Declaration of Mila Kofman ("Kofman Dec.") ¶¶ 26–27, 30–31; Declaration of Christopher R. Monahan

Many of the states' most vulnerable residents in need of comprehensive health coverage will remain in the individual and small group markets as they destabilize and shrink, and will experience significant premium increases, potentially resulting in the loss of coverage entirely. At the same time, the individuals who leave those markets—healthier individuals who may join AHPs—will have substandard coverage that may not cover vital services (such as hospitalization, maternity and newborn care, and prescription drugs) and will be denied access to ACA subsidies that would enable them to acquire coverage for those services.[20]

Where, as here, final agency action is challenged under the APA, "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Stewart v. Azar*, 2018 WL 3203384, *6 (D.D.C. June 29, 2018) (quoting *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted). "[T]he Court's role is limited to reviewing the administrative record, so the standard set forth in Rule 56(c) does not apply." *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 18 (D.D.C. 2012) (quoting *Air Transport Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 32 (D.D.C. 2010); *see also Stewart v. Azar*, 2018 WL 3203384, at *6 (D.D.C. Jun. 29, 2018) ("The summary-judgment standard set forth in Federal Rule of Civil Procedure 56(c), therefore, 'does not apply because of the limited role of a

---

("Monahan Dec.") ¶¶ 14–20; Declaration of Patricia F. O'Connor ("O'Connor Dec.") ¶ 12; Declaration of Maria T. Vullo ("Vullo Dec.") ¶¶ 6–10.

[20] *See* Brown Dec. ¶¶ 10–12, 14; Declaration of Marlene Caride ¶¶ 13–14, 16–17; Dutt Declaration ¶¶ 9–16; Declaration of Audrey Gasteier ¶¶ 7–8; Declaration of Myron Bradford "Mike" Kreidler ¶¶ 6–13, 16–17, 19; Kofman Dec. ¶¶ 15–25, 28–29, 33–34, 36–37; Lucia Dec. ¶¶ 36–39;  Declaration of Pam MacEwan ¶¶ 5–15, 18; Monahan Dec. ¶¶ 26–35; Declaration of Trinidad Navarro ¶¶ 6–9; O'Connor Dec. ¶¶  9–11, 14–16; Declaration of Andrew Stolfi ¶¶ 4–8; Taylor Dec. ¶¶ 12–15, 20; Declaration of Massey S.J. Whorley ¶¶ 3–6.

court in reviewing the administrative record.'") (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006)).[21]

The Final Rule violates the Administrative Procedure Act ("APA"), as it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The States thus respectfully request that this Court grant Plaintiff States summary judgment and vacate the Final Rule.

## I.      The Final Rule Unlawfully Seeks To Override the Affordable Care Act's Market Structure.

Under the Administrative Procedure Act, courts "shall" "hold unlawful and set aside" agency regulatory action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (C). In promulgating the Final Rule, DOL improperly seeks to override the ACA's market structures in a manner that is not in accordance with the ACA, and is in excess of DOL's authority.

### A.   The ACA Requires That an Employer's Market Size Be Determined by Counting the Employees at the Individual Employer Level and Not at the Association-of-Employers Level.

A key component of the ACA is its robust consumer protections for health plans in the markets for individuals and small groups—*i.e.*, small employers and their employees. Congress focused on the individual and small group markets because those markets have historically had worse coverage and were more volatile than the large group market. *See* Compl. ¶¶ 3–4, 52, 54–58. In the ACA, Congress made a legislative judgment that individuals and employees of small employers require more robust consumer protections than employees of large employers.

---

[21] Plaintiffs intend to file a proposed scheduling order with the Court that addresses the filing of the administrative record, consistent with Local Civil Rules 7(h)(2) and 7(n). Plaintiffs' citations to the rulemaking record in this memorandum will, pending the Court's approval of the proposed scheduling order, be included in a joint appendix to be filed with the Court.

The stated intent of the Final Rule is to undo that legislative judgment based on Defendants' belief that Congress made the wrong policy choice. The Final Rule dramatically expands the number of health benefit plans exempt from the ACA's strict protections for individual and small group plans by allowing the package of consumer protections applicable to AHPs to be determined by aggregating "the total number of employees of all the employer-members participating in the AHP." 83 Fed. Reg. at 28,912, 28,915. In other words, under the Final Rule, an association whose employer-members *collectively* have more than fifty employees would be able to offer health plans exempt from the ACA's individual and small group protections—even if those plans are being provided exclusively to individuals or employees of small employers.

The ACA forecloses the aggregation principle that is relied on by the Final Rule. The plain language of the ACA requires that the relevant consumer protections applicable to an employee's group health plan depend on the size of that employee's employer—not on the size of an association or other group of which the employer is a member. The ACA defines a "large employer" as "an employer who employed an average of at least 51 employees" during the preceding year, and a "small employer" as "an employer who employed an average of at least 1 but not more than 50 employees" in the preceding year. 42 U.S.C. §§ 300gg-91(e); 18024(b)(1)–(2).[22] Under analogous statutes defining the reach of a federal law based on the size of an employer, the Supreme Court has made clear that the operative inquiry is the number of employees who work for the employer—*i.e.*, who have a common-law master-servant relationship with the employer.

---

[22] Because the ACA amended multiple existing statutes, including the Public Health Service Act ("PHSA"), the Internal Revenue Code ("IRC"), and ERISA, the market-size definitions are codified in multiple sections, but do not differ in their operative language.

For example, the Americans with Disabilities Act applies to an employer who "has 15 or more employees for each working day in each of 20 or more calendar weeks in the preceding calendar year." 42 U.S.C. § 12111. The Supreme Court has interpreted that language to refer to traditional, common-law employers—*i.e.*, "the person, or group of persons, who owns and manages the enterprise . . . can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of the business are to be distributed." *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 449–50 (2003). The Age Discrimination in Employment Act similarly applies to an employer who "has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 29 U.S.C. § 630(b). Courts have applied the common-law test to that definition as well. *See Weary v. Cochran*, 377 F.3d 522, 525 (6th Cir. 2004). These decisions reflect the general principle that, when Congress uses terms such as "employer" or "employee" that have "accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989) (interpreting "employee" in the Copyright Act).

Indeed, DOL has adopted the common-law understanding of the employer-employee relationship to determine whether benefit plans offered by associations qualify as MEWAs under ERISA. Such benefit plans are MEWAs if they are offered "to the employees of two or more employers." 29 U.S.C. § 1002(40)(A). The dispositive question under this language is whether the individuals covered by the plan are employees of one employer (such as an association) or instead multiple employers (such as the association's employer-members). DOL has expressly relied on the common law to make that determination, concluding that the common-law master-

16

servant test not only determines who is an employee, but also "determin[es] *by whom* an individual is employed" for purposes of ERISA's MEWA provision. DOL Op. No. 93-29A n.2 (emphasis added); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992) (applying common-law test to definition of "employee" under ERISA). In other words, common law principles determine whether an employee is employed by an association or by one of its employer-members for purposes of the MEWA statute.[23]

The same interpretive principles apply to the ACA's textually analogous definitions of large and small employers. Congress specified that a "large employer" is an "employer *who employed*" more than fifty employees. 42 U.S.C. § 300gg-91(e)(2) (emphasis added). As with the other statutory sections discussed above, an employer (including an association) satisfies this definition only if it exercises sufficient control and supervision to satisfy the common-law test for an employer-employee relationship for more than fifty employees. Thus, even if an association were to qualify as an "employer" under the ACA's cross-reference to the definition of "employer" in ERISA § 3(5), *see* 42 U.S.C. § 300gg-91(d)(6), it would not be the "employer *who employed*" its members' employees absent a common law relationship, and accordingly could not aggregate those employees for purposes of being deemed a "*large* employer." *Id.* § 300gg-91(e)(2) (emphases added). The Final Rule contravenes this plain reading of the ACA by allowing an association to aggregate its employer-members' employees to qualify as a large employer, even when those employees do not have a common law master-servant relationship with the association.

---

[23] The same principles apply under ERISA provisions governing when a plan must provide continuation coverage. *See* 29 U.S.C. § 1161(a). Those provisions contain an exemption for employers that employ fewer than twenty employees. *See id.* § 1161(b). Only "common law employees of an employer are taken into account in determining whether" this exemption applies. 26 C.F.R. § 54.4980B-2.

The ACA's own statutory aggregation rules also foreclose the Final Rule's treatment of associations. For purposes of qualifying as a large employer, the ACA allows multiple employers to aggregate their employees in specific, statutorily enumerated circumstances—but those circumstances do not include associations. Specifically, in a provision entitled "Rules for determining employer size," 42 U.S.C. § 18024(b)(4), the ACA sets out an "aggregation rule for employers" that provides, in full: "All persons treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of Title 26 shall be treated as 1 employer," *id.* § 18024(b)(4)(A). The cross-referenced subsections are clauses in the Internal Revenue Code ("IRC") that allow employees of multiple entities to be "treated as employed by a single employer" under specific circumstances, none of which are applicable here. *Id.*[24] The existence of this section demonstrates that, in enacting the ACA, Congress specifically defined the circumstances under which employees of separate employers could be "treated as employed by a single employer" for purposes of "determining employer size" under the ACA, and thus necessarily intended to exclude other circumstances—including aggregation by an association. *See John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 405 (2d Cir. 2018) (describing "interpretive canon of *expressio unius est exclusio alterius*").

Finally, the Final Rule contravenes Congress's intent to apply these principles across all of the different statues amended by the ACA, including the IRC. The Final Rule states that its re-definition of "employer" does not extend to the IRC. *See* 83 Fed. Reg. at 28,915. But in enacting

---

[24] Specifically, aggregation of employees is permitted when: several corporations have a common parent corporation that owns eighty percent of the stock in all of the corporations, *see* 26 U.S.C. § 414(b); a group of partnerships or proprietorships are under "common control," *id.* § 414(c); arrangements in which one organization holds shares in another and performs services for that organization, *id.* § 414(m); and certain arrangements intended to avoid employee benefit requirements, *id.* § 414(o).

18

the ACA, Congress applied core ACA provisions dependent on the term "employer" not only in the Public Health Service Act ("PHSA"), but also in the IRC (and ERISA). *See* Compl. ¶ 58 (quoting 29 U.S.C. § 1185d and 26 U.S.C. § 9815). Congress's simultaneous adoption of substantively identical provisions across all of these statutes unambiguously expressed its intent to apply the same market-size rules across the board.[25] The Final Rule ignores that requirement.

The most egregious disparity introduced by the Final Rule's disregard of the uniform definitions mandated by Congress is its refusal to extend the ACA's employer mandate (which is contained in the IRC) to associations offering AHPs. The employer mandate is a tax added by the ACA to the IRC that is imposed on any large employer that fails to offer its employees affordable coverage that meets certain minimum standards. *See* 26 U.S.C. §§ 36B(c)(2)(C), 4980H. Congress plainly intended the large employer mandate generally to apply to the same employers as the ACA's more lenient consumer protections for large employer plans: the two statutes use the same "employer who employed" language to define the size of the employer, and further contain the same statutory aggregation rules and the same rules for treatment of predecessor employers and employers not in existence in the previous year. *Compare* 42 U.S.C. § 300gg-91(e)(2), *with* 26 U.S.C. § 4980H(c)(2)(A). Congress also specified that any term appearing in the IRC's statutory provision imposing the employer mandate "shall have the same

---

[25] Making doubly clear Congress's intent that these substantively identical provisions across the PHSA, ERISA, and IRC must be construed the same way is a separate provision instructing the pertinent agencies to administer these statutes "so as to have the same effect at all times." Health Insurance Portability and Accountability Act ("HIPAA"), Pub. L. No. 104-191, § 104. That provision, which remains on the books, was enacted when Congress in 1996 enacted the portions of ERISA (Part 7), the PHSA (Part A of Title 27), and the IRC (Chapter 100) later amended by the ACA. The Final Rule acknowledges that this provision applies but omits that it imposes an obligation to construe these statutory provisions the same way. 83 Fed. Reg. at 28,915 n.9 ("The Departments of Labor, HHS, and the Treasury operate under a Memorandum of Understanding that implements section 104 of [HIPAA] and subsequent amendments, including certain sections of the Affordable Care Act, and provides for coordination and consultation.").

meaning" as the same term in the ACA, 26 U.S.C. § 4980H(c)(6), meaning that any entity that qualifies as an employer under the ACA must also qualify as an employer for purposes of the employer mandate.

The Final Rule disregards the statutorily mandated parallel between the meaning of "large employer" in the IRC and the ACA. For purposes of the employer mandate, the preamble to the Final Rule asserts that the employer mandate will *not* apply to the association, but only to a member employer of the association that independently satisfies the definition of an "applicable large employer." 83 Fed. Reg. at 28,933 & n.54. In other words, while the Final Rule declares that a group of employers that band together to form an AHP will be treated as a single large employer for purposes of evading the ACA's protections for small group plans, *see* 83 Fed. Reg. at 28,912, it provides that the same group will *not* be considered a large employer for purposes of the employer mandate, *see id.* at 28,915, 28,933. DOL does not explain—nor could it—how an association could qualify as a "large employer" within the meaning of the market-size definitions but not as an "applicable large employer" within the meaning of the employer mandate. Such a disparity contravenes Congress's intent by purporting to exempt associations from the protections for small group plans *and* from the employer mandate applicable to large group plans.[26]

Finally, DOL misplaces its reliance on a 2011 bulletin issued by the Centers for Medicare & Medicaid Services ("CMS") that provided guidance on how to determine whether associations are large or small employers. *See* CMS Ins. Stds. Bulletin Series (Sept. 1, 2011) ("CMS

---

[26] DOL has represented that the Department of the Treasury—the agency that administers the IRC—offered "consultation" on the Final Rule. 83 Fed. Reg. at 28,915. This token invocation of another agency's assent cannot permit DOL to divorce statutory provisions that Congress meant as complementary—particularly in the absence of even an attempt to address the plain language of the employer mandate.

Bulletin"); *see also* 83 Proposed Rule, 83 Fed. Reg. at 618 & n.12 (quoting CMS Bulletin). The

CMS Bulletin supports Plaintiffs' position by stating that in most cases a "group health plan

exists at the individual employer level and not at the association-of-employers level," meaning

that "the size of each individual employer participating in the association determines whether

that employer's coverage is subject to the small group market or the large group market rules."

CMS Bulletin at 3; *see also* Proposed Rule, 83 Fed. Reg. at 618 (quoting CMS Bulletin). While

DOL relies on a statement in the CMS Bulletin that there are "rare" exceptions to this rule (CMS

Bulletin at 3), that statement did not analyze the provisions of the ACA discussed above, see

*supra* at 15–20, and was incorrect because the ACA does not contain any exception that would

allow associations to aggregate their employer-members' employees for purposes of calculating

market size. In any event, the Final Rule here sweeps well beyond what CMS could possibly

have intended in its 2011 Bulletin. At that time, as the Bulletin acknowledged, only a very

narrow class of "bona fide associations" could be considered "employers" under ERISA; as a

result, allowing this limited number of associations to qualify as large employers was sufficiently

"rare" to not materially affect the character of the small group and individual markets. DOL's

dramatic expansion of the class of associations that may now qualify as "employers" under

ERISA (and "large employers" under the ACA) will have a far more than *de minimis* effect—

indeed, it will enable an association of virtually all employers in a state to qualify as a "large

employer."

### B. Nothing in ERISA Authorizes DOL To Evade the Plain Meaning of "Large Employer" Under the ACA.

DOL's authority to interpret the term "employer" under ERISA cannot justify its

subversion of the ACA's statutory market-size definitions. To be sure, the ACA cross-references

the definition of "employer" in ERISA § 3(5), 42 U.S.C. 300gg-91(d)(6), and the ERISA

definition includes a "group or association of employers" that is acting "indirectly in the interest of an employer, in relation to an employee benefit plan," 29 U.S.C. § 1002(5). But that cross-reference at most establishes that an association of employers may be an "employer." It does not establish—nor does anything in ERISA determine—whether such an employer is a "large" or "small" employer under the ACA, which turns instead on whether the employer *employs* a threshold number of employees under the common-law master-servant standard.

Indeed, as explained above (see *supra* at 16–17), in interpreting ERISA's MEWA statute DOL has explained that although an "association of employers may constitute an 'employer' within the meaning of ERISA Section 3(5)," that classification does not itself determine whether the association's employer-members can be treated in the aggregate as a single employer.[27] To the contrary, as DOL explained in 2013 guidance (that has not been rescinded):

> the individuals typically covered by the group or association-sponsored plan are not "employed" by the group or association and, therefore, are not "employees" of the group or association. Rather, the covered individuals are "employees" of the employer-members of the group or association.

*Id.* Under the principles stated in this interpretation, DOL's classification of an association as an "employer" under ERISA would not by itself permit the association to count its employer-members' employees as the association's own employees for purposes of qualifying as a "large employer" under the ACA. The preamble to the Final Rule does not even acknowledge, let alone distinguish, this recent pronouncement from DOL regarding the limited implications of qualifying as an "employer" under ERISA.

---

[27] U.S. Dep't of Labor, MEWAs: *Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal & State Regulation* 22 (2013), at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/mewa-under-erisa-a-guide-to-federal-and-state-regulation.pdf.

In any event, because the ACA is both "later-enacted" and a "more specific, comprehensive statute that targets the specific subject matter at issue," it prevails if there is any "potential conflict or discrepancy." *Nutritional Health All. v. FDA,* 318 F.3d 92, 102 (2d Cir. 2003) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000)). ERISA's definitional section allows an association, in some circumstances, to be an "employer," but nothing in that section—which defines scores of terms—has anything to do with market sizes or the distinction between large and small employers for purposes of triggering the ACA's consumer protections. *See generally* 29 U.S.C. § 1002.

Finally, ERISA in particular is a statute that should not be read to change the meaning of any other federal statute absent a clear congressional directive. ERISA contains an express non-impairment clause providing that "[n]othing in [ERISA] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." *Id.* at § 1144(d). As the D.C. Circuit has observed, this language is "expansive" and "unequivocal" and thus deserves "broad application." *Oakey v. U.S. Airways Pilots Disability Income Plan*, 723 F.3d 227, 233 (D.C. Cir. 2013). This non-impairment clause further undermines DOL's attempt to leverage the definition of "employer" in ERISA to alter the protections offered by the ACA.

## C. Congress Did Not Delegate to DOL the Authority To Issue Regulations Eliminating Consumer Protections or Substantially Impacting the Health Insurance Market.

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). DOL here exceeded its authority by attempting to override Congress's judgment. While the Final Rule ostensibly seeks only to clarify the meaning of "employer" under ERISA, the purpose and effect of this purported definitional clarification is to

23

dramatically alter the health insurance market structures established under the ACA. This is not "carrying out" a provision of ERISA—it is regulatory hijacking.

The Final Rule identifies no statutory authority authorizing any agency—let alone DOL—to abrogate by ERISA regulation the ACA's critical consumer protections for the individual and small group markets. Nor can such authority be inferred in the face of Congress's silence. The ACA's protections for the individual and small group markets were some of the statute's "key reforms," affecting "millions of people" previously subject to inadequate or discriminatory health plans. *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). Whether and how those protections apply is thus "a question of deep 'economic and political significance' that is central to this statutory scheme; had Congress wished to assign that question to an agency, it surely would have done so expressly." *Id*. No provision of the ACA provides such express authority.

It is especially unlikely that Congress would have left *to DOL* the fundamental policy choice of whether individuals and small employers may, by forming or joining associations, evade the ACA's consumer protection and rating requirements. Not only does this policy determination undermine Congress's specific legislative goal of ensuring comprehensive health benefits and consumer protections for individuals and small employers' employees, but it could undermine the shared risk pools Congress created to stabilize the individual and small group markets. The Final Rule's express purpose is to siphon people out of the individual and small group markets—and thus out of these shared risk pools—by authorizing a new breed of AHPs that will qualify as large group plans. *See, e.g.*, 83 Fed. Reg. at 28,938–39.

Nothing in the ACA or ERISA suggests—let alone expressly provides—that DOL can regulate to reverse the deliberate design of the ACA, which reflected Congress's intent to

24

consolidate rather than balkanize the risk pools for the individual and small group markets. Indeed, DOL does not have expertise regulating healthcare or health insurance marketplaces, and yet DOL's justification for the Final Rule rested heavily on findings about how the health care and health insurance markets function, including the risks and benefits of exempting small employers from the ACA's essential health benefit requirements; the possibility of adverse selection and increased consumer out-of-pocket health care expenses in AHPs; and the effects of siphoning individuals and small businesses out of the individual and small-group markets through the expansion of AHPs. *See, e.g.*, 83 Fed. Reg. at 28,912 (analyzing the economic impact of the Final Rule, including the purported need for regulation). Congress typically delegates this type of analysis not to DOL, but to HHS, which has general authority to carry out the terms of the ACA, including the creation, operation, and oversight of health insurance marketplaces.[28] It is implausible that Congress would have silently delegated to DOL the authority to make fundamental choices about the scope of a statute that a different agency would typically administer. *See Chamber of Commerce v. DOL*, 885 F. 3d 360, 386 (5th Cir. 2018).

Even before the legislative process that led to the ACA's enactment, Congress repeatedly considered and rejected legislation to expand AHPs in precisely the ways that the Final Rule attempts to pursue.[29] Where Congress has repeatedly rejected legislation to amend a statute to achieve a significant policy change (such as an expansion of AHPs under ERISA) and instead

---

[28] *See, e.g.*, 42 U.S.C. § 18041(a); *see also* ACA, Pub. L. No. 111-148, § 1254 (ordering HHS to "conduct a study of the fully-insured and self-insured group health plan markets" to "compare the characteristics of employers" and "determine the extent to which new insurance market reforms are likely to cause adverse selection in the large group market or to encourage small and midsize employers to self-insure."). To be clear: the Final Rule would not be valid if it were promulgated by HHS instead, in light of its other defects.

[29] *See, e.g., Small Business Health Fairness Act of 2005*, H.R. Rep. No. 109-41, at 1–5 (describing Congress's failure pass legislation expanding AHPs in 1995, 1996, 1997, 1998, 1999, 2001, 2002, and 2003).

has enacted different reforms, an agency may not seize upon general language in the existing statute to find an implied delegation to achieve the rejected ends through regulation. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442 ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

During debate on the ACA, and continuing in the years since enactment, members of Congress proposed bills that would more freely allow small employers to band together into large employers. None of those bills have passed, and many were rejected. *See, e.g.*, S. 2818, 110th Cong., § 802 (Small Business Health Plans Act of 2008); S. 1818, 115th Cong. (Small Business Health Plans Act of 2017); *see also* Compl. ¶¶ 64–72 (describing decades of rejected legislation). Indeed, many opponents of the ACA bill expressly argued that it *did not* create a way for small employers to band together to qualify for the large group market, and cited this as an important reason for their opposition.[30] Their efforts to add AHP legislation to the ACA, or to substitute AHP legislation for the ACA, were rejected. *See* Compl. ¶ 71 (describing rejections in committee and on the floor of the House of Representatives). At the same time, members of Congress who supported the ACA bill explicitly recognized the market pressures affecting smaller employers and explained that the bill contained a specific, different solution to that issue. As Senator Baucus, a principal architect of the ACA, explained, "small businesses lack the buying power larger companies have to negotiate affordable group rates," and therefore "[t]he Senate bill creates small business insurance exchanges . . . where small businesses can band

---

[30] *See, e.g.,* 155 Cong. Rec. S13,563-64 (daily ed. Dec. 20, 2009) (statement of Sen. Isakson); 115 Cong. Rec. S13,681 (daily ed. Dec. 21, 2009) (statement of Sen. Enzi); 115 Cong. Rec. S13,829 (daily ed. Dec. 23, 2009) (statement of Sen. Kyl); *id.* S14,126 (daily ed. Dec. 24, 2009) (statement of Sen. Ensign); 156 Cong. Rec. H1,919 (daily ed. Mar. 21, 2010) (statement of Rep. Frelinghuysen).

together and pool their risks." 155 Cong. Rec. S13,573 (daily ed. 2009); *see also id.* S13,864

(daily ed. Dec. 23, 2009) (statement of Sen. Klobuchar) ("small businesses can finally pool their

numbers and do what big businesses do"). DOL cannot substitute its judgment for Congress's,

and it certainly may not negate the requirements Congress chose to apply.

     Finally, whatever authority Congress may have delegated to clarify the precise definitions

of large and small employers under the ACA, Congress could not have authorized an agency to

entirely subvert the ACA's statutory goals. *See Brown & Williamson*, 529 U.S. at 133 (a court

"must be guided to a degree by common sense as to the manner in which Congress is likely to

delegate a policy decision of such economic and political magnitude to an administrative

agency."). But the Final Rule expressly and deliberately seeks to overturn Congress's judgment

that individuals and small employers receive key consumer guarantees. And DOL's attempt to

substitute its policy views for those of Congress is all the more remarkable because the agency

explicitly concedes that an association of "working owners" or small employers will not have the

same incentive to provide quality coverage that large employers do. *See* 83 Fed. Reg. at 28,944.

A true large employer has economic incentives to provide comprehensive coverage, whereas

DOL admits that AHPs will favor "risk differences between, for example, genders, age groups,

and industries, and more tailored, often less comprehensive benefits." *Id.* DOL thus concedes

both (1) that it is attempting to reverse policies set by Congress, and (2) that it will not even be

able to provide an alternative route to the same quality of coverage Congress required.

     "What we have here, in reality, is a fundamental revision of the statute." MCI

*Telecommunications Corp. v. AT&T*, 512 U.S. 218, 231 (1994). Given the "enormous

importance to the statutory scheme" of the ACA's reforms to the individual and small group

markets, *id.*, a regulation that makes those reforms inapplicable to a wide swath of individuals

and employers does not merely adjust the scope of the ACA, but utterly transforms it—changing

it from a scheme with a principal goal of protecting individuals and small employers' employees

into a scheme that gives them fewer protections than the employees of large employers.

Whatever the merits of that idea as a policy matter, "it was not the idea Congress enacted into

law." *Id.* at 232. By seeking to leverage its regulatory authority to effect changes to the ACA, a

law duly enacted by Congress, DOL has acted in excess of its statutory authority. *See Bowen*,

488 U.S. at 208; *Am. Library Ass'n. v. FCC*, 406 F.3d 689, 691 (D.C. Cir. 2005). The Final Rule

is also "not in accordance with law." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 14 (D.C. Cir.

2002) (citing 5 U.S.C. § 706(2)(A)). Therefore, as required by the APA, the Final Rule must be

set aside. 5 U.S.C. §§ 706(2)(A), (C).

## II. The Final Rule Unlawfully Expands the Definition of "Employer" in the ACA and ERISA.

The Final Rule also seeks to undermine the ACA by expanding those individuals and

associations that can qualify as "employers" in two ways that break sharply with judicial

interpretations of ERISA and DOL's longstanding interpretations. First, the Final Rule redefines

a "working owner" with no other employees as an "employer" under ERISA. Second, the Final

Rule upends DOL's decades-long requirement that a group of employers be a "bona fide

association" to qualify as an "employer" under ERISA. Both changes are unlawful.

### A. The Final Rule's Redefinition of a "Working Owner" with No Employees as an "Employer" Is Contrary to Both ERISA and the ACA.

ERISA precludes DOL from redefining a "working owner" without any employees as an

"employer." The Supreme Court spoke directly to this issue in *Yates v. Hendon*, 541 U.S. 1

(2004), stating that "[p]lans that cover *only* sole owners or partners and their spouses . . . fall

outside [ERISA] Title I's domain." *Id.* at 21 (emphasis added); *see also id.* at 21 n.6 ("Courts

28

agree that if a benefit plan covers *only working owners*, it is *not* covered by Title I [of ERISA]")
(emphasis added). The Second Circuit has likewise squarely held that a "sole proprietorship[]"
without employees" cannot "logically be considered an 'employer'" because it has no
employees. *Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 48 (2d Cir.
2002). As a result, the "plain language of the [ERISA] statute would . . . seem to preclude
finding" that an association that includes such sole proprietors qualifies as an "association of
*employers*" under ERISA's definition. *Id.*; *see also Schwartz*, 761 F.2d at 867 (holding that self-
employed individual was not a participant in an ERISA plan where he was the only contributor
to the plan). Many courts of appeals have reached the same result.[31]

DOL's own rule on this question has consistently defined a "working owner" without
employees as outside of ERISA's scope. A DOL regulation promulgated almost immediately
after ERISA's enactment, 29 C.F.R. § 2510.3-3(b),[32] expressly excludes sole proprietors from
the definition of an "employee benefit plan," stating that a plan under which "only partners or
only a sole proprietor are participants covered under the plan will not be covered" by Title I of
ERISA. Likewise, "[a]n individual and his or her spouse shall not be deemed to be employees
with respect to a trade or business, whether incorporated or unincorporated, which is wholly
owned by the individual or by the individual and his or her spouse." *Id.* at § 2510.3-3(c)(1).[33]

---

[31] *See, e.g.*, *Dahl v. Charles F. Dahl, M.D., P.C. Defined Benefit Pension Tr.*, 744 F.3d 623, 629
(10th Cir. 2014); *House v. Am. United Life Ins. Co.*, 499 F.3d 443, 450 (5th Cir. 2007); *Provident
Life & Acc. Ins. Co. v. Sharpless*, 364 F.3d 634, 639 (5th Cir. 2004); *Slamen v. Paul Revere Life
Ins. Co.*, 166 F.3d 1102, 1105 (11th Cir. 1999); *In re Watson*, 161 F.3d 593, 597 (9th Cir. 1998);
*SEC v. Johnston*, 143 F.3d 260, 262–263 (6th Cir. 1998).

[32] *See* 40 Fed. Reg. at 34,526, 34,533 (1975).

[33] For this reason, the Final Rule also amends 29 C.F.R. § 2510.3-3 for the sole purpose of
defining "working owners" as ERISA "employees."

Indeed, DOL's interpretation of ERISA as excluding "working owners" without employees from the definition of "employer" has been consistent for many decades. DOL Op. No. 07-06A (Aug. 16, 2007) ("[T]he Department has previously concluded that sole proprietors without common-law employees are not eligible to be treated as 'employers' for purposes of participating in a bona fide group or association of employers within the meaning of ERISA section 3(5)."); *see also* DOL Op. No. 03-13A (Sept. 20, 2003); DOL Op. No. 95-01A (Feb. 13, 1995); DOL Op. No. 94-07A (Mar. 14, 1994); DOL Op. No. 77-75A (Sept. 21, 1977); DOL Op. No. 75-19 (Oct. 10, 1975). DOL's abrupt reversal in course is thus not only contrary to ERISA, but also inconsistent with the agency's own longstanding interpretation dating to immediately after that statute's enactment.[34]

The Final Rule's classification of "working owners" as "employers" also conflicts with the ACA's statutory text. While the ACA largely incorporates ERISA § 3(5)'s definition of "employer," it further provides that "employer" under the ACA "shall include only employers of two or more employees." 42 U.S.C. § 300gg-91(d)(6). Even if ERISA allowed for a "working owner" without employees to be an "employer," that "working owner" would not be an "employer" under the ACA because she would have only one employee—herself.

DOL cannot circumvent the ACA's unambiguous language by declaring that an *association* of "working owners" has two or more employees in the aggregate. As the Final Rule acknowledges, an association can qualify as an "employer" under the ACA only if it is a "group or association *of employers*"—the same requirement as for ERISA. 83 Fed. Reg. at 28,912 (emphasis added).  Thus, in order to form or join an association that itself is considered an

---

[34] As explained below, see *infra* at 38–41, DOL's largely unexplained reversal of its longstanding interpretation also violates the APA because it is arbitrary and capricious.

employer, the component members must be employers themselves. Non-employers cannot join

together and form an association that is then considered an employer. Yet, the Final Rule seeks

to do just that: it takes "working owners"—who would not be considered "employers" under the

ACA—and deems an association of such "working owners" to be "employers." That result is

simply an unlawful end run around the ACA and ERISA.

  The Final Rule's treatment of "working owners" as "employers" further conflicts with the

ACA's structuring of the health insurance market. Federal agencies have consistently held that

sole proprietors are individuals under the ACA subject to the individual market.[35] That position

is consistent with the text of the ACA, which defines the "individual market" as "the market for

health insurance coverage offered to individuals other than in connection with a group health

plan," and defines group health plan as those offered by small employers and large employers.

42 U.S.C. §§ 300gg-91(a)(1), (e)(1)(A). Because, for the reasons already given, neither "working

owners" nor associations of "working owners" qualify as employers (whether small or large)

under the ACA, "working owners" are necessarily part of the individual market. That result is

consistent with a separate provision of the ACA setting forth the "[t]reatment of very small

groups," which provides that the individual market "includes coverage offered in connection

---

[35] *See* CMS Center for Consumer Information and Insurance Oversight,
https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-
Marketplaces/SHOP.html ("If you're a sole proprietor or self-employed with no employees, you
can get *individual* coverage through the Health Insurance Marketplace.") (emphasis added);
*Health coverage if you're self-employed*, HealthCare.gov, https://www.healthcare.gov/self-
employed/coverage/#self-employedorsmallemployer ("If you're self-employed, you can use the
individual Health Insurance Marketplace to enroll in flexible, high-quality health coverage that
works well for people who run their own businesses. You can enroll through the Marketplace if
you're a freelancer, consultant, independent contractor, or other self-employed worker who
doesn't have any employees. You're considered self-employed if you have a business that takes
in income but doesn't have any employees.").

with a group health plan that has *fewer than two participants as current employees* on the first

day of the plan year"—language that would cover "working owners" that have no other

employees. 42 U.S.C. § 300gg-91(e)(1)(B)(i) (emphasis added).

   The Final Rule thus defies Congress's intent to provide "working owners" with the

ACA's protections for the individual market. *See supra* at 23–28. Before the ACA, individual

premiums were unaffordable because they were "typically based on the risk of the applicant,

such as an individual or family." *America's Healthy Future Act of 2009*, S. Rept. 111-89, at 31.

"[H]ealth insurers—particularly in the individual market—ha[d] adopted discriminatory, but not

illegal, practices to cherry-pick healthy people and to weed out those who are not as healthy."

H.R. Rept. 111-299, pt. 3, at 146. Congress adopted robust protections in the individual market

to respond to these discriminatory practices. DOL's attempt to shift "working owners" from the

individual market, in which they are afforded the panoply of ACA protections, to the large group

market is simply an end run around congressional intent.  Indeed, beyond just losing the ACA's

protections for the individual market, many "working owners" will also be worse off than other

employees in the large group market because, unlike traditional large employers, AHPs will not

have the same incentives to provide quality coverage that large employers do. *See supra* at 23–

28.

### B.  The Final Rule's Abandonment of DOL's Longstanding Interpretation of "Bona Fide Association" Conflicts with ERISA.

   Over the last several decades, the criteria to determine whether an association is a "bona

fide association" under ERISA Section 3(5) have been well-settled. Courts interpreting that

provision, and Congress's intent, agree that for an association to be deemed an "employer" under

the statute, the association maintaining an employee benefit plan under ERISA must be tied to

the contributing employers by *common* economic or representational interests *unrelated* to the

provision of health insurance benefits; and that employer members participating in an employee

benefit program must exercise actual *control* over the program. *E.g.*, *Gruber v. Hubbard Bert

Karle Weber, Inc.,* 159 F.3d 780, 787 (3d Cir. 1998) ("commonality of interest requirement is

well-established in the case law"); *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d

178, 186 n.9 (5th Cir. 1992) (the "statutory language of ERISA and the intent of Congress" made

clear that a plan marketed to all employers in the Texas Panhandle could not be an ERISA plan

as there was no "protective nexus" between the MEWA and the employer-members); *Wisconsin

Educ. Assoc. Ins. Trust v. Iowa State Bd.,* 804 F.2d 1059, 1063, 1065 (8th Cir. 1986)

(interpreting "ERISA's language and Congress' intent" and holding that "the definition of an

employee welfare benefit plan is grounded on the premise that the entity that maintains the plan

and the individuals that benefit from the plan are tied by a *common economic or representation

interest, unrelated to the provision of benefits*.") (emphasis added); *Matthew 25 Ministries, Inc.

v. Corcoran*, 771 F.2d 21, 22 (2d Cir. 1985) (trust that solicited "disparate and unaffiliated"

employer-enrollees that played no role in management of the trust was not "established or

maintained" by an "employer" under ERISA).

In addition, several decades of DOL guidance have clearly established that the employer-

members of a "bona fide association" must share a commonality of interest unrelated to the

provision of health care. *See* DOL Op. No. 08-07A (Sept. 26, 2008) (rejecting chamber of

commerce's attempt to become AHP); DOL Op. No. 94-07A (Mar. 14, 1994) ("None of the

information furnished points to a common economic or representation interest linking employees

of [association's] members to [the association] that is unrelated to their obtaining benefits.").

In a sharp reversal of this longstanding precedent, and in disregard of independent

statutory interpretation by multiple federal courts, the Final Rule now provides that employer-

members have a sufficient commonality of interest if they merely "have a principal place of business within a region that does not exceed the same State or the same metropolitan area (even if the metropolitan area includes more than one State)" or are in the "same trade, industry, line of business, or profession." 83 Fed. Reg. at 28,923, 28,925. The breadth of DOL's new interpretation is staggering: for example, *all* employers in a state joining *one* association could qualify. The Rule also allows an association to form with the "primary purpose" of offering health insurance, if the association has another—undefined—"substantial business purpose." *Id*. at 28,918. Under DOL's interpretation, a single association could exist to sell insurance products for profit to *all* employers in a state, and even to many individuals. Absent state law protections, DOL's new interpretation would allow one association to subsume a state's group insurance markets.

These dramatic departures from longstanding interpretations of ERISA render the Final Rule an unreasonable interpretation of ERISA's definition of "employer." The Final Rule "flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute." *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142 (1976). DOL's abrupt reversal of its longstanding criteria for bona fide associations "alone gives [this Court] reason to withhold approval or at least deference for the Rule." *Chamber of Commerce*, 885 F.3d at 381.

The Final Rule's abandonment of the well-established "bona fide association" test is also unreasonable because it conflicts with ERISA's foundational purpose. As courts have repeatedly recognized, Congress intended to exclude from ERISA's coverage plans "established and maintained by entrepreneurs for the purpose of marketing insurance products or services to others." *MDPhysicians & Assocs., Inc.*, 957 F.2d at 184 (quoting H.R. Rep. No. 94-1785, at

34

48).[36] The purpose of this exclusion was to ensure that "employers" under ERISA—including any "association of employers"—would have the type of "protective nexus" with their direct employees that is missing from commercial insurance. Contravening Congress's intent, the Final Rule would sweep within ERISA's definition of "employer" associations that are (1) newly formed (2) primarily to sell insurance (3) for profit (4) to all employers in the same industry or geographic area (an undefined term that could include a whole state or an area that crosses many states' borders). Little would distinguish these entities from health insurance companies or insurance brokers seeking to develop and market plans for their own profit. By abandoning the requirements that ensured that an association's employer-members have a substantial "commonality of interest," the Rule unreasonably disregards Congress's intent that an association must "act[] indirectly in the interest of" its employer-members, instead of acting as a commercial insurance provider, in order to qualify as an "employer" under ERISA. *See Public Citizen, Inc. v. Mineta*, 340 F.3d 39, 55 (2d Cir. 2003) (vacating agency rule because it contravened the "unambiguously expressed intent of Congress").[37]

---

[36] *See also* Compl. ¶ 45 (noting that this House report has been described as "virtually conclusive as to legislative intent" by a host of federal courts).

[37] Moreover, past enactments by Congress also demonstrate its awareness of the "bona fide association" concept; when it enacted HIPAA in 1996, Congress adopted a definition of that term that is specifically applicable to the PHSA's guaranteed issue and guaranteed renewability requirements. *See* 42 U.S.C. § 300gg-91(d)(3). But Congress has never created a separate definition of that term for ERISA, suggesting that it agreed with DOL's existing interpretation and intended it to remain unaltered. *See* CMS Bulletin at 2 n.4 (noting that the PHSA's definition of "bona fide association" applies "only for purposes of providing limited exceptions from its guaranteed issue and guaranteed renewability requirements").

**C. DOL's Novel Expansion of the Definition of "Employer" Conflicts with Congress's Intent To Incorporate DOL's Longstanding Understanding of That Term into the ACA.**

Even if DOL could abandon its longstanding interpretation of "employer" under ERISA, it could not thereby alter the meaning of that term in the ACA. Congress considered and enacted the ACA against the backdrop of consistent agency and judicial interpretations of ERISA, including settled understandings of the term "employer" as excluding sole proprietors without employees and including only "bona fide associations" with a true commonality of interest. Having enacted multiple rounds of health care reform during the decades in which both Republican and Democratic administrations reaffirmed DOL's longstanding interpretation of "employer," in enacting the ACA, Congress would not have intended to deviate from those settled principles without expressly saying so.

That backdrop necessarily informs the meaning of Congress's incorporation of ERISA's definition of "employer" into the PHSA after the enactment of the ACA. 42 U.S.C. § 300gg-91(d)(6). When Congress has enacted statutes "against the background of [an agency] repeatedly and consistently asserting" a specific interpretation of a statute the agency administers, it "has effectively ratified the [agency]'s previous position." *Brown & Williamson*, 529 U.S. at 156. Moreover, "[t]he consistency of the [agency]'s prior position . . . provides important context" for Congress's subsequent enactments. *Id.* at 157. When the agency has maintained an interpretation for "decades without any action from Congress suggesting disapproval," and where "Congress's inaction cannot be ascribed to lack of interest or knowledge" because it has "frequently tinkered with the statutory scheme in question," then Congress must be deemed to have "acquiesce[ed] in the agency's interpretation." *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 176 (2d Cir. 2006). And once Congress has ratified an agency's prior interpretation, "[t]he consistency of the

36

[agency]'s prior position . . . provides important context" for Congress's subsequent enactments. *Brown & Williamson*, 529 U.S. at 157.

Here, as explained above, DOL has taken the position since ERISA's enactment that the definition of "employer" in ERISA excludes "working owners" without employees, and includes only "bona fide associations" that satisfy certain well-established criteria. These interpretations have been strikingly consistent for decades. Regulated entities have relied upon these interpretations, and courts have consistently affirmed them. And although Congress has repeatedly amended ERISA—including through the ACA—in the decades since its enactment, it has never sought to disturb DOL's well-settled positions about the limitations of the term "employer" intended by Congress.

It is against this backdrop that Congress incorporated the ERISA definition of "employer" into the ACA. Given the striking consistency and vintage of DOL's interpretation of that term, Congress's cross-reference to ERISA in the ACA necessarily reflected Congressional intent to ratify DOL's longstanding interpretations of "employer." *See Chamber of Commerce*, 885 F.3d at 370 (use of a particular term "triggers the settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.") (quotation marks omitted). In the Final Rule, DOL impermissibly seeks to abandon its previously "unwavering position[s]" after Congress already relied upon them in enacting the ACA. *See Brown & Williamson*, 529 U.S. at 157.

Because the Final Rule is not in accordance with either ERISA or the ACA, this Court should hold the Rule unlawful and set it aside as required by the APA. *See* 5 U.S.C. § 706(2)(A).

**III.     The Final Rule Is Arbitrary and Capricious.**

The Final Rule should be vacated for the independent reason that it is arbitrary and capricious. Under the APA, "agencies are required to engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (citation omitted). "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result . . . ." *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). Agencies must "adequately analyze . . . the consequences" of their actions. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017). Here, DOL: (1) failed to provide adequate justification for changing its longstanding definition of "employer"; (2) ignored extensive evidence of MEWAs engaging in fraud and abuse; (3) relied on factors that Congress did not intend it to consider; and (4) created flatly inconsistent statutory interpretations. Therefore, the Final Rule should be set aside as arbitrary and capricious.

**A.  The Final Rule Is a Substantial Departure from DOL's Longstanding Interpretation of "Employer" without Adequate Justification.**

"A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Id.* at 923; *see also Good Fortune Shipping SA v. Comm'r of IRS*, 2018 WL 3595945, at *5 (D.C. Cir. July 27, 2018). Moreover, if a "new policy rests upon factual findings that contradict those which underlay [an agency's] prior policy" or "when [an agency's] prior policy has engendered serious reliance interests that must be taken into account," agencies must provide a reasoned explanation for disregarding facts and circumstances that underlay that long-held policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. at 502, 515 (2009).

38

Here, in promulgating the Final Rule, DOL has not justified the agency's dramatic departure from decades of consistent interpretation of "employer" under Section 3(5) of ERISA. The Rule fails to provide a reasoned explanation for abandoning the long-held agency interpretation of "employer" and insufficiently justifies its dramatic change in course.

DOL adopted its well-established interpretations of "employer" nearly contemporaneously with ERISA's original enactment to promote the core purposes of that statute. *See supra* at 7–8, 34. In reversing course now, the Final Rule says that its radically revised definition of "employer" will allow AHPs to "tailor health coverage to better meet the needs of their members at lower and more actuarially fair prices"—specifically, by allowing AHPs to discriminate in premiums more than otherwise would be allowed by the ACA, and to offer less comprehensive benefits than otherwise would be required by the ACA. 83 Fed. Reg. at 28,939.

By focusing solely on DOL's effort to subvert the ACA, this explanation does not acknowledge, let alone explain the basis for departing from, the compelling reasons that led DOL to adopt and then adhere to its original understanding of "employer" under ERISA itself. That original understanding was formed in response to a wave of fraud and abuse by MEWAs and multiple employer trusts ("METs") in the mid-to-late 1970s and early 1980s. *See, e.g.,* H.R. Rep. No. 94-1785, at 48. DOL's Administrator of Pension and Welfare Benefits, Jeffrey N. Clayton, appeared before Congress in 1982 to describe the "MET Problem":

> While these entities may vary in form, they usually involve a trust fund, which is formed by a promoter who usually has experience in the insurance business. The promoter actively solicits small employers and individuals offering to provide health and other benefits for relatively low rates; people who want to sign up for these benefits become subscribers to the trust and pay their premiums to the trust. The promoter naturally is interested in making a profit through this enterprise which he does either through receiving "sales commissions" for signing up new subscribers to the trust or by charging administrative fees to the trust. Sometimes, these MET arrangements are able to deliver

the benefits they have promised. All too often, however, the METs have become insolvent usually because the promoter has taken excessive fees from the trust or the rates charged were simply too low to pay for all the benefits promised. When these METs collapse, and some very large ones have done so, thousands of individuals are stranded with large unpaid medical bills.[38]

Administrator Clayton expressed "concern for what has happened to the many unfortunate people who have become innocent victims of the MET arrangements,"[39] and explained that because of DOL's construction of ERISA "it has rarely been the case that METs qualify as employee benefit plans."[40] Administrator Clayton likewise testified that "ERISA METs are very rare, as a matter of fact. And the fact that someone waves a flag and says, 'I am an ERISA MET,' . . . in almost all instances is a subterfuge."[41]

The lack of adequate explanation for DOL's fundamental divergence from ERISA's foundational principles renders the Rule arbitrary and capricious.[42] DOL's reasoning further underscores the conflict between the Final Rule's objectives and Congress's design in the ACA.

---

[38] *Oversight Investigation of Certain Multiple Employer Health Insurance Trusts (METs), Evading State and Federal Regulation, Hrg. Before the Subcomm. on Labor-Management Relations of the H. Comm. on Education and Labor*, 97th Cong., Mar. 5, 1982, at 42.

[39] *Id.* at 38.

[40] *Id.* at 39, 42.

[41] *Id.* at 45.

[42] In another example, DOL did not grapple with the textual limit at 42 U.S.C. § 300gg-91(d)(6) that plainly excludes sole proprietors from the definition of "employer" under the ACA's market definitions. In response to comments, DOL claimed only that HHS had agreed with DOL's view (83 Fed. Reg. at 28,931), and stated that the PHSA incorporates the ERISA § 3(5) definition of "employer" without noting the crucial textual distinction that § 300gg-91(d)(6) "shall include only employers of two or more employees." DOL's response fails to satisfy the agency's duty to "make a reasonable attempt to grapple with" the statutory text and thus is arbitrary and capricious. *BP Energy Co. v. FERC*, 828 F.3d 959, 965–66 (D.C. Cir. 2016).

In addition, the Final Rule does not provide a reasoned justification for ignoring the

serious reliance interests of the states.[43] The states are the primary regulators of insurance

markets, as reflected in a variety of federal statutes. *See, e.g.*, 15 U.S.C. § 1011–15. The ACA

places states at the front line of enforcement—states operate health insurance exchanges, *see* 42

U.S.C. § 18031, and states enforce the ACA's key reforms, *see, e.g.*, 42 U.S.C. § 300gg-22.

Thus, for decades, the states have legislated on the subjects of insurance and health care, and

state officials have overseen insurance companies and other businesses, with DOL's prior

interpretation of Section 3(5) as a settled background principle of law. As the front-line

regulators, the states have fundamental reliance interests in ensuring the stability of insurance

markets for the protection of our residents. *See supra* at 12–13 (discussing states' reliance on

existing market structures and the harm that would result from their destabilization). Yet the

Final Rule makes no effort to address these serious reliance interests—instead suggesting that the

states will simply have to bear any additional burdens to police the new AHPs. *See, e.g.*, *Encino*

---

[43] Worse, the Final Rule ignores the reliance interests of the thousands of Americans who were finally able to obtain affordable, quality health insurance under the ACA. "The Supreme Court has set aside changes in agency policy for failure to consider reliance interests that pale in comparison to the ones at stake here." *NAACP v. Trump*, 298 F. Supp. 3d at 240 (citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)); *see also NAACP v. Trump*, 2018 WL 3702588, at *12 (D.D.C. Aug. 3, 2018) (The agency decision "demonstrates no true cognizance of the serious reliance interests at issue here—indeed, it does not even identify what those interests are. 'It would be arbitrary and capricious to ignore such matters,' and it is so here.") (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015)). *See, e.g.*, American Medical Association, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00378.pdf; National Governors Association, Comment Letter on Proposed Rule (Mar. 6, 201[8]), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00695.pdf; Coalition Against Insurance Fraud, Comment Letter on Proposed Rule (Jan. 10, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00041.pdf; American Association of Retired Persons, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00595.pdf.

*Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–27 (2016) (finding DOL's explanation

insufficient in view of the "significant reliance interests involved" in prior law); *Util. Air*

*Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014) ("The fact that the [agency rule] would

place plainly excessive demands on limited governmental resources is alone a good reason for

rejecting it").

### B.  The Final Rule Is Counter to the Evidence Before the Agency.

The Final Rule is also arbitrary and capricious because DOL has "offered an explanation for its

decision that runs counter to the evidence before [it]." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Numerous health care industry

stakeholders and patient groups vigorously opposed the Final Rule as proposed, but DOL wholly

failed to address the serious issues raised by the public comments.[44]

More than 95 percent of the health-care-related organizations that filed comments—266 out of

279—opposed the Proposed Rule or expressed "serious concern." Noam N. Levey, *Trump's New*

*Insurance Rules are Panned by Nearly Every Healthcare Group that Submitted Formal*

*Comments*, L.A. Times, May 30, 2018. Of the groups that represented patients, physicians,

nurses, or hospitals, not a single one supported the Department's proposal. *Id.* In the words of a

former president of the National Association of Insurance Commissioners who had served as a

Republican insurance regulator in Kansas: "Basically anybody who knows anything about

healthcare is opposed to these proposals." *Id.* Among the many organizations whose comment

---

[44] All public comments on the Proposed Rule are available on DOL's website at
https://www.dol.gov/agencies/ebsa/laws-and-regulations/rules-and-regulations/public-
comments/1210-AB85. Individual comments will be incorporated into the appendix containing
cited portions of the administrative record that Plaintiffs anticipate filing at the conclusion of
briefing on this motion.

letters expressly called on DOL to completely withdraw the Proposed Rule were the American

Academy of Family Physicians, the American Medical Association, the American Heart

Association, the American College of Obstetrician and Gynecologists, the American College of

Physicians, the American Hospital Association, the American Lung Association, and others.[45]

    These groups with expertise in health care identified an array of flaws in the Proposed

Rule that needed correction, but two problems in particular were mentioned by the vast majority

of these comments: (1) the demonstrated tendency of AHPs to succumb to fraud, abuse, and

insolvency; and (2) the damage that would be done to the ACA marketplace if AHPs are not

required to cover essential health benefits ("EHBs") or follow community-rating requirements.

DOL's decision to press ahead with the Final Rule despite these glaring flaws in its proposal

unreasonably disregarded these well-supported comments.

---

[45] *See, e.g.*, American Academy of Family Physicians, Comment Letter on Proposed Rule (Mar. 5, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00350.pdf; American Medical Association, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00378.pdf; American Heart Association and American Stroke Association, Comment Letter on Proposed Rule (Mar. 5, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00416.pdf; American College of Obstetricians and Gynecologists, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00585.pdf; American College of Physicians, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00596.pdf; American Hospital Association, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00620.pdf; American Lung Association, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00624.pdf.

First, the long and troubled history of fraud, abuse and insolvency by MEWAs is uncontested. DOL itself acknowledges this past, 83 Fed. Reg. at 28,952, and a wide range of commenters expressed significant concerns about AHPs given their fraudulent and abusive practices.[46] Yet, in direct conflict with this evidence, the Final Rule seeks to vastly expand AHPs. *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 93 (D.C. Cir. 2010) (finding rule arbitrary and capricious where "it defie[d] the expert record evidence and is unexplained."); *see also Morall v. DEA.*, 412 F.3d 165, 167 (D.C. Cir. 2005) (striking down rule as arbitrary and capricious for "fail[ure] to consider contradictory record evidence where such evidence is precisely on point").

Indeed, a core predicate for DOL's long-held interpretation of ERISA Section 3(5) was that a narrow understanding of what constitutes an "association of employers" was necessary to limit fraud and abuse. DOL fleshed out that construction when MEWAs in the 1970s, proffering their own flawed interpretation of ERISA, invoked preemption to defraud consumers and avoid state regulation. DOL's answer to Congress and in court was simple: in almost all instances, those MEWAs were not ERISA plans at all, because of DOL's construction of ERISA.[47]

---

[46] *See, e.g.*, American Medical Association, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00378.pdf; American Academy of Pediatrics, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00637.pdf; American Cancer Society Cancer Action Network, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00539.pdf; Robert Wood Johnson Foundation, Comment Letter on Proposed Rule (Mar. 3, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00334.pdf.

[47] *See* H.R. Rep. No. 94-1785, at 48; Br. for Appellant DOL, at *7, *Donovan v. Dillingham*, 668 F.2d 1196 (11th Cir. 1982) (No. 80-7879), 1980 WL 340211; 128 Cong. Rec. H1,1084 at 11395 (daily ed. May 21, 1982) (statement of Sen. Erlenborn) (describing DOL congressional testimony); *see infra* at 39– 40 (describing congressional testimony of Administrator for Pension and Welfare Benefits Jeffrey Clayton).

DOL offers little explanation for how abandoning this evidence-based construction will safeguard members of AHPs from fraud and abuse. DOL cannot claim that these problems no longer exist, or that they will not surge if this Court permits DOL to reverse its decades-old interpretations. *See* Compl. ¶¶ 44–50 (describing fraud and abuse documented in government reports). The agency itself admits that the Final Rule will exacerbate these problems. 83 Fed. Reg. at 28,953 (AHPs "will introduce increased opportunities for mismanagement or abuse, in turn increasing oversight demands on the Department and State regulators"); *id.* at 28,928 (noting that Final Rule's relaxation of legal requirements would, without safeguards, create "cause for concern about fraud"). Moreover, DOL admits that its own past "enforcement efforts often were too late to prevent or fully recover major financial losses." *Id.* at 28,952.

Instead of offering a reasoned explanation for disregarding these facts, DOL outsources the problem to the states. DOL has acknowledged the burden on state government regulators, *see id.* at 28960, but declined to make any changes in response to that burden. DOL also notes that Congress would need to "appropriate additional funding" to increase DOL's own enforcement resources. *Id.* at 28,954, 28,960. But Congress may never do that, and DOL declined to wait for such funding. *Id.* at 28,960. DOL's speculation about future funding and resources that may never exist do not constitute a reasonable response to the serious problems the Final Rule will facilitate. The lack of reasoned, and reasonable, explanation for promoting the expansion of AHPs in disregard of well-established evidence renders the Rule arbitrary and capricious.

*Second*, commenters showed that failure to require AHPs to cover essential health benefits ("EHBs") would harm both currently healthy individuals and those individuals who are already sicker, older, or in need of special care. As commenters persuasively showed, currently healthy individuals—and their employers—cannot reliably predict what benefits they and their

dependents will need, and thus will tend to forgo insurance coverage of health benefits if given the choice. For example, the American Heart Association pointed out that until the ACA mandated coverage for EHBs, patients would regularly discover that their coverage did not include emergency, life-saving heart care—and that if AHPs are not required to cover EHBs, approximately 27 percent of Americans have conditions that would be denied coverage.[48] A nationwide group of psychiatrists who treat children and adolescents likewise pointed out that when employers do not provide coverage for mental health treatment for their children, there will is a significant coverage gap given that the rate of serious mental illness increases from 13 percent among children and young teenagers to 21 percent in older teenagers.[49] The psychiatrists urged that AHPs be required to provide the EHBs required by the ACA, including mental health coverage, because young patients in particular have far better outcomes if treated when their symptoms first appear.[50] The American College of Obstetricians and Gynecologists similarly noted that before the ACA imposed the EHB requirement, only *12 percent* of plans in the individual market covered maternity care—and those plans were often unaffordable or imposed a waiting period before providing that coverage.[51] Commenters made similar points about the consequences of declining to impose community-rating requirements; for example, the American

---

[48] American Heart Association and American Stroke Association, Comment Letter on Proposed Rule (Mar. 5, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00416.pdf.

[49] American Academy of Child & Adolescent Psychiatry, Comment Letter on Proposed Rule (Mar. 5, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00382.pdf.

[50] *Id.*

[51] American College of Obstetricians and Gynecologists, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00585.pdf.

Heart Association explained that failure to require community-rating would leave the ACA-abiding markets "to fail as the risk pool worsens and premiums spiral out of control."[52]

Making matters worse, commenters emphasized that the absence of an EHB requirement would trigger an adverse selection cycle that segments the market. As the American Medical Association explained, AHPs would have an economic incentive to carefully target their narrower benefit packages to people who are—for the time being, at least—outwardly healthy and without other specific needs, such as maternity care.[53] Even though an AHP could not expressly deny coverage for a specific patient's pre-existing condition, it could achieve the same result by choosing not to cover certain costly conditions for anyone. Before long, "an uneven playing field" would develop between AHPs and the ACA-abiding plans that remain subject to the EHB mandate, because AHPs would "siphon off small businesses with healthier employees."[54] The inevitable consequence of that segmentation would be a rise in premiums for those people whose current conditions cause them to remain in ACA-abiding plans with the mandatory EHBs—premium increases that would be allowed because DOL *also* declined to apply community-rating principles to AHPs. At the same time, those individuals who signed on to skimpier AHP plans because their current needs did not require certain benefits would later find themselves without adequate coverage if their health needs change.[55]

---

[52] American Heart Association and American Stroke Association, *supra* at n.48.

[53] American Medical Association, Comment Letter on Proposed Rule (Mar. 6, 2018), https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-AB85/00378.pdf.

[54] *Id.*

[55] *Id.*

Despite the overwhelming evidence of the damage that will ensue from exempting AHPs from the EHB protections, DOL refused to include EHB or community-rating requirements for AHPs in the Final Rule. The agency made no serious effort to dispute the harmful consequences of exempting AHPs from the ACA's EHB mandate. To the contrary, DOL acknowledged the health care groups' comments that such an exemption would damage risk pools, harm "populations with specific needs," and lead to "cascading effects" on the markets.[56] 83 Fed. Reg. at 28,933. Moreover, the Final Rule identifies no record evidence of any offsetting benefits that consumers will experience to justify these severe harms.

Instead, the Final Rule makes clear that these adverse effects on the health care market are the intended purpose of DOL's radical shift. As the Final Rule explained, DOL declined to adopt commenters' suggestion to require AHPs to provide EHBs because "[s]uch a mandate would run contrary to the goal of leveling the playing field between small employers in AHPs, on the one hand, and large employers, on the other . . . ." *Id.* at 28,933. In other words, DOL intended to substantially eliminate any differences between the small group and large group markets. *Id.* But this rationale is not only contrary to law because it directly opposes Congress's judgment in enacting ACA, as discussed (*see supra* at 23–28); it is also arbitrary and capricious. An agency acts irrationally when, in purporting to balance competing policy costs and benefits, it

---

[56] To the limited extent that DOL disputed the commenters' evidence at all, its reasoning was incomplete or self-contradictory. While DOL pointed to comments arguing that AHPs, like large employers, would not risk their "goodwill and reputation" to offer substandard plans lacking EHBs, 83 Fed. Reg. at 28,933, the Final Rule itself later rejected those very comments, finding that "AHPs and large employers *differ* with respect to their economic incentives, and the Department does not expect that their behavior will be the same," precisely because AHPs "will have incentives to tailor benefits to appeal to lower-risk groups"—in other words, they will offer skimpier plans to attract healthier beneficiaries. 83 Fed. Reg. at 28,941 (emphasis added). DOL also suggested that "State benefit mandates" could take the place of the ACA's EHB mandate, *id.* at 28,934, but it did not at all address the fact that many states do not have such state law mandates.

ignores a cost-benefit judgment that Congress itself performed when it enacted the statutory

scheme. *Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 726–28 (D.C. Cir. 1994);

*see also Chamber of Commerce v. FEC*, 76 F.3d 1234, 1235–36 (D.C. Cir. 1996) (arbitrary and

capricious test overlaps with statutory construction, and agency action is irrational if it

unreasonably applies the statutory scheme). Here, one of the driving purposes behind the ACA

was to apply different and stricter rules to small employers than to large employers. *See supra* at

3–5. Whatever room there may be for DOL to give "weight to the goal of easing the [employer]

administrative burdens," it cannot justify that course based on an analysis that discards the

"statutory objective" that Congress has chosen. *Nat'l Ass'n of Regulatory Util. Comm'rs*, 41 F.3d

at 728.

It is no answer, as DOL asserts, that AHPs will face other forms of regulation, such as the

employer mandate or state law benefit mandates. *See* 83 Fed. Reg. at 28,933–34. The reliance on

the employer mandate is arbitrary and capricious because, as discussed above (see *supra* at 4–5),

the Final Rule does not require AHPs to abide by the employer mandate, except to the limited

extent that their employer-members are large employers in their own right. And although the

Plaintiff States stand ready to fully enforce their own laws, including those that would require

AHPs to provide certain minimum health benefits, it is arbitrary and capricious for DOL to

abandon the "congressionally approved" method of protecting individuals and employees of

small employers—namely, the ACA's federal EHB requirement. *Nat'l Ass'n of Regulatory Util.

Comm'rs*, 41 F.3d at 728. In light of Congress's choice, DOL's belief that the states will pick up

the slack is "not so much a balance of conflicting policy goals as the acceptance of one without

any real consideration of the other." *Id.*

**C. DOL Relied on Factors Congress Did Not Intend it To Consider.**

An agency's action is arbitrary and capricious when the agency has "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Midwater Trawlers Coop. v. Dep't of Commerce*, 282 F. 3d 710, 720 (9th Cir. 2002) (requiring the agency to either promulgate a new rule or provide further justification where the rule's history demonstrated that it "was a product of pure political compromise, not reasoned scientific endeavor"). In promulgating the Final Rule, DOL was motivated by a single goal: to open the floodgates for ACA-exempt AHPs pursuant to the President's Executive Order. In its efforts to achieve that goal, DOL relied heavily on factors Congress did not intend for it to consider when promulgating regulations under ERISA.

Congress passed ERISA to impose minimum fiduciary standards, disclosure requirements, and other safeguards to protect employees against abusive and unfair plan administration practices. "The principal object of the statute is to protect plan participants and beneficiaries," *Boggs v. Boggs*, 520 U.S. 833, 845 (1997), and "Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds." *Mass. v. Morash*, 490 U.S. 107, 115 (1989).

Here, DOL has ignored these goals and instead pursued an unrelated goal: to "facilitate the creation and maintenance of AHPs" in order to undermine the ACA's market structures. 83 Fed. Reg. at 28,938. In particular, in promulgating the Final Rule, DOL relied upon, *inter alia*, the following factors: (1) the purported concern that "[t]oo many have unaffordable options for health insurance or lack insurance altogether"; (2) that under the Final Rule, "AHPs will be able to offer many small businesses more attractive and affordable health coverage options than are currently available to them in the ACA-compliant individual and small group markets"; (3) the

50

ability of ACA-exempt AHPs to offer health coverage at "actuarially fair" premiums because of this more "tailored" coverage, i.e., coverage that could charge certain people more in premiums or offer them fewer benefits; (4) the supposed likelihood of AHPs achieving improved economies of scale; and (5) the possibility that small employers "may use some of the economic gains that they will reap from affordable AHP health coverage to raise pay, hire more employees," and otherwise "contribute[] to economic growth." *See* 83 Fed. Reg. at 28,938–41; *see generally id.* at 28,939–59 (economic impact analysis discussing the purported benefits of not requiring insurers to comply with all of the ACA's consumer protections for the small group markets). Nothing in ERISA suggests Congress intended DOL to rely upon such factors[57] in using its general ERISA regulatory power.

---

[57] Many of these factors are illusory or premised on incorrect information. *Cf. Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006) (holding a rule arbitrary and capricious where agency lacked evidence to support key factual conclusion). For example, while touting supposed administrative savings, DOL stated that self-insured AHPs would be exempt from the ACA provisions limiting administrative costs, *see* Proposed Rule, 83 Fed. Reg. at 618. But did not explain how an AHP would enjoy a greater administrative advantage over an insurance company, and only postulated a narrow setting where an AHP even theoretically could secure better provider discounts than an insurer, *see* Final Rule, 83 Fed. Reg. at 28,942. DOL ultimately conceded that AHPs may involve greater administrative costs. *Id.* at 28,943. In another example, DOL asserts that the number of small businesses offering coverage experienced a steep decline in recent years "from 47 percent of establishments in 2000 to 29 percent in 2016." *Id.* at 28,947. Yet the source on which DOL relied, the Agency for Healthcare Research and Quality, actually concluded that the number was 47.7 percent—nearly double DOL's claimed figure—and not meaningfully different from the figure in 2014, when the ACA's exchanges came online. Agency for Healthcare Research and Quality, MEPS Insurance Chartbook 23 (2016) ("Overall, 47.7 percent of workers in establishments that were part of firms with fewer than 50 workers were offered coverage in 2016."), https://www.meps.ahrq.gov/data_files/publications/cb21/cb21a.pdf.); *see also id.* at 26. That data also showed that small business offer rates rose in some small business categories. *See id.* at 27 (offer rates rose from 52.6 percent to 54 percent among small businesses with between 10 and 24 employees from 2015 to 2016, and from 77.3 percent to 80.1 percent among businesses with between 25 and 99 employees in that period).

Worse yet, DOL pursued these extraneous goals at the expense of ERISA's primary purposes. As noted above, and as DOL acknowledges, AHPs and other MEWAs have a history of fraud, abuse, and insolvency that jeopardized enrollees. DOL admits that the Final Rule will exacerbate these problems, and that in the past, enforcement efforts came too late to protect people or recover financial losses. See *supra* at 44–45.

DOL's determination to rely on factors Congress did not intend it to consider, at the acknowledged expense of factors that are ERISA's core purpose, was arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 49 (noting, under statutory mandate to achieve traffic safety using "practicable and appropriate" standards, an agency could not defer to current technology when Congress intended the statute to be "'technology-forcing' in the sense of inducing the development of superior safety design.").

### D.  The Final Rule Is Predicated on Plainly Inconsistent Statutory Interpretations.

The Final Rule also attempts to interpret the term "employer" in ERISA in a cherry-picked fashion, creating inconsistencies both within ERISA and across other statutes. "That is the very meaning of the arbitrary and capricious standard." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996) (holding that an agency that adopted a court decision as its construction of a statute cannot "treat[] type A cases differently from similarly situated type B cases . . . where the rationale of the court decision applies to both.").

In particular, DOL says its new interpretation of ERISA's definition of "employer" will not apply "in any context other than as applied to an employer group or association sponsoring an AHP." 83 Fed. Reg. at 28,915 n.10. Under ERISA, benefit plans provide a broad range of benefits other than health benefits, such as life insurance and disability, as well as pensions. Yet DOL interprets "employer" expansively for only one benefit (health care) in one context (AHPs),

52

but not for any other welfare or benefit plan or any other context that ERISA covers. That selective application of this new definition creates a stark, unexplained inconsistency across ERISA's statutory scheme.

Another notable inconsistency is DOL's conclusion that the common law master-servant relationship governs whom an individual is an "employee of" under ERISA's MEWA definition, but does not likewise control who is the "employer who employed" that same individual under the ACA's market definitions. The Final Rule is clear that "AHPs are MEWAs." *Id.* at 28,938. The MEWA definition asks whether a plan provides benefits "to the *employees of* two or more employers," or instead to those of a "single employer." 29 U.S.C. § 1002(40) (emphasis added). To determine whether there is more than one employer, DOL looks to whom the employees are "employees of" and applies the common law master-servant test, which is "equally applicable to determining *by whom an individual is employed*." *See* DOL Op. No. 1993-29A (emphasis added) (citing *Prof'l & Exec. Leasing, Inc. v. Comm'r*, 89 T.C. 225 (1987), *aff'd*, 862 F.2d 751 (9th Cir. 1988)); *see also supra* at 22 (quoting 2013 DOL MEWA guide). Thus, if an employee leasing company leases employees to clients and offers associated health benefits, those employees are "employees of" any client who has a master-servant relationship with the leased employees, and the benefit arrangement would be a MEWA. *See* DOL Op. No. 93-29A. But under the ACA's market definitions, *see, e.g.*, 42 U.S.C. § 300gg-91(e), DOL concludes that the common law test does not control who is the "employer who employed" particular employees—such that a statewide chamber of commerce is transformed into the "employer who employed" all of its members' employees. Nothing explains why DOL ascribes such starkly different meanings to "employee of" and "employer who employed" in such closely related provisions.

The Final Rule also creates significant inconsistencies between ERISA and the IRC. DOL disclaims any effect of its revamped definition of "employer" on tax provisions that are the same, word for word, as those that govern group health plans under ERISA and the PHSA. 83 Fed. Reg. at 28,915. Several key ACA provisions apply verbatim not only under the PHSA and ERISA, but also in Chapter 100 of the IRC, where they are enforced via an excise tax. Compl. ¶ 58 (citing 29 U.S.C. § 1185d and 26 U.S.C. § 9815); *see also* 26 U.S.C. § 4980D (enforcement via excise tax). DOL offers no justification for limiting its new interpretation of "employer" only to the statutory provisions that it chooses, and not to identically worded provisions in the IRC. Nor is it likely that DOL would be able to offer such a justification, given that Congress enacted this identical language across these various statutes *in the same legislation*. *Cf. Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

DOL also inexplicably fails to apply its new interpretation to the ACA's employer mandate under the IRC (also known as the "shared responsibility provision"), which would require an AHP (as an "applicable large employer") to offer meaningful coverage or pay a tax penalty. *See supra* at 4–5. DOL offers no explanation for why, if the Final Rule's interpretation of "employer" governs under the ACA, it would not govern under the shared responsibility provision as well. *See Util. Air Regulatory Group*, 134 S. Ct. at 2441 (an agency "must ground its reasons for action or inaction in the statute . . . rather than on reasoning divorced from the statutory text.") (emphasis omitted) (internal citation and quotation omitted).

For the reasons above, the Final Rule is arbitrary and capricious in violation of the APA, and should be set aside. 5 U.S.C. §§ 706(2)(A).

## CONCLUSION

The Court should grant summary judgment to the Plaintiff States, declare that the Final

Rule is illegal, and vacate the Rule in its entirety.

Dated:  August 23, 2018

Respectfully Submitted,

**BARBARA D. UNDERWOOD**
*Attorney General*
*State of New York*

By: */s/ Sara H. Mark*
Sara H. Mark, Special Counsel
Matthew Colangelo (D.C. Bar No. 997893),
Executive Deputy Attorney General
Steven C. Wu (D.C. Bar No. 975434), Deputy
Solicitor General
Lisa Landau, Bureau Chief
Eric R. Haren (D.C. Bar No. 985189), Special
Counsel & Senior Advisor
Elizabeth Chesler, Assistant Attorney General
Matthew W. Grieco, Assistant Solicitor
General
Susan J. Cameron, Deputy Bureau Chief

Office of the New York State Attorney
General
Health Care Bureau
28 Liberty St., 19th Floor
New York, NY 10005
Phone: (212) 416-6305
Matthew.Colangelo@ag.ny.gov

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

By: */s/ Eric M. Gold*
Eric M. Gold, Assistant Attorney General
Stephen B. Vogel, Assistant Attorney General

Health Care Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Phone (617) 727-2200
eric.gold@state.ma.us
stephen.vogel@state.ma.us

**KARL A. RACINE**
*Attorney General*
*District of Columbia*

By: */s/ Robyn R. Bender*
Robyn R. Bender (D.C. Bar No. 465117),
Deputy Attorney General
Andrew J. Saindon (D.C. Bar No. 456987),
Senior Assistant Attorney General
Valerie M. Nannery (D.C. Bar No. 488529),
Assistant Attorney General

Public Advocacy Division
441 4th Street, NW
Suite 630 South
Washington, DC 20001
Phone: (202) 724-6610
Robyn.Bender@dc.gov
Andrew.Saindon@dc.gov
Valerie.Nannery@dc.gov

**MATTHEW P. DENN**
*Attorney General*
*State of Delaware*

By: */s/ Ilona Kirshon*
Ilona Kirshon, Deputy State Solicitor
Jessica M. Willey, Deputy Attorney General

Department of Justice
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801
Phone: (302) 577-8400
Ilona.Kirshon@state.de.us
Jessica.Willey@state.de.us

**XAVIER BECERRA**
*Attorney General*
*State of California*

By: */s/ Julie Weng-Gutierrez*
Julie Weng-Gutierrez, Senior Assistant
Attorney General
Kathleen Boergers, Supervising Deputy
Attorney General
Nimrod P. Elias, Deputy Attorney General
Karli Eisenberg, Deputy Attorney General

Office of the Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Phone: (916) 210-7913
Julie.Wenggutierrez@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Nimrod.Elias@doj.ca.gov
Karli.Eisenberg@doj.ca.gov

**ANDY BESHEAR**
*Attorney General*
*Commonwealth of Kentucky*

By: */s/ J. Michael Brown*
J. Michael Brown, Deputy Attorney General
La Tasha Buckner, Assistant Deputy Attorney
General
S. Travis Mayo, Executive Director, Office of
Civil and Environmental Law
Taylor Payne, Assistant Attorney General

Office of the Attorney General
700 Capitol Avenue
Capitol Building, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Travis.Mayo@ky.gov
Taylor.Payne@ky.gov

**BRIAN E. FROSH**
*Attorney General*
*State of Maryland*

By: */s/ Steven A. Sullivan*
Steven A. Sullivan, Solicitor General
Kimberly S. Cammarata, Director, Health
Education and Advocacy

200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-7038
ssullivan@oag.state.md.us
kcammarata@oag.state.md.us

**ELLEN ROSENBLUM**
*Attorney General*
*State of Oregon*

By: */s/ Scott J. Kaplan*
Scott J. Kaplan, Senior Assistant
Attorney General
Henry Kantor, Trial Attorney
Sarah Weston, Trial Attorney

Oregon Department of Justice
100 Market Street
Portland, OR 97201
Phone: (971) 673-1880
Scott.Kaplan@doj.state.or.us
Henry.Kantor@doj.state.or.us
Sarah.Weston@doj.state.or.us

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

By: */s/ Toby J. Heytens*
Toby J. Heytens, Solicitor General
Matthew R. McGuire, Principal Deputy
Solicitor General

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

By: */s/ Matthew J. Berns*
Matthew J. Berns (D.C. Bar No. 998094),
Assistant Attorney General
Jeffrey S. Posta, Deputy Attorney General

Department of Law and Public Safety
Office of the Attorney General
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor, West Wing
Trenton, NJ 08625-0080
Phone: (609) 376-2965
Matthew.Berns@njoag.gov
Jeffrey.Posta@njoag.gov

**JOSH SHAPIRO**
*Attorney General*
*Commonwealth of Pennsylvania*

By: */s/ Michael J. Fischer*
Michael J. Fischer, Chief Deputy Attorney
General
Nikole N. Brock, Deputy Attorney General

Office of the Attorney General
Strawberry Square
Harrisburg, PA 17120
Phone: (215) 560-2171
mfischer@attorneygeneral.gov
nbrock@attorneygeneral.gov

**BOB FERGUSON**
*Attorney General*
*State of Washington*

By: */s/ Jeffrey G. Rupert*
Jeffrey G. Rupert, Chief, Complex Litigation
Division
Jeffrey T. Sprung, Assistant Attorney General
Marta Deleon, Assistant Attorneys General

Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
Phone: (804) 786-7773
theytens@oag.state.va.us
mmcguire@oag.state.va.us

Office of the Washington Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Phone: (206) 326-5492
Jeffrey.Rupert@atg.wa.gov
Jeff.Sprung@atg.wa.gov
Marta.Deleon@atg.wa.gov