# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STATE OF NEW YORK *et al.*,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
LABOR *et al.*,

      Defendants.

Civil Action No. 18-cv-1747 (JDB)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

BACKGROUND……………………………………………………………………4

I. Statutory and Regulatory Background ........................................................................4

    A. ERISA Delegates Broad Rule-Making Authority to the Secretary of Labor. ......................4

    B. ERISA Has Long Recognized Single Employee Welfare Benefit Plans Offered by Groups of Employers. ...........................................................................................................5

    C. The Department Issues Sub-Regulatory Guidance Governing the Definition of "Employer." .........................................................................................................................6

    D. The ACA Changes Health Insurance Markets to Impose Greater Requirements for Insurance Offered to "Individuals" and "Small Employers." ................................................8

    E. The Department Promulgates the AHP Final Rule. ................................................................9

        1. The President Issues Executive Order 13813 ...........................................................9

        2. The Department Publishes a Notice of Proposed Rulemaking. ...................................9

        3. The Department Issues a Final Rule. .........................................................................11

STANDARD OF REVIEW……………………………………………………………...13

ARGUMENT……………………………………………………………………......14

I. THE COURT SHOULD DISMISS THIS CASE FOR LACK OF JURISDICTION ............14

    A. The Plaintiff States Have Not Established Standing Based On Alleged Injuries To Their Sovereign Interests. ..................................................................................................15

        1. The Plaintiff States Have Not Established Standing Based On Alleged Injuries To Their Interests In Enforcing Their Own Laws. ...................................................15

        2. The Plaintiff States Have Not Established Standing Based On An Alleged Increased Regulatory Burden. ..................................................................................17

    B. The Plaintiff States Have Not Established Standing Based On Alleged Injuries To Their Economic Interests. ....................................................................................................19

    C. The Plaintiff States Lack Standing To Bring This Action Against The Federal Government as *Parens Patriae*. ..........................................................................................22

II. THE AHP FINAL RULE IS A REASONABLE INTERPRETATION OF ERISA SECTION 3(5) AND FURTHERS ERISA'S OBJECTIVE OF ENCOURAGING THE CREATION OF EMPLOYEE BENEFIT PLANS. .................................................... …25

A.   ERISA Section 3(5)'s Definition of "Employer" is Ambiguous. .........................................26

B.   The AHP Final Rule Is Consistent With ERISA's Statutory Framework and Furthers the Statute's Objectives. ...............................................................................................29

C.   The Plaintiff States' Arguments That Section 3(5) Unambiguously Bars the AHP Final Rule Are Belied By Precedent. .................................................................................30

D.   The Department Permissibly Modified Its Long-Held Sub-Regulatory Guidance Interpreting Section 3(5). ..........................................................................................33

E.   The Department's Interpretation of Section 3(5) As Reflected in the Final Rule Is Not Foreclosed By Other Statutory Provisions. ..............................................................34

1.   Other ERISA provisions do not foreclose the interpretation of Section 3(5) as set forth in the AHP Final Rule. ........................................................................35

2.   Nothing in the provisions of either the ACA or the IRC foreclose the AHP Final Rule's interpretation of Section 3(5). .............................................................36

III.   THE FINAL RULE'S TREATMENT OF WORKING OWNERS IS A REASONABLE INTERPRETATION OF ERISA SECTION 3(5). ..........................................44

IV.   THE AHP FINAL RULE'S INTERPRETATION OF "A GROUP OR ASSOCIATION OF EMPLOYERS" IS NEITHER ARBITRARY NOR CAPRICIOUS. ........................................47

A.   The Department Adequately Explained The Basis For Its Decision To Add An Additional Pathway For Forming AHPs. .......................................................................48

B.   The Department Adequately Considered Potential Adverse Effects on Health Insurance Markets And Made A Reasoned Policy Choice. ..................................................50

C.   The Department Appropriately Weighed the Evidence On Both Sides. ............................51

D.   The Department Relied On Factors Congress Intended It To Consider. ..........................55

E.   The Department Did Not Ignore Quantitative Evidence. ...............................................56

CONCLUSION…………………………………………………………………………..57

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*AARP v. EEOC,*
  226 F. Supp. 3d 7 (D.D.C. 2016) ........................................................................................47

*Aetna Health Inc. v. Davila,*
  542 U.S. 200 (2004) .............................................................................................................4

*AFL-CIO v. Brock,*
  835 F.2d 912 (D.C. Cir. 1987)…………………………………………………………………32

*Air Line Pilots Ass'n v. Nw. Airlines, Inc.,*
  627 F.2d 272 (D.C. Cir. 1980) ...........................................................................................43

*Alaska v. U.S. Dep't of Transportation,*
  868 F.2d 441 (D.C. Cir. 1989) ...........................................................................................17

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
  458 U.S. 592 (1982) .................................................................................................... 17, 24

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) .........................................................................................13

*Am. Fed'n of Labor & Congress of Indus. Organizations v. Brock,*
  835 F.2d 912 (D.C. Cir. 1987) ...........................................................................................32

*Am. Freedom Law Ctr. v. Obama,*
  821 F.3d 44 (D.C. Cir. 2016), *cert. denied,* 137 S. Ct. 1069 (2017).........................................24

*Am. Wrecking Corp. v. Sec'y of Labor,*
  351 F.3d 1254 (D.C. Cir. 2003) .........................................................................................51

*Ark Initiative v. Tidwell,*
  816 F.3d 119 (D.C. Cir. 2016), *cert. denied,* 137 S. Ct. 301 (2016).........................................47

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) ....................................................................................... 21, 24

*Boggs v. Boggs,*
  520 U.S. 833 (1997).............................................................................................................4

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994) ...........................................................................................................31

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ................................................................................................25, 32, 33

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ....................................................................................................................18

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .....................................................................................................18, 22, 24

*Cmty. for Creative Non-Violence v. Pierce,*
   814 F.2d 663 (D.C. Cir. 1987) ..............................................................................................16

*Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Auth.,*
   888 F.2d 180 (1st Cir. 1989) .................................................................................................43

*Conkright v. Frommert,*
   559 U.S. 506 (2010) ..............................................................................................................29, 55

*Corley v. United States,*
   556 U.S. 303 (2009) ..............................................................................................................37, 47

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
   563 F.3d 466 (D.C. Cir. 2009) ..............................................................................................23

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ..................................................................................................................14

*Epic Systems Corp. v. Lewis,*
   138 S. Ct. 1612 (2018) .................................................................................................37, 43, 44

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ..................................................................................................................47

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ..............................................................................................................38, 46

*Ferring Pharms., Inc. v. Burwell,*
   169 F. Supp. 3d 199 (D.D.C. 2016) ...................................................................................32

*Grocery Mfrs. Ass'n v. EPA,*
   693 F.3d 169 (D.C. Cir. 2012) ..............................................................................................18

*Gruber v. Hubbard Bert Karle Weber, Inc.,*
   159 F.3d 780 (3d Cir. 1998) ...............................................................................................30, 31

*Helvering v. Stockholms Enskilda Bank,*
   293 U.S. 84 (1934) ....................................................................................................................43

iv

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   219 F. Supp. 2d 57 (D.D.C. 2002)…………………………………………………………..13

*Home Care Ass'n of Am. v. Weil*,
   799 F.3d 1084 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 2506 (2016) ............................................ 31, 47

*IMS, P.C. v. Alvarez*,
   129 F.3d 618 (D.C. Cir. 1987)…………………………………………………………………13

*J.E.M. Ag. Supply, Inc. v. Pioneer High-Bred Int'l*,
   534 U.S. 124 (2001) ....................................................................................................................43

*Judulang v. Holder*,
   565 U.S. 42 (2011) ......................................................................................................................46

*King v. Burwell*,
   135 S. Ct. 2840 (2015)................................................................................................................41

*Kokkonen v. Guardian Life. Ins. Co. of Am.*,
   511 U.S. 375 (1994) ....................................................................................................................14

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ....................................................................................................................39

*Lubow v. U.S. Dep't of State*,
   923 F. Supp. 2d 28 (D.D.C. 2013) .............................................................................................13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................................. 14, 18

*Maryland v. King*,
   567 U.S. 1301 (2012)...................................................................................................................17

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
   301 F. Supp. 3d 248 (D. Mass. 2018) ........................................................................................21

*Md. People's Counsel v. FERC*,
   760 F.2d 318 (D.C. Cir. 1985) ...................................................................................................23

*MD/DC/DE Broads. Ass'n v. FCC*,
   236 F.3d 13 (D.C. Cir. 2001) .....................................................................................................56

*MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*,
   957 F.2d 178 (5th Cir. 1992)..........................................................................................26, 30, 31

*Massachusetts v. Mellon*,
   262 U.S. 477, *aff'g Frothingham v. Mellon*, 53 App. D.C. 47 (1923) ........................................23

*Meredith v. Time Ins. Co.*,
   980 F.2d 352 (5th Cir. 1993) ................................................................................5

*Metropolitan Life Ins. Co. v. Massachusetts*,
   471 U.S. 724 (1985) ................................................................................... 1, 3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ...............................................................................47

*Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*,
   737 F.2d 1095 (D.C. Cir. 1984) .........................................................54

*Nat'l Cable and Telecomms. Assoc. v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ..............................................................................32

*Nat'l Stabilization Agreement of Sheet Metal Industry Trust Fund v. Commercial Roofing & Sheet Metal*,
   655 F.2d 1218 (D.C. Cir. 1981) ………………………………………………………..43

*New York v. United States*,
   505 U.S. 144 (1992) .............................................................................14

*Oregon v. Mitchell*,
   400 U.S. 112 (1970) .............................................................................14

*Pauley v. BethEnergy Mines, Inc.*,
   501 U.S. 680 (1991) .............................................................................37

*Pennsylvania v. Kleppe*,
   533 F.2d 668 (D.C. Cir. 1976) .................................................... 19, 23

*Perez v. Mortgage Bankers Ass'n*,
   135 S. Ct. 1199 (2015) .........................................................................32

*Petit v. U.S. Dep't of Educ.*,
   675 F.3d 769 (D.C. Cir. 2012) ............................................................26

*Pharm. Research & Mfrs. of Am. v. FTC*,
   790 F.3d 198 (D.C. Cir. 2015) ............................................................46

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
   489 F.3d 1279 (D.C. Cir. 2007) ..........................................................17

*Raymond B. Yates, M.D. P.C. Profit Sharing Plan v. Hendon*,
   541 U.S. 1 (2004) ......................................................................44, 45, 46

*Renal Physicians Ass'n v. HHS*,
   489 F.3d 1267 (D.C. Cir. 2007) ............................................... 18, 21

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ........................................................................................................49

*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1983) ..........................................................................................................43

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
   531 U.S. 159 (2001) ........................................................................................................31

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ……………………………………………………………...24

*State of W. Virginia v. HHS*,
   145 F. Supp. 3d 94 (D.D.C. 2015), *aff'd* 827 F.3d 81 (D.C. Cir. 2016) ..............................16

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ..........................................................................................................13

*Styrene Info. & Research Ctr., Inc. v. Sebelius*,
   994 F. Supp. 2d 71 (D.D.C. 2013) ....................................................................................13

*Susan B. Anthony List v. Driehaus*,
   134 S. Ct. 2334 (2014) ....................................................................................................14

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ..........................................................................................................39

*Tuttle v. Jewell*,
   168 F. Supp. 3d 299 (D.D.C. 2016)……………………………………………................13

*United States Ass'n of Reptile Keepers, Inc. v. Jewell*,
   103 F. Supp. 3d 133 (D.D.C. 2015) ..................................................................................31

*United States v. Vonn*,
   535 U.S. 55 (2002) ..........................................................................................................37

*Virginia ex rel. Cuccinelli v. Sebelius*,
   656 F.3d 253 (4th Cir. 2011) ............................................................................................16

*West v. Lynch*,
   845 F.3d 1228 (D.C. Cir. 2017) ........................................................................................13

*Williams v. Lew*,
   819 F.3d 466 (D.C. Cir. 2016) ..........................................................................................18

*Wyoming v. U.S. Dep't of the Interior*,
   674 F.3d 1220 (10th Cir. 2012)..........................................................................................19

**Statutes**

5 U.S.C. § 553(b)(3) ........................................................................................................34

5 U.S.C. § 706 ...........................................................................................................13, 46

26 U.S.C. § 401……………………………………………………………………………45

26 U.S.C. § 4980H ....................................................................................................41, 42

29 U.S.C. § 302(a)(4) (1970) .............................................................................................5

29 U.S.C. § 1001 .........................................................................................................4, 29

29 U.S.C. § 1002 .....................................................................................................*passim*

29 U.S.C. § 1003 .........................................................................................................4, 5

29 U.S.C. § 1021-1114 ......................................................................................................4

29 U.S.C. § 1131 ...............................................................................................................4

29 U.S.C. § 1132 ...............................................................................................................4

29 U.S.C. § 1135 .....................................................................................................*passim*

29 U.S.C. § 1144 .....................................................................................................*passim*

29 U.S.C. § 1150 ...............................................................................................................8

29 U.S.C § 1151 ................................................................................................................8

42 U.S.C. § 300gg-6(a) .....................................................................................................8

42 U.S.C. § 300gg-22 ......................................................................................................23

42 U.S.C. § 300gg-91 .............................................................................................*passim*

42 U.S.C. § 18024 ...................................................................................................*passim*

42 U.S.C. § 18111 ...............................................................................................8, 35, 36

Fed. R. Civ. P. 12(b)(1)....................................................................................................13

**Administrative and Executive Materials**

29 C.F.R. § 2510.3–3 ..........................................................................................................45

Rate Increase Disclosure and Review: Definitions of "Individual Market" and "Small Group
Market",
    76 Fed. Reg. 54,969 (Sept. 6, 2011) ...........................................................................40

Promoting Healthcare Choice and Competition Across the United States,
    Exec. Order No. 13,813, 82 Fed. Reg. 48,385 (Oct. 12, 2017).............................................9

Definition of "Employer" Under Section 3(5) of ERISA—Association Health Plans,
    83 Fed. Reg. 614 (Jan. 5, 2018).......................................................................................10

Definition of "Employer" Under Section 3(5) of ERISA—Association Health Plans,
    83 Fed. Reg. 28,912-01 (June 21, 2018) ("the AHP Final Rule" or "the Final Rule")...............*passim*

Definition of "Employer" Under Section 3(5) of ERISA—Association Retirement Plans and
    Other Multiple-Employer Plans,
    83 Fed. Reg. 53,534 (October 23, 2018) ......................................................................35

**Other Authorities**

American Society of Association Executives Comment Letter,
    https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-
    regulations/public-comments/1210-AB85/00095.pdf ..........................................................8

Answer to Question 5, IRS, "Questions and Answers on Employer Shared Responsibility
    Provisions Under the Affordable Care Act," No. 18, https://www.irs.gov/affordable-care-
    act/employers/questions-and-answers-on-employer-shared-responsibility-provisions-under-
    the-affordable-care-act..........................................................................................42

Dep't of Health & Human Services Centers for Medicare & Medicaid Services, Ins. Stds. Bulletin
    Transmittal No. 02-02 (August 2002),
    https://www.cms.gov/CCIIO/Resources/Files/Downloads/hipaa_02_02_508.pdf.................40

National Retail Federation Comment Letter, https://www.dol.gov/sites/default/files/ebsa/laws-
    and-regulations/rules-and-regulations/public-comments/1210-AB85/00634.pdf ..........................8

Oregon Ins. Bulletin No. 2013-3,
    2013 WL 2419451 (OR INS BUL May 31, 2013) ...............................................................40

Webster's Third New International Dictionary (1976)………………………………………….........26

## INTRODUCTION

In June 2018, the Department of Labor ("the Department") exercised its authority under the Employee Retirement Income Security Act ("ERISA") to issue a rule expanding access to affordable, high-quality healthcare, particularly for employees of small employers and some self-employed individuals. *See* Definition of 'Employer' under Section 3(5) of ERISA – Association Health Plans, 83 Fed. Reg. 28,912 (June 21, 2018) (AR 1-53) ("the AHP Final Rule" or "the Final Rule").[1]  The Department did so to address changes in the "law, market dynamics and employment trends" that had left many employers unable to provide quality healthcare coverage for their employees at reasonable costs, *id.* at 28,914 (AR 3), and to respond to its determination that its prior sub-regulatory guidance had unduly restricted the ability of small business owners and self-employed individuals to form associations to obtain health insurance tailored to their needs at affordable prices. *See, e.g., id.* at 28,915 (AR 4).  During a robust notice-and-comment rulemaking, the Department considered more than 900 comments expressing a range of views and made changes in response.

The AHP Final Rule reasonably interprets ERISA's definition of "employer" to clarify when employers may band together as a group or association of employers to sponsor a multiple-employer "employee welfare benefit plan" called an "association health plan" ("AHP").[2]  Specifically, ERISA defines "employer" to include a "person" "acting … indirectly in the interest of an employer, in relation to an employee benefit plan; and includes *a group or association of employers* acting for an employer in such capacity."  29 U.S.C. § 1002(5) (emphasis added).  Hence, while ERISA has recognized for more than forty years that employers may join together as a single association to offer health benefits

---

[1] Citations to the Administrative Record begin with the prefix "AR."

[2] ERISA "comprehensively regulates" employee welfare benefit plans, which provide employees with "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability [or] death," and may be provided "through the purchase of insurance or otherwise." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732 (1985); 29 U.S.C. 1002(1).

to their employees, it does not clearly define what constitutes such an association of employers.  In prior sub-regulatory guidance interpreting ERISA's "group or association" provision, the Department established a facts-and-circumstances test that required the employers (1) to exercise control over the benefit program, both in form and substance, (2) to have a common economic or representation interest linking the employees of the group's members, and (3) to have a genuine organizational relationship unrelated to the provision of benefits.  The AHP Final Rule makes a measured change: it preserves this path for qualifying as an association of employers, and then provides an alternative path that (1) preserves the control element, (2) adds flexibility on the commonality and organizational purpose elements, and (3) balances this flexibility through new nondiscrimination requirements that do not apply to associations qualifying under the pre-rule guidance.  83 Fed. Reg. at 28,915 (AR 4). The AHP Final Rule also extends this pathway to sole proprietors who meet the regulation's requirements.  *Id.*

The Plaintiff States—eleven states and the District of Columbia—disagree with this measured, reasonable interpretation and policy choice.  They seek to have the AHP Final Rule vacated and set aside in favor of the test set forth in the Department's prior guidance, insisting that it is the only mechanism by which a group of employers may band together to offer ERISA-covered benefit plans. *See* Compl. 52–53, Dkt. 1.  The Plaintiff States brought suit under the Administrative Procedure Act ("APA"), focusing largely on two policy concerns: (1) insulation of their preferred individual and small group health insurance markets from the robust competition created by a potential increase in the number of AHPs, Pls.' Mot. Summ. J., at 12, 13, 41, Dkt. 31-17; and (2) the possibility that third parties, in the future, may violate their ERISA obligations to AHPs by engaging in fraud or misconduct, Pls.' Mot. at 44.  But the Department weighed these concerns in considering whether to promulgate the Final Rule and decided that increasing the availability of health coverage options for small employers and certain self-employed individuals and maintaining robust competition in

2

insurance markets to provide affordable health insurance were reasonable and lawful policy objectives. For this and other reasons, the Plaintiff States' challenge fails.

As an initial matter, the Plaintiff States have not established standing, a jurisdictional obstacle that bars their claims. Their assertion of injury to their sovereign interests fails because the Final Rule does not preempt any of their state laws. They also cannot establish standing based on speculative allegations of an increased regulatory burden premised on the acts of hypothetical, third-party bad actors not before the Court, or based on conclusory assertions of harm to their economic interests. Finally, the Plaintiff States lack standing to proceed as *parens patriae* against the Federal Government.

The merits of Plaintiff States' claims fare no better. The AHP Final Rule elucidates ERISA's "employer" definition by interpreting its ambiguous reference to "a group or association of employers acting for an employer in [relation to an employee benefit plan]." ERISA Section 3(5), 29 U.S.C. § 1002(5). Congress delegated broad rulemaking authority to the Department to fill "gaps" in the statute; the Final Rule reasonably fills one such gap by retaining the prior guidance's framework and adding an additional AHP formation pathway, appropriately balancing competing commenter-submitted proposals and policy rationales in doing so. The rule is therefore entitled to *Chevron* deference and should be upheld.

The Plaintiff States also fail to show that the Final Rule is an impermissible interpretation of the Patient Protection and Affordable Care Act ("ACA"). The Final Rule does not interpret the ACA, only ERISA. And ERISA has long "comprehensively regulate[d]" group health plans like AHPs. *See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732 (1985). When Congress enacted the ACA, it expressly incorporated by reference some of ERISA's Title I definitions, including Section 3(5)'s definition of "employer"—a fact that undermines the Plaintiff States' assertion that the Final Rule conflicts with the ACA. The Plaintiff States' "conflict" arguments also run afoul of the Court's duty

to interpret ERISA and the ACA in a manner that reconciles the two statutes absent a clear and manifest congressional intention otherwise.

Without their manufactured conflict between the AHP Final Rule and the ACA, the Plaintiff States' remaining arguments pit their preferred policy choices against the Department's considered judgment and expertise as the agency charged with administering ERISA, a battle in which the Plaintiff States cannot prevail under *Chevron*.  For these reasons, the Court should dismiss this case for lack of jurisdiction or uphold the Final Rule and enter summary judgment for the Department.

## BACKGROUND

## I.      Statutory and Regulatory Background

### A.      ERISA Delegates Broad Rule-Making Authority to the Secretary of Labor.

In 1974, Congress enacted the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, a comprehensive regulatory scheme designed to protect "'the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans . . . ."  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. § 1001(b)).  Among other statutory provisions, Title I of ERISA contains the statute's definitional and coverage sections, *see* 29 U.S.C. §§ 1002, 1003, substantive regulatory requirements, *see id.* §§ 1021-1114, and enforcement provisions, *see id.* §§ 1131, 1132.  Title I's requirements apply to two types of employee benefit plans: "employee welfare benefit plans" and "employee pension benefit plans."  29 U.S.C. § 1002(3); *see also Boggs v. Boggs*, 520 U.S. 833, 841 (1997).  Importantly, Title I authorizes the Secretary of Labor to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I, including Section 3(5)'s reference to a "group or association of employers acting for an employer." 29 U.S.C. § 1135.

As relevant here, to fall within ERISA's protective scope, an "employee welfare benefit plan," including a medical benefit plan, must be established or maintained by (1) an employer, (2) an

4

employee organization, or (3) both.  29 U.S.C. § 1002(1)(A); *see id.* § 1003(a)(1)-(3).  Section 3(5) of

ERISA defines the term "employer" to mean "any person acting directly as an employer, or indirectly

in the interest of an employer, in relation to an employee benefit plan[.]"  *Id.* § 1002(5).  Title I of

ERISA also makes clear that the term "employer" "'include[s] a *group or association of employers acting for*

*an employer* [in relation to an employee benefit plan]."  *Id.*  ERISA's express recognition of the

formation of "a group or association of employers" acting in relation to an employee benefit plan thus

provides a statutory vehicle through which "smaller employers [may] receive insurance benefits at

group rates."  *Meredith v. Time Ins. Co.*, 980 F.2d 352, 353 (5th Cir. 1993).

**B.    ERISA Has Long Recognized Single Employee Welfare Benefit Plans Offered by Groups of Employers.**

The plain text of ERISA Section 3(5) provides that both a single employer or a "group or

association of employers" may be an "employer" that establishes or maintains a single health benefit

plan.   In fact, ERISA's predecessor statute, the Welfare and Pension Plans Disclosure Act

("WPPDA"), contained the same "employer" definition, which provided that groups of employers

can act as one "employer" offering a single welfare plan.  *Compare* 29 U.S.C. § 302(a)(4) (1970)

(WPPDA), *with* 29 U.S.C. § 1002(5) (ERISA).  Thus, Congress has long recognized that "a group or

association of employers" may join together to establish or maintain a single employee welfare benefit

plan.  *See* 29 U.S.C. § 1003(a)(1); *see also id.* § 1002(5).

ERISA's express inclusion in the definition of "employer" of an association of employers

joining together to "establish or maintain" a single employee welfare benefit plan to serve their joint

interests is consistent with other parts of the statutory framework.  For example, ERISA defines the

term "plan sponsor" to mean "in the case of a plan established or maintained by two or more

employers, . . . the *association*, committee, joint board of trustees, or other similar group of

representatives of the parties who establish or maintain the plan."   29 U.S.C. § 1002(16)(B)(iii)

(emphasis added).  ERISA also specifically recognizes "multiple employer welfare arrangements" ("MEWAs"), which are defined as "an employee welfare benefit plan, or any other arrangement (other than an employee welfare benefit plan), which is established or maintained for the purpose of offering or providing any benefit described in paragraph (1) [that is, § 1002(1)'s definition of employee welfare benefit plan] to the employees of two or more employers . . . or to their beneficiaries."  29 U.S.C. § 1002(40).  In short, ERISA's statutory framework clearly recognizes the ability of an association of employers to sponsor a single ERISA-covered welfare plan.

The existence of groups of employers jointly sponsoring a single ERISA "employee welfare plan," or MEWAs generally, is not a recent development.  AHPs are a type of MEWA, and they trace their origins to long before ERISA's enactment and more than half a century before the ACA's enactment.  *See, e.g.*, Comment Letter of Employee Benefits Task Force at 1 (Mar. 6, 2018) (AR 5646) (noting the existence of "multiple member associations that have continuously and successfully operated AHPs since at least the 1950s"); Comment Letter of Am. Council of Eng'g Cos. at 1-2 (Mar. 6, 2018) (AR 5404-05) (AHP formed in 1965); 83 Fed. Reg. 28,946-47 (AR 35-36) (examining the experience of Plaintiff States Oregon and Washington with AHPs before and after the ACA's enactment).

### C.     The Department Issues Sub-Regulatory Guidance Governing the Definition of "Employer."

Over the years, the Department has issued guidance delineating the scope of the term "employer" under ERISA Section 3(5).  This guidance explains that "the definitional provisions of ERISA recognize that a single employee welfare benefit plan might be established or maintained by a cognizable, bona fide group or association of employers, within the meaning of section 3(5), acting in the interests of its employer members to provide benefits for their employees."  Advisory Opinion 1996-25A (October 31, 1996) (AR 3911).  According to this guidance, "[a] determination whether a

group or association of employers is a bona fide employer group or association must be made on the basis of all the facts and circumstances involved." Advisory Opinion 1996-25A (AR 3911); *see also* Advisory Opinion 2008-07A (September 26, 2008) (AR 3942).

The Department's guidance set forth a facts-and-circumstances test to determine whether a group or association of employers is a bona fide employer group or association, which considered factors such as "how members are solicited," "who is entitled to participate and who actually participates in the association," and "the purposes for which the association was formed." Advisory Opinion 2003-17A (December 12, 2003) (AR 3930). The Department explained its view that "the employers that participate in a benefit program must, either directly or indirectly, exercise control over the program, both in form and in substance, in order to act as a bona fide employer group or association with respect to the program." Advisory Opinion 1996-2A (AR 3911). It also required "common economic or representation interest linking employees of [the group's] members to [the group] that is unrelated to their obtaining benefits." Advisory Opinion 1994-07A (AR 3903). "[W]here several unrelated employers merely execute participation agreements or similar documents as a means to fund benefits, in the absence of any genuine organizational relationship between the employers," the Department concluded that "no employer association can be recognized." Advisory Opinion 2001-04A (AR 3919); *see also* Advisory Opinion 1996-25A (AR 3911). This historical approach ensured that the Department's regulation of employee benefit plans focused on employment-based arrangements, as contemplated by ERISA, rather than merely commercial insurance-type arrangements that lack the requisite connection to the employment relationship. 83 Fed. Reg. at 28,914 (AR 3). As relevant here, the guidance broadly required a "commonality" among the employers, "control" by the employers, and some purpose unrelated to the provision of benefits.

**D.**    **The ACA Changes Health Insurance Markets to Impose Greater Requirements for Insurance Offered to "Individuals" and "Small Employers."**

When Congress enacted the ACA in 2010, it adopted ERISA's longstanding definition of "employer," *see* 42 U.S.C. § 18111, preserved the statutory ability of "groups or associations of employers" to form a single ERISA-covered health plan, 83 Fed. Reg. at 28,939, 28,944–46 (AR 28, 33-35), and reaffirmed the Department's enforcement role over MEWAs by granting it new enforcement tools, *e.g.*, 29 U.S.C § 1150, § 1151. At the time of the ACA's enactment, health insurance plans offered by MEWAs that were treated as single ERISA-covered plans were well-established. *See, e.g.*, Comment Letter of Missouri Bankers Ass'n Voluntary Employees Beneficiary Ass'n at 1 (Mar. 6, 2018) (AR 5482); *see also* 83 Fed. Reg. at 28,952 (AR 41).

While the ACA did not change ERISA's underlying statutory or regulatory tests for when MEWAs provide single ERISA-covered plans, the ACA imposed new distinctions among health insurance markets for "individuals," "small employers," and "large employers," which the ACA based on the number of "employees." 42 U.S.C. § 18024(b). The ACA imposed greater requirements for health insurance offered to "individuals" and "small employers," thereby imposing different regulatory burdens for small employers offering health benefits to their employees, as compared to large employers. 42 U.S.C. § 300gg-6(a). The United States Department of Health and Human Services ("HHS") reaffirmed its prior rules that when "associations or groups of employers" act jointly to offer a single ERISA-covered plan, they are treated as a single "employer" under ERISA and the ACA for purposes of counting employees in the definitions of "small" and "large" employers. *See* Dep't of Health & Human Services Centers for Medicare & Medicaid Services, Ins. Stds. Bulletin Series at 2 (Sept. 1, 2011) (AR 2211).

### E.    The Department Promulgates the AHP Final Rule.

Against this historical backdrop, the Department underwent notice-and-comment rulemaking resulting in the AHP Final Rule.  That Rule is a response to the Department's observation that in the years following its sub-regulatory AHP guidance, there have been significant changes in the "law, market dynamics, and employment trends," 83 Fed. Reg. at 28,914, (AR 3), affecting the ability of many American workers to access affordable, quality health coverage.  In particular, the percentage of small businesses offering health coverage for employees "has declined substantially from 47 percent of establishments in 2000 to 29 percent in 2016."  83 Fed. Reg. at 28,947 (AR 36); *id.* at 28,947 n.113 (AR 36).  And certain local markets face sharp premium increases and scarcity of healthcare choices. *Id.* at 28,953 (AR42).  Further, the structure of certain small employers, such as franchises and farms, makes it difficult for these employers to provide affordable health coverage for employees.  *See* International Franchise Association Comment Letter (AR 5188); Washington Farm Bureau Comment Letter (AR 4749).

### 1.   The President Issues Executive Order 13813.

On October 12, 2017, President Trump signed Executive Order ("E.O.") 13813, expressing the administration's broad policy objective to "facilitate the purchase of insurance across State lines and the development and operation of a healthcare system that provides high-quality care at affordable prices for the American people." 82 Fed. Reg. 48,385 (Oct. 12, 2017) (E.O. 13813, "Promoting Healthcare Choice and Competition Across the United States") (AR 6970).  To accomplish this goal, the E.O. identified AHPs as one of three potential vehicles through which the government could expand small businesses' access to affordable group health insurance through regulations.  *See id.*

### 2.   The Department Publishes a Notice of Proposed Rulemaking.

On January 5, 2018, in response to the President's directive and pursuant to its rulemaking authority under ERISA, *see* 29 U.S.C. § 1135, the Department published a Notice of Proposed

Rulemaking seeking public comment regarding "all aspects of" the agency's proposal to "broaden the criteria under ERISA section 3(5) for determining when employers may join together in an employer group or association that is treated as the 'employer' sponsor of a single multiple-employer 'employee welfare benefit plan' and 'group health plan' as those terms are defined in Title I of ERISA." 83 Fed. Reg. 614, 625 (Jan. 5, 2018) ("AHP Proposed Rule") (AR 6947).  The Proposed Rule retained the framework of the Department's prior guidance, including requirements for commonality and control, but loosened certain restrictive elements in the prior test, including, for example, permitting the employers' geographic proximity to satisfy the commonality test.  *Id.* at 620 (AR 6953).  The AHP Proposed Rule retained this framework in order to distinguish AHPs based on employment-based relationships subject to ERISA as opposed to commercial insurance-type arrangements.  *Id.* at 617 (AR 6950).  At the same time, the Proposed Rule added nondiscrimination provisions not found in the Department's prior guidance.  *Id.* at 635 (AR 6968).

The Department requested comment on its proposal.  *Id.* at 619-620, 624 (AR 6952-53, 6957).  In response, the Department received more than 900 comments from a wide range of stakeholders. 83 Fed. Reg. 28,912, 28,914 (AR 1, 3).  A large number of commenters, including small businesses, working owners, and other interested stakeholders, supported the Proposed Rule, *see id.* at 28,914–15 (AR 3-4), citing their "serious concerns regarding the rising cost of healthcare" as "the primary reason" that they "cannot offer affordable health coverage to their employees and their families."  *Id.*  Several "self-employed individuals," including "farm owners, realtors and court reporters," complained that "they are forced to purchase insurance in a volatile individual insurance market, which tends to offer fewer choices at much higher costs," and thus "strongly supported" the regulatory inclusion of working owners in ERISA Section 3(5)'s definition of "employer."  *Id.* at 28,915, 28,929 (AR 4, 18). Another group of commenters urged the Department to go further than the Proposed Rule to remove requirements found in both the sub-regulatory guidance and the Proposed Rule including the

10

"'commonality of interest' and 'control' requirements altogether because, in the commenters' view, these requirements are not supported by the statutory text of ERISA." *Id.* at 28,916 (AR 5).

Several commenters, including the Plaintiff States, expressed concern with certain elements of the proposal. *See* Comment Letter of 17 State Attorneys General (March 6, 2018) (AR 6356). These commenters urged the Department to issue a regulation that would further restrict the ability of businesses to form AHPs and bar sole proprietors from joining AHPs. Comment Letter of NAIC at 3 (AR 6141); Comment Letter of Massachusetts Division of Insurance at 4 (AR 6042).

### 3. The Department Issues a Final Rule.

On June 21, 2018, after "careful consideration of the issues raised by the written public comments," the Department finalized the proposed rule "with certain modifications made in response to public comments." *Id.* at 28,915 (AR 4). The AHP Final Rule clarifies "which persons may act as an 'employer' within the meaning of ERISA Section 3(5) in sponsoring a multiple employer group health plan," and delineates certain sub-regulatory requirements applicable "for a bona fide group or association of employers" to establish "a group health plan that is an employee welfare benefit plan." *Id.* at 28,962 (AR 51). Importantly, it retains the test articulated in the Department's prior guidance as one pathway to satisfy the Section 3(5) definition. *Id.* at 28,916, 28,954-55 (AR 5, 43-44).

During this notice-and-comment rulemaking process, the Department recognized that previous sub-regulatory guidance discouraged some employers from establishing AHPs and hampered the provision of more affordable health coverage. *See, e.g.,* *id.* at 28,915 (AR 4). As the Final Rule concludes, AHPs provide an affordable health coverage option that can more closely match the preferences of small businesses and improve the welfare of their employees. *Id.* at 28,941 (AR 30). In light of demand for more flexibility to form AHPs for those who may not have satisfied the prior available pathway, the Final Rule adopted an "alternative basis for groups or associations to meet the definition of an 'employer' under ERISA Section 3(5)." *Id.*

11

The alternative pathway retains the framework from the Department's prior guidance, including criteria to demonstrate a "commonality of interest" among employer members of the group or association, "control" by employer members, and requiring that employers be connected in some way unrelated to the provision of benefits. *Id.* at 28,962 (AR 51). The AHP Final Rule also requires AHPs formed under these criteria to abide by nondiscrimination rules that did not exist in prior guidance. *Id.* at 28,918 (AR 7).

At the same time, the Final Rule modifies certain elements of the prior framework, including: (1) changing the requirement that the association have a common economic or representational interest or genuine organizational relationship unrelated to the provision of benefits to having "at least one substantial business purpose unrelated to the provision of benefits," *e.g.*, *id.*; (2) adding geography as a basis for satisfying the commonality requirement as long it is limited to the same state or metropolitan area (even if the metropolitan area includes more than one state), *e.g.*, *id.* at 28,924-25 (AR 13-14); and (3) specifying "the types of working owners without common law employees who can qualify as employer members and also be treated as employees for purposes of being covered by the bona fide employer group or association's health plan." *Id.* at 28,915 (AR 4). The Department explained that these modifications increase options for small businesses that will now "be subject to the same, more flexible rules to which large employer plans are subject, consistent with leveling the regulatory playing field between small and large employers." *Id.* at 28,941 (AR 30).

The AHP Final Rule also establishes three "phased applicability dates." *Id.* at 28,954 (AR 43). The Final Rule allows fully insured plans—an AHP that purchases insurance—to begin operating under the new rule on September 1, 2018. *Id.* Existing self-insured AHPs—those that pay out of their own assets—may begin operating under the new rule on January 1, 2019, and new self-insured AHPs may begin on April 1, 2019. *Id.* at 28,954 (AR 43); *see* 29 U.S.C. § 1144(b)(6). Finally, the Final Rule contains a severability provision. *Id.* at 28,915 (AR 4).

12

## STANDARD OF REVIEW

The Department moves to dismiss this case for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  This Court has a duty to ensure that it is acting within the scope of its jurisdictional authority, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998), and must dismiss the suit where, as here, the Plaintiff States have failed to allege sufficient facts in their complaint to demonstrate that they have standing to pursue the merits of their claims.  *See West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017).

In APA cases such as this one, "the typical . . . standards set forth in Federal Rule of Civil Procedure 56 are not applicable."  *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 994 F. Supp. 2d 71, 77 (D.D.C. 2013); *see also* L.R. 7(h)(2).  Rather, "when a party seeks review of agency action under the APA, the district court sits as an appellate tribunal.  The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  If, as here, "the agency action is supported by the administrative record and otherwise consistent with the APA standard of review," the Court must grant summary judgment in the agency's favor.[3]  *Lubow v. U.S. Dep't of State*, 923 F. Supp. 2d 28, 34 (D.D.C. 2013) (internal quotation marks and citation omitted).

---

[3] Under the APA, "'the task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the [rulemaking] record [that] the agency presents to the reviewing court.'"  *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623–24 (D.C. Cir. 1987) (internal citation omitted); *see also Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 66 (D.D.C. 2002).  To the extent that the fifteen declarations submitted by the Plaintiff States in support of their motion for summary judgment do not address the factual underpinning of their purported standing to bring their APA claims, the declarations are impermissible extra-record evidence, which the Department respectfully requests that the Court not consider in reviewing the merits of the Plaintiff States' APA claims.  *See Tuttle v. Jewell*, 168 F. Supp. 3d 299, 308 n.8 (D.D.C. 2016) (plaintiff's declarations submitted in support of his APA claim are "extra-record evidence that is not permitted under the APA without a strong showing of unusual circumstances justifying the departure from the general rule").

## ARGUMENT

## I.   THE COURT SHOULD DISMISS THIS CASE FOR LACK OF JURISDICTION.

"Federal courts are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To establish standing, the Plaintiff States must show that: (1) they have suffered an injury in fact, *i.e.*, a judicially cognizable injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. A plaintiff "must demonstrate standing for each claim he seeks to press[.]" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006).

The Plaintiff States cannot make the showing required to establish standing. The Final Rule applies to AHPs and not to states; it does not command any state to take, or refrain from taking, any action. Accordingly, this case is unlike the most common situation in which states have standing to challenge federal law or action. *See, e.g.*, *New York v. United States*, 505 U.S. 144 (1992); *Oregon v. Mitchell*, 400 U.S. 112 (1970). Instead, the Plaintiff States complain of injury "from the government's allegedly unlawful regulation (or lack of regulation) of someone else," making standing "substantially more difficult to establish." *See Lujan*, 504 U.S. at 562. The Plaintiff States' challenge to the Department's adjustments to the existing sub-regulatory guidance is based on conjecture about injury to their sovereign interests, incidental financial consequences they allege will flow from the AHP Final Rule, and their alleged interests as *parens patriae*. These standing allegations are insufficient.

14

A.     **The Plaintiff States Have Not Established Standing Based On Alleged Injuries To Their Sovereign Interests.**

1.    **The Plaintiff States Have Not Established Standing Based On Alleged Injuries To Their Interests In Enforcing Their Own Laws.**

The Plaintiff States allege that the AHP Final Rule harms their interests in enforcing their own laws by "vastly expand[ing] the number of AHPs that qualify as 'employee benefit plans' governed by ERISA" and thus would be subject to ERISA's preemption provision, ERISA Section 514, 29 U.S.C. § 1144.  Compl. ¶ 101.  This attempt to establish standing fails for three reasons.

First, the AHP Final Rule does not change ERISA Section 514's preemption provisions, which demarcate the lines between federal and state regulation.  83 Fed. Reg. 28,936–37 (AR 25-26).  These provisions continue to apply to state laws regulating ERISA plans, including pre-existing AHPs and new AHPs.  Indeed, the Final Rule "affirms . . . that the final rule does not modify or otherwise limit existing State authority as established under section 514 of ERISA."  *Id.* at 28,953 (AR 42).

Nor does the AHP Final Rule modify ERISA Section 514's specific provisions on state laws regulating arrangements among multiple employers to provide employee benefits (also known as MEWAs).  And because ERISA classifies AHPs as a form of MEWA, AHPs generally *are* subject to state insurance regulations, as the Plaintiff States acknowledge.[4]  *Id.* at 28,959 (AR 48)).  "Section 514(b)(6) of ERISA gives the Department and State insurance regulators joint authority over MEWAs, including AHPs . . . .  Nothing in the final rule changes this joint structure[.]"  *Id.* at 28,953, 28,959 (AR 42, 48).

Second, tacitly acknowledging the lack of any existing preemption-related injury, the Plaintiff States speculate that the Department will "threaten[ ] to use ERISA to enact *future* regulations to preempt State insurance laws as to AHPs plans if States go 'too far' in regulating them."  Compl. ¶ 101

---

[4] *See* Pennsylvania Insurance Department Comment Letter (AR 5812-18); Declaration of Maria T. Vullo, Superintendent of the New York State Department of Financial Services, Dkt. 31-1 at ¶ 16.

(emphasis added).   However, the possibility of "*future*" preemption "would not *now*" provide the Plaintiff States standing.  *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 270 n.2 (4th Cir. 2011) (emphasis added).  Courts have found that states lack standing when their asserted injury is merely a general allegation that another sovereign's law impermissibly intruded into their domain.  *See Virginia*, 656 F.3d at 269; *see also State of W. Virginia v. United States Dep't of Health & Human Servs.*, 145 F. Supp. 3d 94, 102 (D.D.C. 2015), *aff'd* 827 F.3d 81 (D.C. Cir. 2016); *cf. Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 668 (D.C. Cir. 1987) (state and local officials' allegation that federal agency's report was "unwarranted and illegitimate intrusion by the federal government into State legislative processes" were "simply too abstract" to satisfy Article III).

Third, the Plaintiff States' allegation of future preemption is based on a mischaracterization of the preamble, which simply states that "ERISA section 514(b)(6) provides a potential future mechanism for preempting state insurance laws."  83 Fed. Reg. at 28,937 (AR 26).  However, the Department has neither prescribed regulations for such exemptions nor granted any such exemptions, despite having this statutory authority since 1983.[5]  *See* MEWAs: Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation (AR 2222).  Because the Department has not done so—or even "threatened" to do so—the Plaintiff States cannot show any imminent injury to their sovereign interests.

Accordingly, the Plaintiff States' alleged injury to their sovereign "power to create and enforce a legal code," Compl. ¶ 101 (citation omitted), is purely speculative and amounts to no more than general allegations about hypothetical future ERISA preemption.  *See Virginia*, 656 F.3d at 269.  For

---

[5]  Under ERISA section 514(b)(6)(B), the Department has authority to promulgate regulations exempting non-fully insured MEWAs that are ERISA-covered plans from some state insurance laws. *See* 29 U.S.C. § 1144(b)(6).

all of these reasons, the Plaintiff States' alleged injury to their sovereign interests based on ERISA

preemption is insufficient to establish standing.[6]

### 2. The Plaintiff States Have Not Established Standing Based On An Alleged Increased Regulatory Burden.

Next, the Plaintiff States allege that they are injured because the Final Rule "contemplates a

substantially increased regulatory burden on the States[,]" which they contend will harm them by

"forc[ing]" them "to substantially ramp up enforcement" "or face . . . fraud and abuse." Compl. ¶ 103.

Under this theory, a state would have standing to challenge any regulation in an area in which the state

has any enforcement responsibilities, based on possible future violations of the regulation by third

parties. *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 (D.C. Cir. 2007)

("Were all purely speculative increased risks deemed injurious, the entire requirement of actual or

imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be

dressed up as increased risk of future injury." (citation omitted)). That is not the case.

The Plaintiff States' speculative assertions that any rule-prompted AHP expansion will

increase fraud and force them to ramp up enforcement are insufficient to show standing.[7]

---

[6] The Plaintiff States cite three cases in support of their argument that the Final Rule injures them by limiting their sovereign power to create and enforce a legal code. However, these cases do not support the Plaintiff States' argument where, as here, the Department has not taken any affirmative steps to preempt state laws. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 (1982) (discussing the contours of *parens patriae* standing); *Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3 (2012) (concluding that the plaintiff state was harmed because it was enjoined by a court from effectuating a state statute and the injunction harmed the state's law enforcement and public safety interests); *Alaska v. U.S. Dep't of Transportation*, 868 F.2d 441, 442–44 (D.C. Cir. 1989) (Department of Transportation explicitly stated that specific state consumer protection laws were preempted, and Congress expressly contemplated in the Federal Aviation Act that states may bring suit).

[7] Even the Plaintiff States' declarations support the conclusion that their allegations of fraud and increased regulatory costs are speculative. *See, e.g.*, Declaration of Myron Bradford "Mike" Kreidler, Insurance Commissioner for State of Washington, Dkt. 31-5 at ¶¶ 7, 15 (noting that prior to the ACA, Washington state law allowed AHPs "offered through associations that were formed for the primary purposes of offering health coverage to experience rate individual employers and allowed sole

17

Hypothetical future injury cannot establish injury in fact, particularly where the hypothetical future injury is premised on an unlawful act. *See, e.g., Clapper*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (concluding claim of future injury was speculative where the trigger for that future event was an unlawful act). The Plaintiff States do not provide any basis to presume that parties will not follow the law or that the Department will be unable to enforce the law. And they cannot rely upon past fraud to show future (speculative) fraud, particularly where, as here, the regulatory environment has changed significantly.

Further, even if the Plaintiff States could show an increase in fraudulent AHP formation by unspecified third parties, any injury to the Plaintiff States would not be traceable to the AHP Final Rule, but to such third parties' actions and the Plaintiff States' decisions on how to respond. Standing may not be premised on "an extended chain of contingencies," *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016), especially those that "depend[] on the acts of third parties not before the court." *Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 176 (D.C. Cir. 2012). Where causation and redressability "hinge on the response of the regulated (or regulable) third party to the government action or inaction," the plaintiffs carry the burden of "adduc[ing] facts showing that . . . choices [of the independent actors] have been or will be made in such manner as to produce causation and permit redressability of injury." *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1273 (D.C. Cir. 2007) (quoting *Lujan*, 504 U.S. at 562); *see also Lujan*, 504 U.S. at 562. The Plaintiff States have not done so.

For these reasons, the Plaintiff States have not established a direct injury to their sovereign interests that is actual, imminent, and traceable to the Final Rule.

_____

proprietors to participate in AHPs, very similar to the plans now allowed by the Final Rule," and acknowledging that "Washington has not seen [a] proliferation of fraudulent MEWAs").

###### B.     The Plaintiff States Have Not Established Standing Based On Alleged Injuries To Their Economic Interests.

The Plaintiff States further allege that the Final Rule harms their economic interests in two respects.  "Many States," they assert, "will suffer harm in the form of lost tax revenue or administrative fees paid to state agencies for small group and individual plans obtained on a state insurance exchange."  Compl. ¶ 102.  They also allege that "[m]any States will also experience a rise in their uncompensated care costs due to the Final Rule, especially for individuals with high health needs who risk losing their access to advanced premium tax credits."  *Id.* ¶ 106.  Neither such professed harm confers standing.

First, the Plaintiff States' assertion of lost revenue from taxes and administrative fees due to the Final Rule is speculative.  Conclusory allegations of general harm to a state's budget or tax revenues from a federal policy are insufficient to support standing.  *See, e.g.*, *Pennsylvania v. Kleppe*, 533 F.2d 668, 672–73 (D.C. Cir. 1976) ("the unavoidable economic repercussions of virtually all federal policies . . . suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing"); *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) ("Petitioners in this case have presented us with no evidence that specific loss of tax revenues have occurred, and their assertions of future lost tax revenues are merely speculative.").

The Plaintiff States seek to avoid this case law by claiming that "the Final Rule openly acknowledge[s]" harm to states in the form of lost tax revenue, but this is not the case.  The Final Rule merely acknowledges that self-insured AHPs "*sometimes may* avoid the *potentially* significant cost to comply with State rules that apply to large group issuers, including for example premium taxes[,]" 83 Fed. Reg. at 28,943 (AR 32), because such taxes typically apply to entities that purchase insurance, not those that self-insure.  The acknowledgment that new self-insured AHPs "sometimes may" avoid premium taxes, hardly acknowledges an imminent decline in state tax revenue.  *See Wyoming*, 674 F.3d

at 1231–32.  And the Plaintiff States have set forth no support for their claim that they will be harmed by lost administrative fees.

Second, the Plaintiff States' alleged injury from a hypothetical rise in uncompensated care costs fares no better.  In support of this allegation, the Plaintiff States hypothesize one multi-step example that only illustrates the attenuated nature of their allegation: They hypothesize an employee who makes less than 400 percent of the federal poverty level and works for a small employer that does not offer health coverage, and is thus eligible to use a premium tax credit to purchase qualified health insurance on a state insurance exchange.  Compl. ¶ 106.  Then, they speculate that, because of the AHP Final Rule, the hypothetical small employer will make an AHP available to its employees that does not meet the requirements of minimum essential coverage under the ACA, which might cause the hypothetical employee to lose her eligibility for the premium tax credit.  *Id.*  This will give the hypothetical employee three options, according to the Plaintiff States: (1) to purchase a plan in the marketplace without financial assistance—an unaffordable option, according to the Plaintiff States, (2) to enroll in the AHP, or (3) to remain uninsured.  *Id.*  The Plaintiff States allege that this employee "will now be underinsured or uninsured due to the Final Rule" and that "States will, in many cases, become responsible for providing care to individuals who cannot afford coverage or who are underinsured."  *Id.*

This chain of hypotheticals cannot support standing.  It relies upon an alleged injury to the Plaintiff States that is inherently speculative and traceable to the unfettered choices of third parties, not the Final Rule, and one that might not even be redressable by the relief they seek.  Ultimately, any rise in uncompensated care costs is caused not by any action of the Department, but by the decisions of employers (*e.g.,* whether to offer health coverage to employees and what type of health coverage to offer), as well as the choices of employees (*e.g.,* how to react to an employer's decision to make an AHP available, and whether to explore other options, such as health insurance coverage through a family member's plan).

20

The Plaintiff States have not met their burden to adduce "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (citation omitted). They point to no support for their assertion that any individuals have become or are about to become uninsured or underinsured as a result of new AHPs or the Final Rule. *See Massachusetts v. United States Dep't of Health & Human Servs.*, 301 F. Supp. 3d 248, 263 (D. Mass. 2018) ("[T]he Commonwealth does not identify any employers that are likely to avail themselves of the expanded exemptions, much less identify employees who will cause the Commonwealth the alleged 'significant financial harm.'"). To the contrary, the Final Rule notes that the U.S. Congressional Budget Office predicted that 400,000 people who would have been uninsured will enroll in AHPs. 83 Fed. Reg. at 28,912 (AR 1).

Likewise, the Plaintiff States adduce no facts showing how employers or employees will make insurance choices. *See Renal Physicians*, 489 F.3d at 1273. As the AHP Final Rule notes, "[s]mall employers [who do not currently offer coverage] generally are less likely to begin offering coverage to employees whose demand for such an offer is weak because they currently have access to subsidized comprehensive coverage." 83 Fed. Reg. at 28,948 (AR 37). Even if small employers were to begin offering coverage, only offers of employer-sponsored coverage, including AHPs, that are "affordable" and provide "minimum value," as each of those terms is defined under IRC Section 36B, render employees ineligible for premium tax credits. Depending on the quality of the offer, some employees may have more comprehensive coverage under an employer-sponsored AHP than they would have with the state insurance exchange coverage and the premium tax credit.

Further, even if the Plaintiff States could establish that employees were more likely to become underinsured or uninsured, their allegation that they would become financially responsible for these

individuals' care is unsupported.[8]   The Plaintiff States do not allege that such individuals would lack access to health insurance, such as through a family member's plan.[9]

In short, the Plaintiff States have provided no support for their assertion that this chain of attenuated contingencies is even likely, much less "certainly impending."  *Clapper*, 568 U.S. at 409.

### C.     The Plaintiff States Lack Standing To Bring This Action Against The Federal Government as *Parens Patriae*.

Finally, the Plaintiff States seek to vindicate their interests in preventing harm to the health insurance markets and "the individuals who rely on them."  Pls.' Mot. at 12; Compl. ¶¶ 104–05.  The Plaintiff States allege that health insurance markets will be harmed because the AHP Final Rule will "encourage healthy individuals and employers with healthy individuals to leave the traditional health insurance markets and purchase cheaper plans with fewer benefits through AHPs."  Compl. ¶ 104. The Plaintiff States assert that this will cause premiums to increase and become unaffordable for some individuals and cause some insurance carriers to leave the individual and small group markets.  *Id.* at ¶¶ 104–05.  This attempt to establish standing fails for multiple independent reasons.

---

[8] The Plaintiff States' declarations themselves support the conclusion that this alleged injury to their economic interests is speculative.  *See, e.g.*, Declaration of Myron Bradford "Mike" Kreidler, Insurance Commissioner for State of Washington, Dkt. 31-5 at ¶ 18 ("The Final Rule *may* also result in *indirect* financial harm to Washington State *to the extent* that enrollees receive health services that are not covered by their AHP.  This *could* result in increased expenditures to programs and funding designed to assist uninsured and under insured groups within Washington State." (emphasis added)).

[9] Notably, small group employers who choose to leave health insurance markets for AHPs would still be providing some form of insurance to their employees, even if they do not provide comprehensive coverage.  Additionally, some Plaintiff States have their own benefit mandates that require large group coverage to be more comprehensive.  *See* Pls.' Mot. at 49 ("[T]he Plaintiff States stand ready to fully enforce their own laws, including those that would require AHPs to provide certain minimum health benefits[.]").  The existence of these state benefit mandates, which would apply to AHPs, makes it even less likely that individuals will end up underinsured as a result of new AHPs under the Final Rule and that the Plaintiff States will suffer financial harm due to uncompensated care costs.

As an initial matter, the Plaintiff States' desire to protect their residents' interests, rather than their own,[10] constitutes a *parens patriae* standing theory, and states do not have standing to bring such suits against the Federal Government. *Massachusetts v. Mellon*, 262 U.S. 477, 485-86, *aff'g Frothingham v. Mellon*, 53 App. D.C. 47 (1923); *see also Md. People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985); *Kleppe*, 533 F.2d at 678. As the Supreme Court has explained, "it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the Federal Government," because "[i]n that field it is the United States, and not the State, which represents them as parens patriae." *Mellon*, 262 U.S. at 486; *see also, e.g.*, *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 477 (D.C. Cir. 2009).

The Plaintiff States attempt to escape this basic principle by alleging Congressional authorization "to enforce core ACA provisions," Pls.' Mot. at 12 n.17 (citing 42 U.S.C. § 300gg-22), but that theory fails to support standing in this case for multiple reasons. To begin, 42 U.S.C. § 300gg-22 does not authorize this suit because the Department's Final Rule neither interprets the ACA nor conflicts with it, *see infra* at 34, 36-44. Further, 42 U.S.C. § 300gg-22 is limited to granting states enforcement authority vis-à-vis health insurance issuers and not the ACA requirements generally. *See* 42 U.S.C. § 300gg-22(a)(1).

And even if the Plaintiff States could show congressional authorization, such authorization would not satisfy the Plaintiff States' burden of showing a concrete injury to their residents. *See Maryland People's Counsel v. FERC*, 760 F.2d 318, 322 (D.C. Cir. 1985) (allowing a *parens patriae* suit

---

[10] *See, e.g.*, Declaration of Michael Brown, Deputy Attorney General of Kentucky, Dkt. 31-1 at ¶ 14 (asserting that "The Final Rule will also cause financial harm to Kentucky" but focusing the explanation of this alleged harm on "members of AHPs," "individuals," and "Kentucky citizens" and not asserting any separate harm to the State of Kentucky); Declaration of Marlene Caride, Commissioner of the New Jersey Department of Banking and Insurance, Dkt. 31-2 at ¶ 14 (describing alleged injury to "members" and "individuals"); Declaration of Pam Macewan, chief executive officer of the Washington Health Benefit Exchange, Dkt. 31-7 at ¶¶ 5, 10, 18 (describing alleged injury to "insurance markets" and "consumers").

against the federal government "where the citizen interests represented are concrete interests which the citizens would have standing to protect in the courts themselves"); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) ("Injury in fact is a constitutional requirement, and it is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." (internal quotation marks omitted)); *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607 (noting that a state must allege injury to "a sufficiently substantial" and "identifiable group of individual residents").  Here, the Plaintiff States have alleged only attenuated harm to the insurance markets and the individuals who may purchase health insurance through these markets.  They offer no support for their assertion that premiums will rise significantly in the individual and small group insurance markets.  Their theory of harm rests on a "speculative chain of possibilities" that is not "certainly impending." *Clapper*, 568 U.S. at 414.  Indeed, even if the Plaintiff States' alleged harms were to occur and premiums for comprehensive coverage were to increase, any assertion of causation and redressability would rest on a similarly speculative chain, given the various other intervening factors that could reasonably lead to premium increases.  *See Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 51 (D.C. Cir. 2016) (noting that "many factors determine the cost of health care," and that changes "in any of these factors could cause costs to increase or decrease").[11]  In short, the Plaintiff States have not identified an alleged harm to their residents of sufficient concreteness that they would possess *parens patriae* standing to sue, even if such a suit could be maintained against the federal government.

---

[11] The Court "may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." *Arpaio*, 797 F.3d at 21 (citation omitted); *see also Am. Freedom Law Ctr.*, 821 F.3d at 50 ("[T]he effect of various factors, including the size of risk pools, on health insurance pricing is far from 'basic,' and Appellants have made no concrete allegations, nor provided any specific evidence, establishing that the cost of their health insurance plan is likely to increase in the future, let alone that such an increase will stem from the [challenged policy]. This is a major missing link in the causal chain Appellants must establish to demonstrate that [the challenged policy] is a 'substantial factor motivating' Appellants' alleged harm.").

For these reasons, the Plaintiff States cannot demonstrate standing to pursue their claims, and the Court should dismiss this case for lack of jurisdiction.

## II.   THE AHP FINAL RULE IS A REASONABLE INTERPRETATION OF ERISA SECTION 3(5) AND FURTHERS ERISA'S OBJECTIVE OF ENCOURAGING THE CREATION OF EMPLOYEE BENEFIT PLANS.

The heart of the Plaintiff States' claims is that the AHP Final Rule, although retaining the framework of the Department's long-established sub-regulatory guidance governing the formation of AHPs, adjusts certain of its more restrictive requirements in a way that purportedly conflicts with the Plaintiff States' preferred interpretation of Section 3(5)'s definition of "employer." But this cannot suffice to invalidate the Final Rule where, as here, it simply interprets ERISA Section 3(5), an ambiguous statutory term for which Congress has delegated broad, interpretative authority to the Department to define. *See* 29 U.S.C. § 1135.

The two-step framework established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865-66 (1984), governs the Court's review of the Final Rule. Under *Chevron* step one, the Court must first determine whether ERISA speaks clearly to the precise issue in the AHP Final Rule, *i.e.*, whether Section 3(5) specifies the criteria necessary to form "a group or association of employers" that "act[s]" for an employer in relation to single ERISA-covered group health plan. *Id.* Under *Chevron* step two, if there is any ambiguity, the Court must consider whether the Department's interpretation of Section 3(5) is reasonable. *Id.*

The Plaintiff States prefer the Department's sub-regulatory guidance interpreting "employer," but this interpretation itself demonstrates the ambiguities in Section 3(5)'s definition of "employer" and the Department's resulting efforts to fill the gaps. And where, as here, Congress has tasked the Department with the power to "fill in gaps" under ERISA, and the Department's interpretation reflects a permissible and reasonable interpretation of the statute, it is the Department's preferred interpretation as reflected in the AHP Final Rule that receives *Chevron* deference.

### A.   ERISA Section 3(5)'s Definition of "Employer" is Ambiguous.

ERISA Section 3(5) defines the term "employer" to mean "any *person acting directly as an employer*, or *indirectly in the interest of an employer*, in relation to an employee benefit plan; and includes a group or association of employers *acting for an employer* in such capacity." 29 U.S.C. § 1002(5) (emphasis added). The term "person," in turn, includes an "association." *Id.* § 1002(9). Thus, under Section 3(5), an "employer" may be an "[an association]" acting directly as an "employer," or "indirectly in the interest of an employer." *Id.* § 1002(5); *see also id.* § 1002(9). Section 3(5) also explicitly states that the definition of "employer . . . includes a group or association of employers" that "act[s] for" its employer members "in relation" to an employee benefit plan. *See* 29 U.S.C. § 1002(5); *see also MDPhysician & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 183 (5th Cir. 1992).

Title I of ERISA, however, does not define the terms "group" or "association." In the absence of a statutory definition, courts are bound to give the terms their "ordinary meaning." *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012). But the ordinary meaning of "group" and "association" does nothing to cabin Section 3(5)'s scope. *See* Webster's Third New International Dictionary 132 (1976) ("association" is "an organization of persons having a common interest"); *see also* Webster's Third New International Dictionary 1004 (1981) ("group" means "two or more figures forming a distinctive unit"). Nor does Title I of ERISA delineate what it means for "a group or association of employers" to "*act*" for an "employer" in relation to sponsoring a group health insurance plan. *See MDPhysician*, 957 F.2d at 184.

Indeed, the history of judicial efforts to apply terms within ERISA's definition of "employer" further demonstrates the ambiguity of the definition. In the forty-plus years since ERISA's enactment, courts have long grappled with interpreting Section 3's definitions, often observing that they are "difficult to interpret." *Greenblatt v. Delta Plumbing & Heating Corp.*, 68 F.2d 561, 575 (2d Cir. 1995). Nothing in ERISA's text "specifies the characteristics of" "a group or association of employers"

26

"acting for" an employer "in relation" to establishing and maintaining a single, multiple-employer group health plan on behalf the employer members.  *Id.*

Congress left this gap in Section 3(5) to the Department to fill in accordance with its expertise and experience in administering ERISA.  *See* 29 U.S.C. § 1135.  To fill this gap in the past, the Department has issued sub-regulatory guidance explaining the facts and circumstances under which a group or association of employers represents an employer's interests and when it does not.  *See, e.g.*, Adv. Ops. 2008-07A (AR 3942), 2001-04A (AR 3919).  The Department has now decided to "fill the gap" pursuant to the challenged rulemaking, and there is no provision in ERISA that limits the Department's discretion to modify and adjust its previously-established guidance in response to changes in market dynamics and other considerations that may affect the ability of employers to band together to offer employee welfare benefit plans, as it has done in the Final Rule.  *See* 29 U.S.C. § 1135.

The AHP Final Rule explicitly retains the framework of the Department's prior guidance, similarly requiring that (1) the employers have a common interest, (2) the associations are employment-based and not commercial entities, and (3) the associations are subject to the employers' control.[12]  *See* 83 Fed. Reg. at 28,962 (AR 51).  The AHP Final Rule reasonably adjusts the first two elements of the original framework in discrete ways to create a second pathway for employers to form AHPs, in an effort to provide small businesses and working owners access to affordable health care. *See id.* at 28,918 (AR 7).  For example, under the "commonality of interest" requirement of the Department's original framework, only employers in the same trade, industry, or business could form

---

[12] The Plaintiff States do not challenge the "commonality of interest" test under the Department's prior sub-regulatory guidance, nor do they challenge the Department's prior guidance establishing the "control" requirements, which remain unchanged under the Final Rule.  Rather, they challenge the Department's decision to expand the "commonality of interest" test to allow geography to serve as a factor and to modify the restrictions governing the purpose of the association such that the association's primary purpose may be to provide healthcare coverage provided that the employer members "have at least one substantial business purpose unrelated to" providing the health coverage.

AHPs.  *See id.* at 28,924 (AR 13).   The AHP Final Rule's second pathway expands the definition of "association" to include employers from the same geographic area.  *Id.* at 28,922 (AR 11).  By modifying the "commonality of interest" requirement in this way, the AHP Final Rule provides employer groups and associations "important flexibility" and permits "more employers to join together to secure lower cost healthcare coverage for themselves and their employees through AHPs." *Id.* at 28,924 (AR 13).  At the same time, the modified "commonality of interest" test contains an important restriction (in response to recommendations from commenters) by requiring that the "commonality of interest" test will be met only if the basis for commonality is not implemented in a manner that is a subterfuge for discrimination.  *Id.* at 28,962 (AR 51).

The Final Rule also permits the formation of an association for the primary purpose of providing health care coverage but imposes a limitation to ensure that the association is employer-based by requiring AHPs to have "at least one substantial business purpose" unrelated to the healthcare benefit plan.  *See supra* at 12; 83 Fed. Reg. at 28,918, 28,956 (AR 7, 45).  The Department reasonably concluded that this adjustment to the Department's prior guidance "is appropriate because the intent of this final rule is to expand access to AHP coverage, while protecting plan participants and beneficiaries from imprudent, abusive, or fraudulent arrangements."  *Id.* at 28,956 (AR 45).  In order to prevent abuse and ensure that the arrangements remain employment-based, the Department imposed new nondiscrimination rules to prevent associations from charging employer members different premium rates based on the health status of their employees.  By establishing these prerequisites for AHP formation under the Final Rule's second pathway, the AHP Final Rule reflects the Department's reasonable efforts to supply the criteria necessary to elucidate the definition in Section 3(5) in a manner that is consistent with the statute and ERISA's objective of encouraging the creation of employee benefit plans.

**B. The AHP Final Rule Is Consistent With ERISA's Statutory Framework and Furthers the Statute's Objectives.**

The AHP Final Rule's modification of the Department's prior sub-regulatory guidance is also consistent with ERISA's statutory framework and Congress's objectives in enacting ERISA. The Final Rule's recognition that employers may form "a group or association" that sponsors a single, group health plan comports with other provisions in ERISA that expressly recognize that two or more employers may join together to establish or maintain a single employee welfare benefit plan to serve their collective interests. For example, ERISA permits the formation of MEWAs, pursuant to which "an employee welfare benefit plan, or any other arrangement . . . [may be] established or maintained for the purpose of offering any benefit [defined in § 1002(1)] . . . to the employees of *two or more employers* . . . or to their beneficiaries." 29 U.S.C. § 1002(40) (emphasis added). The term "plan sponsor" in ERISA is also defined by reference to "a plan established or maintained *by two or more employers*." *Id.* § 1002(16)(B)(iii) (emphasis added). The AHP Final Rule's delineation of the criteria necessary to form "a group or association of employers" that sponsors a single, ERISA-covered group health plan for its employer members is consistent with ERISA's statutory framework, which plainly contemplates that two or more employers may join together to offer certain employee benefits. *See id.*; *see also id.* § 1002(40).

Finally, the AHP Final Rule furthers ERISA's statutory purposes. In enacting ERISA, Congress sought to protect "the continued well-being and security of millions of employees and their dependents [who] are directly affected by . . . [employee benefit] plans" and ensure that "employers, employee organizations, and other entities" continue to "establish[] and maintain[]" such plans, which "have become an important factor affecting the stability of employment and successful development of an industrial relations." 29 U.S.C. § 1001(a). Although Congress "did not require employers to establish benefit plans in the first place," it did seek to, *inter alia*, "induce employers to offer benefits."

*Conkright v. Frommert*, 599 U.S. 506, 517 (2010) (internal quotation marks and citation omitted).  By including associations of employers as recognized sponsors of employee benefit plans under ERISA, Congress reasonably determined that the formation of AHPs are one way in which "to induce employers to offer benefits" to their employees, *see id.*, a determination that has gone unchallenged. The AHP Final Rule simply establishes another pathway to create more AHPs, which, in turn, will expand access to affordable healthcare.  In this way, the Final Rule furthers ERISA's objective of encouraging employers to offer employee benefit plans to their employees, *see Conkright*, 559 U.S. at 517, by "promot[ing] broader availability of group health coverage for . . . small business owners and self-employed people."  83 Fed. Reg. at 28,915 (AR 4); *see also id.* at 28,914 (AR 3).

### C. The Plaintiff States' Arguments That Section 3(5) Unambiguously Bars the AHP Final Rule Are Belied By Precedent.

Despite their reliance on the Department's sub-regulatory guidance governing the formation of AHPs, the Plaintiff States nonetheless proffer several arguments in an effort to show that ERISA explicitly bars the modifications of the Department's prior sub-regulatory guidance as reflected in the Final Rule.  First, relying on several out-of-circuit cases, *see* Pls.' Mot. at 32–33, the Plaintiff States insist that Section 3(5) unambiguously precludes the Department's decision to allow the formation of associations whose primary purpose is the provision of health care subject to the association's ability to show "at least one substantial business purpose unrelated" to the healthcare benefits as contemplated under the Final Rule's second pathway.   These cases offer little support for their statutory argument.

The cases on which the Plaintiff States rely stand for the uncontroversial proposition that not every "employee welfare benefit plan" is "established or maintained" by "a group or association of employers" that acts "indirectly in the interest of" its employer members.  *See id.*  That is, Section 3(5)'s definition of "employer" contemplates that "a group or association of employers" may "act"

for its employer members provided that the employers are able to show some "nexus among . . . the unaffiliated businesses . . . other than the [benefit] Plan itself," *see Gruber v. Hubbard Bert Karle Weber, Inc.*, 159 F.3d 780, 787 (3d Cir. 1998), or that they are tied by a "common economic or representation interest *unrelated to the provision of benefits*," *see MDPhysicians*, 957 F.2d at 185 (emphasis in original). However, none of these decisions purports to specify the outer limits of the "nexus" or "common economic tie" required to form "a group or association of employers" under Section 3(5) other than to observe that the "group or association of employers" must have some other purposes other than provision of benefits.  The AHP Final Rule is entirely consistent with this interpretation.

In fact, each of these cases acknowledges the ambiguity inherent in Section 3(5)'s definition and expressly references and discusses the Department's sub-regulatory guidance to buttress the courts' interpretation of the statutory provision.  *See, e.g.*, *Gruber*, 159 F.3d at 787(relying on the Department's sub-regulatory guidance); *MDPhysician*, 957 F.2d 185 ("ERISA does not define the term 'group or association of employers' . . . inject[ing] ambiguity into the statute").  The AHP Final Rule simply modifies the Department's prior sub-regulatory guidance to permit the formation of "a group or association of employers" whose primary purpose is to offer a single, ERISA-covered group health plan subject to employer members' ability to demonstrate "at least one substantial business purpose" unrelated to the group health plan.  *See* 83 Fed. Reg. at 28,928 (AR 17).

The Plaintiff States turn next to several failed bills that purportedly show that Congress unambiguously expressed its intent to preclude the Department's interpretation of Section 3(5) in the Final Rule, *see* Pls.' Mot. at 25-26.  This effort also misses the mark.  The Plaintiff States rely not on the legislative history of the Congress that enacted ERISA in 1974, but instead on that of subsequent Congresses.  Reliance on subsequent Congresses' legislative histories "'form[s] a hazardous basis for inferring the intent of an earlier one.'" *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 153 (D.D.C. 2015) (internal citation omitted).  It is all the more hazardous here, as the Plaintiff

States cite only to the legislative history of failed efforts to enact legislation codifying criteria for AHPs. *See, e.g.*, *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1093 (D.C. Cir. 2015) ("'[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute.'" (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994))). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 681 (2001).

The Plaintiff States also assert that Section 3(5) unambiguously restricts the definition of "employer" to its common law meaning. But this argument cannot be squared with their heavy reliance on the Department's prior sub-regulatory guidance, which they do not challenge (presumably because they believe it is consistent with ERISA). The Department's prior sub-regulatory guidance expressly reflects an interpretation of Section 3(5)'s definition of "employer" that is broader than the term's common law meaning because it encompasses "a group or association of employers" that acts for its employer members in relation to an employee benefit plan. *See, e.g.*, Adv. Op. 94-07A (AR 3903). That is because there is no common law definition of "employer" that includes "a group or association of employers" that acts for its employer members, all of whom have some "protective nexus" or "common economic or representational issue." *See, e.g.*, Adv. Op. 2001-04A (AR 3919); *see also Raymond B. Yates, M.D. P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 12 (2004) ("[T]here is no cause . . . to resort to common law" when "ERISA's text contains indications that Congress intended" to extend beyond the presumption of common law incorporation.).

Nor may the Plaintiff States avoid this conclusion by relying on the Department's sub-regulatory guidance interpreting ERISA's definition of a "multiple employer welfare arrangement," which the Plaintiff States insist proves that the common law definition controls that statutory definition. *See* Pls.' Mot. at 16-17, 22. By its express terms, Section 3(40)'s MEWA definition expressly governs both MEWAs where the common law member-employers are one Section 3(5) "employer"

that sponsors one ERISA plan and MEWAs that are just a collection of common law employers with separate plans. *See* 29 U.S.C. § 1002(40), (41). Section 3(5) supplies the "employer" definition for sponsoring ERISA-plans only, not for membership in a MEWA. *Compare id.* § 1002(40) *with id.* § 1002(5). To that point, in order for multiple employers in a MEWA to be considered a single employer under ERISA, it must satisfy the requirements of both Section 3(40) and Section 3(5).

The absence of any statutory elucidation of Section 3(5)'s reference to when "a group or association of employers" "acts" for an employer "in relation to" an employee benefit plan undermines the Plaintiff States' argument that the statute "unambiguously forecloses" the Final Rule's demarcation of those requirements. *See Nat'l Cable and Telecomms. Assoc. v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005) ("*Brand X*"). Indeed, the Plaintiff States' heavy reliance on, and preference for the Department's prior sub-regulatory guidance to interpret the phrase only reinforces the conclusion that these terms are ambiguous and contain gaps to be filled. *See Meredith*, 980 F.2d at 357. And in that case, deference is owed to the Department's reasonable construction. *Chevron*, 467 U.S. at 865-66; *see Apotex Inc. v. Food & Drug Admin.*, 414 F. Supp. 2d 61, 66 (D.D.C. 2006).

### D. The Department Permissibly Modified Its Long-Held Sub-Regulatory Guidance Interpreting Section 3(5).

The Plaintiff States' contention that the AHP Final Rule represents an impermissible "dramatic departure" of the Department's prior sub-regulatory guidance, *see* Pls.' Mot. at 33-34, is equally flawed. It is well-settled that "'an initial agency interpretation is not instantly carved in stone.'" *Ferring Pharms. Inc. v. Burwell*, 169 F. Supp. 3d 199 (D.D.C. 2016) (quoting *Chevron*, 467 U.S. at 853-54); *see also infra* at 48. There is nothing impermissible about the Department's decision to revisit its prior interpretive guidance through notice-and-comment rulemaking procedures and deliberation, as it did here. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015). This is particularly so where, as here, the Department has adequately explained "the reasons for a [modification] . . . of [its prior sub-

regulatory] policy." *Ferring*, 169 F. Supp. 3d at 216-17.  Indeed, "'change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'"  *Id.* (*Brand X*).

Equally tenuous is the Plaintiff States' contention that Congress implicitly ratified the Department's prior sub-regulatory guidance when it enacted the ACA "against the backdrop of consistent agency and judicial interpretations of ERISA."  Pls.' Mot. at 36.  This argument ignores the well-settled view in this Circuit that Congress must expressly approve an administrative interpretation "if it is to be viewed as statutorily mandated."  *AFL-CIO v. Brock*, 835 F.2d 912, 915 (D.C. Cir. 1987).  The ACA contains no provision "expressly approving" the sub-regulatory guidance, nor have the Plaintiff States pointed to any provision in the ACA that demonstrates "a strong affirmative indication" that Congress intended "the [Department's prior] interpretation to remain in place."  *Am. Fed'n of Labor & Congress of Indus. Organizations v. Brock*, 835 F.2d 912, 916 (D.C. Cir. 1987).

### E.  The Department's Interpretation of Section 3(5) As Reflected in the Final Rule Is Not Foreclosed By Other Statutory Provisions.

Finding no basis in Section 3(5)'s text to bar the Department's interpretation of ERISA's own statutory definition, the Plaintiff States advance several arguments that invite the Court to invalidate the AHP Final Rule because it purportedly conflicts with other ERISA provisions and other federal statutes.  However, under *Chevron*, the Plaintiff States' arguments based on other statutory provisions are relevant only to the extent that these other statutory provisions prove either that (1) the Final Rule's interpretation of ERISA Section 3(5) is unambiguously foreclosed, or (2) the Final Rule's interpretation of ERISA Section 3(5) is unreasonable.  *See Chevron*, 467 U.S. at 837.  As explained below, the statutory provisions on which the Plaintiff States rely do not speak directly to the precise issue addressed in the Final Rule, nor do they show that the Department's interpretation of ERISA is unreasonable.

34

### 1.  Other ERISA provisions do not foreclose the interpretation of Section 3(5) as set forth in the AHP Final Rule.

The Plaintiff States' assertion that Section 3(40)'s definition of "multiple employment welfare arrangements" unambiguously requires the Department to limit Section 3(5)'s definition of "employer" to its "common law" meaning, *see* Pls.' Mot.. at 22-23, is belied by the text of Section 3(40) itself.  As explained above, *see supra* at 32-33, Section 3(40) expressly recognizes that two or more employers may sponsor an ERISA-covered group health plan if the employer members satisfy the requirements of Section 3(40) and Section 3(5).  ERISA's statutory framework serves only to bolster the Department's view that Section 3(5)'s definition of employer expands beyond the common meaning of the term and thus, the Final Rule is a permissible interpretation of the statute.

The Plaintiff States also take issue with the fact that the AHP Final Rule's interpretation of "employer" is currently limited to health benefits and AHPs.  Pls.' Mot. 52–53.  However, as the Department noted in the AHP Final Rule, issues concerning the definition of "employer" as it relates to retirement benefits under ERISA Section 3(2) or other welfare benefits listed in ERISA Section 3(1) are "beyond the scope of this rulemaking."  83 Fed. Reg. at 28,915 n.10 (AR 4); *see* 5 U.S.C. § 553(b)(3).  Additionally, the Department has issued a notice of proposed rulemaking concerning the definition of "employer" under ERISA Section 3(5) for association retirement plans and other multiple employer plans.[13]  *See* Notice of Proposed Rulemaking, Definition of 'Employer' under

---

[13] As an aside, any differences that may exist between the definition of "employer" as it relates to health plans, as compared to retirement and other welfare plans, can be explained by the use of the phrase "a group or association of employers acting for an employer in such capacity" in the definition of "employer" under ERISA section 3(5).  Because retirement and other welfare plans—as compared to health plans—may have different requirements and obligations when an employer sponsors such plans for its employees, an association that seeks to "act[ ] for an employer" in those contexts may have different characteristics in its structure in order to properly step into that role.  Accordingly, the definition of "employer" for associations of employers "acting for an employer" in the context of health plans (AHPs) may properly differ from the definition of "employer" for associations of employers "acting for an employer" in the context of retirement and other welfare plans.

35

Section 3(5) of ERISA – Association Retirement Plans and Other Multiple-Employer Plans, 83 Fed. Reg. 53534 (October 23, 2018).  These arguments provide no basis with which to invalidate the Final Rule.

### 2. Nothing in the provisions of either the ACA or the IRC foreclose the AHP Final Rule's interpretation of Section 3(5).

There is also no merit to the Plaintiff States' assertion that provisions of the ACA and Internal Revenue Code ("IRC") unambiguously bar employers from forming "a group or association of employers" that "acts" for an employer "in relation to" sponsoring a single, ERISA-covered group health plan.  The Plaintiff States rely on provisions they claim impose mandatory standards for determining the total number of employees in the large group, small group, and individual health plan markets.  *See* Pls.' Mot. at 17-18.  Their reliance on these other statutory provisions is misplaced because none of them are inconsistent with the AHP Final Rule.

First, the Plaintiff States' argument ignores the fact that the definitions of "employer," "employee," and "group health plan" are controlled by ERISA, not the ACA or the IRC.  As the Plaintiff States acknowledge, *see id.* at 21-22, when Congress enacted the ACA, it expressly incorporated by reference ERISA's definition of "employer," among other ERISA provisions.  *See* 42 U.S.C. § 18111.  The ACA's provisions governing employer-size (*i.e.,* "small employer" and "large employer") and market-related definitions (*i.e.,* "individual market," "small group market," and "large group market"), *see* 42 U.S.C. § 18024(a)(1)-(3), (b)(1)-(2), do not delineate who is an "employer" and who is an "employee."

Instead, the ACA refers to 42 U.S.C. § 300gg-91—part of Title XXVII of the Public Health Services Act ("PHSA")—to determine who is an "employer" and "employee" and the contours of an ERISA-eligible "group health plan."  *See* 42 U.S.C. § 18111 ("Unless specifically provided for otherwise, the definitions contained in section 300gg-91 of [Title I of the ACA] . . . shall apply with

respect to this title."). And Section 300gg-91, in turn, defines each of those three terms by referencing ERISA Title I. *See, e.g.*, 42 U.S.C. § 300gg-91(a)(1) ("The term 'group health plan' means an employee welfare benefit plan (as defined section 3(1) of the [ERISA]"); *see also id.* § 300gg-91(d)(5) ("The term 'employee' has the meaning given such term under section 3(6) of . . . [ERISA]"); *see also id.* § 300gg-91(d)(6) ("The term 'employer' has the meaning given such term under section 3(5) of . . . [ERISA]"). Thus, the ACA's incorporation of Section 3(5)'s definition of "employer" includes ERISA's recognition that "a group or association of employers" may "act" for an employer "in relation to" a group health plan. *See* 42 U.S.C. § 18111; *see also id.* § 300gg-91(d)(5).

The ACA's express reference to Section 3(5)'s definition of "employer," *see id.* § 300gg-91(d)(6), also demonstrates the fallacy in the Plaintiff States' contention that the ACA's "aggregation rules" as set forth in § 18024(b)(4)(A) are the only method by which to determine the total number of employees in an AHP, *see* Pls.' Mot. at 18. By its express language, § 18024(b)(4)(A) delineates the circumstances under which certain separate but related corporate or other entities will be treated as one employer for purposes of the statute. Noticeably absent from § 18024(b)(4)(A) is any reference to AHPs. In other words, § 18024(b)(4)(A) does not unambiguously address the method by which to determine the total number of employees in an AHP.

Nor may the Plaintiff States avoid this conclusion by insisting that Congress, by specifying that related employers will be treated as a single employer in these circumstances, intended to exclude other circumstances, "including aggregation by an association." Pls.' Mot. at 18. The Supreme Court has cautioned courts against "the dubious reliability of inferring specific intent from silence." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 703 (1991) (citation and internal quotation marks omitted); *see also United States v. Vonn*, 535 U.S. 55, 65 (2002) (canon's "fallibility can be shown by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion of its common relatives"). To that point, § 18024(b)(4)(A)'s demarcation of the specific entities subject

to its aggregation rules must be construed in a manner that considers that the entities listed share similar characteristics. *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1625 (2018).   Section 18024(b)(4)(A)'s list of entities itself indicates that Congress wanted to *limit* the provision to that "class" of specified entities for which Congress sought to prevent the "avoidance of any employee benefit requirement," *see* 26 U.S.C. § 414(o).   Application of the doctrine of *ejusdem generis* suggests that the "group of employers" defined in ERISA Section 3(5) is not within the "class" specified in §18024(b)(4)(A).   *Id.*   To that point, ERISA explicitly differentiated between "multiple employer welfare arrangements," described in Section 3(40)(A), including AHPs, and separate rules that require related entities to aggregate as one employer, *see* Section 3(40)(B)(i)-(iii).   This same coexistence supports the compatibility of rules that permit groups to band together to obtain ERISA coverage along with rules to prevent groups from disaggregating to avoid statutory obligations.

The Plaintiff States' argument also violates the well-settled principle that each statutory provision must be given meaning.   *Corley v. United States*, 556 U.S. 303, 314 (2009); *see Vonn*, 535 U.S. at 65 (rejecting use of *expresio unius* when it resulted in one rule causing another rule to become partially inapplicable).   The Plaintiff States' interpretation of § 18024(b)(4)(A) manufactures a conflict with the ACA's incorporation of Section 3(5) and the long-standing understanding that a group of multiple employers may be treated as a single employer sponsoring a single ERISA-covered plan.

Nor is there any purported conflict between the Final Rule and provisions of the ACA that the Plaintiff States argue "require[] that the relevant consumer protections applicable to an employee's group health plan depend on the size of that employee's employer—not the size of an association or other group of which the employer is a member."   Pls.' Mot. at 15.   The Plaintiff States rely heavily on the fact that the definitions of "large employer" and "small employer" in the ACA both use a particular formulation—an "employer" who "employed" a number of employees—as support that these definitions and related obligations turn on the number of "common law" employees in a

38

"common law" employer, not the total number of employees of an association's employer-members in the AHP. Pls.' Mot. at 15-17. But the Plaintiff States' interpretation misreads this statutory provision and ignores the ACA's statutory framework and structure.

The ACA must be read as a whole, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), and the "large employer" definition must refer to the ACA's incorporation of the PHSA definitions, including its foundational definition of "employer," which states "[t]he term 'employer' has the meaning given such term under section 3(5) of the Employee Retirement Income Security Act of 1974, except that such term shall include only employers of two or more employees." The Plaintiff States contend that the incorporated definition supports their reading because this definition also uses the relationship of "employers" and "employees" for counting purposes. Pls.' Mot. at 17. But this ignores the PHSA's incorporation of ERISA's definition of "employer." By doing so, Congress made the relationship between employers and employees in the PHSA (and therefore by incorporation into the ACA), turn on how that relationship is defined in *ERISA* and not common law. *See* 42 U.S.C. § 300gg-91(d)(6) ("such term [under ERISA] shall include . . .").

To be sure, Section 3(5)'s definition of "employer" includes the common law meaning (*i.e.*, "any person acting directly for an employer"). But the Plaintiff States' insistence that the ACA's references to "employer" contemplate only the "common law" meaning of employer in Section 3(5) renders superfluous much of Section 3(5)'s text, including its references to "any person acting directly as an employer" and "a group or association of employers." *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Furthermore, the Plaintiff States' own reliance on the "aggregation rules" in the ACA undermines their argument, *see infra* at 37-38, because the employers aggregated under the ACA's rules are treated and counted as one entity for the definition of "large employer" or "small employer" even though each employer does not, in fact, "employ" all the members in the aggregated group.

The incorporation of ERISA Section 3(5)'s definition of "employer" into the large employer or small employer definition in the ACA also makes good sense. The ACA's "large employer" definition refers to a Section 3(5) "employer" "who employed an average of at least 51 employees," *see* 42 U.S.C. § 18024, so it applies equally to a "group or association of employers" "who employed an average of at least 51 employees." For similar reasons, the Plaintiff States' argument that sole proprietors are barred because the ACA definition incorporated ERISA Section 3(5) to "include only employers of two or more employees" is flawed. The ACA's definition of "employer" incorporated from the PHSA states, "[t]he term 'employer' has the meaning given such term under section 3(5) of [ERISA], *except that such term shall include only employers of two or more employees*," 42 U.S.C. § 300gg-91(d)(6) (emphasis added). "[E]*mployers* of two or more employees" in the "except" clause clearly refers to "employers*"* that meet the definition of "employer" in ERISA Section (3)(5) adopted in the prior clause. Reading the two clauses together, the ACA's definition of employer "include[s] only" those Section 3(5) employers who have "two or more employees." There is no reason to read the "except" clause to immediately displace ERISA's definition as incorporated in the prior clause, and narrow the ACA definition to include only "common law" employers of two or more employees.

This is also affirmed by long-standing CMS guidance, which specifies that whether an AHP is a "small employer" or "large employer" under § 18024(b) of the ACA, is determined by the total number of employees of all of the employer members in the association participating in the AHP. *See supra* at 37-38; *see also* CMS Insurance Standards Bulletin, "Application of Individual and Group Market Requirements under Title XXVII of the Public Health Service Act when Insurance Coverage Is Sold to, or through, Associations," September 1, 2011 (AR 2211). The 2011 CMS Bulletin makes clear that ERISA's definitions in Title I, not the ACA, govern the existence of a "group health plan" and whether

it is maintained by an "employer."[14]  *Id.* (emphasis added).  The Plaintiff States make much of the fact

that the 2011 CMS Bulletin opines that it is a "rare instance[]" in which "the association of employers

is, in fact, sponsoring the group health plan and the association itself is deemed the 'employer.'"  *See*

Pls.' Mot. at 21.  But the underlying legal guidance does not change based on the alleged "rarity" of

its application.  This long-standing harmonization of these definitions is reasonable.  Indeed, AHPs

have long operated under the PHSA's established market structure and have done so by calculating

the total number of employees of all of the employer-members in the association participating in the

AHP, the exact calculation that the Plaintiff States now challenge in the AHP Final Rule.  *See* 83 Fed.

Reg. at 28,917 (AR 6).[15]

---

[14] HHS issued similar guidance in "Rate Increase Disclosure and Review: Definitions of 'Individual Market' and 'Small Group Market,'" 76 Fed. Reg. 54969, 54971 (Sept. 6, 2011).  Indeed, this is consistent with CMS's interpretation of HIPAA's amendments to the PHSA.  *See* Dep't of Health & Human Services Centers for Medicare & Medicaid Services, Ins. Stds. Bulletin Transmittal No. 02-02 (August 2002), available at https://www.cms.gov/CCIIO/Resources/Files/Downloads/hipaa_02_02_508.pdf; "Rate Increase Disclosure and Review: Definitions of 'Individual Market' and 'Small Group Market,'" 76 Fed. Reg. 54969, 54971 (Sept. 6, 2011).  States agreed.  *See, e.g.*, Oregon Ins. Bulletin No. 2013-3, 2013 WL 2419451 (May 31, 2013).

[15] The long-recognized establishment and operation of AHPs, including the manner in which AHPs determine the total number of employees by calculating the employees of each employer member, undermines the Plaintiff States' assertion that it is "implausible" that Congress would have delegated to the Department the authority "to make fundamental choices about the scope of" the ACA.  Pls.' Mot. at 24-25 (quoting *King v. Burwell*, 135 S. Ct. 2840, 2489 (2015).  In *King*, the Supreme Court upheld a Treasury regulation that interpreted both the premium tax credit provision of the ACA and the ACA's provision establishing the federal and state exchanges statutory provisions that the Court held are among the ACA's "key reforms."  In upholding the validity of Treasury's interpretation of the statutory provisions' ambiguous terms, however, the *King* Court held that given their importance to the statutory scheme, "[w]hether and how those [statutory] protections apply is 'a question of deep economic and political significance'" which the Court would not assume was delegated to Treasury to resolve absent an express delegation in the ACA.  Pls.' Mot. at 24 (quoting *King*, 135 S. Ct. at 2489.  Here, however, the Final Rule interprets Section 3(5) of ERISA, a statute that Congress expressly authorized the Department to administer.  *See* 29 U.S.C. § 1135.  The challenged rule also does not fundamentally alter any of the ACA's "key reforms."  *Id.*

41

The Plaintiff States' reliance on 26 U.S.C. § 4980H suffers the same fate as their reliance on the ACA's market and employer-size provisions. Section 4980H amended the IRC to impose a tax on any "applicable large employer" or "ALE" that does not offer health coverage to its full-time employees (and their dependents) that satisfies certain minimum requirements. According to Plaintiffs, this IRC provision mandates that an employer's status as an "applicable large employer" is based on the size of each member-employer, not the plan as a whole, *see* Pls.' Mot. at 54, rendering the Final Rule unlawful. They are wrong.

As an initial matter, the IRC provisions are not under the interpretive jurisdiction of the Department and the provision in no way limits the Department's ability to promulgate the AHP Final Rule under ERISA. The IRC definition of "employer" for tax purposes does not incorporate ERISA's definition for purposes of the provision of "employee welfare benefit plans"; the definitions are independent of each other. Whether an employer member of an association that offers coverage through an AHP is an ALE depends on the number of full-time employees the employer member employed in the prior calendar year and is unrelated to whether the employer offers coverage through an AHP. IRC Section 4980H and the AHP Final Rule (and the PHSA market-size rules) are different provisions with different purposes.

Accordingly, the same IRC provisions that generally apply to AHPs continued to do so after the enactment of the ACA and continue to apply in the same way after the promulgation of the AHP Final Rule. Indeed, for purposes of implementing the ACA's tax assessment provisions, the Internal Revenue Service has consistently treated § 4980H's requirements as an obligation of the underlying employer, rather than an obligation imposed on the plan. *See* 26 U.S.C. § 4980H(a) and (b) ("there is hereby imposed on the employer an assessable payment…"); *see also* Answer to Question 5, IRS, "Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act," No. 18, https://www.irs.gov/affordable-care-act/employers/questions-and-answers-on-

employer-shared-responsibility-provisions-under-the-affordable-care-act.   In any event, it is reasonable and not contrary to the ACA to continue to treat employer-members of an AHP as small employers for purposes of determining application of the shared responsibility provision.  26 U.S.C. § 4980H.  The shared responsibility provisions refers to "offer[s] [of] coverage" by an employer.  26 U.S.C. § 4980H.  In the case of an AHP, the offer of coverage is made *by* the member-employer of the AHP, even if the offer is *through* that member-employer's membership in the AHP.

The Plaintiff States also identify no statutory authority that requires the Department to construe the term "employer" identically across ERISA and the IRC or that another statutory provision forecloses the interpretation in the Final Rule.  Although there is a presumption that "identical words used in different parts of the same act are intended to have the same meaning," "the presumption readily yields" if the circumstances demonstrate that the words were used "with different intent."  *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934); *see also Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Auth.*, 888 F.2d 180, 187 (1st Cir. 1989).  So too it is with the ERISA and IRC provisions on which the Plaintiff States rely.

The lack of any conflict between the AHP Final Rule and the ACA also renders misplaced the Plaintiff States' reliance on ERISA's non-impairment provision, 29 U.S.C. § 1144(d),[16] which is triggered only if ERISA is interpreted to "amend," "modify," "invalidate," "impair," or "supersede" another federal law.  These terms, as a class, indicate that an inter-statute conflict must be severe and almost irreconcilable.  *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 104 (1983).  The D.C. Circuit, further, has construed § 1144(d) as generally applying only to statutes enacted prior to ERISA.  *See, e.g., Air Line Pilots Ass'n v. Nw. Airlines, Inc.*, 627 F.2d 272, 276 (D.C. Cir. 1980) ("ERISA is not to be read as displacing by implication any pre-existing federal legislation.") (emphasis added); *National*

---

[16] Section 1144(d) of ERISA states in relevant part that the statute should not be construed to "alter, amend, modify, invalidate, impair or supersede any law or regulation of the United States."

*Stabilization Agreement of Sheet Metal Industry Trust Fund v. Commercial Roofing & Sheet Metal*, 655 F.2d 1218, 1223 (D.C. Cir. 1981) (finding "no congressional intent to undermine the validity of existing legislation"). Here, the Plaintiff States bear "the heavy burden of showing 'a clearly expressed congressional intention'" that the AHP Final Rule's interpretation of Section 3(5) and the ACA's market-size provisions "cannot be harmonized, and that one displaces the other." *Epic Sys.*, 138 S. Ct. at 1624 (internal citation omitted). The Plaintiff States have not met this burden; nor can they given Congress's clear intent to incorporate ERISA's definition of "employer" into the ACA'.

In sum, neither the ACA nor the IRC unambiguously foreclose the Department's decision to modify its prior sub-regulatory guidance governing the formation of AHPs. And the Plaintiff States' contention that there is a conflict between the Final Rule and the statutory provisions on which they rely fails to abide by "the canon against reading conflicts into statutes." *Epic Sys.*, 138 S. Ct. at 1630. This Court has a duty "to regard [ERISA, ACA, and the IRC] as effective" absent clear congressional intent otherwise, *J.E.M. Ag. Supply, Inc. v. Pioneer High-Bred Int'l*, 534 U.S. 124, 143-44 (2001) (internal quotation marks and citation omitted), a heavy burden that the Plaintiff States cannot meet.

## III.     THE FINAL RULE'S TREATMENT OF WORKING OWNERS IS A REASONABLE INTERPRETATION OF ERISA SECTION 3(5).

The Plaintiff States' separate argument that the Final Rule's inclusion of working owners as employer members of "a group or association of employers" is unambiguously foreclosed by Section 3(5), *see* Pls.' Mot. at 28-32, also lacks merit. Section 3(5)'s definition of "employer" does not "directly speak to" this precise issue. *See Chevron*, 562 U.S. at 837. Because the statutory provision is silent with respect to this issue, the Court must uphold the Department's interpretation of the term "employer" in ERISA Section 3(5) to include certain working owners as long as it is a reasonable and permissible interpretation. *Id.* As explained below, the Final Rule satisfies this deferential standard and is therefore entitled to *Chevron* deference.

In an effort to demonstrate otherwise, the Plaintiff States contend that the inclusion of working owners as employer members of "a group or association of employers" in the Final Rule is an impermissible interpretation of Section 3(5) because the Supreme Court "spoke directly" to this issue in *Yates*, when it held that "*plans* that cover *only* sole owners or partners and their spouses . . . fall outside [ERISA] Title I's domain.," *see* Pls.' Mot. at 21 (emphasis added) (citing *Yates*, 541 U.S. at 1). But this argument misreads the scope of the *Yates* decision and offers no support for their interpretation of Section 3(5).

*Yates* did not address the "precise issue" in the Final Rule (*i.e.*, whether a working owner may permissibly join "a group or association of employers" that "acts" as an employer "in relation to" an employee welfare benefit plan) but instead addressed whether a "working owner" may qualify as a "participant" in an employee benefit plan covered by ERISA Title I, *see* 29 U.S.C. § 1002(7). The Supreme Court answered this question affirmatively: "If the plan covers one or more employees other than the business owner and his or her spouse, the working owner may participate on equal terms with other plan participants." *Yates*, 541 U.S. at 6. In reaching this decision, the *Yates* Court recognized that the Department's regulation, 29 C.F.R. § 2510.3–3, interpreting the definition "employee benefit plan," removes from ERISA coverage those plans that cover *only* sole owners or partners and their spouses, because Title I's protections would make little sense in plans that cover only one participant and his family. *Id.*, at 23; *see also* Preamble to Final Rule on Reporting and Disclosure, 40 Fed. Reg. 34,526, 34,528 (August 15, 1975). This is also consistent with ERISA's definition of "participant," which refers specifically to "any employee or former employee of an *employer*," *see* 29 U.S.C. § 1002(7) (emphasis added), and thus, in turn, implicates the phrase "group or association of *employers*" in Section 3(5)'s definition of "employer."[17]

---

[17] ERISA was enacted against a background of Internal Revenue Code provisions that permitted and continue to permit working owners (including sole shareholders, sole proprietors, and partners) to

45

By contrast, under the Final Rule, AHPs cover a *group* of employers, including sole proprietorships (or working owners), for whom Congress enacted Title I's protections.  The AHP Final Rule and ERISA, *see* 29 U.S.C. § 1002(16)(B), also ensure the association or group that sponsors the plan is a legitimate entity separate and apart from the individual employers themselves and acts as the "employer" of its employee-members, including the working owner.  In this sense, as an employer member of a group or association of employers, a working owner does not invoke the potentially conflicting or overlapping rights or responsibilities that may result from his dual status as an "employer" and an "employee."  *Cf. Yates*, 541 U.S. at 16 ("Under ERISA, a working owner may have dual status, *i.e.*, he can be an employee entitled to participate in a plan and, at the same time, the employer (or owner or member of the employer) who established the plan.  Both Title IV and the IRC describe the 'employer' of a sole proprietor or partner."); *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (words in a statute should be read as part of "a harmonious whole").[18]

Thus, *Yates*'s observation that the text, structure, and purpose of ERISA contemplate that a working owner may have "dual status" under the statute, *see Yates*, 541 U.S. at 16, supports the Department's interpretation of "employer," which recognizes that working owners may participate as

---

participate in pension plans that meet the qualifications for favorable tax treatment, including that the plans be "for the exclusive benefit of * * * employees."  26 U.S.C. 401(a).  *See, e.g.*, 26 U.S.C. 401(c) (1970 and 2000) ("employee" under Section 401 includes "self-employed individuals," including "owner-employees"); 26 C.F.R. 1.401-1(b)(3) (1973 and 2002) ("Among the employees to be benefited may be persons who are officers and shareholders."); Rev. Rul. 72-4, 1972-1 C.B. 105 (pension plan that benefits "principal or sole shareholder" may qualify under 26 U.S.C. 401(a)).

[18] Justice Thomas in *Yates* noted that he would be "surprised" if the same conclusion did not apply under a "common law" approach to sole proprietorships, because the law would consider the "corporation" as a separate entity that employs the sole proprietor.  *Yates*, 541 U.S. at 26 (Thomas, J., concurring).  In ERISA, the recognition of an "unincorporated organization," see Section 3(9), as a potential "employer" supports the view that such an approach would also apply to owners of unincorporated businesses for the purposes of ERISA's definitions.

46

employer members of "a group or association of employers" that "acts" as an employer "in relation" to sponsoring a group health plan.  This interpretation is also bolstered by ERISA's statutory structure, which expressly recognizes that an ERISA-covered employee welfare plan, such as an AHP, may include "employers" such as "one or more self-employed individuals."  *See* 29 U.S.C. § 1002(40).  The MEWA definition, *see* ERISA Section 3(40), clearly suggests an ERISA-covered employee welfare plan, such as an AHP, may include "employers" such as "one or more self-employed individuals." This again signals that ERISA permits the treatment of the self-employed as "employers" for purposes of employee benefit plans.

## IV. THE AHP FINAL RULE'S INTERPRETATION OF "A GROUP OR ASSOCIATION OF EMPLOYERS" IN SECTION 3(5) IS NEITHER ARBITRARY NOR CAPRICIOUS.

Having identified no flaw in the Department's statutory interpretation, *see supra* at 25-44, nor the notice-and-comment procedures utilized in the Department's rulemaking, the Plaintiff States nonetheless contend the Final Rule is "arbitrary and capricious" in violation of the APA.[19]  Under the APA, agency action may be set aside as substantively unreasonable only if the Court concludes that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).  The Court's review is "narrow," limited to determining whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), *cert. denied*, 137 S. Ct. 301 (2016).  The Court "is not to substitute its judgment

---

[19] Arbitrary and capricious review is generally coextensive with a court's deferential review under *Chevron* step two.  *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011); *see also Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 205 (D.C. Cir. 2015).

for that of the agency," and the question before the Court is whether the agency's decision "was the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 43, 52.

Here, the answer to this question is "yes." In promulgating the AHP Final Rule, the Department presented a thorough, reasoned explanation and set forth its supporting findings in detail. Accordingly, the Court should uphold the Final Rule.

### A.     The Department Adequately Explained The Basis For Its Decision To Add An Additional Pathway For Forming AHPs.

The Plaintiff States contend that the AHP Final Rule is arbitrary and capricious because of its departure from the Department's prior sub-regulatory guidance, allegedly without adequate justification. *See* Pls.' Mot. at 39. But as this Court has recognized, "[a]gencies are permitted to change their minds . . . so long as they explain the reason for the policy change, and the agency is not subject to any more scrutiny when it does change its position than when it is regulating in the first instance." *AARP v. U.S. Equal Employment Opportunity Comm'n*, 226 F. Supp. 3d 7, 24 (D.D.C. 2016) (Bates, J.) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). *Chevron* deference applies so long as the agency "displays awareness that it is changing position, and shows that there are good reasons for the new policy." *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1094–95 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 2506 (2016). "[B]eyond that, the APA imposes no special burden when an agency elects to change course." *Id.* at 1095. The Department's rulemaking satisfied these requirements.

Contrary to the Plaintiff States' assertion, the AHP Final Rule is not a "dramatic departure" from prior policy. Despite substantial criticism of the prior AHP guidance's restrictiveness, the Department decided to leave in place the original pathway and simply add an additional pathway for forming AHPs. This alternative path is not a diluted version of the initial pathway, as some commenters suggested. 83 Fed. Reg. at 28,951 (AR 40). Instead, it tightened some requirements and relaxed others. Indeed, the Plaintiff States themselves supported one such tightened requirement, the

nondiscrimination rules. *See* Massachusetts Division of Insurance, Comment no. 600 at 5 (AR 6043). And even where it relaxed prior requirements, such as allowing geographical proximity to satisfy the "commonality" test to a limited extent, the AHP Final Rule rejected a looser version of this element in the Proposed Rule after reviewing comments. 83 Fed. Reg. at 28,918 (AR 7). Fundamentally, the AHP Final Rule's changes represent a measured adjustment to the prior guidance.

The Department undertook an intensive notice-and-comment process and amply justified its decision. As explained previously, the Department fully addressed the comments it received, and made a number of changes to the proposed rule. These changes included: (1) retaining the original pathway to become an AHP; (2) clarifying that the proposed control test was meant to replicate the control test contained in the sub-regulatory guidance, including the requirement that employers control the plan and association in form and substance; (3) replacing the language in the proposal that did not require a purpose beyond offering benefits by requiring AHPs to have one substantial business purpose apart from offering benefits; and (4) imposing an additional restriction on the commonality test to ensure that AHPs do not create commonality as a subterfuge for discrimination.

Broadly, the Department intended the Final Rule to "expand access to affordable health coverage, especially for employees of small employers and certain self-employed individuals." 83 Fed. Reg. at 28,912–13 (AR 1-2). In particular, small employers purchasing health insurance in the individual and small group markets had long faced economic disadvantages compared to larger employers, including a lack of "potential for administrative efficiencies and negotiating power" and a lack of "large, naturally cohesive risk pools." *Id.* at 28,940 (AR 29). They also faced more rigorous regulatory requirements, which "generally caused adverse selection by limiting choice and raising premiums for those who do not expect to have high medical needs." *Id.* The Final Rule addresses these problems by broadening the conditions under which AHPs will be treated as single large group plans so that more small employers gain access to new, affordable employment-based health coverage

49

options.  *Id.*  The Department also imposed conditions to help prevent fraud and distinguish AHPs

from commercial issuers.  *Id.* at 28,915 (AR 4).  Because the Department explained its reasoning

through detailed analysis, the Final Rule is neither arbitrary nor capricious.  *See Rust v. Sullivan*, 500

U.S. 173, 186 (1991) (explaining that "an initial agency interpretation is not instantly carved in stone

and the agency, to engage in informed rulemaking, must consider varying interpretations and the

wisdom of its policy on a continuing basis" (citations omitted)).

### B.    The Department Adequately Considered Potential Adverse Effects on Health Insurance Markets And Made A Reasoned Policy Choice.

The Plaintiff States argue that the AHP Final Rule does not provide a reasoned justification

for "ignoring the serious reliance interests of the states" "in ensuring the stability of insurance markets

for the protection of [their] residents."  Pls.' Mot. 41; *see also id.* at 38–42.  Not so.  The Department

adequately considered the potential adverse effects on the health insurance markets.  In so doing, it

considered "relevant features of individual and small group markets under the ACA and existing State

rules," as well as "the role of individual market subsidies, the reductions of the individual shared

responsibility payment to $0 for those who do not have minimum essential coverage and do not have

an exemption beginning in 2019, and the role of other (non-AHP) non ACA-compliant plans in

individual and small group markets."  *Id.* at 28,948 (AR 37).  With respect to individual markets, the

Department noted that there may be "modest[]" increases in premiums, but that "[a] large majority of

individuals insured on Exchanges will have some insulation from any premium increases" because of

ACA tax credits that in effect cap the premiums those eligible taxpayers must pay on Exchanges for

coverage.  *Id.* at 28,949 (AR 38).  With respect to small group markets, the Department reasoned that

because "risk itself generally varies less among small groups than among individuals" and "small

employers have more access than individuals to options outside of ACA regulated markets, and some

have pursued this options," "AHPs may be unlikely to increase significantly the degree of risk

segmentation and premium dispersion that currently exists." *Id.* The Department also noted that its conclusion was consistent with the Congressional Budget Office projections. *See id.* at 28,945 (AR 34).

The Department considered reports predicting the degree of market segmentation based on prior proposed legislation, but concluded that the relevance of these reports was diminished in light of the changes to the healthcare markets after the ACA. *Id.* The Department also noted that those studies did not consider the potential effect the nondiscrimination rules contained in the Final Rule, which limit the extent to which AHPs can segment the market. *Id.* at 28,946 (AR 35) ("[M]any comments also affirm that this rule's application of nondiscrimination rules to AHPs established under this final rule will reduce [the] degree [of risk segmentation]."). The studies were also countered by comments demonstrating that "successful AHPs can coexist with stable and viable individual and small group markets." *Id.* at 28,946 n.106 (AR 35); *see also* Comment Letter from State of Washington, Office of Insurance Commissioner, March 6, 2018 (AR 5678-79); Comment Letter from Forterra Inc., on behalf of its parent company, the Association of Washington Business, March 6, 2018, (AR 5933-50).

In the end, the Department made a reasoned policy choice that "this rule delivers social benefits that justify any attendant social costs," including any potential adverse selection against the individual and small group markets. 83 Fed. Reg. at 28,939 (AR 28). Under the arbitrary-and-capricious standard, where an agency has provided an adequate explanation for its action and considered competing views, a court should not displace the agency's ultimate choice. *Am. Wrecking Corp. v. Sec'y of Labor*, 351 F.3d 1254, 1261 (D.C. Cir. 2003).

### C. The Department Appropriately Weighed the Evidence On Both Sides.

Next, the Plaintiff States argue that the Department ignored evidence that (1) demonstrated a "tendency of AHPs to succumb to fraud, abuse, and insolvency," and (2) showed that "damage would

be done to the ACA marketplace if AHPs are not required to cover essential health benefits or follow community-rating requirements." Pls. Mot. at 43; *see also id.* at 42–49.  That argument is factually inaccurate: the Department carefully considered comments raising these issues, and in fact modified the Proposed Rule in response.  *E.g.*, 83 Fed. Reg. at 28,918 (AR 7).  At the same time, the Department considered comments and evidence in support of the opposite view, and it largely determined that they were persuasive on balance.  This process—full consideration of the issues and the evidence on both sides, the adoption of changes in response, and an articulated statement of the reasons for the Department's ultimate decision—was neither arbitrary nor capricious.

Most fundamentally, the Plaintiff States' fraud arguments fail to account for the changes in the regulatory environment, including states' own legislative efforts and the federal government's increased statutory powers.  Indeed, the Department acknowledged comments that fraudulent MEWAs created problems in the past.  *Id.* at 28,936, 28,951 (AR 25, 40).  However, the Department explained that because the ACA enacted provisions that strengthened the Department's enforcement abilities, the Department is better able to prevent fraud and abuse than it was in the past, when prior sub-regulatory guidance was established.  *See id.* 28,951–52 (AR 40-41) (discussing summary seizure orders, cease and desists, expanded reporting and registration requirements, and new criminal penalties for knowingly submitting false statements about MEWA financial conditions or benefits).

Several features of the Final Rule address the Plaintiff States' concern about fraud and abuse.  For example, the Final Rule preserved many of the provisions in prior sub-regulatory guidance aimed at preventing fraud and abuse.  *Id.* at 28,952 (AR 41) (discussing requirements related to organizational structure and control).  It also added nondiscrimination requirements that will work to limit abusive situations by preventing associations from treating employer members differently based on the health status of their employees.  In addition, since AHPs are subject to all of the provisions of ERISA Title I applicable to group health plans, the participants and beneficiaries in AHPs are "entitled to the same

protections under ERISA that are available to participants in single employer health plans." *Id.* The AHP fiduciaries are also subject to ERISA's fiduciary duties. 83 Fed. Reg. at 28,938. (AR 27). Moreover, the Final Rule explicitly preserves traditional state regulatory authority over MEWAs,[20] *see* 83 Fed. Reg at 28,953, 28,959 (AR 42, 48). Some Plaintiff States acknowledge that existing enforcement tools may be sufficient to combat potential fraud.[21]

The Department modified the Proposed Rule in response to potential fraud concerns, which demonstrates its careful consideration of comments raising this issue. The Proposed Rule stated that a group or association may act as an employer within the meaning of ERISA Section 3(5) for purposes of sponsoring a group health plan if the group or association exists for the purpose, in whole or in part, of sponsoring a group health plan that it offers to its employer members. *Id.* at 28,917 (AR 6). But after considering comments arguing that this test could increase the prevalence of fraudulent and abusive practices, *id.*, the Department inserted the substantial business purpose test into the Final Rule. *Id.* at 28,918 (AR 7). This change would achieve the Department's goal of expanding choice in health coverage options while also addressing operational risks such as fraud. *Id.*

Ultimately, the Department was squarely presented with the argument that the Plaintiff States press here: that past problems with MEWA fraud could resurface with AHPs. The Department heard that argument, carefully considered it, and adjusted the Final Rule accordingly—exercising exactly the

---

[20] The Plaintiff States' public comments show that they are aware that the pre-existing enforcement tools have not been changed by the Final Rule. *See, e.g.*, Pennsylvania Insurance Department Comment Letter (AR 5813) ("The proposed rule confirms that Pennsylvania's regulatory structure overseeing MEWAs would remain.").

[21] *See, e.g.*, Massachusetts Division of Insurance Letter (AR 6042) ("State [Divisions of Insurance] are positioned to limit the potential risks, including fraud, insolvency, and market segmentation, which may be associated with AHP proliferation."); New Jersey Department of Banking and Insurance Letter (AR 6293) ("[I]mplementation of the proposed regulation should continue to permit states – like New Jersey – to enforce long-standing laws aimed at . . . ensuring our consumers have comprehensive coverage.").

53

decisional process that the APA requires.  The Plaintiff States' dissatisfaction with the policy choice

the Department ultimately adopted does not equate with an APA violation.

The Plaintiff States also argue that the Department ignored evidence showing that "damage

would be done to the ACA marketplace if AHPs are not required to cover essential health benefits

[("EHBs")]," Pls. Mot. at 43, just as large employers are not required to cover EHBs under the ACA

rules.  Again, however, the Department considered this exact issue, acknowledged comments on the

matter, and explained that AHPs operating under the Final Rule would be subject to other significant

benefit mandates and requirements that apply to large employers, 83 Fed. Reg. at 28,941–42 (AR 30-

31).[22]  The Department reasoned that these mandates "place significant constraints on AHP benefit

designs, but leave ample room for AHPs to offer more tailored, less comprehensive, and more

affordable health coverage than is available in ACA-compliant individual and small group markets."

*Id.* at 28,942 (AR 31).  Additionally, other commenters indicated that they "did not believe that

legitimate membership organizations would risk their goodwill and reputation by offering" AHPs with

inadequate benefits.[23]  *Id.* at 28,933 (AR 22).  These commenters argued that "economies of scale

would enable AHPs to offer more comprehensive coverage to their memberships than they would be

able to purchase on their own."  *Id.*  Another commenter confirmed that "even though self-insured

---

[22] Additional benefit mandates to which AHPs, like other large group plans, would be subject are
described in the Preamble, 83 Fed. Reg. at 28,942 (AR 31).

[23] The Plaintiff States argue in a footnote that "the Final Rule itself rejected" the comments regarding
goodwill and reputation by later stating that, "AHPs and large employers differ with respect to their
economic incentives, and the Department does not expect that their behavior will be the same."  Pls.'
Mot. 48 n.56 (citing 83 Fed. Reg. at 28,941).  Although the Final Rule does acknowledge that "AHPs
generally will have incentives to tailor benefits to appeal to lower-risk groups—an incentive that large
employers generally do not share," 83 Fed. Reg. at 28,941 (AR 30), this does not indicate that AHPs
will offer inadequate benefits.  Associations sponsoring AHPs will face incentives to maintain
"goodwill and reputation" by offering adequate benefits, and they will also face incentives to offer
tailored benefits, and different associations will respond to these competing goals in different ways.

plans and large group market policies are not required to provide EHBs, most do, in fact, provide comprehensive coverage." *Id.* The Department indicated that it "agree[d] with those commenters who asserted that AHPs are not likely to offer relatively low levels and scope of benefits, which could jeopardize their relationship with their members and because other federal and State coverage requirements may apply."[24] *Id.* Accordingly, the Department declined to make the provision of EHBs in an AHP a requirement for a group or association of employers to qualify, explaining that such a mandate could reduce AHPs' flexibility to tailor coverage to the particular needs of the members of the group or association offering benefits. *Id.*

The Department was entitled to consider and rely upon the views of these commenters supporting the Final Rule and weigh them against the comments discussed by the Plaintiff States. *See, e.g., Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1125 (D.C. Cir. 1984) (noting that it is reasonable to rely on comments submitted in the course of administrative process). In the end, as the APA requires, the Department considered the evidence before it and provided a measured approach to balance the competing goals of coverage's affordability and its comprehensiveness.

### D.    The Department Relied On Factors Congress Intended It To Consider.

The Plaintiff States also suggest that ERISA requires the Department to ignore the affordability of the health insurance options available to small businesses and individuals. *See* Pls.' Mot. at 50–52. Nothing in ERISA so requires.

As the Supreme Court recognized, "ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans. Congress sought to create a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place." *Conkright*, 559

---

[24] *See* American Benefits Council Comment Letter (AR 6269); American Society of Association Executives Comment Letter (AR 4195); National Retail Federation Comment Letter (AR 6196).

U.S. at 517 (citations and alterations omitted).  In adjusting the requirements for forming AHPs, the Department properly considered ERISA's goal of promoting plan formation while giving due regard to ERISA's goals of minimum fiduciary standards, disclosures, and other safeguards.  Indeed, the effect of the Final Rule is to encourage *more* AHPs, which are subject to ERISA's stringent requirements.

The Plaintiff States also argue that in promulgating the Final Rule, the Department should have taken into account the effects of the Final Rule on the individual and group markets.  But the Department did just that.  The Department considered not only the affordability and choice of insurance coverage options in the individual and small group markets, 83 Fed. Reg. 28,947-48 (AR 36-37), but also the need for affordable options outside of these markets.  As noted earlier, the Plaintiff States do not contend that the long-standing AHPs operating in their states that offer benefits consistent with the large employer market are impermissible or undesirable ERISA-covered plans.  Congress gave the Department the authority to increase affordability and choice for consumers by using this form of employer-based health insurance.  That is the very essence of administrative discretion.

### E.    The Department Did Not Ignore Quantitative Evidence.

The Plaintiff States allege in their complaint that the Final Rule is arbitrary and capricious because it is insufficiently quantified and ignores significant costs, Compl. ¶ 144, but they have not developed this argument in their motion.  In any event, the Department (although not statutorily obligated to undertake an economic analysis) relied on economic analyses provided to the Department during the comment period and discussed the costs of the Final Rule, including potential premium increases in the individual and small group markets and the potential overall increase in the number of individuals uninsured, and analyzed the benefits of the Final Rule, including greater access to coverage for some individuals, reduced premiums for certain individuals, and potential reduced

administrative costs.  83 Fed. Reg. at 28,938–59 (AR 27-48).  The Plaintiff States may not agree with the Department's weighing of these costs and benefits, but that does not mean that the Department ignored costs or that the Final Rule is arbitrary and capricious.[25]

Finally, the Plaintiff States do not challenge the Final Rule's severability provision, which states that if any of the provisions in the Final Rule is found to be invalid or stayed pending further agency actions, the remaining portions of the rule would remain operative and available for qualifying employer groups or associations.  *See* 83 Fed. Reg. 28,961 (AR 50).  Accordingly, even if the Court concludes that one aspect of the Final Rule should not be upheld (which it should not), vacatur of the entire rule would be inappropriate.

## CONCLUSION

For the foregoing reasons, the Plaintiff States lack standing to bring their claims; thus, the Court should dismiss this action for lack of jurisdiction.  Alternatively, the Court should uphold the AHP Final Rule as a permissible and reasonable interpretation of ERISA, grant summary judgment in the Department's favor, and deny the Plaintiff States' cross-motion for summary judgment.

---

[25] The Plaintiff States argue in a footnote that many of the factors the Department considered "are illusory or premised on incorrect factual information," Pls.' Mot. at 51 n.57; this is not the case.  The Plaintiff States first argue that the Department did not explain how an AHP would enjoy administrative advantages.  However, the Department explained that geographically-based AHPs will be best-positioned to negotiate discounts with providers and that without the benefit of this Final Rule, AHPs were not able to achieve large, local participation that could lead to economies of scale based on size and provider networks.  *See* 83 Fed. Reg. at 28,942 (AR 31).  Next, the Plaintiff States question the Department's assertion that the propensity for small businesses to offer health coverage for employees "has declined substantially from 47 percent of establishments in 2000 to 29 percent in 2016."  83 Fed. Reg. at 28,947 (AR 36); *id.* at 28,947 n.113 (AR 36).  The Plaintiff States attempt to counter these statistics by arguing that 47.7 percent of *workers* at small businesses were offered coverage in 2017.  The Plaintiff States' attempt to compare the percentage of *establishments* offering coverage with the percentage of *workers* who were offered coverage is misleading and carries no weight.

Dated:  October 30, 2018

Of Counsel:
KATE S. O'SCANNLAIN
Solicitor of Labor

G. WILLIAM SCOTT
Associate Solicitor

THOMAS TSO
MELISSA MOORE
ISIDRO MARISCAL
DANIEL COLBERT
Attorneys
United States Department of Labor
Office of the Solicitor

Respectfully Submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Branch Director

CHRISTOPHER HALL
Assistant Branch Director

/s/ Tamra T. Moore
TAMRA T. MOORE
ASHLEY A. CHEUNG
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 305-8628
Email: Tamra.Moore@usdoj.gov

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2018, I electronically filed the foregoing Motion to Dismiss, or, in the Alternative, Cross-Motion for Summary Judgment, and Opposition to Plaintiffs' Motion for Summary Judgment using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: October 30, 2018

/s/  *Tamra T. Moore*
TAMRA T. MOORE
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 305-8628
Email: Tamra.Moore@usdoj.gov

*Counsel for Defendants*