# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF COLUMBIA

STATE OF NEW YORK, et al.,

               Plaintiffs,

      v.

U.S. DEPARTMENT OF LABOR, et al.,

               Defendants.

Civ. Action No. 18-1747-JDB

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ------------------------------------------------------------------------------------- 1

ARGUMENT ---------------------------------------------------------------------------------------------- 2

I.  THE PLAINTIFF STATES HAVE STANDING TO CHALLENGE THE FINAL RULE. ------------------ 2

    A.  *The Plaintiff States Have Established Standing Based on Proprietary Injuries to Their Economic Interests.* ................................................................................................ 3

    B.  *The Plaintiff States Have Established Standing Based on Injury to Their Sovereign Interests in Enforcing Their Own Laws.* .................................................................... 12

    C.  *The Plaintiff States Have Established Standing Based on Injury to their Quasi-Sovereign Interests in Ensuring the Stability of Their Insurance Markets.* ................ 13

II. DOL MAY NOT OVERRIDE THE MARKET STRUCTURE MANDATED BY THE AFFORDABLE CARE ACT (ACA). ---------------------------------------------------------------------------------- 16

    D.  *The ACA—Not ERISA—Determines Market Size for Purposes of Defining the Reach of the ACA's Protections.* ............................................................................................ 16

    E.  *The ACA's Specific Provisions for Aggregating Employers Preclude the Final Rule's Attempt to Add an Additional Aggregation Rule for Associations.* .............................. 19

    F.  *Congress Did Not Delegate to DOL Any Authority to Alter the ACA's Market Structure.* ................................................................................................................. 21

    G.  *DOL Fails to Justify Changing the Meaning of "Employer" for Just One Provision of the ACA While Ignoring the Consequences of That Change for Other Provisions, Including the Employer Mandate.* ................................................................................ 22

III. THE FINAL RULE'S EXPANSION OF THE DEFINITION OF "EMPLOYER" IS CONTRARY TO ERISA AND THE ACA. ------------------------------------------------------------------------------- 24

    A.  *The Final Rule's Redefinition of a "Working Owner" with No Employees as an "Employer" is Contrary to, and an Unreasonable Interpretation of, ERISA and the ACA.* ........................................................................................................................ 24

    B.  *The Final Rule's Extension of "Employer" to Cover Associations of Employers with No Common Interest Other Than Geography and Associations Formed for the Purpose of Offering Health Plans Conflicts with ERISA and Is Unreasonable.* ......... 26

IV.  THE FINAL RULE IS ARBITRARY AND CAPRICIOUS ----------------------------------------- 31

i

*A.*   *Defendants Fail to Demonstrate an Adequate Justification for Fundamentally Upending Decades of ERISA Interpretation.* ............................................................ *31*

*B.*   *The Overwhelming Weight of the Evidence Runs Counter to the Final Rule.* ............. *35*

*C.*   *The Final Rule Relies on Factors Congress Did Not Intend DOL to Consider.* .......... *38*

*D.*   *The Final Rule Is Predicated on Plainly Inconsistent Statutory Interpretations.* ........ *41*

**CONCLUSION** ------------------------------------------------------------------------------------------**45**

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*AARP v. EEOC,*
    226 F. Supp. 3d 7 (D.D.C. 2016) ...................................................................23, 33

*AARP v. EEOC,*
    267 F. Supp. 3d 14 (D.D.C. 2017) ...........................................................................33

*ABM Onsite Servs.—West, Inc. v. NLRB,*
    849 F.3d 1137 (D.C. Cir. 2017) ........................................................................19, 43

*Air Alliance Houston v. EPA,*
    906 F.3d 1049 (D.C. Cir. 2018) .................................................................................3

*Alaska v. U.S. Dep't of Transportation,*
    868 F.2d 441 (D.C. Cir. 1989) .................................................................................12

*Alfred L. Snapp & Son Inc. v. Puerto Rico,*
    *458 U.S. 592 (1982)* ................................................................................................13

*Ass'n of Private Sector Colleges & Universities v. Duncan,*
    681 F.3d 427 (D.C. Cir. 2012) ...................................................................................6

*Atlantic Health Care Benefits Trust v. Foster,*
    809 F. Supp. 365 (M.D. Pa. 1992) ...........................................................................28

*Baucom v. Pilot Life Ins. Co.,*
    674 F. Supp. 1175 (M.D. N.C. 1987) .......................................................................28

*Bell v. Emp. Sec. Benefit Ass'n,*
    437 F. Supp. 382 (D. Kan. 1977) .............................................................................43

*Bracco Diagnostics, Inc. v. Shalala,*
    963 F. Supp. 20 (D.D.C. 1997) ................................................................................42

*California v. HHS,*
    281 F. Supp. 3d 806 (N.D. Cal. 2017).......................................................................9

*Chamber of Commerce of United States of America v. DOL,*
    885 F.3d 360 (5th Cir. 2018).....................................................................................42

*Chang v. U.S. Citizenship & Immigration Servs.,*
    289 F. Supp. 3d 177 (D.D.C. 2018) .........................................................................35

*Chao v. Graf,*
   CV-N-01-0698, 2002 WL 1611122 (D. Nev. Feb. 1, 2002) .......................................... 28-29

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ...................................................................................................24

*Clapper v. Amnesty International USA,*
   568 U.S. 398 (2013) .....................................................................................................4

*Clarke v. Sec. Indus. Ass'n,*
   479 U.S. 388 (1987) .....................................................................................................3

*Competitive Enter. Inst. v. NHTSA,*
   901 F.2d 107 (D.C. Cir. 1990) ....................................................................................6

*Credit Managers Ass'n of S. Cal. v. Kennesaw Life & Accident Ins. Co.,*
   809 F.2d 617 (9th Cir. 1987) .....................................................................................28

*Danvers Motor Co., Inc. v. Ford Motor Co.,*
   432 F.3d 286 (3d Cir. 2005) ........................................................................................3

*Encino Motorcars LLC v. Navarro,*
   136 S. Ct. 2117 (2016) .......................................................................................... 31-32

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ..............................................................................................31, 43

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ...................................................................................................21

*Fogo De Chao (Holdings) Inc. v. DHS,*
   769 F.3d 1127 (D.C. Cir. 2014) ...............................................................................19

*Genuine Parts Co. v. EPA,*
   890 F.3d 304 (D.C. Cir. 2018) ..................................................................................35

*Georgia v. Pruitt,*
   326 F. Supp. 3d 1356 (S.D. Ga. 2018) .....................................................................13

*Georgia v. Tenn. Copper Co.,*
   206 U.S. 230 (1907) ...................................................................................................14

*Good Fortune Shipping SA v. Comm'r of IRS,*
   897 F.3d 256 (D.C. Cir. 2018) ..................................................................................42

*Gruber v. Hubbard Bert Karle Weber, Inc.,*
   159 F.3d 780 (3d Cir. 1998) ................................................................................28, 43

*Halbig v. Burwell,*
   758 F.3d 390 (D.C. Cir. 2014) .......................................................... 3, 8

*Hall v. Maine Mun. Emps. Health Trust,*
   93 F. Supp. 2d 73 (D. Me. 2000) ......................................................... 28

*Hillman v. Maretta,*
   569 U.S. 483 (2013) .......................................................................... 21

*Hispanic Affairs Project v. Perez,*
   206 F. Supp. 3d 348 (D.D.C. 2016) .................................................... 2

*Indep. Petroleum Ass'n of Am. v. Babbitt,*
   92 F.3d 1248 (D.C. Cir. 1996) ........................................................... 42

*Int'l Ass'n of Entrepreneurs of Am. Benefit Trust v. Foster,*
   883 F. Supp. 1050 (E.D. Va. 1995) ............................................... 28-29

*Jennings v. Rodriguez,*
   138 S. Ct. 830 (2018) ........................................................................ 21

*Kansas v. United States,*
   249 F.3d 1213 (10th Cir. 2001) .......................................................... 13

*Kiely v. Shores Grp., Inc.,*
   No. 93-2194, 1994 WL 544358 (D. Kan. Aug. 31, 1994) ..................... 28

*King v. Burwell,*
   135 S. Ct. 2480 (2015) ....................................................................... 3

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ........................................................................... 2

*Marcella v. Capital Dist. Physicians' Health Plan, Inc.,*
   293 F.3d 42 (2d Cir. 2002) ................................................................ 26

*Maryland v. King,*
   567 U.S. 1301 (2012) ........................................................................ 12

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .......................................................................... 14

*Massachusetts v. HHS,*
   301 F. Supp. 3d 248 (D. Mass. 2018) .................................................. 9

*McCaslin v. Blue Cross & Blue Shield of Ala.,*
   779 F. Supp. 1312 (N.D. Ala. 1991) .................................................. 28

*MDPhysicians v. State Bd. of Ins.*,
    957 F.2d 178 (5th Cir. 1992) ..................................................................... 28-29

*Moideen v. Gillespie*,
    55 F.3d 1478 (9th Cir. 1995) ......................................................................... 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................... 35, 38

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) ............................................................. 35

*Nat'l Classification Comm. v. United States*,
    746 F.2d 886 (D.C. Cir. 1984) ..................................................................... 27

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ...................................................................................... 37

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006) ..................................................................... 34

*Nationwide Mut. Ins. Co. v. Darden*,
    503 U.S. 318 (1992) ...................................................................................... 17

*New England Power Generators Ass'n, Inc. v. FERC*,
    882 F.3d 202 (D.C. Cir. 2018) ................................................................. 32, 43

*NRDC v. NHTSA*,
    894 F.3d 95 (2d Cir. 2018) ............................................................................. 7

*Osborn v. Visa Inc.*,
    797 F.3d 1057 (D.C. Cir. 2015) ..................................................................... 3

*Pauley v. BethEnergy Mines, Inc.*,
    501 U.S. 680 (1991) ...................................................................................... 21

*Pennsylvania by Shapp v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976) ....................................................................... 8

*Pennsylvania v. Trump*,
    281 F. Supp. 3d 553 (E.D. Pa. 2017) ............................................................. 9

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011) ..................................................................... 32

*Regents of the Univ. of Cal. v. DHS*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ......................................................... 9

*Renal Physicians Association v. HHS*,
489 F.3d 1267 (D.C. Cir. 2007) ...........................................................6

*Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*,
547 U.S. 47 (2006) ...........................................................................2

*Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.*,
No. 16-cv-10317, 2017 WL 3007074 (E.D. Mich. July 14, 2017) ........................28

*Schwartz v. Gordon*,
761 F.2d 864 (2d Cir. 1985) ...............................................................30

*Shaw v. Delta Air Lines*,
463 U.S. 85 (1983) .........................................................................30

*Sierra Club v. EPA*,
755 F.3d 968 (D.C. Cir. 2014) ..............................................................2

*Steen v. John Hancock Mut. Life Ins. Co.*,
106 F.3d 904 (9th Cir. 1997) ..............................................................28

*Susan B. Anthony List v. Driehaus*,
134 S. Ct. 2334 (2014) ......................................................................4

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ...........................................................3, 13

*Tozzi v. HHS*,
271 F.3d 301 (D.C. Cir. 2001) .............................................................12

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*,
790 F.3d 1000 (10th Cir. 2015) ...........................................................13

*Util. Air Regulatory Group v. EPA*,
134 S. Ct. 2427 (2014) .....................................................................21

*Wayne Chem. Inc. v. Columbus Agency Serv. Corp.*,
567 F.2d 692 (7th Cir. 1977) ..............................................................30

*Wisconsin Educ. Assoc. Ins. Trust v. Iowa State Board of Pub. Instruction*,
804 F.2d 1059 (8th Cir. 1986) ...................................................27, 30, 43

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992) .........................................................................7

*Yates v. Hendon*,
541 U.S. 1 (2004) .......................................................................25-26

vii

**FEDERAL STATUTES**

15 U.S.C.
  § 1012 ...................................................................................................................14

26 U.S.C.
  § 414(b) ...............................................................................................................20
  § 414(c), (m), (o) ................................................................................................20
  § 4980H(b)(1)(A) ................................................................................................23
  § 4980H(c)(6) ......................................................................................................23

29 U.S.C.
  § 1001 ..................................................................................................................30
  § 1002(5) .........................................................................................................25,41
  § 1002(16) ...........................................................................................................42
  § 1021(g) .............................................................................................................39
  § 1144(b)(2)(A) ...................................................................................................42
  § 1185d ................................................................................................................38

42 U.S.C.
  § 300gg-22 ......................................................................................................14, 35
  § 300gg-91(d)(5) ..................................................................................................17
  § 300gg-91(d)(6) ............................................................................................17, 25
  § 18024(b)(4) ................................................................................................. 19-20
  § 18031 ................................................................................................................14
  § 18091(2)(J) .......................................................................................................40

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*,................... passim

Health Insurance Portability and Accountability Act, Pub. L. No. 104-191 (1996) .............39, 45

Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (2010) ........................ passim

Internal Revenue Code, 26 U.S.C. § 1, *et seq*. ......................................................20, 22-23, 44-45

**FEDERAL REGULATIONS**

29 C.F.R. § 2510.3-3(b) ..................................................................................................24

**FEDERAL REGISTER**

83 Fed. Reg. 28,912 (June 21, 2018)............................................................... passim

83 Fed. Reg. 614 (Jan. 5, 2018)...............................................................................8, 29, 43

82 Fed. Reg. 48,385 (Oct. 12, 2017) .............................................................................30

83 Fed. Reg. 53,534 (Oct. 23, 2018) .............................................................................44

**A**GENCY **G**UIDANCE

DOL Op. No. 2008-07A, 2008 WL 4559903, at *1 (Sept. 26, 2008)..........................................43

U.S. Dep't of Labor, MEWAs: *Multiple Employer Welfare Arrangments Under the Employee Retirement Income Security Act (ERISA)*: A Guide to Federal & Sate Regultaion 22 (2013)................................................................................................18

**M**ISCELLANEOUS **A**UTHORITIES

Alexander Acosta, *A Health Fix for Mom and Pop Shops*, Wall St. J. (June 18, 2018)................................................................................................................16, 22, 35

Dep't of Health & Human Servs. Ctrs. for Medicare & Medicaid Servs., Ins. Stds. Bulletin Transmittal No. 02-02 (Aug. 2002)....................................................19

Dep't of Health & Human Servs. Ctrs. for Medicare & Medicaid Servs., Ins. Stds. Bulletin Series at 3 (Sept. 1, 2011) .............................................................19

H.R. Rep. No. 94-1785 (1977) ......................................................................................30

*The Small Business Health Care Crisis: Possible Solutions: Hearing Before the S. Comm. on Small Business & Entrepreneurship, 108th Cong.* ..........................................39

Agency for Healthcare Research and Quality, MEPS Insurance Chartbook (2016)...................34

Dep't of Labor, Emp. Benefits Sec. Admin., Health Ins. Coverage Bulletin (July 25, 2017) .............................................................................................................34

Dep't of Labor, Emp. Benefits Sec. Admin., Health Ins. Coverage Bulletin (July 27, 2012)...............................................................................................................34

United States Census Bureau, Community Facts .......................................................29

## INTRODUCTION

To defend the Association Health Plan Final Rule, Defendants insist that the Department of Labor ("DOL") has done nothing more than exercise its lawful authority to alter the definition of the term "employer" under the Employee Retirement Income Security Act ("ERISA"). Defendants' arguments fundamentally mischaracterize both the purpose and effect of the Final Rule. As explained in the Plaintiff States' Memorandum of Law in Support of Summary Judgment ("Pls.' Br."), the Final Rule unlawfully seeks to override key protections of the Affordable Care Act ("ACA") and radically alters long-settled understandings of the term "employer" under ERISA. This Court should vacate the Final Rule.

Congress passed the ACA to increase the availability of quality, affordable health insurance coverage for all Americans. The ACA's market reforms and consumer protections have successfully led to a significant decrease in the uninsured rate and to far less volatile individual and small employer markets, among other achievements. The Final Rule's overt attempt to roll back the ACA's protections conflicts with Congress's clearly expressed intent and must be invalidated. Defendants' argument that DOL is exercising its lawful authority to interpret ERISA does not resolve this defect: the controlling statute here is the ACA's more specific and later-enacted reforms of the small employer and individual markets, and nothing in the ACA (or in ERISA) authorizes DOL to override those reforms.

Aside from its conflict with the ACA, the Court should invalidate the Final Rule because it dramatically upends decades of settled judicial and administrative interpretations of ERISA's definition of "employer," including by allowing sole proprietors with no employees to be "employers" and vastly expanding the types of associations that may qualify as "employers"

1

under ERISA. These changes go well beyond merely filling "gaps" in the statute and reverse

positions that have been relied on by Congress, the States, and private parties for decades.

The Final Rule thus exceeds DOL's authority, unlawfully contradicts the ACA as well

as ERISA, and is arbitrary and capricious.

## ARGUMENT

## I.     The Plaintiff States Have Standing to Challenge the Final Rule.

To establish standing, a plaintiff must show that (i) it has "suffered a concrete and

particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the

defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision."

*Sierra Club v. EPA,* 755 F.3d 968, 973 (D.C. Cir. 2014) (citing *Lujan v. Defenders of*

*Wildlife,* 504 U.S. 555, 560-61 (1992)). The Plaintiff States have met all of these requirements.[1]

The Final Rule has already inflicted and will continue to inflict injury on the Plaintiff States'

proprietary, sovereign, and quasi-sovereign interests, in the forms of: (i) regulatory,

enforcement, and administrative costs; (ii) decreased tax revenues; (iii) uncompensated care;

(iv) an increase in health plans that state laws will be partially preempted from regulating; and

(v) harm to state insurance markets. These injuries are directly caused by the Final Rule, and

invalidation of the Final Rule will redress the Plaintiff States' injuries.[2]

---

[1] The Plaintiff States all have standing here, but "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.,* 547 U.S. 47, 52 n.2 (2006).

[2] Defendants do not contest the Plaintiff States' prudential standing, and as such, any arguments on these grounds have been waived. *See Hispanic Affairs Project v. Perez*, 206 F. Supp. 3d 348, 367 (D.D.C. 2016), *aff'd in par and rev'd in part*, 901 F.3d 378 (D.C. Cir. 2018); *see generally Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118 (2014) (discussing prudential standing). However, even if this argument had not been waived, the

**A. The Plaintiff States Have Established Standing Based on Proprietary Injuries to Their Economic Interests.**

Economic harm "is a classic form of injury-in-fact." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015); *see also Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005)) This economic injury may be of any amount so long as the party has a direct stake in the outcome of the litigation. "[E]ven an 'identifiable trifle' of harm may establish standing." *Halbig v. Burwell*, 758 F.3d 390, 396 (D.C. Cir. 2014) (quoting *Chevron Natural Gas v. FERC*, 199 F. App'x. 2, 4 (D.C. Cir. 2006) (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973))). The Final Rule imposes three types of direct economic injury on the Plaintiff States: enforcement, regulatory, and administrative costs; decreased tax revenue; and the costs of uncompensated health care.

**1. The Final Rule Inflicts Enforcement, Regulatory, and Administrative Costs Upon the Plaintiff States.**

It is well-established, that the Plaintiff States have demonstrated standing if they will have to make "[m]onetary expenditures to mitigate and recover from harms that could have been prevented absent" the Final Rule. *See Air Alliance Houston v. EPA*, 906 F.3d 1049, 1059 (D.C. Cir. 2018); *see also Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (increased costs to state of issuing more driver's licenses found to be cognizable injury caused by agency action providing legal presence for undocumented immigrants), *aff'd by equally divided Court*,

---

Plaintiff States easily satisfy the prudential "zone of interests" test, because the interests articulated herein are within the "zone of interests" of ERISA and the ACA. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) (applying test). *See also infra* at 14 (noting that States are lead enforcers of ACA insurance protections) and Compl. ¶¶ 46-47 (noting that Congress amended ERISA to clarify States' authority to regulate MEWAs).

136 S. Ct. 2271 (2016) (per curiam). Here, Defendants' own findings in the Final Rule demonstrate that the Plaintiff States will suffer concrete economic injury because there is a substantial risk that they will be required to make greater expenditures on enforcement, regulatory, and administrative actions to respond to the foreseeable consequences of the Final Rule.[3]

As the Final Rule concedes, "the increased flexibility afforded AHPs under this rule will introduce increased opportunities for mismanagement or abuse," including "cause for concern about fraud." 83 Fed. Reg. 28,912, 28,953, 28,928 (June 21, 2018) (AR 42, 17) ("Final Rule"); *see also id.* at 28,939 (AR 28) ("In the past, some AHPs and other [multiple employer welfare arrangements, or MEWAs] suffered from mismanagement and abuse, leading to unpaid claims and loss of coverage."); *id.* at 28,951 (AR 40) ("Historically, some MEWAs have suffered from financial mismanagement or abuse, leaving participants and providers with unpaid benefits and bills."); Compl. ¶¶ 44-50 (describing long and notorious history of fraudulent practices by AHPs). This anticipated growth in abusive practices will "in turn increase[] oversight demands on the Department *and State regulators.*" 83 Fed. Reg. at 28,953 (AR 42) (emphasis added). DOL acknowledges the Final Rule will *unavoidably* heighten the burdens on state regulators: because DOL's own enforcement efforts are likely to be inadequate, *id.* at 28,952 (AR 41) (admitting DOL's own past "enforcement efforts often were too late to prevent or fully recover major financial losses"), "the final rule importantly depends on state insurance regulators for

---

[3] Defendants rely (Br. at 18) on *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013), for the proposition that Plaintiff States must establish that the harms detailed here are "certainly impending." Although that standard is easily met here for many reasons, Defendants do not reference the correct standard. One year after *Clapper*, the Supreme Court reaffirmed that a "substantial risk" of harm suffices. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014).

oversight and enforcement to, among other things, prevent fraud, abuse, incompetence and mismanagement, and avoid unpaid health claims," *id.* at 28,960 (AR 49). Confirming this point, the Final Rule delayed its effective dates specifically to allow States "time to build and implement adequate supervision and possible infrastructure to prevent fraud and abuse" and "to implement a robust supervisory infrastructure and program." *Id.* at 28,953-54 (AR 42-43).

As Defendants predicted, the Plaintiff States have already begun to expend their own resources to protect their citizens from the increased risk of fraud and abuse that DOL acknowledges the Final Rule will create.[4] Defendants' own findings in the Final Rule and the Plaintiff States' predictable and foreseeable responses to the increased risks posed by the Final Rule thus confirm that the Plaintiff States will suffer concrete injury-in-fact from increased expenditure of regulatory and enforcement resources to prevent fraud and abuse by AHPs. *See*

---

[4] Navarro Decl. ¶ 11 (Delaware) (state agency staff members "have already had to reassign and reprioritize assignments in order to prepare the [state agency]" for the Final Rule's rollout and declarant "anticipate[s] a 35% increase in work for current DDOI staff" as a result of the Final Rule"); Vullo Decl. ¶ 17 (New York) (state agency "already has taken action to prevent a potential influx of plans that purport to be authorized by the Final Rule and ERISA but would violate New York legal requirements and/or defraud New Yorkers"); *id.* ¶ 19 (state agency "is undertaking the additional regulatory burden," including planning "to devote additional staff resources and time to policing" AHPs under the Final Rule); Gasteier Decl. (Massachusetts) ¶ 8 ("[T]he Commonwealth will need to incur new costs and resources, such as additional staff time dedicated to enforcement of Minimum Creditable Coverage standards and M.G.L. c. 176J requirements"); Taylor Decl. ¶ 16 (District of Columbia) ("I anticipate having to use additional District resources for the oversight of AHPs. I also expect that the District will have to use increased resources on educational efforts to inform District consumers of the potential harms in seeking coverage through AHPs. The additional oversight and resources will be necessary to protect small employers and individuals in the District."); *see also* O'Connor Decl. ¶ 13 (Maryland); Caride Decl. ¶¶ 10, 12 (New Jersey); Stolfi Decl. ¶¶ 9, 10 (Oregon); Monahan Decl. ¶ 36 (Pennsylvania); Kreidler Decl. ¶ 14 (Washington).

*Ass'n of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 458 (D.C. Cir. 2012)

(finding standing based on final rule's recognition of increased costs for regulated entities).

The other two criteria of standing are also satisfied: (i) the Final Rule caused the

Plaintiff States' increased enforcement expenditures; and (ii) the need for the Plaintiff States to

expend resources to police AHPs formed under the Final Rule would be redressed by

invalidation of the Final Rule's authorization of these AHPs. Defendants' assertion that the

Plaintiff States' injuries are not traceable to the Final Rule, but are instead caused by "third

parties' actions," Defs.' Br. at 18, is meritless.[5] It is well established that a party may establish

standing where its "injury hinges on the reactions of third parties . . . to the agency's conduct."

*Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 113 (D.C. Cir. 1990). And contrary to

Defendants' argument, it makes no difference that a plaintiff's injury may stem from such third

parties' "unlawful act[s]." Br. at 18. For example, the Second Circuit recently held that state and

private plaintiffs had standing to challenge the National Highway Traffic Safety

Administration's reduction of a financial penalty on automobile manufacturers that violated

certain fuel-efficiency standards. The court concluded that plaintiffs had established injury from

---

[5] The case Defendants rely on, *Renal Physicians Association v. HHS*, 489 F.3d 1267 (D.C. Cir. 2007), is inapposite. There, plaintiffs lacked standing where they challenged a *safe harbor* that merely established one way to comply with the Stark Law (governing when physicians can refer a Medicare patient to a laboratory with which the physician has a financial relationship). *Id.* at 1269. The agency promulgated rules to implement the law, and one part of the rule was a safe harbor for physicians. "The agency emphasized the safe harbor was 'entirely voluntary; [health service providers] may continue to establish fair market value through other methods.'" *Id.* at 1270. The agency also announced two presumptively reasonable methods of proof, which "would still enjoy the implicit approval of the agency, absent a rulemaking expressly disapproving those methods." *Id.* at 1272. In that context, because relief invalidating the safe harbor alone would "not undo the harm, because the new status quo is held in place by other forces[,]" the plaintiffs' injury was not redressable. *Id.* at 1278. Here, in contrast, the Final Rule is the sole impetus for creation of new AHPs, and invalidation of the Final Rule directly redresses the Plaintiff States' need to expend enforcement resources.

the likelihood that manufacturers' *noncompliance* with those standards—an unlawful act—would increase in response to the lower penalty. *See NRDC v. NHTSA*, 894 F.3d 95, 104 (2d Cir. 2018). So too here: Defendants' own acknowledgment that the Final Rule's more lenient requirements will lead to "increased opportunities for mismanagement or abuse," 83 Fed. Reg. at 28,953 (AR 42), that will require the Plaintiff States to expend their own resources to "prevent fraud, abuse, incompetence and mismanagement, and avoid unpaid health claims," *id.* at 28,960 (AR 49), conclusively demonstrates the Plaintiff States' standing.

**2. The Final Rule Causes Losses in Tax Revenue for the Plaintiff States.**

Standing may also be shown where a plaintiff identifies "a direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 447-48 (1992). The losses in tax revenue generated by the Final Rule are specific—lost taxes on exchange plan premiums—and directly traceable to an intended and foreseeable consequence of the Final Rule, namely the exit of individuals from the individual and small group markets.

Several Plaintiff States collect revenue by taxing premiums collected by insurers from plans sold on their health insurance exchanges.[6] As DOL concedes, enrollment in those exchange plans will decrease under the Final Rule as individuals and employees of small employers shift from the exchanges to non-ACA-compliant AHPs, which are not subject to the

---

[6] *See* Caride Decl. ¶ 15 (New Jersey) (insurers pay a 2% premium on individual policies and 1% on group premiums); M.G.L. c. 176Q, § 12 (Massachusetts exchange may apply a surcharge to all health plans sold on the exchange); Navarro Decl. ¶ 10 (Delaware) (insurance companies are required to pay an annual premium tax based on their net premium income); Cal. Govt. Code § 100503(n) (state agency that runs California's ACA exchange funded by an assessment on exchange health plan premiums); MacEwan Decl. ¶ 16 (Washington) ("Carriers are taxed two percent on the value of premiums paid, and also charged a flat per-member per-month assessment for enrollees on the Exchange.").

same taxes. Specifically, DOL "expects AHPs to deliver health insurance to millions of people," and a report cited by the Final Rule predicts that "between 2.4 million and 4.3 million individuals would move from the individual and small group markets, and enroll in AHPs by 2022 under a moderate enrollment scenario." 83 Fed. Reg. at 28,948 (AR 37). This substantial exit from state exchanges will result in significant lost tax revenue to several Plaintiff States.[7] Defendants acknowledge as much, noting in the Final Rule that "new self-insured AHPs 'sometimes may' avoid premium taxes," Defs.' Br. at 19; 83 Fed. Reg. at 28,943 (AR 32), and in the proposed rule that "State revenue may also decline in States that tax insurance premiums," 83 Fed. Reg. 614, 627 (Jan. 5, 2018) (AR 6960) ("Proposed Rule"). As "even an 'identifiable trifle' of harm may establish standing," this specific loss of tax revenue is sufficient to confer standing. *See Halbig*, 758 F.3d at 396.

Defendants are thus wrong that the Plaintiff States' injury is based on "[c]onclusory allegations of general harm to a state's budget or tax revenues." Defs.' Br. at 19. Here, there is a specific causal link between the Final Rule, which is expressly intended to steer individuals away from exchange plans toward AHPs, and the loss of tax revenues generated by that shift . *See Pennsylvania by Shapp v. Kleppe*, 533 F.2d 668, 672-73 (D.C. Cir. 1976) (link between

---

[7] *See* Caride Decl. ¶¶ 13, 15 (New Jersey) ("DOBI expects enrollment in the individual and small employer markets to decrease while healthier small groups and working owners will leave the individual and small employer markets…. As business moves from the individual and small group markets to self-funded [AHPs], the taxes paid on premiums from the former markets will decrease."); MacEwan Decl. ¶ 16 (Washington) ("For state fiscal year 2018 (July 2017 to June 2018), Exchange revenues related to QHP premiums and assessments were $36.7 million, and projected revenues for state fiscal year 2019 (July 2018 to June 2019) are $39.1 million. A 20 percent reduction in QHP enrollment could decrease state fiscal year 2019 revenues by approximately $10 million using 2018 premium tax rates."); Navarro Decl. ¶ 10 (Delaware) ("An increase of coverage through self-insured AHPs, made possible through the Final Rule, will result in a decrease in insurance companies' premium income and, therefore, a decrease in the amount of premium tax collected by the State.").

"state's status as a collector and recipient of revenues and the . . . action being challenged" can show standing). Moreover, invalidating the Final Rule will prevent that shift and preserve the Plaintiff States' tax base. The Plaintiff States thus have standing based on lost tax revenue as well.

### 3. The Final Rule Will Inflict Uncompensated Care Costs on the Plaintiff States.

The Plaintiff States also have standing due to the probable rise in uncompensated care costs to states as a result of the Final Rule, "especially for individuals with high health needs." Compl. ¶ 106. The Final Rule will leave individuals uninsured or underinsured, forcing many to rely on publicly funded state programs to cover their health care needs. The increased costs to the Plaintiff States from the likely growth in reliance on these public programs are a cognizable injury. *See, e.g., Regents of the Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1034 (N.D. Cal. 2018) (finding injury where rescinding DACA would cause DACA grantees to lose employer-based insurance, imposing higher healthcare costs on the state).[8]

While Defendants claim this growth in uncompensated care costs is purely "hypothetical," Defs.' Br. at 20, their own findings say otherwise. As the Final Rule acknowledges, some studies have predicted that "AHPs under the Proposed Rule by 2022 on net

---

[8] Two district courts recently held that States had standing on similar grounds in challenges to the Religious and Moral Exemptions Interim Final Rules. *Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 567 (E.D. Pa. 2017) ("As more women residents of the Commonwealth are deprived of contraceptive services through their insurance plans and turn to these State and local programs, the Commonwealth will likely make greater expenditures to ensure adequate contraceptive care."); *California v. HHS*, 281 F. Supp. 3d 806, 822 (N.D. Cal. 2017) (finding that California would incur costs to cover contraceptive services and costs associated with unintended pregnancies); *but see Massachusetts v. HHS*, 301 F. Supp. 3d 248, 259-60 (D. Mass. 2018) (rejecting Massachusetts' claim of standing due in part to a state law requiring employer-sponsored plans in the state to provide contraceptive coverage at no cost to patients).

would add 130,000 individuals to the uninsured population." 83 Fed. Reg. at 28,950 (AR 39).

Among the reasons for this increase in the uninsured population is the likelihood—

acknowledged by the Final Rule—that healthier individuals will move to skimpier but cheaper

AHPs, causing premiums for more comprehensive, ACA-compliant health insurance in the

individual and small group markets to rise as those plans cover less healthy individuals—

inevitably making such health insurance unaffordable for certain individuals.[9] *See* 83 Fed. Reg.

at 28,943 (concluding that AHPs may offer "less comprehensive benefits," give "price discounts

to low-risk groups," and "assembl[e] favorable risk pools"). It is also likely that certain federal

subsidies will become unavailable under the Final Rule, causing individuals to forgo health

insurance altogether or enroll in less comprehensive plans.[10]

Even if the overall number of uninsured individuals does not increase, DOL

acknowledges that "AHPs are likely to influence the composition of the uninsured population

such that it includes, for example, proportionately fewer working owners and individuals from

low-risk demographics, *and proportionately more individuals from high-risk demographics*,

---

[9] *See* 83 Fed. Reg. at 28,949 (AR 38) (listing categories of individuals whose premiums are likely to increase); *id.* at 28,950 (AR 39) (citing Congressional Budget Office report which projected premiums to increase by two to three percent).

[10] The Complaint provides a specific example of an employee of a small employer losing her eligibility for the ACA's premium tax credit and being forced to purchase a plan in the marketplace without financial assistance, enroll in an AHP with inadequate coverage, or become uninsured. Compl. ¶ 6. *See also* Navarro Decl. ¶ 6 (Delaware) ("As a result of the Final Rule, I expect to see financial harm to individuals who may lose eligibility for the ACA's tax credit should their small employer opt to provide minimal essential coverage (which is less comprehensive than ACA's essential health benefits) through an AHP."). Defendants criticize this example as relying on a "chain of hypotheticals," Defs.' Br. at 20, but that criticism misses the point: the example is simply one of many ways in which the Final Rule will increase the uninsured rate, not the only way that adverse consequence will occur.

than would otherwise be the case." 83 Fed. Reg. at 28,950 (AR 39) (emphasis added). In other

words, DOL acknowledges that the Final Rule will lead to either more uninsured individuals, or

more "high-risk" uninsured individuals. Either way, the Plaintiff States will likely have to pick

up the costs of many of these individuals' uncovered health care with safety net providers and

state health care programs—a point that the Plaintiff States' declarations confirm.[11] Defendants

are thus wrong that there is "no support for [Plaintiff States'] assertion that any individuals have

become or are about to become uninsured or underinsured as a result of new AHPs or the Final

Rule." Defs.' Br. at 21.

---

[11] Kofman Decl. ¶ 25 (District of Columbia) ("The cost of uncompensated care will also
increase as a result of people becoming uninsured and from being underinsured. The Final Rule
could result in as much as $26,598,000 (24.6% increase) in additional uncompensated care in
the District."); Dutt Decl. ¶ 15 (California) ("When the uninsured rate rises, more people seek
these services at safety-net providers and in emergency rooms, leading to higher rates of
uncompensated care . . . It also directly harms the state, which provides a substantial portion of
safety net provider funding through Medi-Cal."); Caride Decl. ¶ 16 (New Jersey) ("[T]here is
expected to be an increase in uncompensated care for hospitals and other providers as well as an
increase in charity care expenses for the State."); O'Connor Decl. ¶ 16 (Maryland)
("[Individuals] who experience pregnancy or suffer a sickness or injury that is not covered . . .
may forego necessary care, face financial distress, or require additional expenditures through
the Maryland Medicaid program or other state programs."); Taylor Decl. ¶ 21 (District of
Columbia) ("[M]embers of AHPs that do not cover essential health benefits will obtain care that
puts them in financial distress or unable to pay their bills. And, District residents who enroll in
AHPs that turn out to be fraudulent or that become insolvent may be unable to pay bills when
their claims are denied or are not paid. In both of these situations, additional expenditures will
have to be made through the District's Medicaid program . . . or other District programs that
provide care for such individuals, e.g., the District's Medicaid and Alliance programs.");
Whorley Decl. ¶¶ 5, 6 (Virginia) ("The Final Rule will result in financial harm to Virginia
because the Commonwealth will be required to expend funds through its public hospitals and
other state programs to provide care for these individuals in situations that would have been
covered in they had obtained insurance through the Marketplace."); Kreidler Decl. ¶ 18
(Washington) ("The Final Rule may also result in indirect financial harm to Washington State,
to the extent that enrollees receive health care services that are not covered by their AHP. This
could result in increased expenditures to programs and funding designed to assist uninsured and
under insured groups within Washington State.").

And the Final Rule specifically notes that the ability of "[g]eographically-based AHPs" to secure greater "provider discounts" "could dilute other payers' ability to obtain discounts, thereby increasing costs for such payers' enrollees"—and identifies state-funded Medicaid programs as one such affected payer. 83 Fed. Reg. at 28,942 (AR 31) (footnote omitted).

These substantial costs to the Plaintiff States are directly caused by the Final Rule and would be redressed by invalidation of that rule. *See Tozzi v. HHS*, 271 F.3d 301, 308 (D.C. Cir. 2001) (requiring a showing that "the agency action is at least a substantial factor motivating the third parties' actions"). Therefore, the Plaintiff States have established standing based on the increase in uncompensated care costs they will have to bear under the Final Rule.

### B. The Plaintiff States Have Established Standing Based on Injury to Their Sovereign Interests in Enforcing Their Own Laws.

Preemption of state laws is the quintessential form of injury to a state's sovereign interests. *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers); *Alaska v. U.S. Dep't of Transportation*, 868 F.2d 441, 442-44 (D.C. Cir. 1989). Defendants assert that the Plaintiff States have not been injured on this ground because the Final Rule does not alter the statutory standards for ERISA preemption. Defs.' Br. at 15. But this argument misses the point.  While the Final Rule does not change the standards of preemption and appropriately recognizes that ERISA generally preserves state insurance laws, state non-insurance laws remain at risk of preemption,[12] and the Final Rule will vastly expand the scope of that preemption by increasing the number of entities that can claim it and sweeping "millions of people" into such plans. 83 Fed. Reg. at 28,948 (AR 37). This vast expansion of entities exempt

---

[12] As the Complaint notes, DOL in the Proposed Rule stated "that under ERISA [non-insurance State laws] may be preempted as well, with no statement in the Final Rule disclaiming that intent." Compl. ¶ 101. States have many non-insurance laws.

from state non-insurance regulation meaningfully interferes with the Plaintiff States' ability to

"enforce a legal code." *Snapp*, 458 U.S. at 601; *see Ute Indian Tribe of the Uintah and Ouray

Reservation v. Utah*, 790 F.3d 1000, 1005-06 (10th Cir. 2015) (Gorsuch, J.) (tribe has sovereign

interest in thwarting incursion into tribal authority over particular lands); *Kansas v. United

States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001) (State established irreparable harm over

potential loss of sovereignty over particular tract of land despite dispute over extent of State's

interest in the tract); *cf. Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018).

### C. The Plaintiff States Have Established Standing Based on Injury to their Quasi-Sovereign Interests in Ensuring the Stability of Their Insurance Markets.

States have a "quasi-sovereign interest in the health and well-being—both physical and

economic—of [their] residents in general." *Alfred L. Snapp & Son*, 458 U.S. at 607. While

assertion of quasi-sovereign interests can take the form of *parens patriae* standing, States may

also invoke injury to these interests as part of an Article III standing analysis.[13] *See Texas*, 809

F.3d at 152 (relying on the State's quasi-sovereign interests to grant the State "special

solicitude" and ultimately, standing). At stake here are the Plaintiff States' quasi-sovereign

interests in the stability of their insurance markets—interests which Congress has repeatedly

recognized by statute. The injury to those interests caused by the Final Rule—along with the

likelihood of a favorable decision to redress that injury—is another independent basis for the

Plaintiff States' standing.

The Plaintiff States' interests in ensuring the stability of their insurance markets are

fundamental to their roles as sovereigns. The States' role as the primary regulators of insurance

---

[13] Defendants misrepresent this injury to the Plaintiff States' health insurance markets as based on *parens patriae* standing alone. Defs.' Br. at 22-24. It is not. Rather, it is a clear injury to the Plaintiff States' quasi-sovereign interests.

markets is reflected in a variety of federal statutes. *See, e.g.*, 15 U.S.C. § 1012 ("The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business."). Specifically relevant in this case, the ACA places States at the front line of regulation and enforcement: States operate health insurance exchanges, *see* 42 U.S.C. § 18031, and States enforce the ACA's key reforms, *see, e.g.*, 42 U.S.C. § 300gg-22.[14] As such, the Plaintiff States have significant quasi-sovereign interests in ensuring the stability of insurance markets for the protection of the health and welfare of our residents. *See Massachusetts v. EPA*, 549 U.S. 497, 519-20 (2007) (relying for standing on the state's quasi-sovereign interests in enforcing the federal statute in question and in protecting its territory and its residents' health); *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) ("In that capacity [as a quasi-sovereign], the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain.").

DOL readily admits the array of harms likely to befall the individual and small group insurance markets as a result of the Final Rule. *See, e.g.*, 83 Fed. Reg. at 28,9444 (AR 33) (AHPs will "segment risks" and "will increase premiums somewhat in ACA-compliant individual and small group markets"); *id.* at 28,945 (AR 34) (citing a report estimating a "combined premium increase [for individuals remaining in the individual and small group markets] of between $7.7 billion and $14.1 billion"); *id.* at 28,948 (AR 37) (citing a report that estimated "between 2.4 million and 4.3 million individuals would move from the individual and

---

[14] Again, Defendants raised no argument that the Plaintiff States failed to satisfy the "zone-of-interests" test to assert claims under the APA. Even if Defendants had contested the Plaintiff States' prudential standing, such argument would fail as the Plaintiff States' interests in ensuring the stability of their health exchanges and enforcing the ACA's individual and small group market reforms fall squarely within the ACA's "zone of interests."

small group markets combined, and enroll in AHPs by 2022 under a moderate enrollment scenario"); *id.* at 28,949 (AR 38) (listing categories of individuals whose premiums are likely to increase); *id.* at 28,950 (AR 39) (citing CBO report which projected premiums to increase by two to three percent); *id.* at 28,950-51 (AR 39-40) (citing reports that forecast increases to uninsured population); *id.* at 28,950 (AR 39) (more high-risk people will be uninsured).

The Plaintiff States' declarations confirm DOL's admissions: as healthy individuals exit the exchanges in favor of AHPs, premiums for the less healthy people left in the individual and small group markets will increase, and the risk pools will be left with sicker people, threatening the stability of those markets. This risk is far from hypothetical: at least one Plaintiff State experienced "substantial harm [from AHPs] by damag[e] [to] the regulated health insurance markets in the 1990s." Brown Decl. ¶ 13 (Kentucky) ("Over 20 insurance carriers left the market; 45 companies withdrew from the individual market, leaving only two companies.").[15] Such harms to States' quasi-sovereign interests support the Plaintiffs' standing.

---

[15] *See also* Kofman Decl. ¶ 19 (District of Columbia) (small group market in the District of Columbia to decrease by as much as 90%, and individual market to decrease by as much as 25%; small group premiums to increase by as much as 23.3% and individual market premiums by as much as 23.0%); *id.* at ¶ 20 (on average, a small business would pay $1,640 per employee more, and an individual would pay $1,307 more, for ACA-compliant health coverage because of the Final Rule); Whorley Decl. ¶ 3 (Virginia) (estimating the "average individual premium on the [Virginia] Marketplace would be almost $15,000 by 2022, while the average [AHP] premium would be $6,200"); Brown Decl. ¶ 10 (Kentucky) ("The Department of Labor's Final Rule . . . will have a dramatic and negative impact on the individual and small group insurance markets in Kentucky. We expect a decrease in the enrollment and increase of premiums in the individual and small-group markets."); Dutt Decl. ¶ 13 (California) ("[S]ome of these less healthy consumers will lose their health coverage if they . . . cannot afford the higher premiums caused by the segmented risk pool."); Gasteier Decl. ¶ 7 (Massachusetts) ("The Department of Labor's Final Rule re-interpreting ERISA's definition of employer [] is likely to have a negative impact on the merged individual and small group insurance markets in Massachusetts [], including the Health Connector and the populations it serves."); Kreidler Decl. ¶ 6

## II.     DOL May Not Override the Market Structure Mandated by the Affordable Care Act (ACA).

As the Plaintiff States explained in their opening brief (Pls.' Br. at 3-5, 11, 14), Congress

enacted the ACA to mandate robust consumer protections in health plans for individuals and

employees of small employers, including essential health benefits, risk pooling, and non-

discrimination. The Final Rule openly seeks to undo that considered policy judgment by

authorizing the creation of AHPs exempt from many of the ACA's core protections. *See* 83 Fed.

Reg. at 28,933 (AR 22); Alexander Acosta, *A Health Fix for Mom and Pop Shops*, Wall St. J.

(June 18, 2018) (Secretary Acosta announced the Final Rule as "relief" from the ACA, which

he called a "backward" statute because it places more requirements on small employers than

large employers), *available at* https://www.wsj.com/articles/a-health-fix-for-mom-and-pop-

shops-1529363643. The Final Rule conflicts with the ACA and must be invalidated as contrary

to law.

### D.  The ACA—Not ERISA—Determines Market Size for Purposes of Defining the Reach of the ACA's Protections.

---

(Washington) (The Final Rule "will negatively impact the individual and small group insurance markets in Washington State by increasing market segmentation."); *Id.* at ¶ 10 ("[U]nder the new rule, market segmentation noted in the Mathematica study will likely be exacerbated. Particularly under the new pathway described in the Final Rule, more people are likely to be pulled out of both the small group and individual markets."); Taylor Decl. ¶ 14 (D.C.) ("If the analysis is correct that 90% of the small group market will move to AHPs, the District's small group market will have fewer than 10,000 people left . . . the remaining risk pool would simply be too small for any insurer to want to make an investment to compete."); MacEwan Decl. ¶ 5 (Washington) ("The Final Rule is likely to segment risk and further destabilize the individual and small group insurance markets by undermining the stability that pooling of risk offers to any regulated market."); *id.* at. ¶ 6 ("[A]s AHP enrollees develop health conditions and need services not covered by their AHP, they will reenter the regulated markets to obtain those services, further perpetuating segmentation of the risk pool and driving up the cost of coverage in the regulated market . . . Increased premiums raise the possibility of a 'death spiral' in the Exchange market, where more and more enrollees leave the marketplace due to higher costs and fewer carriers participate due to greater risk.").

Defendants fundamentally err in asserting (Br. at 39-40) that DOL's authority to interpret the term "employer" in ERISA authorizes the agency to override the ACA's more specific and later-enacted market-size definitions, which determine the reach of the ACA's consumer protections. While the ACA cross-references the definition of "employer" in ERISA § 3(5), *see* 42 U.S.C. § 300gg-91(d)(6), its market-size definitions go beyond ERISA and impose additional requirements tailored to the health care objectives that Congress sought to implement in the ACA. Nothing in the ACA authorizes DOL to override these additional requirements based on its interpretation of a different statute.

Specifically, the ACA considers a "large employer" to be any "employer who employed an average of at least 51 employees" in the prior year, *id.* § 300gg-91(e)(2), and a "small employer" to be any "employer who employed an average of at least 1 but not more than 50 employees" in the prior year, *id.* § 300gg-91(e)(4). Even if the meaning of the word "employer" in these definitions were identical to DOL's interpretation of that term in ERISA, there would remain the further question of whether a particular employer was one "who employed" the requisite number of "employees." As the Plaintiff States noted (Pls.' Br. at 15-17), the term "employee" typically refers to the common-law master-servant test for determining the employer-employee relationship. Indeed, the Supreme Court has specifically held that this common-law definition applies to ERISA's own definition of "employee," which the ACA borrows, 42 U.S.C. § 300gg-91(d)(5). *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 319 (1992). Likewise, courts have applied this traditional common-law test to determine whether an employer has *employed* a threshold number of individuals under numerous federal statutes. *See* Pls.' Br. at 16. Thus, under the ACA, an employer is deemed to have "employed" only those "employees" with whom it has a common-law master-servant relationship.

This interpretation of the ACA's market-size definitions precludes the Final Rule's attempt to allow an association of employers to qualify as a "large employer" by aggregating its employer-members' employees. There is no dispute that such an association ordinarily lacks the requisite indicia of control over its employer-members' employees to satisfy the common-law test. As a result, as DOL confirmed in 2013 guidance that it has never rescinded, individuals covered by an association's health plan "are not 'employed' by the group or association and, therefore, are not 'employees' of the group or association." Dep't of Labor, Emp. Benefits Sec. Admin., MEWAs: Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation at 22 (2013) (AR 2249). In that guidance, DOL explicitly relied on ERISA's distinct definitions of "employer" and "employee," explaining that even though "employer" may refer to an entity acting indirectly for an employer, the term "employee" has a more restrictive meaning requiring a common-law employer-employee relationship between the individual and the entity counting that individual as its employee. *Id.* at 23 (AR 2250). Here, because an association does not have an employer-employee relationship with its employer-members' "employees," under the plain terms of the ACA, the association cannot seek to qualify as a large employer by aggregating those individuals. Put simply, an association that does not have at least fifty-one common-law employees cannot be a "large employer."

A 2011 guidance document issued by the Centers for Medicare & Medicaid Services (CMS) does not say otherwise. *See* Pls.' Br. at 21. To the contrary, the CMS guidance expressly confirmed the general rule that, for purposes of determining market size under the ACA, the size of the association is immaterial, and it is "the size of each *individual employer* participating in the association [that] determines whether that employer's coverage is subject to the small

group market or the large group market rules." Dep't of Health & Human Servs. Ctrs. for

Medicare & Medicaid Servs., Ins. Stds. Bulletin Series at 3 (Sept. 1, 2011) (AR 2213)

(emphasis added). Defendants misplace their reliance on a single unsupported statement in the

guidance suggesting that there may be "rare" exceptions to this rule. *See* Defs.' Br. at 40-41. In

positing such an exception, CMS did not address the statutory language discussed here and

provided no reasoning for its assertion that there was *any* exception to the ACA's market-size

definitions, rare or not. That stray suggestion merits no deference and should be disregarded.

*See Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1136-37 (D.C. Cir. 2014); *ABM*

*Onsite Servs.—West, Inc. v. NLRB*, 849 F.3d 1137, 1146 (D.C. Cir. 2017) ("[A]n agency cannot

avoid its duty to explain a departure from its own precedent simply by pointing to another

agency's unexplained departure from precedent.").[16]

### E. The ACA's Specific Provisions for Aggregating Employers Preclude the Final Rule's Attempt to Add an Additional Aggregation Rule for Associations.

While the ACA ordinarily counts only an employer's direct common-law employees to

determine the relevant market for the employer, its "[r]ules for determining employer size," 42

U.S.C. § 18024(b)(4), specify narrow exceptions to that general rule under which multiple

employers can aggregate their employees under certain circumstances: for example, where one

employer owns the other, or where both employers share a corporate parent. *See* Pls.' Br. at 18

---

[16] The same is true of the 2002 CMS guidance document that DOL cites. *See* Defs.' Br. at 41 n.14. That document similarly contained no analysis of market-size provisions and merely made a conclusory statement that "requirements relating to small group coverage apply differently" to associations and that CMS "expect[ed] to clarify such distinctions in a future bulletin." Dep't of Health & Human Servs. Ctrs. for Medicare & Medicaid Servs., Ins. Stds. Bulletin Transmittal No. 02-02 at 2 & n.v. (Aug. 2002), https://www.cms.gov/CCIIO/Resources /Files/Downloads/hipaa_02_02_508.pdf. In any event, the 2002 guidance predates the ACA and thus has no bearing on the ACA-specific argument at issue here.

& n.24; *see also* 26 U.S.C. § 414(b), (c), (m), (o). There is no dispute that AHPs are not covered by the ACA's aggregation rules.

Contrary to Defendants' contention (*see* Defs.' Br. at 37-40), the special exceptions set forth explicitly in the ACA confirm, rather than contradict, the Plaintiff States' interpretation of the ACA's market-size definitions. These exceptions are part of the ACA's "[r]ules for determining employer size" to determine "large" or "small" employers for purposes of the ACA's substantive protections. 42 U.S.C. § 18024(b)(4). Congress's careful articulation of these exceptions shows that it considered the specific question of when multiple employers can aggregate their employees, and concluded that such employees could be "treated as employed by a single employer" under the ACA only under certain narrowly defined circumstances, 26 U.S.C. § 414(b). That careful consideration of permissible aggregation for purposes of the ACA left no ambiguity for *any* agency, let alone DOL, to fill.

Defendants' contrary arguments (*see* Defs.' Br. at 37-38) are meritless. Defendants note that the ACA's aggregation provision, 42 U.S.C. § 18024(b)(4), is silent about AHPs, but it is precisely because "any reference to AHPs" is "[n]oticeably absent" (Defs.' Br. at 37) from the ACA's "[r]ules for determining employer size" that the statute must be read to forbid the use of AHPs to aggregate multiple employers' employees. Defendants also contend that the ACA's aggregation provision was meant to apply only to the entities identified in the cross-referenced provisions of the Internal Revenue Code (IRC) (*see* Defs.' Br. at 38), but that argument again proves the Plaintiff States' point that Congress intended to allow aggregation only in the circumstances it specified and not in others. Finally, Defendants' generalized attack on the *expressio unius* canon (*see* Defs.' Br. at 37-38) is misguided. The Supreme Court has not "cautioned courts against" use of the canon, as Defendants suggest. Defs.' Br. at 37-38. To the

contrary, the Supreme Court regularly applies the canon to conclude that, when Congress affirmatively adopts an "express exception" to a general statutory rule, it excludes other exceptions not listed. *See, e.g.*, *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018); *Hillman v. Maretta*, 569 U.S. 483, 496 (2013). Defendants cite a case (*see* Br. at 37) in which the Court cautioned against applying the canon when doing so would lead to an interpretation "inconsistent with the purpose and language of the authorizing statute." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 703 (1991). But applying the canon here leads to no such inconsistent result; to the contrary, aggregating multiple employers' employees only in the circumstances specifically enumerated by the ACA advances Congress's considered decision to define market sizes under the ACA in particular ways.

## F. Congress Did Not Delegate to DOL Any Authority to Alter the ACA's Market Structure.

DOL's attempt to scale back the reach of the ACA's protections through a purported interpretation of ERISA is also invalid because there is no indication whatsoever that Congress intended to give DOL the power to radically revise the ACA's market definitions. *See Util. Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000). Because the ACA's consumer protections for the individual and small group markets lie at the core of the ACA's reforms, which employers are subject to those requirements is "a question of deep 'economic and political significance.'" *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015); *see* Pls.' Br. at 23-28. "[H]ad Congress wished to assign that question to an agency, it surely would have done so expressly." *Id.* But no such express delegation to any agency, let alone DOL, appears in the ACA or ERISA.

DOL seeks to avoid this conclusion by asserting that the Final Rule "does not fundamentally alter any of the ACA's 'key reforms'" (Defs.' Br. at 41 n.15), but that assertion

is plainly false. One of the ACA's core protections is its requirement that health coverage provided by small employers to their employees include coverage of ten essential health benefits, community rating, and risk pooling. Pls.' Br. at 24; Compl. ¶¶ 52-63. An overt purpose of the Final Rule is to allow small employers to avoid these key consumer protections by forming AHPs that will qualify as large employers and thus be exempt from many of the ACA's principal benefits. Acosta, *supra* at 17. The intended result of this change, as the Final Rule freely admits, is to allow small employers to offer health plans that will discriminate on the basis of gender and age (and other factors) rather than adhere to community rating, and that will offer "less comprehensive benefits" than required by the ACA's essential benefits provision. 83 Fed. Reg. at 28,944 (AR 33). There is no plausible interpretation of the Final Rule's purpose and effect except as a deliberate alteration of key ACA reforms.

### G. DOL Fails to Justify Changing the Meaning of "Employer" for Just One Provision of the ACA While Ignoring the Consequences of That Change for Other Provisions, Including the Employer Mandate.

Defendants' objective to override the ACA is perhaps most evident in its inconsistent application of the Final Rule's expanded definition of "employer." Specifically, the Final Rule treats an association of employers as a "large employer" for purposes of evading the ACA's individual and small group market consumer protections, but *not* for purposes of applying the shared responsibility payment (i.e., the employer mandate), a consumer protection that the ACA specifically imposes on large employers alone. *See* Defs.' Br. at 42-43.

DOL defends its inconsistency (*see* Defs.' Br. at 42) by asserting that it has not been delegated authority to interpret the IRC, where the employer mandate is codified. DOL also has not been delegated authority to interpret the ACA's market-size definitions, but claims the ability to alter key reforms in the ACA through ERISA nonetheless. *Cf. King*, 135 S. Ct. at

2489. Moreover, DOL has in the past conducted joint rulemakings with HHS and the Department of the Treasury to ensure consistent interpretation of statutes under all three agencies' jurisdictions.[17] Defendants' justification for not achieving consistency across the relevant statutes thus fails.

Defendants also assert that the Plaintiff States "identify no statutory authority that requires the Department to construe the term 'employer' identically across ERISA and the IRC." Defs.' Br. at 43. That argument is wrong. As the Plaintiff States have pointed out (*see* Pls.' Br. at 19-20), Congress expressly mandated symmetry between terms used in the IRC's employer mandate provision and in the ACA, expressly providing that "[a]ny term" used in the employer mandate provision "shall have the same meaning" as the same term in the ACA. 26 U.S.C. § 4980H(c)(6). Here, the employer mandate is triggered when "an applicable large employer" (defined as "an employer who employed" a certain number of people) "offers to its full-time employees" minimum essential coverage for which the employees receive premium tax credits or cost-sharing reductions. 26 U.S.C. § 4980H(b)(1)(A). Defendants concede that, under this IRC provision, even when an association qualifies as an "employer," it cannot aggregate its members' employees to qualify as a "large employer." Defs.' Br. at 43. Yet despite the symmetry mandated by 26 U.S.C. § 4980H(c)(6), the Final Rule would allow an association, merely by qualifying as an "employer," to aggregate its members' employees to count as a

_____

[17] In a case relied on by the Defendants (*see* Br. at 48), for example, this Court described a regulation promulgated to administer HIPAA's "wellness program" provision as "promulgated jointly in 2006 by the Departments of Labor, Health and Human Services, and the Treasury (collectively known as the tri-departments or tri-agencies)." *AARP v. EEOC*, 226 F. Supp. 3d 7, 12 (D.D.C. 2016) (Bates, J.). The provisions at issue there parallel those at issue here: one provision from Part 7 of ERISA, 29 U.S.C. § 1182(b)(2)(B), one from Chapter 100 of the IRC, 26 U.S.C. § 9802(b), and one from Part A of Title 27 of Public Health Service Act, 42 U.S.C. § 300gg-4.

"large employer" for purposes of the ACA's market-size definitions. DOL's inconsistency is further reason to invalidate the Final Rule.

### III.     The Final Rule's Expansion of the Definition of "Employer" is Contrary to ERISA and the ACA.

The Final Rule also unlawfully expands the definition of "employer" by redefining a "working owner" without employees as an "employer," by reinventing "bona fide associations," and by applying both of these altered definitions to the ACA. These changes are not "permissible constructions" of either ERISA or the ACA, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984), and are not entitled to deference.

### A.   The Final Rule's Redefinition of a "Working Owner" with No Employees as an "Employer" is Contrary to, and an Unreasonable Interpretation of, ERISA and the ACA.

Both ERISA section 3(5) and the ACA preclude the Final Rule's redefinition of "employer" to include a "working owner" without any common-law employees. As the Plaintiff States have noted, courts have consistently held that a sole proprietor without commom-law employees is not an "employer" under ERISA. *See* Pls.' Br. at 29 & n.31. Indeed, the Department's own regulation, 29 C.F.R. § 2510.3-3(b), expressly excludes plans that cover only sole proprietors from the definition of an "employee benefit plan" under Title I of ERISA, as do countless advisory opinions and other longstanding guidance on this precise question. *See* Pls.' Br. at 30. In addition, the ACA's definition of "employer," the structure of the ACA's insurance markets, and Congress's intent in enacting the ACA to protect individuals unambiguously foreclose DOL's attempted redefinition of "working owners" as "employers." *See id*. at 31-32.

24

Defendants do not even attempt to dispute most of Plaintiffs' arguments on this point. Instead, they make three arguments to support their redefinition of "employer" to include "working owners" with no employees. Their arguments fail.

First, Defendants misconstrue the Plaintiff States' argument based on the ACA's definition of "employer." The ACA provides that "[t]he term 'employer' has the meaning given such term under section 3(5) of [ERISA], *except that such term shall include only employers of two or more employees*." 42 U.S.C. § 300gg-91(d)(6) (emphasis added). As even Defendants concede (Br. at 40), this definition encompasses only "employers who have 'two or more employees'"; it thus necessarily excludes "working owners" with no employees. Contrary to Defendants' characterization, the Plaintiff States have never asserted that the ACA's definition of "employer" "displace[s] ERISA's definition." *Id.* Rather, the Plaintiff States have consistently argued that, regardless of *ERISA's* definition of "employer," a "working owner" would not be an "employer" *under the ACA* because there would be only one purported employee—the "working owner" herself. *See* Pls.' Br. at 30-31.

Second, Defendants seek to circumvent the ACA definition of "employer" by declaring that an association of "working owners" has two or more employees in the aggregate and so qualifies as an "employer" under the ACA. *See* Defs.' Br. at 46-47. But an association can only qualify as an "employer" if it is a "group or association of *employers*." ERISA § 3(5), 29 U.S.C. § 1002(5); 83 Fed. Reg. at 28,912 (AR 1) (emphasis added). Thus, non-employers such as sole proprietors cannot join together into an association that is then considered an "employer." *See* Pls.' Br. at 30-31.

Third, Defendants spend much time seeking to reinterpret *Yates v. Hendon*, 541 U.S. 1 (2004), in a manner consistent with their newfound definition. But *Yates* stated that a "working

25

owner" with no common-law employees cannot be an "employer" under ERISA. *See id.* at 21 n.6 ("Courts agree that if a benefit plan covers *only working owners*, it is not covered by Title I." (emphasis added)). And Defendants' attempts to differentiate the Final Rule's "working owners" from *Yates*'s clear statement (and several cases approvingly cited in *Yates*) merely repeat the same error: they again assert that joining non-employer "working owners" together transforms them into an "association of employers," which then meets ERISA's definition of "employer." *See* Defs.' Br. at 45-46. Courts have repeatedly rejected this argument. As the Second Circuit concluded, because a "sole proprietorship[] without employees" cannot "logically be considered an 'employer,'" the "plain language of [ERISA] would . . . seem to preclude finding" that an association of *non-employer* sole proprietors somehow qualifies as an "'association of *employers*.'" *Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 48 (2d Cir. 2002) (emphasis added); *see also* Pls.' Br. at 29 n.31 (collecting cases).

**B. The Final Rule's Extension of "Employer" to Cover Associations of Employers with No Common Interest Other Than Geography and Associations Formed for the Purpose of Offering Health Plans Conflicts with ERISA and Is Unreasonable.**

The Final Rule's changes to the definition of "bona fide association" are similarly drastic departures from the longstanding and widely accepted standard used for decades by the federal courts and DOL. First, the Final Rule would allow any group of employers located in the "same region" (with no other connection) to form an association that could qualify as an ERISA employer able to offer an AHP. 83 Fed. Reg. at 28,962 (AR 51). Second, the Final Rule would allow an association that has the "primary purpose" of offering insurance to qualify as an ERISA employer able to offer an AHP. *Id.* Both of these dramatic changes render the Final Rule unreasonable and contrary to clear Congressional intent. *See* Pls.' Br. at 34-35.

At several points, Defendants state that "there is no provision in ERISA that limits the Department's discretion to modify and adjust its previously-established guidance." *See* Defs.' Br. at 27, 33. But as the Plaintiff States have noted, the courts have consistently interpreted ERISA since its enactment to impose the very limits the Final Rule now discards. Because these consistent judicial precedents are often based on ERISA itself rather than DOL's interpretations, DOL is not free to simply abandon these settled understandings of ERISA's meaning. *See* Pls.' Br. at 34-35. Congress's repeated rejection of an expansion of AHPs, even when urged by a President and Labor Secretary favoring them on policy grounds, *see* Compl. ¶¶ 64-72, confirms that Congress never granted such authority to DOL. *Nat'l Classification Comm. v. United States*, 746 F.2d 886, 892-93 (D.C. Cir. 1984) ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.").

For example, federal courts (and, until now, DOL) have uniformly found that ERISA's text and Congressional intent require that, to qualify as an ERISA employer, a group or association that sponsors an AHP, as well as the individuals who will benefit from the plan, must be "tied by a common economic or representation interest, unrelated to the provision of benefits." *Wisconsin Educ. Assoc. Ins. Trust v. Iowa State Board of Pub. Instruction*, 804 F.2d 1059, 1063-65 (8th Cir. 1986) ("*WEAIT*") (court found "no need to resort to the Department of Labor's interpretations").[18] As many courts have held, without such a true

---

[18] As Defendants note, many of these cases "reference[] and discuss[]" DOL's "sub-regulatory guidance." Defs.' Br. at 31. But it is also true, and Defendants fail to mention, that the cases cited here make clear that the courts' decisions were premised exclusively on ERISA's statutory language and the intent of Congress.

common interest, there cannot be the "protective nexus" between the association and its covered

employees that is necessary for the association to qualify as an employer able to sponsor an

ERISA plan. *See MDPhysicians v. State Bd. of Ins.,* 957 F.2d 178, 186 & n.9 (5th Cir. 1992)

(decision grounded "on the statutory language of ERISA and the intent of Congress").[19]

The Final Rule purports to establish the requisite "commonality of interest" by the mere

physical proximity of the employers eligible to join an AHP. But DOL does not even attempt to

---

[19] Other courts have reached similar conclusions by relying on various combinations of ERISA's text, congressional intent, and DOL's prior guidance. *See Gruber v. Hubbard Bert Karle Weber, Inc.*, 159 F.3d 780. 786-87 (3d Cir. 1998) ("Congressional commentary, Department of Labor (DOL) advisory opinions, and case law from other circuits applying ERISA to multi-employer plans have interpreted the statute to preclude ERISA coverage of plans established for entrepreneurial purposes."); *Int'l Ass'n of Entrepreneurs of Am. Benefit Trust v. Foster*, 883 F. Supp. 1050, 1058-59 (E.D. Va. 1995) (associations in which members share "adherence to the principles of entrepreneurial spirit and free enterprise" do not "establish the kind of commonality envisioned by the law"); *Atlantic Health Care Benefits Trust v. Foster*, 809 F. Supp. 365, 373 (M.D. Pa. 1992) (relying on *WEAIT* and *MDPhysicians* to hold that there must be a cohesive bond between employer-members other than their common participation in the disputed plan), *aff'd*, 6 F.3d 778 (3d Cir. 1993); *Baucom v. Pilot Life Ins. Co.*, 674 F. Supp. 1175, 1180 (M.D. N.C. 1987) (similar); *McCaslin v. Blue Cross & Blue Shield of Ala.*, 779 F. Supp. 1312, 1315-18 (N.D. Ala. 1991) (holding that a professional association and its different types of members have "differing economic interests" and therefore lack a "sufficient commonality of interest"); *Kiely v. Shores Grp., Inc.*, No. 93-2194, 1994 WL 544358, at *3 (D. Kan. Aug. 31, 1994) (holding, without relying on DOL guidance, that a MEWA was not an ERISA employer because no evidence of a "cohesive bond" between the MEWA and the employer-members or of a "protective nexus" between the MEWA and the covered employees); *Chao v. Graf*, CV-N-01-0698, 2002 WL 1611122, at *5-6 (D. Nev. Feb. 1, 2002) (association not ERISA plan because it "recruited unrelated, heterogeneous employers to join with no preexisting relationship between them" and therefore did not fit within the "statutory definition of 'employer'"); *Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.*, No. 16-cv-10317, 2017 WL 3007074, *10-11 (E.D. Mich. July 14, 2017) (adopting *WEAIT* requirement that plan and individual participants must be tied by a common economic or representation interest, unrelated to the provision of benefits); *Credit Managers Ass'n of S. Cal. v. Kennesaw Life & Accident Ins. Co.*, 809 F.2d 617 (9th Cir. 1987); *Moideen v. Gillespie*, 55 F.3d 1478 (9th Cir. 1995); *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904 (9th Cir. 1997); *Hall v. Maine Mun. Emps. Health Trust*, 93 F. Supp. 2d 73 (D. Me. 2000).

explain how all employers in a state or metropolitan area could possibly have an actual common economic or representational interest, as ERISA requires. *See* Defs.' Br. at 27-28. As courts have recognized, physical proximity alone does not provide the "protective nexus" required by ERISA under any reasonable interpretation of the statute because there is no unifying connection among the various eligible employers. *See MDPhysicians*, 957 F.2d at 186 (plan marketed to employers in Texas Panhandle not an ERISA plan); *Chao*, 2002 WL 1611122, at *5-6 (plan open to "unrelated, heterogeneous employers . . . with no preexisting relationship" not a single-employer ERISA plan); *International Ass'n of Entrepreneurs of Am. Benefit Trust*, 883 F. Supp. at 1058-59 (small businesses that shared "common entrepreneurial interests and concerns" do not have "the kind of commonality envisioned by" ERISA).

Permitting all businesses in any state or metropolitan area to form an association, as the Final Rule would allow, would render the "commonality of interest" standard meaningless. Indeed, under the Final Rule, the two million companies in New York and 3.5 million in California[20] would all purportedly share a commonality of interest through a single association. DOL has not provided any rationale for this deeply counterintuitive result.[21] *See* 83 Fed. Reg. at 28,923-26 (AR 12-15); 83 Fed. Reg. 614, 619-20 (AR 6952-53).

The Final Rule also unreasonably and unlawfully allows new associations to form for the "primary purpose" of offering health coverage—including for profit-seeking purposes. This

---

[20] *See* United States Census Bureau, https://factfinder.census.gov/faces/nav/jsf/ pages/community_facts.xhtml (As of 2012, 2,008,988 businesses located in New York and 3,548,449 businesses in California). These numbers can be obtained by entering the name of the State in the "Community Facts" field and then clicking on the Business and Industry heading.

[21] Defendants identify certain purported benefits of expanding the availability of AHPs, *see* Br. at 28, but fail to explain how geography alone provides the requisite commonality of interest that would allow an AHP to fall within ERISA.

type of AHP is barely distinguishable from the run-of-the-mill commercial insurance arrangements that have long been held to be strictly outside of ERISA's coverage. *See, e.g.,* H.R. Rep. No. 94-1785, at 48 (1977) (MEWAs established or maintained by entrepreneurs for the purpose of marketing insurance products or services are not ERISA plans); *WEAIT*, 804 F.2d at 1063-64 (entrepreneurial ventures are outside of ERISA); *Wayne Chem. Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 699 (7th Cir. 1977) ("Congress would have had no reason to exempt from state regulation insurance programs that are established and maintained by entrepreneurs for their own profit."). Permitting AHPs to qualify as ERISA plans where the association's "primary purpose" is to provide health coverage—including for profit— is unreasonable and contrary to the unambiguous intent of Congress. Pls.' Br. at 7, 34-35.

Defendants assert that the Final Rule's radical changes to long-standing interpretations of "employer" under ERISA are permissible because they "further[]" ERISA's purposes. Defs.' Br. at 29-30. But the Final Rule was promulgated pursuant to Executive Order 13,813, which does not even mention ERISA's purposes.[22] In any event, Defendants' claim cannot withstand scrutiny. Congress enacted ERISA to protect employees and pensioners in response to widespread abuses and improper management of employee welfare benefit and pension plans. *See* 29 U.S.C. § 1001; *Shaw v. Delta Air Lines*, 463 U.S. 85, 90-91 (1983); *Schwartz v. Gordon*, 761 F.2d 864, 868 (2d Cir. 1985) (observing that Title I of ERISA was adopted to, *inter alia* "remedy the abuses that existed in the handling and management of welfare and pension plan

---

[22] The Executive Order's single mention of ERISA is in its direction that "the Secretary consider expanding the conditions that satisfy the commonality-of-interest requirements under current Department of Labor advisory opinions interpreting the definition of an 'employer' under section 3(5) of the Employee Retirement Income Security Act of 1974. The Secretary of Labor should also consider ways to promote AHP formation on the basis of common geography or industry." Exec. Order No. 13,813, 82 Fed. Reg. 48,385 (Oct. 12, 2017).

assets"). The Final Rule contravenes that purpose by eliminating key protections for consumers

in the small group and individual insurance markets, and by opening the door to what the Final

Rule acknowledges will be "increased opportunities for mismanagement or abuse." 83 Fed.

Reg. at 28,953 (AR 42); *see* Pls.' Br. at 23-25 and *supra* Point II. Providing *fewer* protections

and *increasing* mismanagement and abuse could not be further removed from the intent of

Congress when it enacted and amended ERISA. *See infra* at 39-40 (explaining that Congress

did not intend DOL to form more plans the likes of which Congress has repeatedly resisted).

## IV.    The Final Rule Is Arbitrary and Capricious

### A. Defendants Fail to Demonstrate an Adequate Justification for Fundamentally Upending Decades of ERISA Interpretation.

When an agency discards a prior interpretation based on factual premises, or when a

prior interpretation has engendered serious reliance interests, the agency must provide a detailed

justification for discarding those premises or discounting those interests. *FCC v. Fox Television

Stations, Inc.*, 556 U.S. 502, 515 (2009). Instead of setting out the reasons for such a significant

change, Defendants simply maintain that they can expand a statutory definition on the general

principle that "an initial agency interpretation is not instantly carved in stone." Defs.' Br. at 50.

Defendants' reliance on that principle is misplaced here.

At the outset, the Court should reject Defendants' attempt to minimize the breadth of the

Final Rule by claiming that it is "not a 'dramatic departure' from prior policy" but a "measured

adjustment." Defs.' Br. at 48-49. The new rule is broad enough to encompass *every* employer

and sole proprietor (applying a newly loosened test) in a state, among other changes.

Defendants cannot plausibly describe the Final Rule's changes as minimal. *Cf. Encino

Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (agency must "display awareness"

about its change in position); *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (agency must account for changes in "a significant factual predicate").

Defendants offer no reasoned justification for discarding the factual predicates for forty-plus years of settled ERISA law—consistent judicial and administrative interpretations forged in response to a well-documented (and undisputed) wave of fraud, abuse, and insolvency that left millions of injured people with hundreds of millions of dollars of unpaid medical bills that regulators were unable to stop. *See* 83 Fed. Reg. at 28,952 (AR 41). While Defendants claim here—without any support—that the Final Rule will impose "conditions to help prevent fraud" (Br. at 50), the Final Rule says the opposite, conceding that it may *exacerbate* fraud, mismanagement, and abuse, 83 Fed. Reg. at 28,953 (AR 42). Defendants fail to resolve the tension between this increased risk of harm and DOL's longstanding position that the term "employer" should be narrowly construed to prevent these precise injuries. *See New England Power Generators Ass'n, Inc. v. FERC*, 882 F.3d 202, 207-12 (D.C. Cir. 2018) (agency decision establishing electricity rates and auction procedures was invalid when it could not be squared with agency's prior conclusion that similar procedures would harm market participants).

It is no answer that the Final Rule contains certain nondiscrimination requirements. Those requirements are minimal, permitting AHPs to discriminate in benefits and premiums on a far broader range of factors than federal law allows for commercial insurance plans offered to individuals and small businesses. *See* Compl. ¶¶ 93-94 (explaining that the final rule allows discrimination across a range of factors, such as gender, age, industry, case size, or geographic location, within groups of similarly situated individuals, and even health-factor discrimination between groups that are not similarly situated). And even if these nondiscrimination requirements were effective at preventing certain consumer abuses, Defendants nowhere

articulate how they address other defects that have plagued AHPs, including insolvency. *Cf.*

*AARP v. EEOC*, 267 F. Supp. 3d 14, 29-30 (D.D.C. 2017) (Bates, J.) (rejecting agency reliance

on HIPAA nondiscrimination provisions as method of ascertaining meaning of term "voluntary"

in antidiscrimination statutes).[23] As the National Association of Insurance Commissioners

(NAIC) explained, "Solvency is . . . a challenge for [AHPs] under the best of circumstances

because they are, by their very nature, an unstable risk pool. They do not have the consistency

of membership like a true large employer." National Association of Insurance Commissioners,

Comment Letter (Mar. 6, 2018) (AR 6139). DOL agreed with NAIC's premise—that AHPs are

not like true large employers, *see* 83 Fed. Reg. at 28,941 (AR 30)—but failed to explain why it

was disregarding the natural consequences of that premise (heightened risk of insolvency from

unstable risk pools).

Defendants also purport to justify the Final Rule as necessary to respond to "significant

changes in the 'law, market dynamics, and employment trends,' affecting the ability of many

American workers to access affordable, quality health coverage. In particular, the percentage of

small businesses offering health coverage for employees 'has declined substantially from 47

percent of establishments in 2000 to 29 percent in 2016.'" Defs.' Br. at 9 (quoting 83 Fed. Reg.

at 28,914, 28,947 (AR 3, 36)). The data do not support this justification. As Plaintiff States

---

[23] Defendants' reliance on this Court's denial of a preliminary injunction in *AARP* is misplaced. Defs.' Br. at 48. While this Court initially denied a preliminary injunction in that case, in part on the ground that the agency's statutory interpretation there appeared "reasonable on its face," *AARP v. EEOC*, 226 F. Supp. 3d 7, 13-14, 22-23, 24-25 (D.D.C. 2016) (Bates, J.), the Court ultimately concluded that the agency's interpretation improperly departed from its long-standing prior approach and that its explanations for doing so were faulty, *see* 267 F. Supp. 3d at 29-30.

pointed out (Br. at 51 n.57), one source from which DOL obtained its data (the Agency for

Healthcare Research and Quality) concluded that with respect to small employers, "the offer

rate was unchanged from 2015 to 2016," and not meaningfully different from the figure in 2014

when the ACA's exchanges came online.[24] That data also showed that small business offer rates

rose in some small business categories. Pls.' Br. at 51 n.57. Defendants do not dispute these

data. Moreover, Defendants concede that "just 18 percent of small firm employees were

uninsured." 83 Fed. Reg. at 28,947 n.113 (AR 36). In fact, Defendants' own data show that

figure *plummeted* after the ACA's enactment and implementation: from 29 percent in 2010 to

18 percent in the most recent year available, with 5.6 million fewer uninsured workers at small

employers.[25] Thus, a major premise of the Final Rule—that there has been a steep decline in

health coverage offered by small employers affecting workers' ability to obtain coverage—is

wrong. *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006) (holding

a rule arbitrary and capricious where agency lacked evidence to support key factual conclusion).

Defendants also unjustifiably brush aside the serious reliance interests of the Plaintiff

States and millions of Americans. As intended by Congress, the Plaintiff States have faithfully

carried out the ACA's reforms, devoting regulatory and legislative time and energy. *See, e.g.*,

---

[24] *See* Agency for Healthcare Research and Quality, MEPS Insurance Chartbook 4 (2016), at https://www.meps.ahrq.gov/data_files/publications/cb21/cb21a.pdf.

[25] Table 2 of DOL's 2016 Health Insurance Coverage Bulletin states that 10.0 million out of 56.7 million workers (17.6 percent) at employers with fewer than 50 employees were uninsured in 2015. Dep't of Labor, Emp. Benefits Sec. Admin., Health Ins. Coverage Bulletin 11 tbl.2 (July 25, 2017), https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf. The 2011 bulletin states that 15.6 million out of 54.7 million such workers (28.5 percent) were uninsured in 2010. Dep't of Labor, Emp. Benefits Sec. Admin., Health Ins. Coverage Bulletin 11 tbl.2 (July 27, 2012), https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2011.pdf.

42 U.S.C. §§ 300gg-22 (state enforcement), 18041 (state creation of health exchanges). As a result, millions of Americans and their families have been able to obtain quality, affordable coverage benefiting from the ACA's individual and small-group market reforms. Having enlisted states in this shared enterprise, the federal government (acting through DOL) should not be permitted to disregard the states' interests by undercutting those shared objectives. "The Supreme Court has set aside changes in agency policy for failure to consider reliance interests that pale in comparison to the ones at stake here." *NAACP v. Trump*, 298 F. Supp. 3d 209, 240 (D.D.C. 2018) (citing *Encino Motorcars*, 136 S. Ct. at 2126).

**B.   The Overwhelming Weight of the Evidence Runs Counter to the Final Rule.**

Agency action is arbitrary and capricious when the agency's explanation "runs counter to the evidence before" the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Chang v. U.S. Citizenship & Immigration Servs.*, 289 F. Supp. 3d 177, 186 (D.D.C. 2018) (Bates, J.) (agency action is arbitrary and capricious when it "'runs counter to the evidence before the agency' and thus lacks a 'rational connection between the facts found and the choice made.'") (quoting *State Farm*).

DOL's conclusions on two key issues ignored the overwhelming weight of the evidence: (1) the demonstrated tendency of AHPs to succumb to fraud, abuse, and insolvency, and (2) the damage that would be done to the ACA marketplace if AHPs are not required to cover essential health benefits ('EHBs') or follow community-rating requirements. Pls.' Br. at 43. Each of these points is supported by numerous expert comments submitted to DOL, and DOL does not contend otherwise. *Cf. Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("[A]n agency cannot ignore evidence contradicting its position." (quoting *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010))).

Defendants do claim, however, that they "modified the Proposed Rule in response." Defs.' Br. at 52. Yet their so-called modifications are either insufficient or nonexistent. With respect to EHBs and community rating, Defendants made no modification to the Final Rule. From the beginning to the end of the regulatory process, DOL stated that AHPs would *not* have to offer EHBs or be community-rated. *See* Compl. ¶ 74 (quoting proposed rule). The Secretary himself argued in an op-ed that Congress's choice to impose benefit requirements and rating restrictions in the small group market was "backward," confirming that DOL's intent was to undo ACA-mandated EHB and community-rating protections. Compl. ¶ 8; Acosta, *supra*.

While Defendants contend that "other significant benefit mandates and requirements that apply to large employers" will make AHPs sufficiently comprehensive (Br. at 54), this contention rests on a series of faulty assumptions. One is Defendants' mistaken belief that there is little difference between the benefits required for large group, small group, and individual market plans. The statutory scheme refutes that claim: it requires (among other things) ten essential health benefits only for the latter two types of plans. Compl. ¶ 57. Defendants fail to explain how other benefit requirements will substitute for this mandate. While Defendants note that some states mandate similar coverage of essential health benefits (Br. at 55), not every state does, and it was arbitrary and capricious for DOL to eschew the "congressionally approved" method of protecting individuals and employees of small employers in any event. *See* Pls.' Br. at 49.

Defendants also seek to minimize their own concession that an AHP "will have incentives to tailor benefits to appeal to lower-risk groups—an incentive that large employers generally do not share," 83 Fed. Reg. at 28,941, by claiming that this admission "does not indicate that AHPs will offer inadequate benefits" because AHPs will want to maintain their

"goodwill and reputation," Defs.' Br. at 54 n. 23. Defendants' explanation fails. Defendants'

position rests not on evidence in the record, but on hope and speculation that market forces will

take the place of legal protections.[26] But the health insurance markets have long failed to

provide these protections; indeed, that failure was a major impetus for the ACA in the first

place. *See* Compl. ¶¶ 51-52 (comparing large group, small group, and individual markets); *Nat'l*

*Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 591-99 (Ginsburg, J., concurring in part and

dissenting in part); *id.* at 650-51 (joint dissent) (describing community rating and guaranteed

issue requirements as responses to insurance companies' natural tendency to charge more to

riskier people). Moreover, the Final Rule recognizes that AHPs will try to save money by *not*

---

[26] Defendants' response is based on two statements that do not support Defendants' ultimate assertion. First, Defendants state that "even though self-insured plans and large group policies are not required to provide EHBs, most do, in fact, provide comprehensive coverage." Defs.' Br. at 54-55 (quoting 83 Fed. Reg. at 28,933 (AR 22)). That an ordinary large-employer plan may be responsible has little bearing on how an AHP—which can cherry-pick among small businesses or individuals—will conduct itself, a point with which DOL agreed. *See* 83 Fed. Reg. at 28,941 (AR 30). Moreover, as DOL designed the Final Rule, AHPs will not be required (as are most large-employer plans) to meet the comprehensiveness standards of the ACA's employer mandate, further reducing the validity of Defendants' reliance on large employers' plans' conduct. *See supra* at 23-24. Second, Defendants state that "commenters indicated that they 'did not believe that *legitimate membership organizations* would risk their goodwill and reputation by offering' AHPs with inadequate benefits." Defs.' Br. at 54 (quoting 83 Fed. Reg. at 28,933 (AR 22)) (emphasis added). A statement about "legitimate membership organizations" says nothing about how all AHPs (which are not limited to such organizations) may conduct themselves. The sources Defendants cite (Br. at 55 n.24) confirm the point. For example, the American Society of Association Executives letter warned that "allowing anyone to form an AHP without a clear connection to an existing membership association could lead to the abuses of the past," and accordingly recommended that AHPs be formed only if the underlying association meets a series of factors, such as being non-profit, operating for more than five years, and having $5 million in average revenue in the last five years. American Society of Association Executives, Comment Letter at 3 (Feb. 8, 2018) (AR 4197). The National Retail Federation focused on "bona fide trade associations" but warned that "absent higher barriers to entry, single purpose AHPs could prove unstable or more fraud prone, like many past [MEWAs]." National Retail Federation, Comment Letter at 3 (Mar. 6, 2018) (AR 6198).

providing essential health benefits and by discriminating in premiums. *See supra* at 10, 33-34. The Final Rule's unenforceable reliance on AHPs' "goodwill and reputation" thus is unsupported.

### C. The Final Rule Relies on Factors Congress Did Not Intend DOL to Consider.

Agency action is arbitrary and capricious when the agency has "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. DOL has done so here.

Defendants do not meaningfully dispute that the Final Rule's purpose is to narrow the ACA's core protections for individuals and employees of small employers, and, therefore, to segment the markets by diverting healthier people to skimpier AHPs and away from exchange plans. But Congress made a different choice in the ACA by mandating "single risk pools" in the small-group and individual markets that would help spread the risk across much broader populations than had previously existed. Defendants entirely ignore this congressional purpose.

Defendants quote a pre-ACA Supreme Court case about pension plans for the generic proposition that ERISA balances protecting employees' rights and limiting undue administrative costs to encourage employers to offer plans. Defs.' Br. at 55 (quoting *Conkright v. Frommert*, 559 U.S. 506, 517 (2010)). Defendants' apparent point is that the rule is justified because DOL can take actions that reduce administrative costs and encourage plan formation.

That argument fails for several reasons. First, it assumes that satisfying an ERISA purpose in a vacuum is sufficient to uphold the Final Rule. But the Final Rule's deliberate interference with health care markets cannot be squared with the ACA's purposes, which Congress directed DOL to carry out through ERISA. *See* 29 U.S.C. § 1185d; Compl. ¶ 58.

Second, encouraging "plan formation" by a much more broadly defined class of associations (Defs.' Br. at 56) is not a policy that Congress intended DOL to pursue. Beginning

with hearings in the 1970s, legislation in the early 1980s, and additional legislation in 1996 and

2010, Congress repeatedly recognized the extreme dangers of MEWAs (a category of plan or

arrangement that includes AHPs) and sought to curb them—not foster their formation. *See*

Compl. ¶¶ 44-47; HIPAA, Pub. L. No. 104-191, § 101, 110 Stat. 1936, 1952 (enacting 29

U.S.C. § 1021(g), enabling DOL to require annual registration by MEWAs that were not ERISA

plans); Pub. L. No. 111-148 (ACA), § 6606, 124 Stat. 119, 781 (amending 29 U.S.C. § 1021(g)

to require such DOL action); ACA § 6601, 124 Stat. at 779 (criminal penalties for false

marketing statements in MEWAs); ACA § 6605, 124 Stat. at 781 (cease-and-desist authority for

a MEWA that "is fraudulent, or creates an immediate danger to the public safety or welfare, or

is causing or can be reasonably expected to cause significant, imminent, and irreparable public

injury"). Moreover, Congress has repeatedly *rejected* legislation to expand AHPs under

ERISA—and enacted the ACA's risk-pooling mechanisms *instead of* authorizing AHPs. *See*

Compl. ¶¶ 64-72; *see also The Small Business Health Care Crisis: Possible Solutions: Hearing*

*Before the S. Comm. on Small Business & Entrepreneurship*, 108th Cong. 148-54 (statement of

Kansas Insurance Commissioner speaking on behalf of National Association of Insurance

Commissioners) ("This is not just speculation, but fact borne of years of experience with

[MEWAs], multi-state association plans, out-of-state trusts, and other schemes to avoid or limit

state regulation."). DOL cannot justify the Final Rule as promoting the formation of plans that

Congress has long resisted and did not intend to promote.

Third, even assuming that reduction of administrative costs were a legitimate factor for

promulgating the Final Rule, Defendants' position fails as a matter of logic because the Final

Rule (by their own admission) does not reduce such costs. By DOL's own design, an AHP

would be conducting more substantial underwriting of enrollees than would an insurer that can

vary premiums based only on simple, easily ascertainable factors delineated by the ACA—as Congress found. *See* Compl. ¶ 58 (describing community rating); 42 U.S.C. § 18091(2)(J) (noting that ACA would "creat[e] effective health insurance markets that do not require underwriting and eliminate its associated administrative costs"). And AHPs will have marketing and startup expenses that established insurers do not have. Moreover, "[e]ach business member of the AHP will have unique service requirements, and both the human capital and actual costs of tending to many small companies will be higher than those associated with a true single business entity." *See* National Association of Health Underwriters, Comment Letter at 2 (Mar. 6, 2018) (AR 5504). All of that suggests more, not less, administrative cost—hence DOL's apparent concession in the Final Rule that AHPs will have *greater* administrative costs and will only be able to secure provider discounts in an exceedingly narrow and likely illusory setting. *See* Pls.' Br. at 51 n.57;[27] *see also* National Association of Health Underwriters, Comment Letter at 2 (AR 5504) ("even if an AHP attracts a considerable number of participants, its size and bargaining power is unlikely to supersede the scope of even a smaller private health insurer's pool of participating small employers. Therefore, costs for many smaller companies' health insurance will be similar or even slightly more expensive than if coverage is purchased through a traditional small group plan."). Worse yet, the ACA capped administrative costs in the individual and small-group markets—but the Final Rule apparently would lift such

---

[27] Defendants' response to Plaintiffs' point about *administrative costs* (*see* Pls.' Br. at 51 n.27) ignores that issue. Instead, Defendants refer to the page of the Final Rule describing the extremely narrow and illusory setting in which DOL believes an AHP might succeed in obtaining *provider discounts*—essentially a large, geographically focused AHP that limits consumers' choice of providers by keeping its "networks narrow." DOL admits that, on net, even that possibility is a wash because any such discounts would raise prices for other payers, such as Medicaid. *See* 83 Fed. Reg. at 28,942 (AR 31).

restrictions for self-funded AHPs, a point to which Defendants do not respond. *See* Pls.' Br. at 51 n.57 (citing 83 Fed. Reg. at 618 (AR 6951)).

### D. The Final Rule Is Predicated on Plainly Inconsistent Statutory Interpretations.

The Final Rule is premised on multiple inconsistent statutory interpretations that render it arbitrary and capricious. *See* Pls.' Br. at 52-54.

First, as Plaintiff States argued (Br. at 53), Defendants inconsistently apply the common-law master-servant test to determine whether an employer-employee relationship exists under ERISA's MEWA provision but forgo that test in determining whether an employer-employee relationship exists under the ACA.

Unable to explain this inconsistency, Defendants resort to a non sequitur. They argue that the MEWA definition contemplates MEWAs that both are, and are not, ERISA plans. But that point is irrelevant: either way, there is a MEWA in the first place only if there are "*employees of* two or more employers," and DOL concedes that that critical question is governed by the common law employer-employee relationship. Defs.' Br. at 32-33. Defendants' response makes no effort to explain why that well-established test governs the phrase "employee of" in the MEWA statute but not the phrase "employer who employed" in the ACA's market definitions.[28]

Second, Defendants do not meaningfully dispute that the Final Rule creates an array of unexplained inconsistencies in statutory interpretation across different types of ERISA-covered benefits. *See* Pls.' Br. at 52. For example, the Final Rule's expanded definition of "employer"

---

[28] Defendants' statement (Br. at 33) that Section 3(5) does not supply the "employer" definition "for membership in a MEWA" is wrong. Section 3(5) defines "employer" for purposes of other ERISA definitions in the same section that use the term "employer." 29 U.S.C. § 1002(5) (defining "employer" "[f]or purposes of this subchapter").

applies to *health* plans, but not to a broad range of other plans covered by ERISA, including short- or long-term disability plans, accident benefits, life insurance benefits, unemployment benefits, and more. In another example of inconsistency, the AHP redefinition of "employer" to cover sole proprietors also apparently applies solely to AHPs but not to other ERISA plans.[29] "The disparate treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious." *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 28 (D.D.C. 1997); *id.* at 27 (collecting cases).

Rather than attempting to reconcile these inconsistencies, Defendants instead appear to assert that they are free to apply *identical* statutory text differently in different contexts. Defs.' Br. at 35 n.13. This rationale is counter to D.C. Circuit precedent. *See, e.g.*, *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996) (single statutory standard for royalty payments must be applied alike to different types of payments); *Good Fortune Shipping SA v. Comm'r of IRS*, 897 F.3d 256, 264 (D.C. Cir. 2018) (treatment of functionally similar categories differently in regulatory interpretation of statute is "enough to render the distinction inadequate"). It is also contrary to the plain text of ERISA, which uses *one* definition of "employer" to cover welfare plans offering a vast array of benefits, as well as pension plans.

---

[29] Enabling a sole proprietor to be both her own employer and employee under ERISA generally would be absurd: such a person could (theoretically) sponsor her own employee benefit plan, 29 U.S.C. § 1002(16)(B) (the plan sponsor is the employer for a single-employer plan), be the administrator of her own plan, *id.* § 1002(16)(A)(ii), be subject to a variety of ERISA obligations, *see, e.g.*, *id.* § 1021, and be partially insulated from state law notwithstanding Congress's directive that insurance, banking, and securities laws largely be unaffected by ERISA, *id.* § 1144(b)(2)(A). That DOL attempts to avoid that result by limiting its "sole proprietor" expansion to AHPs does not suffice to save it. "Agencies are not free to adopt unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness." *Chamber of Commerce of United States of America v. DOL*, 885 F.3d 360, 383 (5th Cir. 2018) (quoting *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2446 (2014)).

In a footnote, Defendants vaguely assert that unspecified "different requirements and obligations" may justify applying identical statutory text differently. Defs.' Br. at 35 n.13. That wholly unsupported assertion carries no weight here. In addition, Defendants' response represents an unannounced and explained major change in agency policy that is invalid for that reason alone. *Fox Television*, 556 U.S. at 515 ("An agency may not . . . depart from a prior policy *sub silentio*."). Defendants appear to be describing a shift from a uniform approach to whether a "group or association" is an "employer" under ERISA (regardless of the type of ERISA-covered benefit offered) to a disparate approach that varies based on the benefit offered, other undefined "different requirements and obligations," or yet other undescribed policy considerations. Defs.' Br. at 35 n.13. But Defendants' prior, uniform approach had been DOL's and the courts' approach for decades.[30] Nothing in the record explains Defendants' shift from a uniform construction to disparate treatment of this crucial jurisdictional term. *Cf. New England Power Generators*, 881 F.3d at 210-11 (holding that, to the extent an agency seeks to justify a departure by reference to differing facts, "it is the agency's responsibility to provide a reasoned explanation of why those facts matter"); *ABM Onsite Services—West, Inc. v. NLRB*, 849 F.3d 1137, 1140, 1146-47 (D.C. Cir. 2017) (invalidating change in construction of term governing jurisdiction of two federal agencies).

---

[30] *See, e.g.*, *Gruber*, 159 F.3d at 784 (health, dental, and other benefits); *WEAIT*, 804 F.2d at 1060 (noting that plan at issue provided "health, life, and disability benefits"); *Bell v. Emp. Sec. Benefit Ass'n*, 437 F. Supp. 382, 384 (D. Kan. 1977) ("major medical expense and death benefit plan"); DOL Op. No. 2008-07A, 2008 WL 4559903, at *1 (Sept. 26, 2008) (rejecting ERISA status for local chamber of commerce plan that would have offered "medical and dental coverage, wellness programs, third party administration, legal aid services, life insurance, disability insurance and business travel accident insurance"); 83 Fed. Reg. at 615 n.2 (AR 6948) ("prior guidance under ERISA section 3(5) addressed health benefits *and other benefits* under section 3(1)." (emphasis added)).

Seeking to minimize the inconsistencies their interpretation generates, DOL points to a newly proposed rule to authorize "Association Retirement Plans," which also adopts a broad definition of "employer" to include the same expanded class of associations that may offer AHPs. *See* Definition of "Employer" Under Section 3(5) of ERISA—Association Retirement Plans and Other Multiple-Employer Plans, 83 Fed. Reg. 53,534 (Oct. 23, 2018). Defs.' Br. at 35-36. But this proposed rule only highlights the inconsistency and selectivity of DOL's continuing efforts to radically alter decades of settled interpretations of the word "employer." First, this proposed rule applies only to one type of ERISA pension plan—defined *contribution* plans, such as 401(k) plans—rather than defined *benefit* plans, such as traditional pensions. 83 Fed. Reg. at 53,536. Second, this proposed rule imports a whole new category of entity from the IRC, a category known as a "professional employer organization," into ERISA's employer definition, apparently for the sole purpose of Association Retirement Plans—another unexplained inconsistency. *Id.* at 53,538. Third, for professional employer organizations to be deemed ERISA employers, DOL requires certain indicia of "substantial control" or "substantial employment functions." *Id.* at 53,540. But even though an association or other person must act in the same statutory capacity to qualify as an "employer" under ERISA section 3(5), DOL requires no such indicia of a true employment relationship for an association in the proposed Association Retirement Plan rule (or in the Final Rule at issue here).

Finally, the Final Rule relies on divergent interpretations of identical statutory language applied within the Public Health Service Act (PHSA), ERISA, and the Internal Revenue Code (IRC). Defendants do not dispute that the ACA's core reforms apply *identically* in the PHSA, IRC, and ERISA—nor do they dispute that Congress directed the relevant agencies to apply the relevant provisions in parallel. *See* Pls.' Br. at 18-19 & n.25. It is no answer that "IRC

provisions are not under the interpretive jurisdiction of the Department" (Defs.' Br. at 42) because Congress not only directed that identical provisions be construed the same but also ordered different agencies to act together to ensure consistency. *See* HIPAA, Pub. L. No. 104-191, § 104, 110 Stat. at 1978; 83 Fed. Reg. at 28,915 n.9 (AR 4) (noting that HIPAA § 104 governs HIPAA "and subsequent amendments, including certain sections of the Affordable Care Act"). Yet, as previously explained (*see* Pls.' Br. at 18-19), the Final Rule inexplicably applies DOL's expanded definition of "employer" only to the ACA's market-size definitions, while declining to apply this definition to parallel provisions in the IRC (or for that matter to the employer mandate, where Congress also mandated symmetry, *see supra* at 23-24). This additional inconsistency provides another reason to find the Final Rule arbitrary and capricious.

## CONCLUSION

The Court should deny the Defendants' motion and grant the Plaintiffs States' motion, declare that the Final Rule is illegal, and vacate the Final Rule in its entirety.

Dated: November 28, 2018

Respectfully Submitted,

**BARBARA D. UNDERWOOD**
*Attorney General*
*State of New York*

By: */s/ Susan J. Cameron*
Susan J. Cameron, Deputy Bureau Chief
Matthew Colangelo (D.C. Bar No. 997893),
Executive Deputy Attorney General
Steven C. Wu (D.C. Bar No. 975434),
Deputy Solicitor General
Lisa Landau, Bureau Chief
Sara H. Mark, Special Counsel
Eric R. Haren (D.C. Bar No. 985189),
Special Counsel to the Solicitor General

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

By: */s/ Eric M. Gold*
Eric M. Gold, Assistant Attorney General
Stephen B. Vogel, Assistant Attorney
General

Health Care Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Phone (617) 727-2200
eric.gold@state.ma.us

Elizabeth Chesler, Assistant Attorney
General
Matthew W. Grieco, Assistant Solicitor
General

Office of the New York State Attorney
General
Health Care Bureau
28 Liberty St., 19th Floor
New York, NY 10005
Phone: (212) 416-6305
susan.cameron@ag.ny.gov

stephen.vogel@state.ma.us

**KARL A. RACINE**
*Attorney General*
*District of Columbia*

By: */s/ Robyn R. Bender*
Robyn R. Bender (D.C. Bar No. 465117),
Deputy Attorney General
Andrew J. Saindon (D.C. Bar No. 456987),
Senior Assistant Attorney General
Valerie M. Nannery (D.C. Bar No. 488529),
Assistant Attorney General

Public Advocacy Division
441 4th Street, NW
Suite 630 South
Washington, DC 20001
Phone: (202) 724-6610
Robyn.Bender@dc.gov
Andrew.Saindon@dc.gov
Valerie.Nannery@dc.gov

**XAVIER BECERRA**
*Attorney General*
*State of California*

By: */s/ Julie Weng-Gutierrez*
Julie Weng-Gutierrez, Senior Assistant
Attorney General
Kathleen Boergers, Supervising Deputy
Attorney General
Nimrod P. Elias, Deputy Attorney General
Karli Eisenberg, Deputy Attorney General

Office of the Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Phone: (916) 210-7913
Julie.Wenggutierrez@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Nimrod.Elias@doj.ca.gov
Karli.Eisenberg@doj.ca.gov

**MATTHEW P. DENN**
*Attorney General*
*State of Delaware*

By: */s/ Ilona Kirshon*
Ilona Kirshon, Deputy State Solicitor
Jessica M. Willey, Deputy Attorney General

Department of Justice
Carvel State Building, 6th Floor
820 North French Street

**ANDY BESHEAR**
*Attorney General*
*Commonwealth of Kentucky*

By: */s/ J. Michael Brown*
J. Michael Brown, Deputy Attorney General
La Tasha Buckner, Assistant Deputy
Attorney General
S. Travis Mayo, Executive Director, Office of
Civil and Environmental Law
Taylor Payne, Assistant Attorney General

Wilmington, DE 19801
Phone: (302) 577-8400
Ilona.Kirshon@state.de.us
Jessica.Willey@state.de.us

Office of the Attorney General
700 Capitol Avenue
Capitol Building, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Travis.Mayo@ky.gov
Taylor.Payne@ky.gov

**BRIAN E. FROSH**
*Attorney General*
*State of Maryland*

By: */s/ Steven A. Sullivan*
Steven A. Sullivan, Solicitor General
Kimberly S. Cammarata, Director, Health
Education and Advocacy

200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-7038
ssullivan@oag.state.md.us
kcammarata@oag.state.md.us

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

By: */s/ Matthew J. Berns*
Matthew J. Berns (D.C. Bar No. 998094),
Assistant Attorney General
Jeffrey S. Posta, Deputy Attorney General

Department of Law and Public Safety
Office of the Attorney General
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor, West Wing
Trenton, NJ 08625-0080
Phone: (609) 376-2965
Matthew.Berns@njoag.gov
Jeffrey.Posta@njoag.gov

**ELLEN ROSENBLUM**
*Attorney General*
*State of Oregon*

By: */s/ Scott J. Kaplan*
Scott J. Kaplan, Senior Assistant
Attorney General
Henry Kantor, Trial Attorney
Sarah Weston, Trial Attorney

Oregon Department of Justice
100 Market Street
Portland, OR 97201
Phone: (971) 673-1880
Scott.Kaplan@doj.state.or.us
Henry.Kantor@doj.state.or.us
Sarah.Weston@doj.state.or.us

**JOSH SHAPIRO**
*Attorney General*
*Commonwealth of Pennsylvania*

By: */s/ Michael J. Fischer*
Michael J. Fischer, Chief Deputy Attorney
General
Nikole N. Brock, Deputy Attorney General

Office of the Attorney General
Strawberry Square
Harrisburg, PA 17120
Phone: (215) 560-2171
mfischer@attorneygeneral.gov
nbrock@attorneygeneral.gov

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

By: */s/ Toby J. Heytens*
Toby J. Heytens, Solicitor General
Matthew R. McGuire, Principal Deputy
Solicitor General

Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
Phone: (804) 786-7773
theytens@oag.state.va.us
mmcguire@oag.state.va.us

**BOB FERGUSON**
*Attorney General*
*State of Washington*

By: */s/ Jeffrey G. Rupert*
Jeffrey G. Rupert, Chief, Complex Litigation
Division
Jeffrey T. Sprung, Assistant Attorney General
Marta Deleon, Assistant Attorneys General

Office of the Washington Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Phone: (206) 326-5492
Jeffrey.Rupert@atg.wa.gov
Jeff.Sprung@atg.wa.gov
Marta.Deleon@atg.wa.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2018, I electronically filed the foregoing

Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss, or, in

the Alternative, for Summary Judgment, and Reply to Defendants' Opposition to Plaintiffs'

Motion for Summary Judgment using the Court's CM / ECF system, causing a notice of filing

to be served upon all counsel of record.

Dated: November 28, 2018          */s/ Susan J. Cameron*
                                  SUSAN J. CAMERON
                                  Deputy Bureau Chief
                                  Office of the New York State Attorney General
                                  Health Care Bureau
                                  Phone: (212) 416-6251
                                  Susan.Cameron@ag.ny.gov