**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| STATE OF NEW YORK, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>U.S. DEPARTMENT OF LABOR, *et al.*,<br><br>                    Defendants. |

Civil Action No. 18-1747 (JDB)

**BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS**

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Ashwin P. Phatak (DC Bar No. 1531218)
CONSTITUTIONAL ACCOUNTABILITY
    CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae Members
of Congress*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTEREST OF *AMICI CURIAE* ......................................................................................... 1

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 5

    I.   THE DISTINCTION BETWEEN INDIVIDUAL, SMALL GROUP, AND
       LARGE GROUP MARKETS IS CRITICAL TO THE AFFORDABLE CARE
       ACT'S STRUCTURE AND CONGRESS'S LEGISLATIVE PLAN IN
       ENACTING THE ACT. ............................................................................................ 5

   II.   THE DEPARTMENT OF LABOR RULE IS AT ODDS WITH THE LAW'S
       TEXT, STRUCTURE, AND HISTORY BECAUSE IT WOULD UNDERMINE
       THE ACA'S FUNDAMENTAL DISTINCTION BETWEEN SMALL AND
       LARGE EMPLOYERS. ............................................................................................ 10

CONCLUSION ................................................................................................................... 17

APPENDIX ......................................................................................................................... 1A

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989) ................................................................................ 11

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ................................................................................ 14

*Gruber v. Hubbard Bert Karle Weber, Inc.*,
    159 F.3d 780 (3d Cir. 1998) .................................................................. 14

*Gulf Oil Corp. v. Copp Paving Co.*,
    419 U.S. 186 (1974) ................................................................................ 16

*King v. Burwell*,
    135 S. Ct. 2480 (2015) ........................................................................ 5, 13

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .................................................................................. 6

Legislative and Executive Branch Materials

26 U.S.C. § 36B ........................................................................................... 10

26 U.S.C. § 36B(c)(2)(C) .............................................................................. 15

26 U.S.C. § 45R ........................................................................................... 10

26 U.S.C. § 414(b) ....................................................................................... 13

26 U.S.C. § 414(c) ....................................................................................... 13

26 U.S.C. § 414(m)(2)(A) .............................................................................. 13

26 U.S.C. § 1563(a) ...................................................................................... 13

26 U.S.C. § 4980H(a)(1) ............................................................................... 10

29 U.S.C. § 1002(5) ....................................................................................... 3

42 U.S.C. § 300gg ......................................................................................... 2

42 U.S.C. § 300gg(a)(1) ............................................................................... 10

42 U.S.C. § 300gg-3 ................................................................................ 5, 10

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

42 U.S.C. § 300gg-6(a) ................................................................................. 2, 8

42 U.S.C. § 300gg-91(a) .............................................................................. 14

42 U.S.C. § 300gg-91(a)(6) ......................................................................... 12, 13

42 U.S.C. § 300gg-91(e) .............................................................................. 2, 8

42 U.S.C. § 300gg-91(e)(2) ......................................................................... 4

42 U.S.C. § 18022(b)(1) .............................................................................. 2, 9

42 U.S.C. § 18022(b)(2)(A) ........................................................................ 9

42 U.S.C. § 18024(b)(4) .............................................................................. 13

42 U.S.C. § 18031 ....................................................................................... 10

42 U.S.C. § 18032(c)(1) .............................................................................. 2, 8

42 U.S.C. § 18032(c)(2) .............................................................................. 2, 8

42 U.S.C. § 18091(2)(D) ............................................................................. 1, 5

155 Cong. Rec. (daily ed. Oct. 21, 2009) ................................................... 7

155 Cong. Rec. (daily ed. Nov. 18, 2009) .................................................. 7, 8

155 Cong. Rec. (daily ed. Dec. 23, 2009) ................................................... 15

155 Cong. Rec. (daily ed. Dec. 24, 2009) ................................................... 15

155 Cong. Rec. (daily ed. Mar. 21, 2010) ................................................... 16

Coverage; Reporting and Disclosure Requirements, 40 Fed. Reg. 34,526 (Aug. 15, 1975) ....................................................................................... 3

Definition of "Employer" Under Section 3(5) of ERISA – Association Health Plans, 83 Fed. Reg. 28,912 (June 21, 2018) ............................. 3, 4, 15

Exec. Order No. 13813, 2017 WL 4546389 (Oct. 12, 2017) ...................... 11

Final Vote Results for Roll Call 885 (Nov. 7, 2009, 10:28 PM), http://clerk.house.gov/ evs/2009/roll885.xml ............................................................................... 16

H.R. Rep. No. 109-41 (2005) ....................................................................... 16

H.R. Rep. No. 111-299 (2009) ..................................................................... 6, 7

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

<u>Books, Articles, and Other Authorities</u>

Alexander Acosta, *A Health Fix for Mom and Pop Shops*, Wall St. J. (June 18,
2018) ...................................................................................................................... 14

Black's Law Dictionary (8th ed. 2004).......................................................................... 11

Dep't of Labor, Opinion Letter on ERISA, No. 2007-06A (Aug. 16, 2007)................. 3

*Overview of Provisions in the Amendment in the Nature of a Substitute to H.R. 3962 Offered by Mr. Boehner of Ohio*, Congressional Research Service, R40906 (Nov. 10, 2009) ...................................................................................................................... 16

President Donald Trump, *Remarks at the National Federation of Independent Businesses 75th Anniversary Celebration* (June 19, 2018)............................................................. 2

U.S. Dep't of Labor, *MEWAs: Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation* (Aug. 2013)............................................................................................................... 12

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are Democratic leaders in the House of Representatives who were actively involved in the enactment of the Patient Protection and Affordable Care Act ("ACA" or "the Act") and are thus particularly well suited to provide the Court with background on the text, structure, and history of the law.  In particular, *amici* can provide insight into how the law was designed to achieve its goal of expanding access to affordable health insurance through the reform of state individual health insurance markets.  *Amici* thus have unique knowledge about, and a strong interest in, the question whether the Department of Labor's new Rule is consistent with the text, structure, and history of the ACA.  As *amici* well know, it is not: the ACA was structured to distinguish between small group and individual markets on the one hand, and the large group market on the other, and the new Rule eviscerates that distinction in a manner that violates the text of the ACA and under-mines Congress's plan in passing it.  A full listing of *amici* appears in the Appendix.

## INTRODUCTION

In 2010, Congress enacted the Patient Protection and Affordable Care Act, a landmark law dedicated to achieving widespread, affordable health coverage.  To help achieve the statute's goal of "near-universal coverage," 42 U.S.C. § 18091(2)(D), without regard to pre-existing health con-ditions or health status, Congress extensively studied the health insurance market and the reasons why affordable health insurance was unavailable to so many Americans.  It determined that a key problem with the health insurance market prior to the ACA's enactment was the asymmetry in benefits and protections provided by large and small employers.  Specifically, individual and small group plans often lacked coverage of important benefits, and the premiums were often

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

unaffordable because they were based on the health risk of applicants on an individual or small group basis. Most large employers, by contrast, already offered comprehensive health benefits and other protections to their employees.

To address that asymmetry, Congress distinguished between three different markets—individual, small group, and large group, *see* 42 U.S.C. § 300gg-91(e) (defining individual market, large employer, and small employer)—and imposed certain reforms only on the individual and small group markets. For example, Congress limited discrimination in premiums based on factors such as health, gender, region, and occupation in individual and small group plans. *Id.* § 300gg. It required that individual and small group plans provide an "essential health benefits package" that includes ten essential benefits, thereby ensuring comprehensive coverage. *Id.* § 300gg-6(a); *id.* § 18022(b)(1)(A)-(J). And it required that insurers offering individual and small group plans treat all enrollees in these markets as "members of a single risk pool." *Id.* § 18032(c)(1)-(2). Thus, this distinction between individual and small group plans on the one hand, and large group plans on the other, was critical to Congress's plan in passing the ACA.

Despite the key role that this distinction plays in the structure of the ACA—or, more accurately, because of it, *see* Compl. ¶ 6 (noting that President Trump hailed the rule as a means to "escape some of ObamaCare's most burdensome mandates" (quoting President Donald Trump, *Remarks at the National Federation of Independent Businesses 75th Anniversary Celebration* (June 19, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-federation-independent-businesses-75th-anniversary-celebration)—the Trump Administration's Department of Labor has promulgated a final rule that eviscerates that distinction by abandoning the Department's long-standing approach to defining the term "employer" under the Employee Retirement Income Security Act (ERISA), the federal law that governs employee group

2

health plans.  Under ERISA, the term "employer" is defined to include "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity."  29 U.S.C. § 1002(5).  At the time of the ACA's enactment, the criteria the Department of Labor considered in determining whether an "association" should qualify as an "employer" were well established.  Among other things, the Department looked at the process and purpose by which the association was formed, whether there was a pre-existing relationship among employer members, who was entitled to participate, and whether employer members actually controlled the benefit plan's activities.  *See, e.g.*, Dep't of Labor, Opinion Letter on ERISA, No. 2007-06A (Aug. 16, 2007).  At the time of the ACA's enactment, it was also well settled that an individual with no employees could not be both an "employer" and an "employee."  Coverage; Reporting and Disclosure Requirements, 40 Fed. Reg. 34,526, 34,533 (Aug. 15, 1975).

The Department of Labor's new Rule changes these well-settled interpretations in two ways.  First, the new Rule explicitly provides that an association qualifies as an employer even if "[t]he primary purpose of the group or association [is] to offer and provide health coverage to its employer members and their employees," so long as the association also has "at least one substantial business purpose unrelated to offering and providing health coverage," such as "promoting common business interests of its members."  Definition of "Employer" Under Section 3(5) of ERISA – Association Health Plans, 83 Fed. Reg. 28,912, 28,962 (June 21, 2018).  Such an association would not have qualified as an "employer" under the Department's prior policy.  Second, the new Rule provides that a self-employed person with no other employees is an "employer" and is therefore entitled to form or join an employer association.  And in order to ensure that these new associations are exempt from the ACA's small-group market provisions, the Rule provides that

"because an [Association Health Plan (AHP)] would constitute a single group health plan, whether the AHP would be buying insurance in the large or small group market would be determined by reference to the total number of employees of all the member employers participating in the AHP." *Id.* at 28,915.

The effect of these changes will be, as the Rule frankly acknowledges, to undermine the protections that the ACA put in place specifically in the small group and individual marketplaces. As the Rule explains, participation in AHPs will enable "employees of small employers and working owners . . . to obtain coverage that is not subject to the regulatory complexity and burden that currently characterizes the market for individual and small group health coverage and, therefore, [to] enjoy flexibility with respect to benefits package design comparable to that enjoyed by large employers." *Id.* at 28,912; *id.* at 28,933 (stating that the Rule is designed to "level[] the playing field between small employers in AHPs, on the one hand, and large employers, on the other"); *id.* at 28,913 (noting that "[w]hether, and the extent to which, various regulatory requirements apply to association health coverage depends on whether the coverage is individual or group coverage and, in turn, whether the group coverage is small or large group coverage"). In short, the Rule permits individual and small group health plans to skirt the requirements that the ACA specifically and intentionally imposed on those plans.

This outcome is at odds with the ACA's text, structure, and history, and therefore cannot stand. First, the Rule is unlawful under the text of the ACA, which defines a large employer as "an employer who *employed* an average of at least 51 *employees*" during the preceding year. 42 U.S.C. § 300gg-91(e)(2) (emphasis added). Congress's use of the words "employed" and "employees" cabins the category of "employer[s]" that qualify as "large" employers for purposes of the ACA to those organizations that have an employer-employee relationship with more than 50

individuals.  Organizations and individuals that band together to form an AHP do not "employ" at least 51 "employees" and thus cannot qualify as "large" employers.

Second, the Rule is unlawful because it would undermine the fundamental structure of the ACA, which was designed to apply different benefits and protections to large-employer, small-employer, and individual health plans.  While Congress applied some of the Act's reforms to all markets, *see, e.g.*, *id.* § 300gg-3 (pre-existing conditions), the number of provisions that addressed only the individual and small group markets reflects the importance of the distinction that Congress drew between those markets on the one hand, and the large group market on the other—as well as how significant that distinction is to the structure and overall operation of the ACA.  By permitting small employers and individuals to band together in an AHP, the Rule would exempt these employers from the requirements imposed on individuals and small employers under the Act while simultaneously exempting them from the employer mandate that applies only to large employers under the Act.  The creation of this giant loophole in the ACA's protections runs contrary to the structure of the Act.

Third, and finally, the Rule contravenes the history of the ACA's enactment because Congress considered—and rejected—a proposal to permit AHPs similar to the ones allowed by this Rule during the debate over the ACA.  Similar proposals were also rejected multiple times in the years before the ACA's passage.  For all those reasons, the Department of Labor's Rule is contrary to the ACA and cannot survive.

**ARGUMENT**

I.  **THE DISTINCTION BETWEEN INDIVIDUAL, SMALL GROUP, AND LARGE GROUP MARKETS IS CRITICAL TO THE AFFORDABLE CARE ACT'S STRUCTURE AND CONGRESS'S LEGISLATIVE PLAN IN ENACTING THE ACT.**

As the ACA's text makes clear, its goal was to achieve "near-universal coverage" and to ensure that that coverage would be affordable for all Americans.  42 U.S.C. § 18091(2)(D); *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015) (ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market"); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (ACA adopted "to increase the number of Americans covered by health insurance and decrease the cost of health care").

In order to determine how best to achieve those goals, Congress extensively studied the health insurance market and the reasons why affordable health insurance was unavailable to so many Americans.  As *amici* well know from their involvement in the drafting and passage of the ACA, Congress determined that a key problem with the health insurance market prior to the ACA's enactment was the asymmetry between large and small employers.  As one House report explained, "[a]pproximately 99% of large employers (200 or more workers) offer health benefits to at least some of their employees," while "[l]ess than half of all small employers (less than 50 employees) offer health insurance coverage to their employees."  H.R. Rep. No. 111-299, pt. 1, at 321-22 (2009).

The reasons for this disparity lay in key differences between the two markets.  At the time of the ACA's passage, "[l]arge employers [were] generally able to obtain lower premiums for a given health insurance package than small employers and individuals" because small-employer pools were "generally considered to be less stable than larger pools, as one or two employees moving in or out of the pool (or developing an illness) would have a greater impact on the average

per-person cost of health care than they would in a larger pool.  Also, small groups lack[ed] the economies of scale and leveraging ability available to large employers." *Id.*  As a result, "the vast majority of large firms typically [could] find and provide health insurance in the private market, in contrast with small firms and individuals." *Id.* at 322; *see id.* (noting that prior to the ACA's passage, "small employers face[d] greater difficulties in obtaining health insurance in the private market than large employers").

Congress recognized that similar factors also made it more difficult for *individuals* to obtain coverage—or at least comprehensive coverage—in the individual health insurance market. According to the same House report, "[d]epending on the applicable state laws, individuals who purchase health insurance in the non-group market may be rejected or face premiums that reflect their health status, which can make premiums lower for the healthy but higher for the sick.  Even when these individuals are issued a health insurance policy, the insurer may be allowed to exclude coverage for pre-existing health conditions." *Id*.

As the ACA was being drafted and debated, the differences between individual and small group markets on the one hand, and the large group market on the other, and the need to address those differences, were a constant refrain.  Senator Mark Warner, for example, noted the "enormous challenges that small businesses face in the health care market."  155 Cong. Rec. S11446 (daily ed. Nov. 18, 2009); *see id.* ("Small businesses currently lack the bargaining power of large firms . . . .  Small businesses are the group that falls through the cracks.").  Representative Bart Stupak also noted the problems in the small group market, explaining that "[t]he insurance companies take advantage of lax State laws and regulations, and they purge out small businesses because they're unprofitable if someone gets sick." *Id.* at H11570 (daily ed. Oct. 21, 2009); *see id.* ("Because Federal law guarantees small businesses can't be denied insurance once they have it,

they impose unpredictable, increasingly unaffordable premium increases.  These unsustainable premiums force the small businesses to drop their health insurance because it's no longer affordable.").

With all this information in mind, Congress ultimately decided that the best way to address these differences and thereby ensure affordable, near-universal coverage for all Americans was to guarantee that individuals and employees of small employers would have access to the same health insurance as individuals employed by large employers.  To achieve that end, Congress distinguished between three different markets—individual, small group, and large group—and applied different reforms to each of the three groups.  *See* 42 U.S.C. § 300gg-91(e) (defining individual, large employer, and small employer markets).

Significantly, the Act imposed a number of reforms that were specific to the individual and small group markets.  *See* Dkt. No. 48-1, at 8 ("The ACA imposed greater requirements for health insurance offered to 'individuals' and 'small employers,' thereby imposing different regulatory burdens for small employers offering health benefits to their employees, as compared to large employers." (citing 42 U.S.C. § 300gg-6(a))).  The Act, for example, took aim at the fragmentation of risk pools that led to premium volatility, inadequate benefits, and discrimination, providing for single risk pools in the individual and small group markets.  *See* 42 U.S.C. § 18032(c)(1) ("A health insurance issuer shall consider all enrollees in all health plans (other than grandfathered health plans) offered by such issuer in the individual market, including those enrollees who do not enroll in such plans through the Exchange, to be members of a single risk pool."); *id.* § 18032(c)(2) ("A health insurance issuer shall consider all enrollees in all health plans (other than grandfathered health plans) offered by such issuer in the small group market, including those enrollees who do not enroll in such plans through the Exchange, to be members of a single risk pool."); *see also* 155

Cong. Rec. S11447-48 (daily ed. Nov. 18, 2009) (statement of Sen. Mark Udall) ("The new health insurance exchanges envisioned under the reform packages before us would permit small employers to purchase policies that spread risk across a much larger population.").

The Act also addressed the inadequacy of benefits in the individual and small group markets by expressly providing that insurance offered in those markets would include "essential health benefits." 42 U.S.C. § 300gg-6(a) ("A health insurance issuer that offers health insurance coverage in the individual or small group market shall ensure that such coverage includes the essential health benefits package required under section 18022(a) of this title."). While the law gave the Secretary of Health and Human Services authority to define what those "essential health benefits" would be, the law specified that "such benefits shall include at least the following general categories": ambulatory patient services, emergency services, hospitalization, maternity and newborn care, mental health and substance use disorder services, prescription drugs, rehabilitative and habilitative services, laboratory services, preventive and wellness services and chronic disease management, and pediatric services, including oral and vision care. *Id.* § 18022(b)(1). Indeed, the text of the law made clear that the goal of this essential benefits package was to ensure that the benefits provided to individuals and employees of small employers were comparable to those provided to employees of larger employers, and that small employer plans could not undermine the Act's goal of mandating coverage for certain benefits by cherry-picking which essential benefits to provide to consumers. *Id.* § 18022(b)(2)(A) ("The Secretary shall ensure that the scope of the essential health benefits under paragraph (1) is equal to the scope of benefits provided under a typical employer plan, as determined by the Secretary.").

Finally, the Act addressed premium volatility by again imposing a reform specific to the individual and small group markets, providing that premiums may not vary except based on certain

narrow categories.  "With respect to the premium rate charged by a health insurance issuer for health insurance coverage offered in the individual or small group market—(A) such rate shall vary with respect to the particular plan or coverage involved only by—(i) whether such plan or coverage covers an individual or family; (ii) rating area, as established in accordance with paragraph (2); (iii) age, except that such rate shall not vary by more than 3 to 1 for adults (consistent with section 300gg-6(c) of this title); and (iv) tobacco use, except that such rate shall not vary by more than 1.5 to 1; and (B) such rate shall not vary with respect to the particular plan or coverage involved by any other factor not described in subparagraph (A)."  *Id.* § 300gg(a)(1).[2]

The ACA did not impose these same requirements on large group employers because most large group employers already provided comprehensive health insurance to their employees.  Indeed, even though the ACA required large employers to provide health coverage or pay a tax penalty, *see* 26 U.S.C. § 4980H(a)(1) (large employer must offer "its full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage"), the mandated coverage was not required to meet the same standards as those set for the individual and small group markets.

Thus, while Congress applied some of the Act's reforms to all markets, *see, e.g.*, 42 U.S.C. § 300gg-3 (pre-existing conditions), its decision to apply numerous critical reforms only to the individual and small group markets reflects the importance of the distinction that Congress drew between those markets on the one hand, and the large group market on the other—as well as how significant that distinction is to the structure and overall operation of the ACA.  The Department

---

[2] The ACA also provided other reforms specific to the individual and small group markets: tax credits to subsidize individuals' purchase of health insurance, 26 U.S.C. § 36B; credits for small businesses, *id.* § 45R; and the establishment of exchanges for the purchase of individual and small group coverage, 42 U.S.C. § 18031.

of Labor Rule at issue here would fundamentally undermine that distinction and is at odds with the ACA's text, structure, and history, as the next Section discusses.

## II.   THE DEPARTMENT OF LABOR RULE IS AT ODDS WITH THE LAW'S TEXT, STRUCTURE, AND HISTORY BECAUSE IT WOULD UNDERMINE THE ACA'S FUNDAMENTAL DISTINCTION BETWEEN SMALL AND LARGE EMPLOY-ERS.

On October 12, 2017, President Trump signed Executive Order 13813, which, among other things, directed his Administration to identify means of expanding Association Health Plans (AHPs). The Order made clear that "[e]xpanding access to AHPs" would "allow more small busi-nesses to avoid many of the [Affordable Care Act's] costly requirements." Exec. Order No. 13813, 2017 WL 4546389 (Oct. 12, 2017). Fulfilling that directive, the Department of Labor promulgated a Rule that will dramatically expand the number of AHPs and thereby undermine the ACA's de-liberately heightened protections for individuals and for employees of small employers.

The Department of Labor's Rule is at odds with the text, structure, and history of the ACA. *First*, the Rule is at odds with the text of the ACA because the ACA's use of the terms "employed" and "employees" in defining the size of employers makes clear that to qualify as a large "em-ployer" under the ACA, an employer must have a real employer-employee relationship with an average of at least 51 individuals during the preceding year. An "employee" is "[a] person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." *Employee*, Black's Law Dictionary (8th ed. 2004); *see also Employ*, Black's Law Dictionary (8th ed. 2004) ("employ" is defined as "[t]o make use of," "[t]o hire," "[t]o use as an agent or substitute in trans-acting business," and "[t]o commission and entrust with the performance of certain acts or func-tions or with the management of one's affairs"); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989) ("In the past, when Congress has used the term 'employee' without

defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.").

The Department of Labor's new Rule violates this statutory language because it treats an AHP as a "large employer," even though the member employers of the Plan do not actually "employ" more than 50 "employees" in the ordinary sense of those words.  *See* Dkt. No. 1, at 6 (Associations "may be composed of entirely unrelated and separate employers (including potentially all employers in a State) and purportedly self-employed individuals.").  To be sure, the ACA provides that "[t]he term 'employer' has the meaning given such term under section 3(5) of the Employee Retirement Income Security Act of 1974 [(ERISA)] except that such term shall include only employers of two or more employees," 42 U.S.C. § 300gg-91(a)(6), and the Department of Labor has some flexibility in how it defines terms like "employer," *see* Dkt. No. 48-1, at 3 (Department has "rulemaking authority . . . to fill 'gaps' in the statute").  But the Department of Labor may not promulgate a rule that is inconsistent with a statute that, like the ACA, was passed later in time, and the Department of Labor's own guidance makes clear that an "association" can qualify as an "'employer' within the meaning of ERISA Section 3(5)," and still not "employ[]" the individuals "covered by the group or association-sponsored plan," U.S. Dep't of Labor, *MEWAs: Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation* 22 (Aug. 2013), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/mewa-under-erisa-a-guide-to-federal-and-state-regulation.pdf.  Thus, by treating AHPs as large employers, the Department of Labor's Rule conflicts with the ACA's use of the terms "employ" and "employees," which makes clear that the Department of Labor may not define a large employer to include a collection of *unrelated* employers that individually "employ" fewer than 50 "employees."  And the Act

12

makes explicit that the Department may not define the term "employer" to include individuals who employ *zero* employees because the Act limits the definition of "employer" to "include only employers of two or more employees," 42 U.S.C. § 300gg-91(a)(6).

On top of the ACA's use of "employ" and "employee," the ACA also explicitly identifies certain circumstances in which the employees of more than one employer can be counted together for the purpose of determining the size of an employer, but does not include an AHP as one of those circumstances. *See* 42 U.S.C. § 18024(b)(4). Specifically, the Act allows for aggregation when, among other things, several corporations have a common parent corporation that owns eighty percent of the stock in all of the corporations, 26 U.S.C. § 414(b); *id.* § 1563(a); when a group of partnerships or proprietorships are under "common control," *id.* § 414(c); and when one organization holds shares in another and provides services to that organization, *id.* § 414(m)(2)(A). In other words, Congress chose to identify in the text of the Act certain circumstances where employees of more than one employer can count for determining employer size, but explicitly left out AHPs. And that is with good reason: in setting up this critical distinction between small employers and individuals on the one hand, and large employers on the other, Congress did not want that distinction to be easily subverted by aggregating multiple, unrelated small employers and individuals.

*Second*, even if there were ambiguity in the text of the Act (which there is not), the new Rule cannot survive because it is so plainly at odds with the structure of the ACA and Congress's plan in enacting it. *See King*, 135 S. Ct. at 2492 ("Given that the text is ambiguous, we must turn to the broader structure of the Act to determine [its] meaning . . . ."). As discussed above, when Congress drafted the ACA, it drew a critical distinction between the individual and small group markets on the one hand, and the large group market on the other. As *amici* well know from their

13

involvement in the drafting of the ACA, that distinction was a deliberate response to the problem of fewer benefits and protections in the individual and small group markets, with plans in these markets often cherry-picking which benefits to provide to consumers.  *See supra* at 5-10.  Thus, Congress imposed certain requirements, like providing single risk pools and including essential health benefits, on only small group and individual markets—that is, employers with fewer than 50 employees.  *Id.*

Congress did, of course, link the meaning of "employer" to the term "employer" in ERISA. *See* 42 U.S.C. § 300gg-91(a).  But it did so based on a decades-old understanding that a group or association could qualify as an "employer" under ERISA only if "tied by a common economic or representation interest, unrelated to the provision of benefits" and if "the association's employer members . . . have control—in form and substance—over, and direct involvement in the establishment or maintenance of, the plan and the association."  Dkt. No. 1, at 14 (quoting *Gruber v. Hubbard Bert Karle Weber, Inc.*, 159 F.3d 780, 787 (3d Cir. 1998)); *cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156 (2000) ("Congress has affirmatively acted to address the issue of tobacco and health, relying on the representations of the FDA that it had no authority to regulate tobacco.").  By throwing out that decades-old understanding upon which the ACA was premised, the Rule at issue here would fundamentally undermine the distinction between large employers and small employers.  That is not only the effect of the Rule, but its explicit purpose.  In an op-ed promoting the Rule, Labor Secretary Alexander Acosta noted that "ObamaCare imposes starkly different rules on large companies and small businesses," and made clear that the Rule was designed to eviscerate that distinction.  Alexander Acosta, *A Health Fix for Mom and Pop Shops*, Wall St. J. (June 18, 2018), https://www.wsj.com/articles/a-health-fix-for-mom-and-pop-shops-

1529363643; *see id.* (noting that "[s]mall businesses should face the same regulatory burden as large companies, if not a lighter one").

The Rule is at odds with the structure of the ACA in another respect as well.  As described above, large employers that are not subject to the ACA's more stringent consumer protections are subject to an employer mandate that requires them to offer their employees affordable coverage that meets certain minimum standards.  26 U.S.C. § 36B(c)(2)(C).  Yet the new Rule provides that the employer mandate will not apply to an AHP, but only to any member employers of that AHP that independently satisfy the definition of "large employer."  83 Fed. Reg. at 28,933 & n.54.  In other words, the Department of Labor's new Rule creates a special loophole for members of AHPs that would exempt them from the reforms that apply to individual and small group plans *and* the employer mandate applicable to large group plans.  The Rule therefore completely subverts Congress's plan in enacting the ACA.

*Third* and finally, the Department of Labor's Rule is also at odds with the history of the Act's enactment.  During the lengthy deliberations and debate over the ACA, many opponents of the Act complained that the legislation did not do exactly what the Department of Labor now proposes to do by rule: allow small employers and individuals to band together to qualify for the large group market.  Senator John Ensign, for example, cautioned his colleagues that they should not "settle for this bill" because, in his view, it would be better to have a "system that allows small businesses to pool their purchasing power to provide health insurance to their employees through Small business health plans."  155 Cong. Rec. S14126 (daily ed. Dec. 24, 2009) (statement of Sen. John Ensign); *see id.* at S13829 (daily ed. Dec. 23, 2009) (statement of Sen. John Kyl) ("We should also allow small businesses to band together to pool their risk and purchase insurance at the same rates large corporations get.").  As Representative Rodney Frelinghuysen noted, "this bill is . . .

15

notable for what it does not contain. . . .  It fails to recognize the value of Association Health Plans, which permit small businesses to pool their risk in order to secure lower insurance rates."  155 Cong. Rec. H1919 (daily ed. Mar. 21, 2010).

Despite these arguments, Congress rejected an amendment to the ACA that would have established Association Health Plans. *See Overview of Provisions in the Amendment in the Nature of a Substitute to H.R. 3962 Offered by Mr. Boehner of Ohio*, Congressional Research Service, R40906 (Nov. 10, 2009), https://www.everycrsreport.com/files/20091110_R40906_0f669b179c4aa1e6cb7c69407920dd29c19268c1.pdf ("The Amendment would establish Association Health Plans (AHPs) to facilitate the offer and purchase of health insurance sponsored by bona fide associations. . . . AHPs would have sole discretion to determine the specific items and services to be included as benefits, except in the case of [certain specified] state laws . . . ."); Final Vote Results for Roll Call 885 (Nov. 7, 2009, 10:28 PM), http://clerk.house.gov/evs/2009/roll885.xml (vote on Boehner of Ohio Substitute Amendment). When Congress considers a provision while crafting a bill, but does not ultimately include it, this "strongly militates against a judgment that Congress intended a result that it expressly declined to enact," *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974).  And this was not the first time that Congress rejected legislation permitting AHPs; it also rejected such legislation repeatedly from 1995 to 2005.  *See* H.R. Rep. No. 109-41, at 1-5 (2005); *see also* Dkt. No. 1, at 26-28.  In short, Congress's long and consistent history of rejecting legislation that would permit AHPs— including particularly its rejection of such a proposal during the debate over the ACA—only bolsters what the ACA's text and structure already make clear: that these Plans undermine the Act's distinction between small and large employers and are therefore unlawful.

* * *

16

In sum, the text, structure, and history of the ACA all confirm what everyone in Congress understood at the time the law was enacted: the distinction between the individual and small group markets on the one hand, and the large group market on the other, is critical to the effective operation of the ACA.  The Department of Labor's new Rule eviscerates that distinction, violating the text of the ACA and undermining Congress's legislative plan in passing it.  The Department of Labor's new Rule is therefore unlawful.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Respectfully submitted,

Dated:  November 29, 2018

/s/ Brianne J. Gorod
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Ashwin P. Phatak (DC Bar No. 1531218)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae Members of Congress*

**APPENDIX:**
LIST OF *AMICI*

Rep. Nancy Pelosi
     Democratic Leader

Rep. Steny H. Hoyer
     Democratic Whip

Rep. James E. Clyburn
     Assistant Democratic Leader

Rep. Joseph Crowley
     Democratic Caucus Chair

Rep. Linda T. Sánchez
     Democratic Caucus Vice-Chair

Rep. Robert C. "Bobby" Scott
     Ranking Member, Committee on Education and the Workforce

Rep. Frank Pallone, Jr.
     Ranking Member, Committee on Energy and Commerce

Rep. Jerrold Nadler
     Ranking Member, Judiciary Committee

Rep. Richard E. Neal
     Ranking Member, Committee on Ways and Means

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2018, the foregoing document was filed with the Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: November 29, 2018

/s/ Brianne J. Gorod
Brianne J. Gorod
