**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

State of New York, et al.,

                Plaintiffs,

v.

United States Department of Labor, et. al.,

                Defendants.

Civil Action No. 18-1747 (JDB)

**BRIEF OF *AMICI CURIAE* AMERICAN MEDICAL ASSOCIATION AND MEDICAL SOCIETY OF THE STATE OF NEW YORK IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Chad I. Golder (Bar ID: 976914)
MUNGER, TOLLES & OLSON LLP
1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357
Telephone: (202) 220-1100
Fax: (202) 220-2300

*Counsel for* Amici Curiae American Medical Association and Medical Society of the State of New York

# **TABLE OF CONTENTS**

**Page**

I.      THE AHP RULE SABOTAGES THE AFFORDABLE CARE ACT'S PATIENT
        PROTECTIONS ...................................................................................................6

        A.      The Affordable Care Act Included Consumer Protection Provisions to
                Improve the Quality of Health Care Coverage Accessible to Americans ..............6

        B.      The AHP Rule Will Undermine the Consumer Protection Provisions in the
                Affordable Care Act, Leaving Patients Vulnerable to Worse Health
                Outcomes and/or Financial Ruin ...........................................................................9

II.     THE AHP RULE WILL DESTABILIZE THE HEALTH INSURANCE
        MARKET.................................................................................................................17

III.    THE AHP RULE CREATES AN UNDENIABLE RISK OF FRAUDULENT OR
        ABUSIVE INSURANCE PRACTICES.......................................................................21

CONCLUSION..................................................................................................................23

CERTIFICATE OF COMPLIANCE.......................................................................................25

CERTIFICATE OF SERVICE .............................................................................................26

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Cutler v. U.S. Dep't of Health and Human Servs.*,
   797 F.3d 1173 (D.C. Cir. 2015) ..........................................................................4, 19

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ...............................................................................................23

*National Federation of Independent Business v. Sebelius*,
   567 U.S. 519 (2012) ............................................................................................4, 5, 8

*Seven-Sky v. Holder*,
   661 F.3d 1 (D.C. Cir. 2011) ........................................................................................4

**FEDERAL STATUTES**

5 U.S.C. § 706(2)(A) ..............................................................................................................15

26 U.S.C. § 4980H ..................................................................................................................10

42 U.S.C. § 18022 ......................................................................................................................8

42 U.S.C. § 18022(b)(1) ............................................................................................................8

42 U.S.C. § 18091(2)(I) ........................................................................................................7, 20

42 U.S.C. § 18091(2)(E)-(G) ....................................................................................................7

**FEDERAL REGULATIONS**

Definition of "Employer" Under Section 3(5) of ERISA—Association Health
   Plans, 83 Fed. Reg. 28,912 (June 21, 2018) ......................................................4, 10

Definition of "Employer" Under Section 3(5) of ERISA—Association Health
   Plans, 83 Fed. Reg. 614-01, 615 (Jan. 5, 2018) .........................................................9

**OTHER AUTHORITIES**

Aaron S. Kesselheim, et al., *Prescription Drug Insurance Coverage and Patient
   Health Outcomes: A Systematic Review*, 105 Am. J Public Health e17 (Feb
   2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4318289/ ....................11

## **TABLE OF AUTHORITIES**

**Page**

Allen St. John, *How the Affordable Care Act Drove Down Personal Bankruptcy:*
*Expanded health insurance helped cut the number of filings by half*, Consumer
Reports (May 2, 2017), https://www.consumerreports.org/personal-
bankruptcy/how-the-aca-drove-down-personal-bankruptcy/.....................................................7

American Academy of Actuaries, *Issue Brief: Association Health Plans*, February
2018, www.actuary.org/content/association-health-plans-0.....................................................19

American Academy of Child & Adolescent Psychiatry, Comment Letter on
Proposed Rulemaking, Definition of Employer-Association Health Plans (RIN
1210-AB85) (March 5, 2018) ..................................................................................................12

American Academy of Family Physicians, Comment Letter on Proposed
Rulemaking, Definition of Employer-Small Business Health Plans (RIN 1210-
AB85) (March 5, 2018)............................................................................................................14

American Academy of Pediatrics, Comment Letter on Proposed Rulemaking,
Definition of Employer-Small Business Health Plans (RIN 1210-AB85)
(March 6, 2018) .......................................................................................................................12

American Cancer Society, Comment Letter on Proposed Rulemaking, Definition
of Employer-Association Health Plans (RIN 1210-AB85) (March 6, 2018) .........................17

American College of Obstetricians and Gynecologists, Comment Letter on
Proposed Rulemaking, Definition of Employer-Association Health Plans (RIN
1210-AB85) (March 5, 2018) ..................................................................................................13

American Medical Association, Comment Letter on Proposed Rulemaking,
Definition of Employer-Small Business Health Plans (RIN 1210-AB85)
(March 5, 2018) .........................................................................................................................5

Centers for Disease Control & Prevention, *Gateway to Health Communication &*
*Social Marketing Practice: Pregnancy and Prenatal Care*,
https://www.cdc.gov/healthcommunication/
toolstemplates/entertainmented/tips/PregnancyPrenatalCare.html..........................................11

Dan Mendelson, et al., *Association Health Plans Projected to Enroll 3.2M*
*Individuals*, Avalere.com, Feb. 28, 2018,
http://avalere.com/expertise/managed-care/insights/association-health-plans-
projected-to-enroll-3.2m-individuals .......................................................................................18

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

Gary Claxton, et al., *Pre-existing Conditions and Medical Underwriting in the
  Individual Insurance Market Prior to the ACA*, Henry J. Kaiser Family
  Foundation (Dec. 12, 2016), https://www.kff.org/health-reform/issue-
  brief/pre-existing-conditions-and-medical-underwriting-in-the-individual-
  insurance-market-prior-to-the-aca/ ...........................................................................................6

Gary Claxton, Larry Levitt, & Karen Pollitz, *Pre-ACA Market Practices Provide
  Lessons for ACA Replacement Approaches*, Henry J. Kaiser Family
  Foundation (Feb 16, 2017), https://www.kff.org/health-costs/issue-brief/pre-
  aca-market-practices-provide-lessons-for-aca-replacement-approaches/................................6

Hannah Nichols, *The Top 10 Leading Causes of Death in the United States*,
  Medical News Today, Feb. 23, 2017,
  https://www.medicalnewstoday.com/articles/282929.php ....................................................11

*Information on Essential Health Benefits (EHB) Benchmark Plan*s, Centers for
  Medicare & Medicaid Services, https://www.cms.gov/cciio/resources/data-
  resources/ehb.html ...............................................................................................................8

Josh Katz, *Drug Deaths in America are Rising Faster than Ever*, New York
  Times, June 5, 2017 ............................................................................................................12

Katie Keith, *Reports Find Risk of Non-ACA-Compliant Plans to be Higher than
  Federal Estimates*¸ Health Affairs Blog, March 4, 2018,
  https://www.healthaffairs.org/ do/10.1377/hblog20180303.392660/full/ .............................18

*Lifetime & Annual Limits*, U.S. Department of Health & Human Services,
  https://www.hhs.gov/healthcare/about-the-aca/benefit-limits/index.html...............................8

Lueck, Sarah, *Trump Rule on Association Health Plans Could Devastate Small
  Group Markets*,  Center for Budget and Policy Priorities, Jan. 5, 2018,
  https://www.cbpp.org/blog/trump-rule-on-association-health-plans-could-
  devastate-small-group-markets .............................................................................................11

Michelle Andrews, *Thinking About an Association Health Plan? Read The Fine
  Print*, Kaiser Health News (June 26, 2018) ..........................................................................16

Mila Kofman, *Association Health Plans: Loss of State Oversight Means
  Regulatory Vacuum and More Fraud*, Georgetown Health Policy Institute
  (2005), https://hpi.georgetown.edu/ahp.html........................................................................21

Mila Kofman, et al., *Association Health Plans: What's All the Fuss About?*, 25
  Health Affairs 1591 (Nov. 1, 2006)
  https://www.healthaffairs.org/doi/full/10.1377/hlthaff.25.6.1591....................................21, 22

# TABLE OF AUTHORITIES

**Page**

Mila Kofman, et al., *Health Insurance Regulation by States and the Federal
    Government: A Review of Current Approaches and Proposals for Change*,
    Georgetown Health Policy Institute (April 2006), https://www-
    tc.pbs.org/now/politics/Healthinsurancereportfinalkofman pollitz.pdf ................................21

National Alliance on Mental Illness, *Mental Health Facts In America*,
    https://www.nami.org/NAMI/media/NAMI-
    Media/Infographics/GeneralMHFacts.pdf ............................................................................11

National Association of Insurance Commissioners, Letter to Consumer
    Representatives regarding Proposed Rules Related to AHPs (Feb. 1, 2018),
    uphelp.org/sites/default/
    files/attachments/naic_rep_letter_ahps_020118_final_0.pdf ..................................................16

National Institutes of Health, *What is Prenatal Care and Why Is It Important?*,
    https://www.nichd.nih.gov/health/topics/pregnancy/conditioninfo/prenatal-
    care ........................................................................................................................................12

National Women's Law Center, *Turning to Fairness: Insurance Discrimination
    Against Women Today and the Affordable Care Act* (March 2012),
    https://www.nwlc.org/sites/default/files/pdfs/nwlc_2012_turningtofairness_re
    port.pdf ..................................................................................................................................13

Niraj Chokshi, *Historians Take Note: What America Looked Like Before
    Obamacare*, Washington Post, March 26, 2014 .......................................................................6

Noam N. Levey, *Trump's New Insurance Rules are Panned by Nearly Every
    Healthcare Group that Submitted Formal Comments*, L.A. Times, May 30,
    2018...........................................................................................................................................4

*Non-Group Health Plans*, Henry J. Kaiser Family Foundation (June 14, 2017),
    https://www.kff.org/health-reform/press-release/analysis-before-aca-benefits-
    rules-care-for-maternity-mental-health-substance-abuse-most-often-
    uncovered-by-non-group-health-plans/......................................................................................9

PerryUndem Research & Communication, *Examining the Mental Health Care
    Needs and Preferences of Women Ages 18 to 44* (2017)
    https://www.plannedparenthood.org/uploads/filer_public/50/2e/502ec309-
    c5f3-4aed-82c2-d73adb02aa8b/centering_srh_and_mh_care_-_generic.pdf .........................13

*Pre-Existing Conditions*, U.S. Department of Health & Human Services,
    https://www.hhs.gov/healthcare/ about-the-aca/pre-existing-
    conditions/index.html................................................................................................................8

# TABLE OF AUTHORITIES

**Page**

President Donald Trump, Remarks at the National Federation of Independent
    Businesses 75th Anniversary Celebration (June 19, 2018),
    https://www.whitehouse.gov/briefingsstatements/ remarks-president-trump-
    national-federationindependent-businesses-75thanniversary-celebration/ ...............................9

Protectourcare.org, Fact Sheet: Association Health Plans (May 17, 2018)
    https://www.protectourcare.org/fact-sheet-association-health-plans/......................................21

Robert Pear & Reed Abelson, Foiled in Congress, Trump Moves on His Own to
    Undermine Obamacare, New York Times, Oct. 11, 2017,
    https://www.nytimes.com/2017/10/11/us/politics/trump-obamacare-executive-
    order.html?_r=0 ...............................................................................................................9, 10

Ryan Schultz, Oliver Wyman, Letter to DC Health Benefit Exchange regarding
    Potential Impact of Association Health Plans in the District of Columbia, Feb.
    21, 2018)
    https://hbx.dc.gov/sites/default/files/dc/sites/hbx/publication/attachments/Revi
    ew%20of%20Impact%20of%20AHPs%202.21.2018.pdf........................................................19

Sabrina Corlette, et al., *New Rules to Expand Association Health Plans*, The
    Actuary, May 2018, Theactuarymagazine.org/new-rules-to-expand-
    association-health-plans.........................................................................................................18

Ted MacKinney, et al., *Does Providing Care for Uninsured Patients Decrease
    Emergency Room Visits and Hospitalizations?*, US National Library of
    Medicine, National Institutes of Health (March 11, 2013),
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4818592/ ......................................................7

U.S. General Accounting Office, Private Health Insurance: Employers and
    Individuals are Vulnerable to Unauthorized or Bogus Entities Selling
    Coverage, GAO-04-312 (Feb. 2004) .....................................................................................21

US National Library of Medicine, National Institutes of Health (March 11, 2013),
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4818592/ ......................................................7

Ylan Q. Mui, *The Shocking Number of Americans Who Can't Cover a $400
    Expense*, Washington Post, May 25, 2016,
    https://www.washingtonpost.com/news/wonk/wp/2016/05/ 25/the-shocking-
    number-of-americans-who-cant-cover-a-400-expense/?utm_term=.
    2f6208458f41...........................................................................................................................7

## **CORPORATE DISCLOSURE STATEMENT**

*Amici curiae* are non-profit organizations.  They have no parent corporations and do not issue stock.

## INTEREST OF *AMICI CURIAE*[1]

The American Medical Association (AMA) is the largest professional association of physicians, residents, and medical students in the United States.  Additionally, through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all US physicians, residents, and medical students are represented in the AMA's policy making process.  The objectives of the AMA are to promote the science and art of medicine and the betterment of public health.  AMA members practice and reside in all states and in the District of Columbia.

The Medical Society of the State of New York ("MSSNY") is comprised of physicians, residents and medical students who practice in the State of New York.  MSSNY is represented in the AMA House of Delegates and shares the AMA objectives to promote the science and art of medicine and the betterment of public health.  The primary purpose of MSSNY is to enhance the delivery of medical care of high quality to all people in the most economical manner and to promote and maintain high standards in medical education and in the practice of medicine in an effort to ensure that quality medical care is available to the public.

*Amici* share a commitment to increasing access to the best and most affordable healthcare coverage for their members' patients.  The Affordable Care Act was an important step towards achieving these goals.  The Department of Labor's June 21, 2018 Final Rule regarding Association

---

[1]     In accordance with Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that (1) this brief was authored entirely by counsel for *amici curiae* and not by counsel for any party, in whole or in part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from *amici curiae* and their counsel, no other person contributed money to fund preparing or submitting this brief.

Health Plans ("AHP Rule") will undermine the Act's vital reforms in ways that will harm physicians, patients, and the healthcare system as a whole.[2]

---

[2] The AMA and MSSNY join this brief on their own behalves and as representatives of the Litigation Center of the American Medical Association and the State Medical Societies. The Litigation Center is a coalition among the AMA and the medical societies of each state, whose purpose is to represent the viewpoint of organized medicine in the courts.

# INTRODUCTION

*Amici curiae* seek to improve healthcare in the United States.  A key part of this mission is advocating for access to affordable, meaningful health coverage for all patients.  As courts have recognized again and again, this is the same goal as underpins the Affordable Care Act itself.[3]

The Department of Labor's June 21, 2018 Final Rule regarding Association Health Plans ("AHP Rule")[4] is antithetical to this mission.  The AHP Rule will be devastating to the health, well-being, and pocketbooks of millions of Americans.  To understand why, this Court need look no further than the hundreds of comments Defendants received during the rulemaking process.  Remarkably "[n]ot a single group representing patients, physicians, nurses or hospitals voiced support" for the proposed rule.[5]  Sandy Praeger, a former state insurance regulator in Kansas and onetime president of the National Association of Insurance Commissioners captured it well: "'Basically anybody who knows anything about healthcare is opposed to these proposals.'"[6]

*Amici* respectfully submit that they, too, know something about healthcare.  And like the many other groups and individuals that participated in the rulemaking process, they believe that the AHP Rule is both unwise and unlawful.  The AMA's comment during the rulemaking process perfectly captures the uniform opposition by those who know healthcare the best:

---

[3]     *E.g.*, *Cutler v. U.S. Dep't of Health and Human Servs.*, 797 F.3d 1173, 1175 (D.C. Cir. 2015) ("Congress enacted the Affordable Care Act in 2010 in an effort to 'increase the number of Americans covered by health insurance and decrease the cost of health care.'" (quoting *National Federation of Independent Business* v. *Sebelius*, 567 U.S. 519, 538-539 (2012)); *Seven-Sky v. Holder*, 661 F.3d 1, 4 (D.C. Cir. 2011) ("Suffice it to say that the Affordable Care Act sought to reform our nation's health insurance and health care delivery markets with the aims of improving access to those markets and reducing health care costs and uncompensated care.").

[4]     See Definition of "Employer" Under Section 3(5) of ERISA—Association Health Plans, 83 Fed. Reg. 28,912 (June 21, 2018).

[5]     Noam N. Levey, *Trump's New Insurance Rules are Panned by Nearly Every Healthcare Group that Submitted Formal Comments*, L.A. Times, May 30, 2018.

[6]     *Id.*

[T]he coverage gains of the past decade should be maintained. Central to this principle is ensuring meaningful coverage, assisting individuals with low-incomes or unusually high medical costs in obtaining health insurance coverage and meeting cost-sharing obligations, and ensuring the continuation of essential health benefit (EHB) categories and their associated protections against annual and lifetime limits and out-of-pocket expenses. Affordability is also critical, as is stabilizing and strengthening the individual health insurance market, maintaining key insurance market reforms under current law, and expanding choice of health insurance coverage to best meet individual needs.

While the proposed rule expanding AHPs could potentially aid small businesses and individuals by enhancing consumer choice and making health insurance plans less expensive, the AMA is very concerned that, overall, DOL's proposal does not maintain key consumer protections and does not meet the AMA's key principles on health system reform as summarized above, and would result in substandard health insurance coverage.[7]

*Amici* respectfully ask this Court to bear these principles in mind as it evaluates this case. More importantly, they ask this Court to bear consequences of the AHP in mind as well. As explained below, the AHP Rule will (1) deprive patients of essential care; (2) allow insurers to discriminate against individuals based on pre-existing health conditions; (3) destabilize the insurance markets; and (4) expose patients to fraud. One need "not express any opinion on the wisdom of the Affordable Care Act" to recognize that upholding the AHP Rule will sabotage the ACA's crucial reforms. *National Federation of Independent Business*, 567 U.S. at 588. That alone demonstrates why plaintiffs should prevail in this case. The information below, drawn from *amici*'s vast expert medical experience, makes clear that defendants cannot survive the most deferential Administrative Procedure Act review. Plaintiffs' motion for summary judgment should be granted.

---

[7] American Medical Association, Comment Letter on Proposed Rulemaking, Definition of Employer-Small Business Health Plans (RIN 1210-AB85) (March 5, 2018) at 1-2.

## ARGUMENT

## I.   THE AHP RULE SABOTAGES THE AFFORDABLE CARE ACT'S PATIENT PROTECTIONS

### A.   The Affordable Care Act Included Consumer Protection Provisions to Improve the Quality of Health Care Coverage Accessible to Americans

Prior to passage of the ACA, millions of Americans struggled to obtain adequate health coverage.  Approximately 30% of Americans lacked meaningful health care coverage.  Almost 18% of Americans were completely uninsured.[8]  Nearly 12% were underinsured (that is, spent a high share of their income on medical care despite having insurance).[9]

Insurance companies contributed to this problem with the ways they managed the risk of high payouts.  Among other strategies, some individuals, especially those with pre-existing conditions, were priced out of new insurance plans because of the high costs that could be expected to treat their conditions.[10]  If they lost their coverage for any reason, they could have difficulty obtaining new coverage.  Insurance policies also routinely included provisions limiting liability under the policy for costs that could be linked to a condition predating the policy.[11]

Physicians and patients ultimately paid for these limitations.  Instead of obtaining preventative care and routine examinations, "many individuals would wait to purchase health

---

[8] Niraj Chokshi, *Historians Take Note: What America Looked Like Before Obamacare*, Washington Post, March 26, 2014, https://www.washingtonpost.com/blogs/govbeat/wp/2014/03/26/historians-take-note-what-america-looked-like-before-obamacare/.

[9] *Id.*

[10] Gary Claxton, Larry Levitt, & Karen Pollitz, *Pre-ACA Market Practices Provide Lessons for ACA Replacement Approaches*, Henry J. Kaiser Family Foundation (Feb 16, 2017), https://www.kff.org/health-costs/issue-brief/pre-aca-market-practices-provide-lessons-for-aca-replacement-approaches/.

[11] Gary Claxton, et al., *Pre-existing Conditions and Medical Underwriting in the Individual Insurance Market Prior to the ACA*, Henry J. Kaiser Family Foundation (Dec. 12, 2016), https://www.kff.org/health-reform/issue-brief/pre-existing-conditions-and-medical-underwriting-in-the-individual-insurance-market-prior-to-the-aca/.

insurance until they needed care."  42 U.S.C. § 18091(2)(I).  But at that point, they often sought

expensive emergency treatment.[12]  This resulted in much sicker patients and much higher costs

than if medical problems had been addressed earlier.  *See generally* 42 U.S.C. § 18091(2)(E) ("The

economy loses up to $207,000,000,000 a year because of the poorer health and shorter lifespan of

the uninsured.  By significantly reducing the number of the uninsured, the requirement, together

with the other provisions of this Act, will significantly reduce this economic cost.").

     If patients' poorer health outcomes were not bad enough, the increased cost of care meant

that they were left with significant medical debt.  *Id*. § 18091(2)(E)-(G) ("62 percent of all personal

bankruptcies are caused in part by medical expenses."); *see* Allen St. John, *How the Affordable*

*Care Act Drove Down Personal Bankruptcy: Expanded health insurance helped cut the number*

*of filings by half*, Consumer Reports (May 2, 2017), https://www.consumerreports.org/personal-

bankruptcy/how-the-aca-drove-down-personal-bankruptcy/.  This medical debt could financially

cripple the patients and leave their caregivers facing their own losses.  And inability to afford high

medical costs was not confined to a small percentage of indigent Americans:  a 2016 survey by

the Federal Reserve found that approximately *46%* of Americans did not have enough money to

cover a $400 emergency expense, meaning they would have to pay such expense by credit card

and face debt from the credit card company, borrow from friends and family, or leave the bill

unpaid.[13]

---

[12] *See, e.g.*, Ted MacKinney, et al., *Does Providing Care for Uninsured Patients Decrease Emergency Room Visits and Hospitalizations?*, US National Library of Medicine, National Institutes of Health (March 11, 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4818592/.

[13] Ylan Q. Mui, *The Shocking Number of Americans Who Can't Cover a $400 Expense*, Washington Post, May 25, 2016, https://www.washingtonpost.com/news/wonk/wp/2016/05/25/the-shocking-number-of-americans-who-cant-cover-a-400-expense/?utm_term=.2f6208458f41.

In response to the staggering numbers of uninsured and underinsured Americans and the exploding health care costs throughout the system, Congress passed the ACA in 2010.[14]  The ACA implemented a number of reforms to help more Americans obtain affordable, meaningful health coverage, including, as is relevant here, requiring insurance plans to cover pre-existing conditions and to provide a basic set of services called "Essential Health Benefits."[15]

These protections provided a crucial check on the historic problems of underinsurance and skyrocketing medical expenses.  By requiring plans to cover pre-existing conditions, the ACA eliminated a major factor leading to the denial of claims and refusal to provide affordable coverage. Similarly, the ACA required all plans to provide patients with coverage for certain types of common, basic care that was nonetheless frequently excluded from individual insurance plans before its enactment.  The ACA's "Essential Health Benefits" include: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.[16]

Before the ACA, many of these essential services were not covered by a significant percentage of health insurance plans.  For example, 75% of non-group health plans did not cover

---

[14] *See National Federation of Independent Business*, 567 U.S. 538.

[15] *See, e.g.*, 42 U.S.C. § 18022; *Lifetime & Annual Limits*, U.S. Department of Health & Human Services,  https://www.hhs.gov/healthcare/about-the-aca/benefit-limits/index.html;  *Pre-Existing Conditions*, U.S. Department of Health & Human Services, https://www.hhs.gov/healthcare/about-the-aca/pre-existing-conditions/index.html.

[16] 42 U.S.C. § 18022(b)(1); *see also Information on Essential Health Benefits (EHB) Benchmark Plan*s, Centers for Medicare & Medicaid Services, https://www.cms.gov/cciio/resources/data-resources/ehb.html.

delivery and inpatient maternity care.[17]   Similarly, 45% did not cover substance abuse disorder

services and 38% did not cover mental health services.[18]   Nearly 20% had some limitation on

coverage of prescription medications.[19]   Under the ACA, however, individual and small group

insurance plans are all required to cover these services, providing meaningful coverage to those

who did not have it before.

**B.     The AHP Rule Will Undermine the Consumer Protection Provisions in the Affordable Care Act, Leaving Patients Vulnerable to Worse Health Outcomes and/or Financial Ruin**

The AHP Rule threatens to undo the ACA's vital patient reforms and consumer protections.

In fact, Defendants' made no attempt to hide that this is one of the rule's primary goals.   The

proposed rule explicitly stated:   "Expanding access to AHPs will also allow more small businesses

*to avoid* many of the [ACA's] costly requirements."[20]   And when announcing the final rule,

President Trump declared that it would allow Americans to "escape some of Obamacare's most

burdensome mandates."[21]   But avoiding and escaping the ACA's statutory requirements will move

---

[17] Amy Jeter & Craig Palosky, *Analysis: Before ACA Benefits Rules, Care for Maternity, Mental Health, Substance Abuse Most Often Uncovered by Non-Group Health Plans*, Henry J. Kaiser Family Foundation (June 14, 2017), https://www.kff.org/health-reform/press-release/analysis-before-aca-benefits-rules-care-for-maternity-mental-health-substance-abuse-most-often-uncovered-by-non-group-health-plans/.

[18] *Id.*

[19] *Id.*

[20] Definition of "Employer" Under Section 3(5) of ERISA—Association Health Plans, 83 Fed. Reg. 614-01, 615 (Jan. 5, 2018) (emphasis added)

[21] President Donald Trump, Remarks at the National Federation of Independent Businesses 75th Anniversary Celebration (June 19, 2018), at https://www.whitehouse.gov/briefingsstatements/ remarks-president-trump-national-federationindependent-businesses-75thanniversary-celebration/; *see generally* Robert Pear & Reed Abelson, Foiled in Congress, Trump Moves on His Own to Undermine Obamacare, New York Times, Oct. 11, 2017, https://www.nytimes.com/2017/10/11/us/politics/trump-obamacare-executive-order.html?_r=0 ("President Trump, after failing to repeal the Affordable Care Act in Congress, will act on his own to relax health care standards on small businesses that band together to buy health insurance and may take steps to allow the sale of other health plans that skirt the health law's requirements.").

the healthcare system back to the days where Americans had no or inadequate insurance.  By doing so, it will lead to worse health outcomes for *amici*'s patients.

By any measure, the new regulation vastly expands the availability of AHPs.  Indeed, the AHP Rule notes that the Congressional Budget Office predicts that an additional *four million people* will enroll in AHPs as a result of the rule.[22]  The final rule increases access to these AHPs in several ways, including by allowing (1) unrelated employers to join "associations" formed primarily for the purpose of offering insurance; (2) associations to include employers that are either in the same line of business or have a principal place of business in the same geographic area; and (3) self-employed individuals with no other employees to qualify as "employers" under ERISA, which enables them to form or join "associations."[23]

A proliferation of AHPs under the final rule will have serious adverse consequences for physicians and the patients in their care.  By its design, the AHP Rule would allow new AHPs to offer health insurance that qualifies as "large group coverage" under the ACA.  The ACA, however, treats the large group market differently than the individual or small group healthcare markets.[24]  Unlike those smaller markets, large group coverage under the ACA *does not* have to comply with many of the Act's core consumer protections—including providing the abovementioned "Essential Health Benefits."  As a result, AHPs could dramatically reduce their benefits or drop some entirely.  Small employers with an ostensibly healthy workforce might

---

[22] 83 Fed. Reg. 28,912.

[23] *Id*. at 28,913-28,914.

[24] *See generally* 26 U.S.C. § 4980H.

choose such plans because of their low premiums.  But when a medical emergency strikes, an employee might discover that essential care is not covered.[25]

As *amici*'s physician members know well, and as Congress recognized, the essential benefits are crucial for patient health, and in some cases lifesaving.  For example, 1 in 5 adult Americans has some form of mental illness.[26]  One such mental health condition, depression, is the leading cause of disability worldwide.  The overwhelming majority—90%—of suicides, which is the tenth leading cause of death for men in the United States, occur when the victim has an underlying mental illness.[27]  Mental health treatment can alleviate the symptoms of depression and prevent suicide, but it may not be covered by certain AHPs.

Other "Essential Health Benefits" are equally critical for *amici*'s patients.  For example, studies have found that coverage gaps or caps on prescription drug coverage generally lead to worse health outcomes.[28]  Similarly, the CDC has described prenatal care as "essential," because it can help prevent low birth weight, which is the "single most important factor influencing neonatal mortality."[29]  Prenatal care can help identify and eliminate life-threatening health

---

[25] Lueck, Sarah, *Trump Rule on Association Health Plans Could Devastate Small Group Markets*, Center for Budget and Policy Priorities, Jan. 5, 2018, https://www.cbpp.org/blog/trump-rule-on-association-health-plans-could-devastate-small-group-markets.

[26] National Alliance on Mental Illness, *Mental Health Facts In America*, https://www.nami.org/NAMI/media/NAMI-Media/Infographics/GeneralMHFacts.pdf.

[27] *Id.*; Hannah Nichols, *The Top 10 Leading Causes of Death in the United States*, Medical News Today, Feb. 23, 2017, https://www.medicalnewstoday.com/articles/282929.php.

[28] Aaron S. Kesselheim, et al., *Prescription Drug Insurance Coverage and Patient Health Outcomes: A Systematic Review*, 105 Am. J Public Health e17 (Feb 2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4318289/.

[29] Centers for Disease Control & Prevention, *Gateway to Health Communication & Social Marketing Practice: Pregnancy and Prenatal Care*, https://www.cdc.gov/healthcommunication/toolstemplates/entertainmented/tips/PregnancyPrenatalCare.html.

complications caused by pregnancy.[30]   And drug overdose—which "essential" substance abuse treatment helps avoid—is the leading cause of death among Americans under 50.[31]   As any virtually every physician knows, these services have been deemed "essential" for a reason—they are vital to a patient's general health and well-being.

Excluding "Essential Health Benefits" from AHPs would be particularly devastating to our most vulnerable populations, including individuals in poor health, such as those with chronic conditions like HIV, mental illness, or substance abuse.   They are also especially damaging to children.   As the American Academy of Pediatrics explained:   "Pediatricians have reported that their experiences with AHPs include poor reimbursement and inadequate benefit packages that have harmed the ability of their patients to access affordable and comprehensive health coverage."[32]   These harms can acutely damage younger patients:

> Children are not little adults; they require services and care specific to their unique development and medical needs.   Children need a benefit package that ensures timely and affordable access to a comprehensive set of pediatric services….   The expansion of AHPs has the potential to move children to cheaper, less comprehensive coverage.   We fear this could erode access to important essential health benefits like vaccines, prescription drugs, mental health services, dental and vision services, and habilitative services.   A gap in benefits can result in life-long health consequences that are both avoidable and costly.[33]

---

[30]  National Institutes of Health, *What is Prenatal Care and Why Is It Important?*, https://www.nichd.nih.gov/health/topics/pregnancy/conditioninfo/prenatal-care.

[31]  Josh Katz, *Drug Deaths in America are Rising Faster than Ever*, New York Times, June 5, 2017, https://www.nytimes.com/interactive/2017/06/05/upshot/opioid-epidemic-drug-overdose-deaths-are-rising-faster-than-ever.html.

[32]  American Academy of Pediatrics, Comment Letter on Proposed Rulemaking, Definition of Employer-Small Business Health Plans (RIN 1210-AB85) (March 6, 2018) at 2.

[33]  *Id*.; *see also* American Academy of Child & Adolescent Psychiatry, Comment Letter on Proposed Rulemaking, Definition of Employer-Association Health Plans (RIN 1210-AB85) (March 5, 2018) at 1-2 ("When needed, early and prompt mental health intervention is essential to the healthy development of children and adolescents and changes the trajectory of young lives for the better….Prevention and early intervention is key to better child and adolescent mental health outcomes before these conditions become far more serious, more costly, and difficult to treat…. Leaving the door open to removing the requirement to cover these essential services in AHPs

AHPs may also be particularly harmful to women.  Many of the "Essential Health Benefits" "have important implications for women's health."[34]  Most obviously, these benefits include maternity and newborn health services.  Because approximately half of pregnancies are unplanned,[35] women may obtain AHP coverage when they do not expect to require prenatal or maternity care, but then suddenly find themselves in need of such services.  What is more, women are twice as likely as men to say they have been diagnosed with a mental health issue.[36]  And it is particularly easy for AHPs to exclude certain prescription drugs that are targeted at health conditions that women experience more commonly than men.  For instance, a health plan could exclude hormone replacement medication commonly prescribed in connection with menopause. But again, employers may choose lower cost plans that exclude such benefits.  As the American Academy of Family Physicians explained: "Women and older, sicker Americans would likely face higher costs and fewer affordable insurance options.…  For instance, if an insurer wanted to scale

---

would only serve to worsen existing difficulties in accessing mental health and substance use disorder services and harm some of the nation's most vulnerable citizens—our children and adolescents.").

[34] National Women's Law Center, *Turning to Fairness: Insurance Discrimination Against Women Today and the Affordable Care Act* (March 2012) at 14, https://www.nwlc.org/sites/default/files/pdfs/nwlc_2012_turningtofairness_report.pdf.

[35] American College of Obstetricians and Gynecologists, Comment Letter on Proposed Rulemaking, Definition of Employer-Association Health Plans (RIN 1210-AB85) (March 5, 2018) at 2.

[36] PerryUndem Research & Communication, *Examining the Mental Health Care Needs and Preferences of Women Ages 18 to 44* (2017) https://www.plannedparenthood.org/uploads/filer_public/50/2e/502ec309-c5f3-4aed-82c2-d73adb02aa8b/centering_srh_and_mh_care_-_generic.pdf

back prescription drug coverage, it could do so."[37]   And as a result, women could end up facing larger medical bills and insufficient care.

The coverage limitations in AHP plans can be particularly devastating for those who develop a new chronic condition after obtaining an AHP plan.  Health status is not static, and those who are initially healthy may be less likely to carefully investigate the limits of their coverage. And of course, most healthy people would not have reason to seek out insurance that covers a medical condition they have yet to develop.  But these individuals will learn of the limits of their AHP coverage *after* they have developed a medical condition or require a higher level of services, potentially devastating them medically *and* financially at their most vulnerable time.  As AHP plans can limit or exclude benefits like prescription drug benefits and can deny claims based on pre-existing conditions, AHP plans can exclude coverage for the services that are most important to patients with chronic conditions.

Defendants blew past these concerns in the AHP Rule.  The rule observed that "[c]ommenters raised the possibility that AHPs would seek to deliver low premiums by providing benefits that are not as comprehensive as other coverage options available to working owners and small employers" and that "in order to mitigate these effects, the Department should require AHPs to provide EHBs or some other minimum level of benefits."[38]  Despite these legitimate concerns, the AHP Rule stated that such a "mandate would run contrary to the goal of leveling the playing field between small employers in AHPs, on the one hand, and large employers, on the other, who generally are not subject to the EHB requirements."[39]  Put another way, through this *ipse dixit*, the

---

[37] American Academy of Family Physicians, Comment Letter on Proposed Rulemaking, Definition of Employer-Small Business Health Plans (RIN 1210-AB85) (March 5, 2018) at 2.

[38] 83 Fed. Reg. at 28,933.

[39] *Id*.

AHP Rule privileged its asserted goal of "leveling the playing field" over the health and well-being of patients and the ACA's goal of ensuring basic levels of care.  Plaintiffs' rightly contend that this approach is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

If all of this were not enough, there is a significant risk that AHPs could disproportionately impact individuals with pre-existing conditions.  To be sure, on its face, the regulation states that it protects coverage of preexisting conditions.[40]  But in reality, AHPs can easily evade that crucial legal requirement by using proxies for health status.  AHPs can change premiums based on factors that are not explicitly defined in terms of health or medical condition, but that closely track those forbidden factors.  As such, the AHP Rule allows AHPs to charge different premiums based on age, gender, industry, or geography.[41]  But each of those seemingly-neutral characteristics can be used to disguise differential treatment based on health status or one's likelihood of suffering from particular pre-existing conditions.  As the National Association of Insurance Commissioners have correctly explained: "[A]n AHP could avoid covering certain benefits (such as specialty drugs or mental health care) and could charge far higher premiums to people who are older, female, or who work in professions or live in neighborhoods that are deemed high-risk….  People who enroll in

---

[40] 83 Fed. Reg. at 28,941 ("The Department notes that AHPs operating under this final rule, like other large group plans, though not subject to the requirement to cover EHB and other requirements applicable only to issuers in the small group and individual markets, are in fact subject to some other significant benefit mandates. These include, for example, a ban on charging participants and beneficiaries higher premiums because they have a pre-existing health condition.").

[41] 83 Fed. Reg. at 28,941, 28,944-45

an AHP could find they don't have coverage of benefits they need, or that they must pay large amounts out of pocket for their medical care."[42]

A few commonsense examples illustrate how easily AHPs can use purportedly neutral criteria to discriminate.  An AHP could, for instance, charge companies that employ certain workers higher premiums than others.  To take just one example, the Blue Cross Blue Shield Association suggested during the rulemaking process that rates for engineering companies could be 9% lower than what insurers would charge on the small group or individual markets, whereas those for the taxicab industry would be almost 15% higher.[43]  Likewise, AHPs could charge industries that employ higher proportions of women more than those that employ men on the theory that women might require maternity or prenatal coverage.  Again, the Blue Cross Blue Shield Association predicted that AHP premiums for women in their earlier 30s might be more than 30% *higher* than regular rates in individual and small group plans; by contrast, rates for men in their earlier 30s would be 40% *lower* than ACA rates.[44]  Finally, AHPs could discriminate based on preexisting conditions through meager menus of essential benefits.  In particular, they could exclude essential benefits that some populations use more frequently, such as insulin or other prescription drugs, maternity care, rehabilitative services that are particularly important to certain blue-collar professions, or mental health services.  As the American Cancer Society Action Network explained, "[a]n AHP seeking to achieve favorable selection would face few constraints on its ability to fashion and price products that attract the lowest-cost, lowest-risk enrollees.  We

---

[42] National Association of Insurance Commissioners, Letter to Consumer Representatives regarding Proposed Rules Related to AHPs (Feb. 1, 2018) at 2-3, uphelp.org/sites/default/files/attachments/naic_rep_letter_ahps_020118_final_0.pdf

[43] Michelle Andrews, *Thinking About an Association Health Plan? Read The Fine Print*, Kaiser Health News (June 26, 2018).

[44] *Id.*

are concerned that this provision provides a back-door way for an AHP to use health status to determine premiums."[45]

    *Amici* share that concern as well.  Denying patients coverage based on *seemingly* neutral characteristics that the insurance industry knows, in reality, are associated with higher medical costs or pre-existing conditions would leave patients with lower quality care, greater out-of-pocket expenses, and overall poorer health outcomes.  Those consequences subvert the object and design of the ACA.

## II.    THE AHP RULE WILL DESTABILIZE THE HEALTH INSURANCE MARKET

    The negative effects of the AHP Rule are not confined to those who purchase AHP plans issued pursuant to that rule.  Patients and employers who do not purchase those plans *also* will be harmed.  Because AHP plans do not need to play by the same rules as individual and small group markets, they will be able to offer cheaper coverage to small employers by offering less comprehensive care.  What is more, by allowing individual employers to enroll in AHPs, rather than the individual marketplace, the consumers most likely to purchase such plans are those who (at least at the time of purchase) are healthy.  Healthy people are less likely to inquire into the specific limitations of AHP plans because they do not have specific conditions about which they need to investigate, and are less likely to expect that they will need to use a significant amount of medical services.  That alone raises the risk of catastrophic consequences for a patient's health and pocketbook, since we all know that medical tragedies cannot be predicted.

    To make matters worse, the exit of healthy people from ACA insurance markets increases the costs of the more comprehensive plans.  If healthy people exit the small and individual markets

---

[45] American Cancer Society, Comment Letter on Proposed Rulemaking, Definition of Employer-Association Health Plans (RIN 1210-AB85) (March 6, 2018) at 5.

for ACA-compliant insurance to obtain lower-premium AHP plans, those who remain in the market for ACA-compliant plans will be on the whole less healthy, with higher average healthcare costs.  As a result, the premiums for ACA-compliant plans will rise as fewer healthy people with lower healthcare costs remain in the risk pool to offset the higher costs of the less healthy people.

Independent studies confirm these consequences.[46]  *First*, *The Actuary*, an information source for the Society of Actuaries, partnered with faculty from Georgetown University to study the impact of the AHP Rule.  Their models indicate that anywhere from 3 to 10 percent of the individual market would enroll in AHPs because of the rule.  These members would be substantially healthier than the remaining members of the markets, leading to meaningful increases in average claims.[47]  The study concluded that the expansion of the AHP marketplace "will ultimately result in higher premiums for individuals remaining in the ACA-compliant market."[48]  *Second*, an independent study by Avalere revealed that the AHP Rule would result in an additional 3.2 million people enrolling in AHPs, with 1 million coming from the individual market (5% of that market) and 2.2 million from the small group market (7% of that market).[49]  As a result of these shifts, premiums for those remaining in the individual ACA market would increase by 0.5% and 3.5% in the in small group market, largely due to the exit of healthier enrollees.  What is more, it would result in approximately 130,000 additional individuals becoming uninsured by 2022

---

[46] Katie Keith, *Reports Find Risk of Non-ACA-Compliant Plans to be Higher than Federal Estimates*¸ Health Affairs Blog, March 4, 2018, https://www.healthaffairs.org/do/10.1377/hblog20180303.392660/full/.

[47] Sabrina Corlette, et al., *New Rules to Expand Association Health Plans*, The Actuary, May 2018, Theactuarymagazine.org/new-rules-to-expand-association-health-plans.

[48] *Id.*

[49] Dan Mendelson, et al., *Association Health Plans Projected to Enroll 3.2M Individuals*, Avalere.com, Feb. 28, 2018, http://avalere.com/expertise/managed-care/insights/association-health-plans-projected-to-enroll-3.2m-individuals.

because of premium increases in the individual market. *Third*, Oliver Wyman conducted a study on the impact of the proposed AHP Rule on the District of Columbia insurance market. Consistent with the other two studies discussed above, Oliver Wyman's report found that the AHP Rule could increase claim costs by as much as 11 percent for the individual market and 26 percent for the small group market, depending on certain assumptions.[50]

Leading independent professional associations have recognized the exact same risks that this data shows. For instance, the American Academy of Actuaries has stated that a "key to sustainability of health insurance markets is that health plans competing to enroll the same participants must operate under the same rules." Subjecting AHPs to different requirements, as the AHP Rule does, invites the problem of "adverse selection" and "would result in higher premiums in the non-AHP plans. Ultimately, higher-cost individuals and small groups would find it more difficult to obtain coverage."[51]

The ACA's interlocking and closely intertwined reforms were intentionally designed to avoid this kind of "adverse selection" problem.[52] Indeed, the Act's express findings state: "By significantly increasing health insurance coverage, the requirement, together with the other provisions of this Act, will minimize this adverse selection and broaden the health insurance risk

---

[50] Ryan Schultz, Oliver Wyman, Letter to DC Health Benefit Exchange regarding Potential Impact of Association Health Plans in the District of Columbia, Feb. 21, 2018) https://hbx.dc.gov/sites/default/files/dc/sites/hbx/publication/attachments/Review%20of%20Imp act%20of%20AHPs%202.21.2018.pdf.

[51] American Academy of Actuaries, *Issue Brief: Association Health Plans*, February 2018, www.actuary.org/content/association-health-plans-0.

[52] *E.g.*, *Cutler v. U.S. Dep't of Health and Human Servs.*, 797 F.3d 1173, 1176 n.1 (D.C. Cir. 2015) ("'Adverse selection' is an economic term of art that describes problems that can arise in insurance markets when the healthy have insufficient incentive to purchase health insurance, and thus the resulting pool of insureds consists predominantly of the sick and those actively using their insurance.")

pool to include healthy individuals, which will lower health insurance premiums."[53]   The effect of the AHP Rule, however, is to raise the risk of the very "adverse selection" problem that Congress expressly recognized and sought to curtail when enacting the ACA's market reforms.

Defendants justify the AHP Rule in the hope that expansion of AHP plans will "promote broader availability of group health coverage for … small business owners and self-employed people, and help alleviate their problems of limited or non-existent affordable healthcare options for these small businesses and self-employed people."[54]   And despite the clear, independent evidence that the AHP Rule will distort and damage the health insurance markets, the final rule dismissively declares that adverse selection concerns are "overstated."[55]   At bottom, it appears that the AHP Rule privileges its desire for so-called choice above the overall stability of the healthcare system.   But even if AHP Rule's stubborn policy preference were rational or lawful, the rule will *not* increase consumer choice in any meaningful way.   By requiring plans to provide a minimum set of services and play by the same rules designed to protect consumers and give them meaningful coverage, ACA sets the terms for competition:   insurance plans can compete on services by offering more than the minimum consumer protections, or they can compete on price by reducing costs like overhead.   They cannot compete on price by discriminating based on health status or by eliminating essential benefits.   In short, the AHP Rule might increase consumer choices in the sense that more plans will be available, and it might allow small businesses to obtain cheaper coverage by offering less comprehensive services.   But this is a false choice because the new plans are irreconcilable with the ACA.

---

[53] 42 U.S.C. § 18091(2)(I).

[54] 83 Fed. Reg. at 28,915.

[55] 83 Fed. Reg. at 28,933.

III.     **THE AHP RULE CREATES AN UNDENIABLE RISK OF FRAUDULENT OR ABUSIVE INSURANCE PRACTICES**

It is important to offer a brief and final word about the long history of fraud and abuse in connection with AHPs. From the time ERISA was enacted, AHPs have been a font for scams.[56] Indeed, some experts have observed that "in the recent past, the most prevalent way to sell phony health insurance has been through associations."[57]

Yet again, independent studies confirm these fundamental flaws associated with AHPs. In 2004, for example, the General Accounting Office (GAO) published a report indicating that between 2000 and 2002, fraudulent AHPs left over 200,000 policyholders with over $252 million in unpaid medical bills.[58] "Operators collect premiums but fail to pay medical claims, illegally

---

[56] Mila Kofman, et al., *Association Health Plans: What's All the Fuss About?*, 25 Health Affairs 1591 (Nov. 1, 2006) https://www.healthaffairs.org/doi/full/10.1377/hlthaff.25.6.1591 ("These scams first appeared after ERISA's enactment. Multiple employer arrangements were a vehicle of choice for promoters of phony insurance because of minimal federal oversight and ERISA's preemption of states over "employee benefit plans," which promoters of scams inevitably claimed to be. After extensive investigations, in 1982 Congress amended ERISA to clarify that states could regulate any entity considered to be a MEWA regardless of whether it also might qualify as an employee benefit plan.").

[57] Mila Kofman, et al., *Health Insurance Regulation by States and the Federal Government: A Review of Current Approaches and Proposals for Change*, Georgetown Health Policy Institute (April 2006) at 8 https://www-tc.pbs.org/now/politics/Healthinsurancereportfinalkofman pollitz.pdf; see also Mila Kofman, *Association Health Plans: Loss of State Oversight Means Regulatory Vacuum and More Fraud*, Georgetown Health Policy Institute (2005) at i, https://hpi.georgetown.edu/ahp.html ("There has been a 30-year history of health insurance scams involving associations and multiple employer arrangements. Scams flourished after Congress exempted these arrangements from state oversight in 1974 through the Employee Retirement Income Security Act (ERISA). Operators targeted small businesses and self-employed people through legitimate and phony associations."); *see also* Protectourcare.org, Fact Sheet: Association Health Plans (May 17, 2018) https://www.protectourcare.org/fact-sheet-association-health-plans/ (cataloguing AHP-related fraud schemes).

[58] *Id.* at 2 n.4 (citing U.S. General Accounting Office, Private Health Insurance: Employers and Individuals are Vulnerable to Unauthorized or Bogus Entities Selling Coverage, GAO-04-312 (Feb. 2004)).

diverting funds for personal use.  They leave small businesses and self-employed people, workers, and their dependents with major medical debt and without insurance."[59]

This Court need not take *amici's* word for it, however.  The AHP Rule *itself* recognizes the "the Department anticipates that the increased flexibility afforded AHPs under this rule will introduce increased opportunities for mismanagement or abuse, in turn increasing oversight demands on the Department and State regulators."[60]  What is more, the AHP Rule also acknowledges that its own "enforcement efforts often were too late to prevent or fully recover major financial losses."[61]  Nevertheless, consistent with its single-minded desire to expand AHPs, the AHP Rule kicks the enforcement can to the states, explaining that "the final rule does not modify or otherwise limit existing State authority" to take action against AHP fraud.[62]  Those words provide cold comfort to the thousands of individuals who will suffer from AHP-fraud when states are unable to keep up with the illegal abusive practices that are virtually certain to increase as a result of the AHP Rule.

In the end, *amici* remain profoundly concerned that insolvent and sham AHPs would negatively impact patients, physicians, and other providers by leaving them to cover the cost of services that should have been paid by the AHP.  The result would be increased costs to patients and the health care system overall.  What's more, those costs would be coupled with decreased quality of care; patients' health may be adversely impacted when they discover that they would

---

[59] 25 Health Affairs at 1598.

[60] 83 Fed. Reg. at 28,953.

[61] 83 Fed. Reg. at 28,952.

[62] 83 Fed. Reg. at 28,953; see also 83 Fed. Reg. at 28,954 ("Commenters also called for the Department to increase its enforcement activities. This increase would require Congress to appropriate additional funding for the Department's oversight of expanded AHPs and for the Department to expand staff and related enforcement support resources to meet that broader enforcement/oversight mission.").

have limited access to care because a fraudulent AHP would not cover their expenses.  Put simply, the expansion of AHPs would increase overall health costs, while threatening patients' health and financial security and the financial stability of physician practices and other providers. Defendants' disregard for these near-inevitable consequences cannot be squared with the Administrative Procedure Act.

* * * *

*Amici* share Defendants' goal of aiding small businesses and self-employed individuals by making health insurance plans less expensive and increasing their options for coverage.  But the AHP Rule will lead to an explosion of inadequate health insurance policies, the destabilization of the health insurance marketplace, and a demonstrated risk of fraud.  A desire for increased consumer choice for small business owners cannot justify results so inimical to the ACA. "Congress passed the Affordable Care Act to improve health insurance markets, not to destroy them."  *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015).  Defendants, like courts, must implement and "interpret the Act in a way that is consistent with the former, and avoids the latter."  *Id.*  The AHP Rule does precisely the opposite.  It should be vacated.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted.

Dated:  December 5, 2018

/s/ Chad I. Golder
Chad I. Golder
MUNGER, TOLLES & OLSON LLP
1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357
Telphone: (202) 220-1100
Fax: (202) 220-2300

*Counsel for Amici Curiae American Medical
Association and Medical Society of the State
of New York*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing complies with Local Civil Rule 7(o)(4) and does not

exceed 25 pages.

Dated:  December 5, 2018                          */s/ Chad I. Golder*
                                                    Chad I. Golder

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 5, 2018, I caused a true and correct copy of the

foregoing to be served on all counsel of record through the Court's CM/ECF system.

Dated:  December 5, 2018

*/s/ Chad I. Golder*
Chad I. Golder